EDWARD G. POPLAWSKI (State Bar No. 113590)
epoplawski@wsgr.com
OLIVIA M. KIM (State Bar No. 228382)
okim@wsgr.com
BRIAN LAM (State Bar No. 272624)
blam@wsgr.com
S. FERRELL ALMAN, JR. (State Bar No. 287746)
falman@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

CHRISTOPHER D. MAYS (State Bar No. 266510)
cmays@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Counsel for Defendant
BLUE COAT SYSTEMS, INC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>BLUE COAT SYSTEMS, INC., a Delaware Corporation,<br><br>Defendant. | CASE NO.: 13-cv-03999-BLF-PSG<br><br>**DEFENDANT BLUE COAT SYSTEMS, INC.'S *DAUBERT* MOTION**<br><br>Date: July 6, 2015<br>Time: 9 a.m.<br>Place: Courtroom 3, 5th Floor<br>Before: Hon. Beth Labson Freeman |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# **TABLE OF CONTENTS**

**PAGE(s)**

NOTICE OF MOTION AND MOTION ..................................................................................... - 1 -

RELIEF REQUESTED ........................................................................................................... - 1 -

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... - 1 -

I.      INTRODUCTION......................................................................................................... - 1 -

II.     LEGAL STANDARD ................................................................................................... - 4 -

III.    MOTION TO STRIKE DAMAGES OPINIONS OF DR. ANNE LAYNE-
        FARRAR .................................................................................................................... - 4 -

        A.      Dr. Layne-Farrar's Royalty Base Apportionment Methodologies In Her
                Method 1 And Method 2 Are Not Tethered To The Relevant Facts Or
                Circumstances Of This Case. ..................................................................... - 6 -

                1.      Dr. Layne-Farrar's Use Of Forward-Citation For Apportionment In
                        Method 1 Lacks Any Sound Economic Or Factual Predicates. ............. - 7 -

                2.      Dr. Layne-Farrar's Use Of A Generic List Of Features Across Blue
                        Coat's Product Line Completely Ignores The Alleged Patented
                        Features In The Accused Products. ......................................................... - 9 -

        B.      Dr. Layne-Farrar's Damages Calculation For The '844 Patent Which
                Includes Alleged Convoyed Sales Is Legally Improper. ................................. - 11 -

        C.      Dr. Layne-Farrar's Calculation Of Damages Under Her Method 3
                Improperly Applies The Entire Market Value Rule. ....................................... - 13 -

IV.     MOTION TO STRIKE CERTAIN PORTIONS OF EXPERT REPORT OF
        FINJAN'S TECHNICAL EXPERT, DR. NENAD MEDVIDOVIC ......................... - 14 -

        A.      Dr. Medvidovic Failed To Independently Analyze Infringement. ................... - 14 -

                1.      Dr. Medvidovic Relied On Other Experts' Characterizations Of The
                        Operation Of The Accused Products. ..................................................... - 16 -

                2.      Dr. Medvidovic Merely Regurgitated The Opinions Of Drs. Cole
                        And Mitzenmacher. ................................................................................. - 16 -

                3.      Dr. Medvidovic's Alleged Tests Are Unreliable And Not
                        Independent. ........................................................................................... - 17 -

        B.      Dr. Medvidovic's Opinions That Blue Coat Recognized The Importance Of
                Finjan's Patents Should Be Struck. .............................................................. - 18 -

1.   Dr. Mitzenmacher's Opinion Regarding Blue Coat's Subjective Beliefs Are Pure Speculation. ............................................................. - 19 -

2.   Dr. Medvidovic Lacks Expertise To Opine About The Alleged Blue Coat's Subjective Beliefs. ........................................................... - 19 -

V.   MOTION TO STRIKE CERTAIN PORTIONS OF EXPERT REPORTS OF FINJAN'S TECHNICAL EXPERTS, DR. ERIC COLE AND DR. MICHAEL MITZENMACHER .................................................................................... - 20 -

A.   The Alleged Testing Performed By Drs. Cole And Mitzenmacher Are Conclusory And Unreliable. ........................................................... - 21 -

B.   Dr. Cole's Opinion That Blue Coat Recognized The Importance Of Finjan's Patents Should Be Struck. .......................................................... - 23 -

VI.   CONCLUSION .......................................................................................... - 24 -

**TABLE OF AUTHORITIES**

**CASES**                                                                      PAGE(S)

*Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262 (Fed. Cir. 2008) ...........................11

*Arista Records LLC v. Lime Grp. LLC*, No. 06 CV5936KMW, 2011 WL 1674796
    (S.D.N.Y. May 2, 2011) ..........................................................................17

*Atlas IP, LCC v. Medtronic, Inc.*, No. 13-civ-23309, 2014 U.S. Dist. LEXIS
    158787 (S.D. Fla. 2014) ........................................................................10

*Commonwealth Scientific & Indus. Research Organisation v. Cisco Sys., Inc.*, No.
    6:11-CV-343, 2014 WL 3805817 (E.D. Tex. July 23, 2014) ...........................11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......................4, 17

*DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...............................5

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, No. C-11-05973-PSG, 2013 U.S.
    Dist. LEXIS 12043 (N.D. Cal. Aug. 22, 2013) .........................................10

*Garretson v. Clark*, 111 U.S. 120 (1884) ....................................................................6

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116
    (S.D.N.Y. 1970) ...................................................................................5

*Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999) ...........5

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) ...............................................................17

*Info-Hold, Inc. v. Muzak LLC*, No. 1:11-CV-283, 2013 WL 4482442 (S.D. Ohio
    Aug. 20, 2013) *aff'd in relevant part*, No. 2014-1167, 2015 WL 1865685
    (Fed. Cir. Apr. 24, 2015) ..................................................................15, 16

*Kuiper v. Givaudan, Inc.*, 602 F. Supp. 2d 1036 (N.D. Iowa 2009) ...............................15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51.................................4, 6, 13

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .............................5

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. CIV.A. H-05-1634, 2007 WL
    150606 (S.D. Tex. Jan. 16, 2007)..........................................................15

*Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394 (5th Cir. 2008) .......................19, 23

*Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043 (Fed. Cir. 2001) ...............17, 23

*Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382 (S.D.N.Y.2007)..............................15

*Rambus, Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597 (N.D. Cal. 2008)............19, 20, 23

*ResQNet.com v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ............................................5

*Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302 (Fed. Cir. 2002) ..........................5

*Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 867 (1995) ......................................................................11, 12

*Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008) ...................4, 19, 23

*Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 WL 2037732 (N.D. Cal. May 12, 2008).................................................19, 23

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .........................6, 8

*VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308 (Fed. Cir. 2014) ......................................6, 10

**STATUTES**

35 U.S.C. § 284 .................................................................................................4

**RULES**

FED. R. EVID. 702 ...........................................................................................4, 19, 23

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 6, 2015, or as soon thereafter as the matter may be heard by the Honorable Beth Labson Freeman in Courtroom 3, 5th Floor, United States District Court for the Northern District of California, 280 South 1st Street, San Jose, CA 95113, Defendant Blue Coat Systems, Inc. ("Blue Coat") shall and hereby does move the Court to exclude (1) opinions of Plaintiff Finjan, Inc.'s ("Finjan") damages expert, Dr. Anne Layne-Farrar; (2) certain portions of opinions of Finjan's technical expert, Dr. Nenad Medvidovic; and (3) certain portions of opinions of Finjan's technical experts, Drs. Eric Cole and Michael Mitzenmacher.  The motion is based on this notice of motion and supporting memorandum of points and authorities, the Declaration of Olivia M. Kim in in support of the motion ("Kim Decl.") and exhibits attached thereto, and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

**RELIEF REQUESTED**

Blue Coat seeks to exclude (1) opinions of Finjan's damages expert, Dr. Anne Layne-Farrar; (2) certain portions of opinions of Finjan's technical expert, Dr. Nenad Medvidovic; and (3) certain portions of opinions of Finjan's technical experts, Drs. Eric Cole and Michael Mitzenmacher.

**MEMORANDUM OF POINTS AND AUTHORITIES**

# I.   INTRODUCTION

## Motion to Strike Dr. Layne-Farrar's Damages Opinions

Dr. Layne-Farrar's damages opinions consist of three different methodologies of calculating reasonable royalty, all of which lack sound economic and factual predicates and fail to tie proof of damages to the claimed invention.  First, Dr. Layne-Farrar's royalty base apportionment methodologies used in her Method 1 and Method 2 fail to tie damages to the relevant facts or circumstances in this case.  For Method 1, concluding that not all patents are created equal, she applied percentages of forward-citations for each of the patents-in-suit.  But this method is not apportionment of base at all, as the forward-citation analysis is limited only to the six patents-in-suit.  Consequently, Dr. Layne-Farrar actually applied 100% of the royalty base to

the damages for the combined six patents-in-suit.   More importantly, this apportionment methodology completely ignores any facts and circumstances surrounding the accused features in the accused products.   For Method 2, rather than separately considering allegedly patented and non-patented features within each specific accused product, Dr. Layne-Farrar improperly uses a high-level list of functions available across Blue Coat's product line relating to the web secure gateway, which includes non-accused products.   In other words, Dr. Layne-Farrar's apportionment merely separates out, on a very high level, the accused products from the non-accused products (instead of accused and non-accused features within each accused products, as is proper).   As such, this methodology fails to tie the apportionment to the facts regarding the specific accused patented features in the accused products.

Second, Dr. Layne-Farrar improperly includes "convoyed sales" of a non-accused product, ProxySG, to the damages for U.S. Patent No. 6,154,844 for her Method 1 and Method 2.   Dr. Layne-Farrar failed to set forth any basis to include the convoyed sales, as she shows no evidence that the accused feature of the accused product (WebPulse) drives the sale of the non-accused product (ProxySG).   Indeed, the evidence shows the contrary.   Blue Coat's WebFilter, which allows ProxySG customers to use the accused WebPulse, is only an *optional* add-on feature to ProxySG and a significant number of customers use ProxySG without WebFilter (and therefore, WebPulse).   Further, not only did Dr. Layne-Farrar improperly include ProxySG to her damages calculation, she compounds her error by significantly overstating the alleged convoyed sales damages by failing to apply any reasonable royalty rate to the royalty base (*i.e.*, using 100% reasonable royalty rate to the convoyed sales damages).

Lastly, Dr. Layne-Farrar's Method 3 should be precluded as it improperly applies the entire market value rule.   Dr. Layne-Farrar's Method 3 calculates damages by applying a per-user royalty rate of WebPulse.   But the royalty rate Dr. Layne-Farrar uses—$2.25 per user—reflects the entire functionality performed by of the accused WebPulse service.   Dr. Layne-Farrar failed to show any evidence that the allegedly patented feature in WebPulse (*i.e.*, Cookie2) drives the demand for the entire WebPulse (WebFilter) service.   She does not even consider what is accused

1   within WebPulse in her analysis.  Accordingly, Dr. Layne-Farrar has no basis to apply the entire

2   market value rule.

3        Motion to Strike Certain Portions of Dr. Medvidovic's Opinions

4        Dr. Medvidovic provided an expert report offering opinions regarding the "importance" of

5   the technology of the patents-in-suit and how the patents-in-suit "relate" to Blue Coat products.

6   These categories, however, are merely euphemisms masking the true purpose of Dr. Medvidovic's

7   report: to bolster the credibility of Finjan's other experts by providing an additional expert's

8   "opinion" that agrees with those other experts in every single regard.  Dr. Medvidovic's expert

9   report should be struck for two reasons.  First, Dr. Medvidovic's opinions on infringement and

10   application of the patents-in-suit to Blue Coat's technology are unreliable because he relies solely

11   on the work and opinions of others without *any* independent analysis.  Second, Dr. Medvidovic's

12   opinion that "Blue Coat recognized the importance of Finjan's patented technology" is improper

13   because it is based on sheer speculation, Dr. Medvidovic's interpretation of handful of internal

14   Blue Coat documents, and because  Dr. Medvidovic—a technical expert—is not qualified to

15   render an opinion of how Blue Coat may have appraised Finjan's technology in the context of a

16   competitive market.  Dr. Medvidovic's opinions cannot assist the trier-of-fact and should therefore

17   be struck from his report.

18        Motion to Strike Certain Portions of Drs. Cole's and Mitzenmacher's Opinions

19        Dr. Cole and Dr. Mitzenmacher provided expert reports relating to infringement of the

20   patents-in-suit.  In providing their opinions of infringement, Drs. Cole and Mitzenmacher refer to

21   certain testing that they have performed in order to confirm infringement.  However, both experts

22   failed to specifically identify what specific steps were taken in their testing, what was specifically

23   used for their testing, or what specific results they obtained from testing.  Accordingly, any

24   reference to testing performed by Drs. Cole and Mitzenmacher should be excluded as they are

25   conclusory and unreliable.

26        In addition, similar to Dr. Medvidovic, Dr. Cole opined that "Blue Coat understood how

27   important Finjan's patent technology was and implemented the technology into Blue Coat's

28

1   products."  Dr. Cole's opinion in this regard is improper and unhelpful to the jury for the exact

2   same reasons discussed above, and should be struck from his report accordingly.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert* place upon the Court a responsibility to protect against the misuse of expert testimony.  FED. R. EVID. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  "[T]rial judges [have] the responsibility of acting as gatekeepers to exclude unreliable expert testimony."  FED. R. EVID. 702, committee notes on rules, 2000 amendment.  The Court's gatekeeping function is critical because "[u]nlike an ordinary witness … an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert*, 509 U.S. at 592.  Indeed, the jury may believe that the court has put its "stamp of authority on a witness's opinion" simply because the Court designates the witness as an "expert."  FED. R. EVID. 702, committee notes on rules, 2000 amendment (internal quotation and citation omitted).

Expert testimony is admissible only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702.  Thus, an expert may offer testimony only to the extent that his or her "specialized knowledge" will assist the jury.  *Id.*; *cf. Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) ("The court, in its role as gatekeeper, must exclude expert testimony that is not reliable and not specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions.").

## III.    MOTION TO STRIKE DAMAGES OPINIONS OF DR. ANNE LAYNE-FARRAR

"By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement.' Such damages must be awarded 'for the use made of the invention by the infringer.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66-67 (citing 35 U.S.C. § 284).  "A 'reasonable royalty' derives from a hypothetical

1    negotiation between the patentee and the infringer when the infringement began.    A

2    comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable

3    royalty calculation appears in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp.

4    1116, 1120 (S.D.N.Y. 1970)."   *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)

5    (internal citation omitted).   "[A] reasonable royalty analysis requires a court to hypothesize, not to

6    speculate."   *Id.*   "To prevent the hypothetical from lapsing into pure speculation, this court

7    requires sound economic proof of the nature of the market and likely outcomes with infringement

8    factored out of the economic picture." *Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d

9    1341, 1350 (Fed. Cir. 1999).   Finjan bears the burden of proving it is entitled to damages in this

10   patent case, and it must establish the admissibility of its expert testimony by a preponderance of

11   the evidence.   *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)

12   (emphasizing patentee's burden to prove damages); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d

13   1140, 1146-47 (N.D. Cal. 2003) ("The proponent of the [expert] testimony must establish

14   admissibility by a preponderance of the evidence.") (citation omitted).

15        Importantly, the Federal Circuit has made it clear that proper calculation of patent damages

16   requires "sound economic and factual predicates" coupled with a "careful tie [of] proof of

17   damages to the claimed invention's footprint in the marketplace."   *ResQNet.com*, 594 F.3d at 869;

18   *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).   The damages

19   opinions of Finjan's expert, Dr. Layne-Farrar, do neither.   Dr. Layne-Farrar's opinions consist of

20   three different methodologies of calculating a reasonable royalty, all of which lack sound

21   economic and factual predicates and fail to tie proof of damages to the claimed invention.   First,

22   Dr. Layne-Farrar's apportionment methodologies used in her Method 1 and Method 2 are not tied

23   to the relevant facts or circumstances in this case.   Second, Dr. Layne-Farrar uses faulty logic and

24   fails to follow Federal Circuit precedent by improperly including convoyed sales to damages for

25   the '844 patent.   Lastly, Dr. Layne-Farrar applies the entire market value rule for her Method 3

26   without any basis.   Accordingly, Dr. Layne-Farrar's damages opinions in all of her three

27   methodologies should be struck.

28

A.   **Dr. Layne-Farrar's Royalty Base Apportionment Methodologies In Her Method 1 And Method 2 Are Not Tethered To The Relevant Facts Or Circumstances Of This Case.**

"[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages **between the patented feature and the unpatented features**, and such evidence must be reliable and tangible, and not conjectural or speculative . . ." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  "Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.  Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics*, 694 F.3d at 67.  "[T]he requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).

In her expert report, after concluding that the accused products are "smallest salable patent-practicing unit," Dr. Layne-Farrar considered two approaches to apportionment of royalty base. (Ex. 1,[1] Layne-Farrar Report at ¶¶ 143, 149.)  For Method 1, after further concluding that not all patents are created equal, she applied percentages of forward-citations for each of the patents-in-suit.  (*Id.* at ¶¶ 150-155.)  However, this method is not apportionment of the base at all, as the forward-citation analysis is limited only to the six patents-in-suit.  Consequently, Dr. Layne-Farrar actually applied 100% of the royalty base to the damages for the combined six patents-in-suit. More concerning is that this apportionment methodology completely ignores any facts and circumstances surrounding the accused features in the accused products.  For Method 2, Dr. Layne-Farrar uses a single slide page of a Blue Coat presentation that shows different functionalities available for Blue Coat's security web gateway, which consists of many different products, including non-accused products.  (*Id.* at ¶¶ 156-159.)  Rather than using the specific

---

[1] All exhibits are attached to Declaration of Olivia M. Kim in support of this motion filed concurrently hereto.

accused products of each of the patent-in-suit to analyze what features within the accused products are allegedly patented compared to non-patented, Dr. Layne-Farrar improperly uses a high-level list of functions available across Blue Coat's product line relating to the web secure gateway.  In other words, Dr. Layne-Farrar's apportionment merely separates out, on a very high level, the accused products from the non-accused products.  As such, this methodology fails to tie the apportionment to the facts regarding the specific accused patented features in the accused product.

Accordingly, Dr. Layne-Farrar's royalty base apportionment methodologies in Method 1 and Method 2 are neither reliable nor tangible, and should be struck.

**1.      Dr. Layne-Farrar's Use Of Forward-Citation For Apportionment In Method 1 Lacks Any Sound Economic Or Factual Predicates.**

For the royalty base apportionment in Method 1, Dr. Layne-Farrar looked at how many times each patent-in-suit received citations over its lifespan—*i.e.*, how many times other patents cited each patent-in-suit as prior art.  (Ex. 1, Layne-Farrar Report at ¶ 151.)  After gathering such data, she calculated the following value of forward cites for each of the patent-in-suit, where the combined value of the six patents-in-suit total 100%:

| Table 8. Value Apportionment based on Forward Cites | |
|---|---|
| Patent-in-Suit | Forward Cite % |
| U.S. Patent No. 6804780 B1 | 19.1% |
| U.S. Patent No. 6154844 A | 52.9% |
| U.S. Patent No. 7418731 B2 | 1.2% |
| U.S. Patent No. 6965968 B1 | 10.9% |
| U.S. Patent No. 7058822 B2 | 14.3% |
| U.S. Patent No. 7647633 B2 | 1.5% |
| Total | 100% |

(*Id.* at ¶ 155, Table 8.)  Dr. Layne-Farrar then applied the above-calculated "Forward Cite %" to the royalty base (*i.e.*, the revenue of the accused products) to determine a reasonable royalty for each of the patents-in-suit.

The use of the "Forward Cite %" has no meaningful connection to the accused features (*i.e.*, claimed invention) of the accused products.  The accused products for the patents-in-suit are as follows:

| Patent | Asserted Claims | Accused Product(s) |
|--------|-----------------|--------------------|
| '780 | 9, 13 and 18 | ProxySG + ProxyAV |
| '844 | 1, 7, 11, 15, 16 and 41 | WebPulse |
| '731 | 1 and 17 | ProxySG + WebPulse + WebFilter |
| '822 | 9 and 10 | ProxySG |
| '633 | 8 and 14 | 1. ProxySG (claim 8 only)<br>2. MAA<br>3. ProxySG + CAS + MAA |
| '968 | 1, 9 and 33 | ProxySG + WebPulse + WebFilter |

But Dr. Layne-Farrar fails to consider any of the allegedly patented features of the accused products or even the accused products themselves for her analysis in Method 1. For example, Finjan has accused Blue Coat's services called WebPulse for U.S. Patent No. 6,154,844.[2] Rather than apportioning between "the patented feature and the unpatented features" of WebPulse for the '844 patent as required by the Federal Circuit (*e.g.*, *Uniloc*, 632 F.3d at 1318), Dr. Layne-Farrar completely ignores the accused product and what portions of the accused product relate to the claimed invention. Instead, she compared the alleged value of the '844 patent against the ***other patents-in-suit***. Thus, the result of Dr. Layne-Farrar's calculation in Method 1 is that the total damages for the six patents-in-suit are calculated using 100% royalty base (*i.e.*, the whole revenue base of the accused products), without any proper, specific apportionment.

Accordingly, Dr. Layne-Farrar's "apportionment" methodology used for Method 1 should be precluded.

---

[2] As the '844 patent is the oldest of the six patents-in-suit, it is not surprising that it has the highest percentage of "Forward Cite %." The older the patent, it is more likely that it was cited more than the younger patents.

**2.** **Dr. Layne-Farrar's Use Of A Generic List Of Features Across Blue Coat's Product Line Completely Ignores The Alleged Patented Features In The Accused Products.**

For the royalty base apportionment in Method 2, Dr. Layne-Farrar uses the following slide from one of Blue Coat's PowerPoint presentations, with an understanding that it "covers all features in the full suite of Blue Coat security products" (Ex. 1, Layne-Farrar Report at ¶ 156):



(Ex. 2, BC0210379.)  Dr. Layne-Farrar counted that there are 24 functions identified in the slide, and concluded that the patents-in-suit "drive the functionality" of certain functions identified in the slide.  (Ex. 1, Layne-Farrar Report at ¶ 157.)  For example, she concluded that the '844 patent captured the "Global Intelligence Network" function, therefore, she used the apportionment factor of 1/24 to calculate royalty base for the '844 patent.  (*Id.* at ¶ 157.)  As another example, Dr. Layne-Farrar concluded that the apportionment factor of 3/24 should apply to the '731 and '928 patents because they capture three of the functions identified in the slide.  (*Id.*)

Similar to Method 1, Dr. Layne-Farrar's Method 2 completely ignores the specific products accused in the case.  Instead, Dr. Layne-Farrar uses a broad list of functions found in Blue Coat's line of products.  Indeed, the functions listed in the slide used by Dr. Layne-Farrar reflect many different products of Blue Coat, including products that are not accused in the case, such as DLP, Director, PacketShaper, and Secure Analytics.[3]  These non-accused products are

---

[3] *See, e.g.*, https://www.bluecoat.com/products/web-security-service.

separate from and independent of any of the accused products.  Although Dr. Layne-Farrar began her apportionment methodology by claiming that the accused products for each of the patent-in-suit are the "smallest salable patent-practicing unit," she ignores this conclusion and goes beyond the accused products to apply her apportionment methodology.  The proper way to apportion, as made clear by the Federal Circuit in *VirnetX*, is to first identify the "smallest salable patent-practicing unit" and then apply the apportionment to the "smallest salable patent-practicing unit": "Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature (as VirnetX claims it was here), the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology."  767 F.3d at 1328; *see also Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, No. C-11-05973-PSG, 2013 U.S. Dist. LEXIS 12043, at *10-12 (N.D. Cal. Aug. 22, 2013) (holding that expert's analysis is flawed where he selected the smallest salable unit-the VCS product—and ended the analysis there, when the accused feature DLP is only a component of the VCS product); *Atlas IP, LCC v. Medtronic, Inc.*, No. 13-civ-23309, 2014 U.S. Dist. LEXIS 158787, at *12-13 (S.D. Fla. 2014) (excluding damages expert testimony where apportionment was based on defendant's website listing four "unique features" of the accused products because it was conclusory).

As an example, Dr. Layne-Farrar claimed that the "Global Intelligence Network" function is captured by the '844 patent.  However, only WebPulse is accused for the '844 patent and WebPulse is only a part of Blue Coat's Global Intelligence Network.[4]  Moreover, the other 23 functions identified in the slide go to the high-level functions of products that include non-accused products.  Such apportionment skews any contribution of the patented component in the accused product because Dr. Layne-Farrar failed to apply apportionment to the accused product, *i.e.*, the "smallest salable patent-practicing unit."[5]  Rather than comparing patented to non-patented features in each accused product, Dr. Layne-Farrar merely compared the broad functions found in

---

[4] *See, e.g.*, https://www.bluecoat.com/products/global-intelligence-network.

[5] Dr. Layne-Farrar applies the same method for all of the patents-in-suit.

the accused product to those that are found in other products, including non-accused products.  (Ex. 1, Layne-Farrar Report at ¶¶ 156-159).   This is not an appropriate methodology.   A proper apportionment methodology would calculate the value of the claimed invention *within* the accused product (*e.g.*, WebPulse), without looking at the functions made available by other non-accused products and services.  *See, e.g.*, *Commonwealth Scientific & Indus. Research Organisation v. Cisco Sys., Inc.*, No. 6:11-CV-343, 2014 WL 3805817, at *8 (E.D. Tex. July 23, 2014) (rejecting methodology where damages expert "fail[ed] to adequately apportion, in a quantifiable manner, differences between the accused and unaccused products based on factors not attributable to [patent-in-suit]").

Accordingly, Dr. Layne-Farrar's improper apportionment methodology used for Method 2 should be struck.

### B.      Dr. Layne-Farrar's Damages Calculation For The '844 Patent Which Includes Alleged Convoyed Sales Is Legally Improper.

"A 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated non-patented product."  *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008).   "When a patentee seeks damages on unpatented components sold with a patented apparatus, courts have applied a formulation known as the 'entire market value rule' to determine whether such components should be included in the damage computation, whether for reasonable royalty purposes . . . or for lost profits purposes."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 867 (1995).   In order to recover damages for convoyed sales, the patentee must first show that the patented component functions together with the unpatented component.  *Id.* at 1550 ("[W]hen recovery is sought on sales of unpatented components sold with patented components, to the effect that the unpatented components must function together with the patented component in some manner so as to produce a desired end product or result.").   The patentee must also show that the patented component drives the sale of the unpatented component.  *Id.* at 1549 ("We have held that the entire market value rule permits recovery of damages containing several features when the patent-related feature is **the 'basis for customer demand**.'") (emphasis added).

1    Although recognizing that ProxySG is not accused for the '844 patent, Dr. Layne-Farrar

2    calculated damages for the '844 patent by including the revenues of ProxySG as "convoyed sales"

3    for both her Method 1 and Method 2.  (*See, e.g.*, Ex. 1, Layne-Farrar Report at ¶ 160-161.)  Her

4    methodology is based on her understanding that "software products accused of infringing the '844

5    Patent, namely WebPulse and WebFilter,[6] cannot be run without the ProxySG . . ." (*Id.* at ¶ 160.)

6    However, just because an accused component cannot be used without an non-accused component

7    does not entitle Finjan to get damages for the non-accused component.  Finjan must show that the

8    accused component drives the sale of the non-accused component.  But Dr. Layne-Farrar fails to

9    set forth any evidence that customers buy ProxySG (non-accused) because they want to use the

10   allegedly patented features of WebPulse (accused).  In other words, there is no evidence that the

11   accused features of WebPulse drive the sale of ProxySG.  Indeed, the evidence is to the contrary.

12   Blue Coat's WebFilter, which allows ProxySG customers to use the accused WebPulse, is an

13   **optional** add-on feature to ProxySG.  (Ex. 3, Product Use Guide, BC0182518-528 at BC0182520.)

14   Because it is merely an optional add-on feature, "a pretty significant percentage of Blue Coat

15   customers would buy the ProxySG for just what the ProxySG did."  (Ex. 4, 01/15/15 Clare Dep. at

16   46:17-19.)  As such, Dr. Layne-Farrar's inclusion of ProxySG as "convoyed sales" is improper

17   under Federal Circuit precedent.  *See Rite-Hite Corp.*, 56 F.3d at 1549-50.

18   Further, not only did Dr. Layne-Farrar improperly include ProxySG in her damages

19   calculation, she compounds her error by significantly overstating the alleged convoyed sales by

20   applying a 100% reasonable royalty rate.  (Ex. 5, Exhibit 3a-Method 1 to Layne-Farrar Report.)  In

21   her analysis, Dr. Layne-Farrar calculated the ProxySG revenue associated with WebPulse and

22   the '844 patent.  (Ex. 1, Layne-Farrar Report at ¶ 161.)  She also concluded that the reasonable

23   royalty rate in this case should be 6-8% and applied such rate to the royalty base for the accused

24   WebPulse for the '844 patent.  (*Id.* at ¶ 141.)  However, when adding the ProxySG revenue as

25   convoyed sales to the damages for the '844 patent, she does not apply any reasonable royalty

---

[6] WebPulse service is not sold and is used with many different Blue Coat products.  However, the WebFilter product is needed if a customer wants to use the WebPulse service with ProxySG. WebFilter is sold separately from ProxySG.

rate—namely the 6-8%—resulting in 100% reasonable royalty rate.  (*Id.*)   In other words, Dr. Layne-Farrar concluded that Blue Coat would have agreed to apply a 100% royalty rate to the ProxySG revenue associated with WebPulse when the alleged patented feature is only found in WebPulse.  Such analysis is not only nonsensical, but far from any economic reality or facts in this case.  For example, under Method 1, Dr. Layne-Farrar calculates alleged damages for the '844 patent for the accused WebPulse (WebFilter) product through January 12, 2015 as ranging between $300,500 and $400,700.  But she calculates alleged damages for the convoyed sales of ProxySG (non-accused) during the same time period to be $3,580,700, almost ***eleven times more*** than the damages of the WebPulse (WebFilter), the product actually accused of infringement.  (Ex. 5, Exhibit 3a-Method 1 to Layne-Farrar Report.)

Accordingly, Dr. Layne-Farrar's inclusion of convoyed sales for the '844 patent grossly overstates the damages and should not be allowed.

**C.      Dr. Layne-Farrar's Calculation Of Damages Under Her Method 3 Improperly Applies The Entire Market Value Rule.**

"Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit." *LaserDynamics*, 694 F.3d at 67. "The entire market value rule is a ***narrow exception*** to this general rule.  If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id.* (emphasis added).

For Method 3, Dr. Layne-Farrar calculated "royalty for infringement of the '844, '968, and '731 Patents [] based on the value that Blue Coat placed on a license to OEM WebPulse, which is accused of infringing the '844, '968 and '731 Patents." (Ex. 1, Layne-Farrar Report at ¶ 121.)  Relying on one internal Blue Coat presentation, Dr. Layne-Farrar concluded that ███████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ (*Id.* at ¶ 122.)  She then applied the

$2.25 per user royalty to the alleged number of WebFilter users to calculate damages.   This methodology is seriously flawed because it improperly applies the entire market value rule and fails to apportion the accused feature in WebPulse.   The royalty rate of $2.25 per user is for the whole WebPulse service.   But Dr. Layne-Farrar does not show any evidence that the patented feature in WebPulse (*i.e.*, Cookie2) drives the demand for the entire WebPulse (WebFilter) service. She does not even consider what is accused within WebPulse in her analysis.   (*See id.* at ¶¶ 121-125.)   Although she admitted in her Method 1 and Method 2 that apportionment must be applied (as discussed above), Dr. Layne-Farrar fails to apply any apportionment in her Method 3.

Accordingly, Dr. Layne-Farrar's Method 3 should be precluded as it improperly applies the entire market value rule.

## IV.   MOTION TO STRIKE CERTAIN PORTIONS OF EXPERT REPORT OF FINJAN'S TECHNICAL EXPERT, DR. NENAD MEDVIDOVIC

One of Finjan's technical experts, Dr. Medvidovic, provided an expert report offering an "opinion as to the importance of technology of [the patents-in-suit] and how they relate to Blue Coat products . . ." (Ex. 6, Medvidovic Report at 1:1-10.)   Dr. Medvidovic's expert report should be struck in two regards:   (1) his opinions on infringement and application of the patents-in-suit to Blue Coat's technology and (2) his opinions regarding Blue Coat's subjective beliefs about Finjan's products.   First, Dr. Medvidovic's opinions on infringement and application of the patents-in-suit to Blue Coat's technology are unreliable because he solely relies on other expert opinions without any independent analysis.   Second, Dr. Medvidovic's opinion that "Blue Coat recognized the importance of Finjan's patented technology" is based on sheer speculation, which is based on Dr. Medvidovic's interpretation of a handful of internal Blue Coat documents.   Further, Dr. Medvidovic—a technical expert—is not qualified to render an opinion on how Blue Coat may have appraised Finjan's technology in the context of a competitive market.   Dr. Medvidovic's opinions cannot assist the trier-of-fact and should therefore be struck from his report.

### A.   Dr. Medvidovic Failed To Independently Analyze Infringement.

An expert's methodology falls short when the expert acts as a mere mouthpiece for another to the extent that the expert merely parrots the views of another instead of performing an

1   independent analysis.  *See Info-Hold, Inc. v. Muzak LLC*, No. 1:11-CV-283, 2013 WL 4482442, at

2   *5 (S.D. Ohio Aug. 20, 2013) *aff'd in relevant part*, No. 2014-1167, 2015 WL 1865685 (Fed. Cir.

3   Apr. 24, 2015) (striking expert report for failure to independently verify facts); *Kuiper v.*

4   *Givaudan, Inc.*, 602 F. Supp. 2d 1036, 1049 (N.D. Iowa 2009) (excluding duplicative expert

5   testimony); *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. CIV.A. H-05-1634, 2007 WL

6   150606, at *4 (S.D. Tex. Jan. 16, 2007) ("Alworth's opinions appear to be mere *ipse dixit*,

7   presenting little more than a parroting of Bartley's personal views.  Rather than conduct and report

8   the results of critical, independent analysis, it appears that Alworth relied heavily, if not

9   exclusively, on what Bartley told him."); *Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382, 390

10  (S.D.N.Y.2007) (where expert testimony substantially overlaps with the testimony of another

11  expert, courts exclude that testimony).

12          Throughout his report, Dr. Medvidovic states that "I understand that [Dr. Cole or Dr.

13  Mitzenmacher] has provided an opinion that [Blue Coat's products] infringe the [Asserted Patent].

14  I have read [Dr. Cole's or Dr. Mitzenmacher's] expert report and agree with his analysis." (*See* Ex.

15  6, Mitzenmacher's Report at ¶¶ 58, 70, 76, 81, and 88.)  However, Dr. Medvidovic's report and

16  subsequent deposition reveal that he in fact performed no independent analysis to corroborate Drs.

17  Cole's and Mitzenmacher's opinions.  He failed to independently review the accused products'

18  source code, relying entirely on Drs. Cole's and Mitzenmacher's characterizations of the source

19  code.  Dr. Medvidovic also failed to perform any independent testing, relying solely on a testing

20  environment provided to him by Dr. Cole but with unknown configurations and parameters.

21  Finally, Dr. Medvidovic was unable to answer many questions about ***his own opinions on***

22  ***infringement*** without reciting from Drs. Cole's and Mitzenmacher's reports.  On balance, Dr.

23  Medvidovic failed to perform an independent analysis regarding infringement, and thus, his

24  opinions regarding application of the patents-in-suit to Blue Coat's technology should be stuck.

25  (*See, e.g.*, *id.* at ¶¶ 58-60, 70-72, 76-77, 81-83, 88-89, 93-98.)

26

27

28

### 1.   Dr. Medvidovic Did Not Independently Analyze The Operation Of The Accused Products.

Dr. Medvidovic's report does not support his opinions on infringement with reference or citation to any of Blue Coat's source code or technical documents.   Indeed, Dr. Medvidovic admitted during his deposition that he did not analyze any of the accused products' source code. (Ex. 7, 02/17/15 Medvidovic Dep. Tr. at 286:9-12.)   On the contrary, Dr. Medvidovic informed himself of the accused products' source code—the primary evidence of the accused products' operation—solely by reviewing Drs. Cole's and Mitzenmacher's reports.   (*Id.* ("So I did not analyze the source code.  I didn't go on Blue Coat's premises to look at the source code.  But I did see a lot of it referenced in -- in the infringement expert reports.").

### 2.   Dr. Medvidovic Merely Regurgitated The Opinions Of Drs. Cole And Mitzenmacher.

"It is improper at law for [an expert] to form his opinions by relying on the facts and data of another expert's report without conducting his own investigation or independent verification." *Info-Hold, Inc.*, 2013 WL 4482442 at *5.   Here, Dr. Medvidovic revealed his lack of an independent analysis during his deposition, when he relied on the expert reports of Drs. Cole and Mitzenmacher—not his own report—to answer several questions from counsel.   Two such examples include:

> Q.  Do you have any understanding of what that mobile protection code is, that's being sent by CAS to MAA?
>
> A.  I will look that up for you in just a second.  Give me -- so sorry *I have spent a little bit of time trying to find the evidence for this in Mr. Cole's report*.  And I'm running the risk of taking too long. There is a document that Mr. Cole references that I don't have, but it's from BlueCoat.com.  "Content Analysis System Guide, Version 1.2."

(Ex. 7, 02/17/15 Medvidovic Dep. Tr. at 365:19-366:5 (emphasis added); *see also id.* at 372:2-23.) Similarly:

> Q. What do you mean by "policy decisions that are made by the system?"
>
> A. So, for example, if you look at Dr. Mitzenmacher's report, paragraph 359 is a good example where he talks about the ███████████████████████████████████████████

And that is what -- the kind of thing that I'm referring to in my report on lines 19 and 20 on Page 23.

(*Id.* at 382:19-383:9; *see also id.* 395:21-396:16.)   By regurgitating wholesale the opinions of other experts, Dr. Medvidovic revealed his lack of independent knowledge—and failure to independently analyze the accused products.  This subjects his opinions to being stricken by the Court.  *See In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (concluding blind reliance by expert on other expert's opinion was flawed methodology under *Daubert*); *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV5936KMW, 2011 WL 1674796, at *10 (S.D.N.Y. May 2, 2011) ("[Expert's] failure to perform any independent analysis results in an opinion that is only a summary of what other experts have said, without application of his own expertise.  This is not an appropriate type of expert testimony.")..

> **3.**     **Dr. Medvidovic's Alleged Tests Are Unreliable And Not Independent.**

Dr. Medvidovic claims that he corroborated the opinions of Drs. Cole and Mitzenmacher by performing a series of test simulations of the accused products.  However, this claim is unreliable for a number of reasons.  First, Dr. Medvidovic does not discuss or disclose any independent testing in his expert report, and alleged that such tests occurred for the first time during his deposition.  However, Dr. Medvidovic was unable to testify regarding any of the details of these tests, including the critical inquiries regarding the parameters and configurations of any test simulations he allegedly performed.  (Ex. 7, 02/17/15 Medvidovic Dep. Tr. at 274:21-275:1.) He concedes that he did not memorialize any of these alleged tests with notes, photographs, or recordings.  (*Id.* 276:1-24.)  He also concedes that no other individuals witnesses or participated in any such tests.   (*Id*).  An expert's failure to provide any of the foundational details regarding simulations or tests underlying is a basis to strike his opinions.  *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) ("There is nothing inherently unreliable or suspect about computer simulations as evidence.  But every simulation of a physical process embodies at least some simplifying assumptions, and requires both a solid theoretical foundation and realistic input parameters to yield meaningful results.  Without knowing these foundations, a

court cannot evaluate whether the simulation is probative, and it would be unfair to render an expert's opinion immune to challenge because its methodology is hidden in an uncommented computer model.").

Setting aside the unreliable nature of these alleged tests, it is clear that any tests Dr. Medvidovic performed were not independent of Drs. Cole or Mitzenmacher, and so do not reliably corroborate their opinions. For example, Dr. Medvidovic did not independently establish the testing environment he used. Instead, Dr. Medvidovic simply re-used Dr. Cole's testing simulation. (Ex. 7, 02/17/15 Medvidovic Dep. Tr. at 238:22-239:2.) Dr. Medvidovic did not know how the testing simulation was configured, nor did he have the ability to make any modifications to the testing environment. (*Id.* at 272:20-23; 275:22-25.) Dr. Medvidovic also had no *a priori* input in configuring any of the tests, and conceded that the testing environment was "already set up and configured by the time I tested it." (*Id.* at 273:16-25.) Indeed, as noted above Dr. Medvidovic did not even recall how the tests were configured. In short, Dr. Medvidovic had no information—and had no way to obtain such information—to corroborate the accuracy of Dr. Cole's testing environment. Dr. Medvidovic tests were not reliable, and not reliably independent of Dr. Cole's analysis.

For these reasons, Dr. Medvidovic's opinions on any alleged infringement by Blue Coat and his opinions regarding application of the patents-in-suit to Blue Coat's technology are unreliable and unhelpful to the jury. Dr. Medvidovic's opinions should be struck accordingly.

### B.    Dr. Medvidovic's Opinions That Blue Coat Recognized The Importance Of Finjan's Patents Should Be Struck.

In paragraphs 99 and 100 of his Report, Dr. Medvidovic cites documents Blue Coat produced in this litigation and opines that: "As demonstrated in these documents, Blue Coat recognized the importance of Finjan's patented technology and began the process of implementing the technology into Blue Coat's product line." (Ex. 6, Mitzenmacher Report at ¶ 99.) Dr. Medvidovic's opinions on this issue should be struck for two reasons. First, such opinions regarding Blue Coat's subjective beliefs are pure speculation and not properly the subject of expert opinion because they are not helpful to the jury. Second, Dr. Medvidovic lacks the expertise

needed to testify regarding commercial issues such as the features Blue Coat may or may not have considered competitively important in the market.  Both issues serve as independent bases for striking Dr. Medvidovic's opinions in paragraphs 99-100.

### 1.  Dr. Mitzenmacher's Opinion Regarding Blue Coat's Subjective Beliefs Are Pure Speculation.

Dr. Medvidovic's opinion amounts to nothing more than his interpretation of the cited documents.  (Ex. 6, Mitzenmacher Report at ¶¶ 99-100.)  Dr. Medvidovic uses these documents to speculate about what Blue Coat may or may not have believed.  (*Id.*)  Courts have consistently held that opinions regarding a party's subjective beliefs are not helpful to the jury and not properly the subject of expert testimony.  *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 WL 2037732, at *4 (N.D. Cal. May 12, 2008) ("It bears repeating that no expert of any kind will be allowed to speculate as to anyone's subjective intent or knowledge."); *see also Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 402 (5th Cir. 2008) (affirming district court's exclusion of "speculative" expert testimony).

Any purported testimony regarding how the jury should interpret the documents invades the province of the jury to interpret the factual effect of certain statements in the documents on the balance of evidence.  It is for the jury to determine the factual effect of any internal Blue Coat documents relating to what Blue Coat may or may not have believed.  *Cf. Sundance, Inc.*, 550 F.3d at 1364 ("the court, in its role as gatekeeper, must exclude expert testimony…which invades the province of the jury to find facts").  The jury will not need Dr. Medvidovic to tell them how to interpret these documents, or what conclusions they should draw.  The jury can interpret the facts just as well as Dr. Medvidovic.  However, unlike Dr. Medvidovic, the jury will not be biased in favor of Finjan and, therefore, the jury will interpret the information in an even-handed manner. Therefore, Dr. Medvidovic's opinions about Blue Coat's beliefs are improper.

### 2.  Dr. Medvidovic Lacks Expertise To Opine About The Alleged Blue Coat's Subjective Beliefs.

Speculative or not, Dr. Medvidovic's qualifications do not permit him to offer opinions on this topic.  FED. R. EVID. 702; *Cf. Sundance*, 550 F.3d at 1359-65; *Rambus, Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 604 (N.D. Cal. 2008) (citing *Sundance*, 550 F.3d 1359-65).

1   Dr. Medvidovic's expertise extends only to technical matters regarding computer architecture and

2   security.  (Ex. 6, Medvidovic Report at ¶¶ 1-17 & App. A (Dr. Medvidovic's curriculum *vitae*).)

3   He freely admits that he lacks expertise related to the type of analyses that Blue Coat may or may

4   not have undertaken to determine what it considered competitively important.  (Ex. 7, 02/17/15

5   Medvidovic Dep. Tr. at 415:18-416:9 ("I don't, as a matter of course, do market analyses.").)[7]

6   Thus, Dr. Medvidovic's lack of expertise renders him unqualified to offer opinions on this subject,

7   even if his opinions were not pure speculation (which they are).  *See Rambus*, 254 F.R.D. at 604.

8       Dr. Medvidovic's conclusions amount to nothing more than Finjan attempting to imbue a

9   lay person's speculative interpretation of documents with an air of expertise.  For these reasons,

10  paragraphs 99 and 100 of Dr. Medvidovic's report should be struck.

11  **V.    MOTION TO STRIKE CERTAIN PORTIONS OF EXPERT REPORTS OF**
12  **FINJAN'S TECHNICAL EXPERTS, DR. ERIC COLE AND DR. MICHAEL**
    **MITZENMACHER**

13      Dr. Cole and Dr. Mitzenmacher provided expert reports relating to infringement of the

14  patents-in-suit.  In providing their opinions of infringement, Drs. Cole and Mitzenmacher refer to

15  certain testing that they have performed in order to confirm infringement.  However, both experts

16  failed to specifically identify what specific steps were taken in their testing, what was specifically

17  used for their testing, or what specific results they obtained from testing.   Accordingly, any

18  reference to testing performed by Drs. Cole and Mitzenmacher should be precluded as conclusory

19  and unreliable.

20      Further, similar to Dr. Medvidovic, Dr. Cole opined that "Blue Coat understood how

21  important Finjan's patent technology was and implemented the technology into Blue Coat's

22  products."  As with Dr. Medvidovic's opinions, Dr. Cole's opinions in this regard are both

23  unqualified and based on sheer speculation.  They should be struck from his report for the same

24  reasons previously discussed.

25

26  _____

27  [7] Dr. Medvidovic acknowledged that his understanding of the market came primarily from
    Finjan's other expert, Dr. Layne-Farrar.  (Ex. 7, 02/17/15 Medvidovic Dep. Tr. at 415:18-416:9;
28  417:6-419:11.)

### A.    The Alleged Testing Performed By Drs. Cole And Mitzenmacher Are Conclusory And Unreliable.

Drs. Cole and Mitzenmacher both opined and concluded that:  "As a result of my testing, my opinion that the Accused Products infringe the Finjan patents is confirmed."  (Ex. 8, Cole Report at ¶ 10; Ex. 9, Mitzenmacher Report at ¶ 26.)   However, neither Drs. Cole nor Mitzenmacher explained what exactly they did to test the products to come to a conclusion that the accused products infringe the patents-in-suit.

Dr. Cole merely makes vague, conclusory assertions in his report concerning testing and what he observed.  He does not specifically identify what specific steps were taken in his testing, what was specifically used for his testing, or what specific results he obtained from testing.  For example, Dr. Cole's Report merely states:

- "During testing, I observed that the ProxySG Products with WebFilter integrated with WebPulse Service inspected unknown URLs and would mark them as suspicious.  Further, I observed that the ProxySG Products would block javascript by injecting mobile protection code.  I also observed that the ProxySG Products with CAS and MAA would sandbox content using mobile protection code." (Ex. 8, Cole Report at ¶ 86; *see also id.* at ¶ 88.)

- "As describe in my report, I have performed extensive testing of the Accused Products.  During my testing, I was able to confirm that the WebPulse Service is a service that performs a method."  (*Id.* at ¶ 113.)

- "I observed this claim element via testing of the '844 Accused Products.  When visiting various websites, the WebPulse Service would perform analysis and have the ability to block content that was not categorized by WebFilter on the ProxySG server.  Both malicious pdf and JavaScript was accessed and the WebPulse Service properly categorized and blocked the downloading of the malicious code."  (*Id.* at ¶ 133; *see also id.* at ¶¶ 155, 183, 223, 248, 265, 298, 368, 385, 406, and 433.)

- "I have tested the ProxySG product and confirmed that it is a processor-based system [for the '822 patent]."  (*Id.* at ¶ 451; *see also id.* at ¶¶ 465, 498, 532, and 567.)

1    • "I observed this functionality during the testing of the products and confirmed that
2         the products were a computer processor-based system for computer security [for
3         the '633 patent].  In addition, sites that contained malicious content were visited
4         and via communication with the CAS and MAA.  The CAS and MAA were then
5         turned off and when the sites with malicious content were visited they were not
6         analyzed.  Clearly the CAS with the MAA provides monitoring and protection from
7         malicious mobile code." (*Id.* at ¶ 641; *see also id.* at ¶¶ 683, 739, 813, 846, 876,
8         913, 965, and 1013.)

9         Similarly, Dr. Mitzenmacher's Report also fails to provide any specific details of the
10   testing allegedly performed.  For example, Dr. Mitzenmacher's Report merely states:

11   • "I have tested the ProxySG products with the CAS which I understand contains the
12        same relevant technology as the ProxyAV.  My testing confirmed that the '780
13        Accused Products meet this element." (Ex. 9, Mitzenmacher Report at ¶ 101; *see
14        also id.* at ¶¶ 133, 162, 186, 199, 232, 252, and 287.)

15   • "I have tested the ProxySG, Webfilter and Webpulse products and have confirmed
16        that it operates as a policy-based cache manager [for the '968 patent]." (*Id.* at ¶
17        324; *see also id.* at  ¶¶ 360, 405, 444, 463, 473, 508, 547, 573, 597, 627, 656, 684,
18        714, 752, and 792.)

19   • "I have tested ProxySG, Webfilter and Webpulse and verified that they operate as a
20        gateway for an intranet of computer as they analyze content that is requested by
21        clients in order to determine whether the content is malicious or not [for the '731
22        patent]." (*Id.* at ¶ 816; *see also id.* at ¶¶ 855, 886, 913, 948, 973, 983, 1013, 1043,
23        1069, 1101, and 1133.)

24        In sum, the opinions of Drs. Cole and Mitzenmacher lack details with regards to how the
25   testing was done, specific details of what was used for testing, and identification of specific results
26   based on their testing.  Because there were no details of how and what tests were conducted, there
27   is no way for Blue Coat to rebut any findings or conclusions that arise from the alleged testing.
28   Accordingly, Drs. Cole and Mitzenmacher should be precluded from discussing any testing

performed by them to prove or confirm infringement. *See Novartis Corp.*, 271 F.3d 1043, 1054 ("There is nothing inherently unreliable or suspect about computer simulations as evidence. But every simulation of a physical process embodies at least some simplifying assumptions, and requires both a solid theoretical foundation and realistic input parameters to yield meaningful results. Without knowing these foundations, a court cannot evaluate whether the simulation is probative, and it would be unfair to render an expert's opinion immune to challenge because its methodology is hidden in an uncommented computer model.").

**B.    Dr. Cole's Opinion That Blue Coat Recognized The Importance Of Finjan's Patents Should Be Struck.**

Similar to Dr. Medvidovic, Dr. Cole also opined that "Blue Coat understood how important Finjan's patent technology was and implemented the technology into Blue Coat's products." (Ex. 8, Cole Report at ¶ 84, *see also id.* at ¶¶ 72-84.) As discussed above with regards to Dr. Medvidovic's opinions, Dr. Cole's opinions on this issue should be struck for two reasons. First, such opinions regarding Blue Coat's subjective beliefs are pure speculation and not properly the subject of expert opinion because they are not helpful to the jury. *See, e.g., Therasense, Inc.*, 2008 WL 2037732, at *4 ("It bears repeating that no expert of any kind will be allowed to speculate as to anyone's subjective intent or knowledge."); *see also Nano-Proprietary, Inc.*, 537 F.3d at 402 (affirming district court's exclusion of "speculative" expert testimony). Second, Dr. Cole, as a technical expert, lacks the expertise needed to testify regarding commercial issues such as the features Blue Coat may or may not have considered competitively important in the market. FED. R. EVID. 702; *Cf. Sundance*, 550 F.3d at 1359–65; *Rambus*, 254 F.R.D. at 604 (citing *Sundance*, 550 F.3d 1359-65).

Accordingly, Dr. Cole's opinions and conclusions that Blue Coat recognized the importance of Finjan's patents should be struck.

1

## VI.    CONCLUSION

For the foregoing reasons, Blue Coat respectfully requests that the Court exclude (1) opinions of Finjan's damages expert, Dr. Anne Layne-Farrar; (2) certain portions of opinions of Finjan's technical expert, Dr. Nenad Medvidovic; and (3) certain portions of opinions of Finjan's technical experts, Drs. Eric Cole and Michael Mitzenmacher.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

DATED:   May 28, 2015              By:   _/s/ Olivia M. Kim_
                                         EDWARD G. POPLAWSKI
                                         OLIVIA M. KIM
                                         BRIAN LAM
                                         S. FERRELL ALMAN, JR.
                                         CHRISTOPHER MAYS

                                         Counsel for Defendant
                                         BLUE COAT SYSTEMS, INC.