[REDACTED]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

FINJAN, INC.,

        Plaintiff,

    v.

BLUE COAT SYSTEMS, INC.,

        Defendant.

Case No. 13-cv-03999-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF 174, 179]

United States District Court
Northern District of California

Before the Court are the parties' respective motions for summary judgment. Plaintiff Finjan, Inc. ("Plaintiff") seeks judgment that defendant Blue Coat Systems, Inc.'s ("Defendant") Internet security software products infringe six of Plaintiff's patents. Defendant seeks partial judgment that certain of its accused products do not infringe those patents. The Court heard oral argument on April 16, 2015 and thereafter took the matter under submission. After careful consideration Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

### A. The Technology and the Asserted Patents

Plaintiff asserts six patents against Defendant, all relating to content-based Internet security. Rather than scanning and maintaining a list of known viruses and actual malicious code signatures as would be typical in well-known virus protection systems, content-based security identifies, isolates, and neutralizes actually or *potentially* malicious code in files downloaded from the Internet based on the detected behavior and characteristics of the code in those files.

The six asserted patents are directed to various aspects of a system of content-based security. Five of the patents share a common inventor—Shlomo Touboul. U.S. Patent No.

6,804,780 (the "'780 Patent") claims a method and system for "generating a Downloadable ID to identify a Downloadable." *See* '780 Patent at Abstract. A "Downloadable" is "an executable application program, which is downloaded from a source computer and run on the destination computer." *Markman* Order at 4, ECF 118. Downloadables frequently reference other software components that are not always delivered with the Downloadable when it is requested from a web server. The '780 Patent is generally directed toward identifying such a Downloadable by creating a unique ID for it and its referenced components so that future iterations of that Downloadable can be recognized according to its ID, whether or not that Downloadable is delivered with the components that it references. '780 Patent, cols. 1:65-2:16, 4:64-66.

U.S. Patent No. 6,154,844 (the "'844 Patent") claims a system and methods of network protection wherein an inspector reviews a piece of downloadable-information for suspicious code or behavior according to a set of rules. '844 Patent, col. 2:3-19. The inspector generates a profile characterizing the areas of suspicion and then attaches that profile to the downloadable-information. *Id.* The profile can include other unique identifiers and certificates that are later read by a protection engine to determine whether or not to trust the profile. *Id.* col. 2:20-48. By providing verifiable profiles, the object of the invention is to provide flexible, efficient protection against known and unknown hostile downloadable information without having to re-inspect the same piece of downloadable-information each time. *Id.* col. 2:61-3:7.

U.S. Patent No. 7,418,731 (the "'731 Patent") describes systems and methods of operating computer and network gateways that protect an intranet of computers. The claimed inventions provide for caching of security information and policies at the gateway. '731 Patent at Abstract. This caching of specific types of security profiles and security policies mitigates network latency—delay in the transmission of data—caused when the gateway processes downloadable information to protect intranet devices. *Id.* col. 1:55-67.

U.S. Patent No. 6,965,968 (the "'968 Patent") is directed to policy-based caching, and more specifically to the management of multiple caches. Content from the Internet can be cached so that the same web page does not have to be retrieved each time a user on the network requests the page. However, users on the same network can also have different security policies—sets of

United States District Court
Northern District of California

rules that govern whether a file is allowed through the security filter.  The '968 Patent provides a system and method of managing cached content in relation to multiple security policies by, *inter alia*, providing a "policy-based index . . . indicating allowability of cached content relative to a plurality of policies" that can be easily utilized by a cache manager to determine whether cached content is allowable for different requesting users.  '968 Patent, cols. 1:63-2:11.

Finally, U.S. Patent Nos. 7,058,822 and 7,647,633 (the "'822 Patent" and "'633 Patent" respectively) are related patents with the same specification.[1]  These patents provide systems and methods for protecting devices on an internal network from code, applications, and/or information downloaded from the Internet that performs malicious operations.  '822 Patent at Abstract.  At a high level, the disclosed embodiments describe a protection engine that generally resides on a network server and inspects incoming downloads for executable code.  *Id.* col. 2:20-3:4.  Upon detection of executable code, the protection engine deploys "mobile protection code" ("MPC") and protection policies to the download destination.  *Id.* col. 3:5-21.  At the destination, the downloadable-information is executed, typically within a sandboxed environment, and malicious or potentially malicious operations that run or attempt to run are intercepted and neutralized by the MPC according to set protection policies.  *Id.* col. 3:22-40.

### B.    The Accused Products

Plaintiff accuses Defendant's ProxySG, ProxyAV, WebPulse, Malware Analysis Appliance ("MAA"), and Content Analysis System ("CAS") of infringing various claims of the asserted patents.  ProxySG is a proxy server that provides, among other things, web security through policy control.  Features contained within ProxySG are accused of infringing the asserted claims of the '822 and '633 Patents.  ProxySG is often connected to or integrated with some or all of the other accused products to work as a comprehensive web security system.  ProxyAV, an appliance that provides anti-virus and other malware detection services, is typically connected to and used in conjunction with ProxySG as a gateway to protect networks from incoming web content.  ProxyAV, as well as ProxyAV in combination with ProxySG, are accused of infringing

---

[1] The '822 Patent is the only asserted patent that does not name Schlomo Touboul as an inventor.

3

the asserted claims of the '780 Patent.  MAA is a customizable sandboxing environment that is individually accused of infringing the asserted claims of the '633 Patent.  MAA can integrate with CAS—another antivirus scanner integrated with ProxySG—and therefore the combination of ProxySG, MAA, and CAS is also accused of infringing the asserted claims of the '633 Patent. Finally, WebPulse is a cloud-based infrastructure that categorizes web pages and runs background processes, "some of which look for evidence of malware activity."  WebPulse contains a real-time content analyzer component called the Dynamic Real-Time Rating ("DRTR").[2]  When integrated with ProxySG, the combination is accused of infringing the asserted claims of the '731 and '968 Patents.  By itself, WebPulse is also accused of infringing the '844 Patent asserted claims.  *See* Def.'s Mot. 4, ECF 173-3; Def.'s Opp. 5, ECF 185-4; Pl.'s Mot. 5-6, ECF 175-4.

As helpfully provided by the parties, the following chart illustrates the patents, asserted claims, and accused products and product combinations at issue:

| Patent | Asserted Claims | Accused Product(s) |
|---|---|---|
| '780 Patent | 9, 13 and 18 | ProxyAV; ProxySG with ProxyAV |
| '844 Patent | 1, 7, 11, 15-16 and 41 | WebPulse |
| '731 Patent | 1 | ProxySG (and WebFilter) with WebPulse |
| '968 Patent | 1, 9 and 33 | ProxySG (and WebFilter) with WebPulse |
| '822 Patent | 9 and 10 | ProxySG |
| '633 Patent | 8 and 14 | ProxySG; MAA; ProxySG with CAS and MAA |

*See* Def.'s Mot. 4; Pl.'s Mot. 1, 6.

### C.  Procedural History

The Court held a *Markman* hearing on August 22, 2014 and construed ten terms.  On April 16, 2015, the Court heard oral argument on the present motions for summary judgment. Following that hearing, the parties filed motions to strike infringement and invalidity theories in their respective expert reports that were not previously disclosed in the contentions required under

---

[2] Plaintiff also accuses WebFilter, which it alleges is simply a component contained within ProxySG that interacts with WebPulse.  *See* Pl.'s Mot. 6 n.3, ECF 175-4.

United States District Court
Northern District of California

the Patent Local Rules. *See* Pl.'s Mot. to Strike, ECF 218; Def.'s Mot. to Strike, ECF 216. Defendant's motion to strike touches upon some of the specific infringement theories on which it has also affirmatively sought summary judgment. Defendant also seeks to strike all of Plaintiff's doctrine of equivalents assertions. Def.'s Mot. to Strike 1-2. These motions are set to be heard on June 4, 2015. The Court therefore addresses the merits of the parties' arguments without deciding whether any theories that survive summary judgment may ultimately be presented to a jury.

## II. LEGAL STANDARDS

### A. Summary Judgment

The parties have respectively moved for summary judgment of infringement and non-infringement of the asserted patent claims. Summary judgment is only appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists if the issue of fact could reasonably be resolved in favor of either party. The dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Infringement, both literal and under the doctrine of equivalents, is an issue of fact. *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1275 (Fed. Cir. 2013); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). A court may nonetheless determine infringement on summary judgment "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1201 (Fed. Cir. 2014) (quoting *Innovention Toys, LLC v. MGA Entmn't, Inc.*, 637 F.3d 1314, 1319 (Fed. Cir. 2011)) (internal quotation marks omitted). Where a defendant seeks summary judgment of non-infringement, "nothing more is required than the filing of a . . . motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused [products] did not meet the claim limitations." *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006). The burden of production then shifts to the patentee to "identify genuine issues that preclude summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990 (Fed.

United States District Court
Northern District of California

1    Cir. 2006).

2        In considering all motions for summary judgment, "[t]he evidence of the non-movant is to

3    be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at

4    255; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

5        **B.    Infringement**

6        The infringement analysis entails two separate steps: (1) interpreting the meaning and

7    scope of patent claims through claim construction; and (2) determining whether the claims, as

8    construed, read on the accused product. *Markman v. Westview, Instruments Inc.*, 52 F.3d 967,

9    976, 979 (Fed. Cir. 1995) (en banc); *Southwall Techs.*, 54 F.3d at 1575.  This Court issued its

10   claim construction ruling on October 20, 2014, and the parties have incorporated those

11   constructions in to their summary judgment arguments.

12       To establish infringement, a patentee must show that the defendant's accused product

13   "meets each claim limitation either literally or under the doctrine of equivalents." *Seachange Int'l,*

14   *Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005).  Literal infringement requires a

15   showing that each claim element is present, exactly. *Becton Dickinson & Co. v. C.R. Bard, Inc.*,

16   922 F.2d 792, 796 (Fed. Cir. 1990).  "[A] product or process that does not literally infringe upon

17   the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence'

18   between the elements of the accused product or process and the claimed elements of the patented

19   invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).

20   Infringement under this doctrine of equivalents can be proven through showing that any difference

21   between the claimed invention and the accused product is "insubstantial." *Graver Tank & Mfg.*

22   *Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950); *see also Pozen Inc. v. Par Pharm., Inc.*,

23   696 F.3d 1151, 1167 (Fed. Cir. 2012).  One way of doing so is "by showing on a limitation by

24   limitation basis that the accused product performs substantially the same function in substantially

25   the same way with substantially the same result as each claim limitation of the patented product."

26   *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009);

27   *see also Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

28   Regardless of how the test is characterized, "'[e]quivalence, in the patent law, is not the prisoner

United States District Court
Northern District of California

6

of a formula and is not an absolute to be considered in a vacuum.'" *Warner-Jenkinson*, 520 U.S. at 24-25 (quoting *Graver Tank*, 339 U.S. at 609).

## III. DEFENDANT'S MOTION

Defendant seeks summary judgment that ProxySG, ProxyAV, and WebPulse do not infringe the respective patent claims asserted against them. Defendant does not seek a determination on the accused MAA product. Plaintiff opposes Defendant's motion and cross moves for summary judgment in its favor on infringement by all of the accused products. The Court addresses the parties' respective arguments below in regard to each of the Asserted Patents.

### A. The '780 Patent

Plaintiff accuses ProxyAV, individually and in conjunction with ProxySG, of infringing Claims 9, 13, and 18 of the '780 Patent. Claims 9 and 18 are independent claims, and Claim 13 depends from Claim 9. Claim 9 reads:

> 9. A system for generating a Downloadable ID to identify a Downloadable, comprising:
>
> a communications engine for obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable; and
>
> an ID generator coupled to the communications engine that fetches at least one software component identified by the one or more references, and for performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID.

Claim 18 is directed toward a computer-readable storage medium storing program code for causing a computer to perform steps accomplishing the task of the system described in Claim 9.

All three claims share the limitation that the ID generator be capable of "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID." The parties agreed that this limitation should be construed as "performing a hashing function on the Downloadable *together with* its fetched software components," and the Court adopted that construction in its *Markman* order.[3] *Markman* Order at 4 (emphasis added).

---

[3] The parties agree that a "Downloadable" is "an executable application program, which is downloaded from a source computer and run on the destination computer." *Markman* Order at 4.

United States District Court
Northern District of California

1    Lurking beneath this apparent agreement on wording, however, is a dispute over what those words

2    actually mean.  *See* Def.'s Reply 3, ECF 193-4.

3         Defendant contends that ProxyAV does not perform a hashing function on a Downloadable

4    "together with" its referenced components because ProxyAV "performs a hashing function only

5    on [an] individual file or object."  Def.'s Mot. 8; Decl. of Olivia Kim, ECF 174-3 Exh. 6

6    (Ahlander Dep. Pt. 1) 54:9-56:14; *id.* Exh. 4 (Rebuttal Expert Report of Dr. Azer Bestavros,

7    hereinafter "Bestavros Report") ¶¶ 149-56; *id.* Exh. 7 (Bestavros Dep.) 90:14-21.  ProxyAV

8    receives "independent files" and objects and applies an MD5 hashing computation to each, never

9    hashing two or more files or objects together.  Def.'s Mot. 8; *see also* Bestavros Report ¶ 149;

10   Def.'s Reply 3.  In Defendant's view, then, ProxyAV does not infringe because the limitation of

11   performing a hashing function on a Downloadable "together with" its referenced components

12   means that the Downloadable and the disparate files and objects it references must be combined

13   and hashed as a whole.  *See* Def.'s Reply 3-5.

14        Plaintiff strenuously disagrees with this interpretation of the parties' agreed construction.

15   Plaintiff asserts that the hashing function limitation reads on ProxyAV because it retrieves a web

16   page and the components referenced in the web page and loads them all into a buffer for

17   processing.  Pl.'s Opp. 6-7, ECF 187-3; *see also* Pl.'s Mot. 25; Decl. of James Hannah, ECF 175-5

18   Exh. 30 (Ahlander Dep. Pt. 2) 51:16-59:18; Kim Decl. Exh. 1 (Expert Report of Dr. Michael

19   Mitzenmacher, hereinafter "Mitzenmacher Report") ¶¶ 68, 75, 139-145, 147, 156-61.  Critically,

20   however, Plaintiff does not dispute that an MD5 computation is applied to each file or object in

21   the buffer, and not to a combination of the files and objects.  *See* Pl.'s Opp. 7-8 (citing source code

22   functions such as ███████████████████████████████████████████

23   ██████████████████████); *see also* Mitzenmacher Report ¶ 145 (ProxyAV Products

24   create "MD5 hash*es*" of Downloadables and fetched software components "*in parallel*" by

25   ███████████████████████████████████████████████████

26   (emphasis added)); Kim Decl. Exh. 28 (Mitzenmacher Dep. Pt. 2) 273:17-274:4; Decl. of Benu

27   Wells, ECF 188-2 Exh. 1 (Mitzenmacher Dep. Pt. 1) 261:12-23 ("when they all reside on the

28   ProxyAV . . . *each* has the MD5 function applied to it" (emphasis added)).  Rather, Plaintiff

United States District Court
Northern District of California

1    appears to be arguing that "together with" is satisfied by togetherness in time.  In other words,

2    because the Downloadable and its fetched components are buffered, processed "in parallel," and

3    then combined into a Downloadable ID, Plaintiff argues that an overall hashing function (the

4    collection of individual MD5 computations) is applied to the Downloadable "together with" its

5    fetched components.  *See* Pl.'s Opp. 7; Mitzenmacher Dep. Pt. 1, 253:3-20, 261:12-23 ("when

6    there's a Downloadable that has associated software components, those are fetched.  Generally,

7    those are grouped and then in parallel they would be processed").

8         Defendant replies that this interpretation eliminates the requirement that the Downloadable

9    and its fetched components be hashed "together."  Def.'s Reply 3.  Defendant further contends that

10   there is no evidence that ProxyAV combines the hashes of individual files and objects into a single

11   Downloadable ID.  *See id.* at 4-5.  In order to assess this dispute, the Court must first determine

12   what the parties agreed construction means.

13        The Court begins by observing that neither party asserts that there is a definition of

14   "hashing function" that is generally known in the art.  Dr. Mitzenmacher indicates that "[a] hash

15   function takes an object, such as a file, and by computing a function on the contents of that objects

16   [sic], such as the characters it contains, produces an output number or string, that is usually some

17   fixed length, such as 32 bits, 64 bits, or 128 bits, depending on the context.  This number or string

18   output from the hash function is an identifier (ID) for the object."  Mitzenmacher Report ¶ 76.

19   Accepting that a hashing function is an operation that transmutes a file of indeterminate size or

20   length into a fixed-length "number or string output," there is ample disclosure in the '780 Patent to

21   support Defendant's argument that a hashing function performed on a Downloadable "together

22   with" its referenced components must operate across the combination of a Downloadable and its

23   fetched components.

24        The clearest example of this can be seen in the flowchart at Figure 8 and its accompanying

25   description of "a method 800 for generating a Downloadable ID."  '780 Patent, col. 9:58-59.

26   Within this method, "[t]he ID generator 315 in step 820 may fetch some or all components

27   referenced in the Downloadable code, and in step 830 *includes the fetched components in the*

28   *Downloadable code*."  *Id.* col. 9:62-65 (emphasis added).  The ID generator then "in step 840

performs a hashing function on at least a portion of the Downloadable code to generate a Downloadable ID." *Id.* col. 9:65-67; *see also id.* Fig. 8. Thus, when "a hashing function" is performed, it is performed on Downloadable code that includes components referenced in the code and fetched by the ID generator. *See also id.* col. 5:52-54 ("the code scanner 325 uses conventional parsing techniques to decompose the code (*including all prefetched components*) of the Downloadable into the DSP data 310" (emphasis added)); *id.* col. 7:63-67 ("The ID generator 315 in step 604 generates a Downloadable ID identifying the received Downloadable, preferably, by generating a digital hash of the Downloadable code (*including prefetched components*)." (emphasis added)). Furthermore, although "a hashing function" may not necessarily be limited to a single MD5 computation or the like, it must create a unique and reproducible ID when applied to a Downloadable and its components. The advantage of this feature of the claimed invention is stated in the inventor's own words:

> An advantage of the present invention is that it produces the same ID for a Downloadable, regardless of which software components are included with the Downloadable and which software components are only referenced . . . . The same Downloadable may be delivered with some required software components included and others missing, and in each case the generated Downloadable ID will be the same. Thus the same Downloadable is recognized through many equivalent guises.

Kim Decl. Exh. 30 (July 31, 2003 Amendment and Response to Office Action); *see also* '780 Patent col. 4:64-66 ("Accordingly, the Downloadable ID for the Downloadable will be the same each time the ID generator 315 receives the same Downloadable."). As such, the plain import of these disclosures is that the limitation "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID," as construed to mean "performing a hashing function on the Downloadable *together with* its fetched software components to generate a Downloadable ID," requires a hashing function that transmutes the Downloadable *and* its components into a unique and reproducible "number or string output."

Contrary to Plaintiff's assertion at oral argument, this interpretation of the disputed limitation does not violate the general rule that the indefinite articles "'a' or 'an' can mean 'one or more.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). First,

10

as the Court already stated, the '780 Patent is not so limited that "a hashing function" means a single hash—the overall function of hashing an object or combination of objects could potentially be accomplished by a sequence of several hashes or computations. Second, the rule that indefinite articles mean "one or more" is most applicable in "open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). The claim at issue here refers to a system that *comprises components*, one of which carries out the limitation of "performing a hashing function." Thus, while Claim 9 of the '780 Patent may contemplate a system containing more than one ID generator, it does not necessarily follow that the ID generator performs "one or more" hashing functions to generate "one or more" Downloadable IDs for *each* Downloadable. Indeed, such would obviate the advantage of generating the same ID for the same Downloadable. Thus, the more sensible reading would be that the ID generator performs "one or more" hashing functions to generate "one or more" Downloadable IDs for "one or more" Downloadables. Finally, when "a hashing function" and "a Downloadable ID" are taken out of a vacuum and considered in the context of a specific Downloadable being processed, it is clear that the phrase "performing *a* hashing function on *the* Downloadable *together with* its fetched software components to generate *a* Downloadable ID," requires a computation or combination of computations that transmutes the Downloadable and its components into a unique and reproducible ID for that Downloadable. Thus clarified, the Court turns to whether Plaintiff has evidence that ProxyAV performs this limitation.

As previously stated, there is no material dispute that ProxyAV applies MD5 computations to each file or object that it buffers, and not to a combination of the files and objects in the buffer. Although Dr. Mitzenmacher opines extensively about the processing of these files and objects "in parallel" in the "object pipeline," *see* Mitzenmacher Report ¶¶ 139-60, the only evidence of what ProxyAV does with the results of the MD5 computations is in paragraph 161 of his report. There, Dr. Mitzenmacher states: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Mitzenmacher Report ¶

11

161.  Plaintiff asserts that Dr. Mitzenmacher testified "[i]n no uncertain terms" that ProxyAV generates a single Downloadable ID.  Pl.'s Opp. 7 (citing Mitzenmacher Dep. Pt. 1, 253:3-20). However, immediately following the cited portion, Dr. Mitzenmacher clarified that "[t]here's a single Downloadable ID, which I believe as I described in my report corresponds to *the combination* of applying an MD5 function to the individual software component*s* in the file." Mitzenmacher Dep. Pt. 1, 253:25-254:3 (emphasis added).  Elsewhere in his deposition, Dr. Mitzenmacher further states that "when we think of the Downloadable ID, the hashing function consists of applying MD5 to each component and then putting those components together." *Id.* 255:8-12.  While it is not overwhelming, there is thus some evidence in the record that ProxyAV combines MD5 computations of the individual components in a buffer in a way that would be understood by one of ordinary skill in the art as an overall "hashing function" to create a Downloadable ID.  Dr. Bestavros's non-infringement report for Defendant does not directly address this assertion.  As such, there is a genuine dispute of material fact concerning how ProxyAV uses the MD5 computations of the Downloadable and its corresponding components. Rendering all inferences in Plaintiff's favor, a reasonable jury could find that if ProxyAV performs in the manner described by Dr. Mitzenmacher, it would meet the "performing a hashing function on the Downloadable together with its fetched software components to generate a Downloadable ID" limitation of the '780 Patent asserted claims.

Plaintiff's literal infringement theory veers admittedly close into doctrine of equivalents territory, as in both instances Plaintiff argues that a combination of hashes of individual components comprises the Downloadable ID described in the patents.  *Compare* Pl.'s Opp. 6-9 *with id.* at 9-10; *compare* Mitzenmacher Report ¶¶ 139-161 *with id.* ¶ 165 ("[a] hash function is applied to the Downloadable and the fetched software components, so each individual part is hashed, and one can use the union of these individual hashes as the Downloadable ID for the Downloadable and the fetched software components").  In truth, the difference appears to be semantic (whether the combination is part of a hashing function or is only equivalent to a hashing

United States District Court
Northern District of California

function) and the doctrine of equivalents is likely where Plaintiff's case lies.[4]  In any event, the same factual dispute—whether and how ProxyAV combines the individual hashes into a single Downloadable ID that identifies the Downloadable—underlies both theories.  Defendant moreover argues that an ID cobbled together from individual hashes would be useless for the stated purpose and that only a single hash performed on a Downloadable packaged with its fetched components could result in a Downloadable ID that can be used to identify future iterations of the same Downloadable.  Def.'s Mot. 10; *see also* Bestavros Report ¶¶ 157-62; Def.'s Reply 4-5.  Clearly, the parties and their experts vigorously dispute this point as well.  As such, infringement under the doctrine of equivalents is a question for the jury.

Defendant's Motion for Summary Judgment is accordingly DENIED with respect to non-infringement by ProxyAV of the asserted claims of the '780 Patent either literally or under the doctrine of equivalents.

**B.    The '844 and '731 Patents**

Plaintiff asserts Claims 1, 7, 11, 15, 16, and 41 of the '844 Patent against Defendant's WebPulse product.  Claims 7 and 11 depend from independent Claim 1; Claim 16 depends from independent Claim 15; and Claim 41 is an independent claim.  Plaintiff also alleges that WebPulse in combination with ProxySG infringes independent Claim 1 of the '731 Patent.  Common to all of these claims is a "security profile" limitation.  For example, Claim 1 of the '844 Patent provides:

> 1. A method comprising:
>
> receiving by an inspector a Downloadable;
>
> generating by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable; and
>
> linking by the inspector the first Downloadable security profile to

---

[4] Indeed, although the outcome in *Finjan v. Secure Computing Corp., et al.* is irrelevant to the Court's consideration of the present motions, Plaintiff's reliance on that case for the proposition that "the exact same technology at issue in this case was already found to infringe in [*Secure Computing*]" is telling.  Pl.'s Opp. 8.  In *Secure Computing*, on analogous arguments, the jury found that the accused product did not literally infringe the '780 Patent but did infringe under the doctrine of equivalents.  *See Finjan Software, Ltd. v. Secure Computing Corp.*, No. CA 06-369(GMS), 2009 WL 2524495, at *6-7 (D. Del. Aug. 18, 2009) *aff'd in part, rev'd in part on other grounds sub nom. Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010); *see id.* at ECF 242 (Judgment and Verdict Form).

United States District Court
Northern District of California

the Downloadable before a web server makes the Downloadable available to web clients.

'844 Patent, col. 11:13-21; *see also id.* at 44-46 (Claim 11) ("wherein the first Downloadable security profile includes a list of operations deemed suspicious"). The Court previously construed "Downloadable security profile that identifies suspicious code in the received Downloadable" to mean "a profile that identifies code in the received Downloadable that performs hostile or potentially hostile operations." *Markman* Order at 16-18. In doing so, the Court rejected Defendant's proffered construction requiring that the profile more specifically identify suspicious code but noted that "identifies" connotes more than simply detecting the presence of suspicious code. *Id.* at 16. Similarly, Claim 1 of the '731 Patent provides a computer gateway including a scanner "for scanning incoming files from the Internet and deriving security profiles for the incoming files, wherein each of the security profiles comprises a list of computer commands that a corresponding one of the incoming files is programmed to perform." '731 Patent, col. 11:38-42. Thus, all of the asserted claims of the '844 and '731 Patents require a "security profile" that variously identifies suspicious code, includes a list of suspicious operations, or comprises a list of computer commands.

Plaintiff contends that WebPulse creates the "security profile" claimed in the '844 and '731 Patents through its Dynamic Real Time Rating ("DRTR") component, which generates a profile that is then stored in DRTR's "response cache." Pl.'s Opp. 11; *see also* Pl.'s Mot. 18-19. Part of this alleged profile is the metadata Cookie2, which is the center of the parties' dispute.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████. Def.'s Mot. 12-13; Bestavros Report ¶¶ 182-84. Defendant argues that because Cookie2 is merely ████████████████████████

████████████████████████████████████████████████████████"

there is no evidence that Cookie2 contains any of the data required to be in the security profile limitation of the asserted claims. Def.'s Mot. 12-13 (quoting Kim Decl. Exh. 11). In contrast, Plaintiff disputes the manner of WebPulse's operation and how much information Cookie2 actually contains. Specifically, Plaintiff identifies ████████████████████████████████

14

█████████████████████████████████████████████████████████████

██████████████████████████████ Pl.'s Opp. 11-13; Kim Decl. Exh. 2 (Expert Report of Dr. Eric Cole, hereinafter "Cole Report") ¶ 137; Mitzenmacher Report ¶ 825; *see also* Def.'s Mot. 13-15. Furthermore, ███████████████████████████████████████████████████████

███████████████████████████████████" that more specifically identifies the potentially malicious code. Pl.'s Opp. 11; *see also e.g.*, Cole Report ¶ 143; Mitzenmacher Report ¶ 829. Plaintiff asserts that all of this information in Cookie2 constitutes a "security profile" that identifies suspicious operations in the scanned file, lists those operations, and lists commands that the corresponding incoming file is programmed to perform. Pl.'s Opp. 13-14; Cole Report ¶¶ 135-39; *see also* Mitzenmacher Report ¶¶ 820-26.

The parties' dispute concerning the actual operation and use of Cookie2 precludes summary judgment for either side. Rendering all inferences in Plaintiff's favor, a reasonable jury could find that the totality of information reported in Cookie2—███████████████████

███████████████████████████—satisfy each of the "security profile" limitations found in the asserted claims of the '844 and '731 Patents. Likewise, even if the Cookie2 information does not literally infringe, there is substantial room for disagreement regarding whether Cookie2 is a "security profile" under the doctrine of equivalents. Def.'s Mot. 16-17; Pl.'s Opp. 14-16. Infringement under the doctrine of equivalents is thus also a question of fact for the jury to resolve.

Defendant's Motion for Summary Judgment is accordingly DENIED with respect to non-infringement by WebPulse of the asserted claims of the '844 and '731 Patents either literally or under the doctrine of equivalents.

**C.    The '968 Patent**

Plaintiff asserts that the combination of Defendant's ProxySG and WebPulse products infringes Claims 1, 9, and 33 of the '968 Patent, which provides a system and methods for storing and managing policy-based caches. A "policy" includes one or more rules that determine whether a file is allowed or not allowed to pass through the filter, and "typically only allowable [files] are cached." '968 Patent, col. 1:39-47. The claimed invention "enabl[es] a single cache to serve as

multiple caches" so as to "control content relative to a plurality of policies." *Id.* col. 1:63-67. This is accomplished through a "policy index" for the contents of a cache. The parties agree that this "policy index" is "a data structure indicating allowability of cached content relative to a plurality of policies." *Markman* Order at 4. Independent Claims 1 and 33 both describe iterations of the claimed system, and Claim 9 depends from Claim 1. The policy index limitation is common to all three asserted claims with the further requirement that "the policy index includ[es] entries that relate cache content and policies by indicating cache content that is known to be allowable relative to a given policy, for each of a plurality of policies." '968 Patent, col. 9:49-53 (Claim 1); *see also id.* col. 13:5-9 (Claim 33).

Defendant contends that Plaintiff has no evidence that ProxySG stores, as entries in the policy index, allowability determinations resulting from consultation with user policies. Def.'s Mot. 17-18. Plaintiff disputes this assertion, pointing to the "policy cache" in ProxySG, which allegedly stores "the results of applying policy conditions to content in a policy index." Pl.'s Opp. 16-18. In support of this assertion, Plaintiff relies upon the testimony of Defendant's 30(b)(6) designee, Gary Tomic, who testified that the policy cache stores "████████████████████ ████████████████████████" Decl. of James Hannah 175-5 Exh. 25 (Tomic Dep.) 122:1-4; *see* Pl.'s Mot. 17. As Defendant notes, Mr. Tomic clarified that the "decision" stored in the policy cache refers to "████████████████████████ ███████████████████████████████████████ ████████" Tomic Dep. 122:1-23. ████████████████████████ ██████████████████████████████████████" *Id.*; *see* Def.'s Reply 8-9. Similarly, Dr. Mitzenmacher's report indicates that ███████████████ ██████████████████████████████████████ ██" Mitzenmacher Report ¶ 331. "████████████████████ ███████████████████████████████████████ ███████████████████████████ *Id.*; Tomic Dep. 151:15-17 ("████████████████████████ █████████████████"). Dr. Mitzenmacher also provides some evidence that when ProxySG

16

analyzes content pursuant to a user-defined policy layer, the condition evaluation is determinative of whether the evaluated content is allowed relative to the user policy. Mitzenmacher Report ¶ 330; Pl.'s Opp. 18-19 (citing Hannah Decl. Exh. 33).

There is no dispute that to the extent ProxySG stores any determinations as "entries," it stores only the results of condition evaluations; that is, whether certain conditions referenced in a policy are satisfied. *See* Def.'s Opp. 17-19; Pl.'s Reply 9; *see also* Mitzenmacher Report ¶ 331; Bestavros Report ¶ 319. However, the parties dispute whether these condition evaluations are the same as determinations of allowability. Plaintiff argues that the results of condition evaluations are "entries related to allowability of cached content" "because conditions are stored that indicate whether a rule is met in a particular context, or in other words, whether content is allowable based on a particular policy." Pl.'s Opp. 19 (citing Hannah Decl. Exh. 35); *see also* Mitzenmacher Report ¶ 331. Defendant asserts that the condition evaluation results do not indicate allowability but are instead precursors to that determination: ProxySG makes an allowability determination each time using a specific user's policy settings and the cached condition evaluation results, "regardless of whether the content was previously denied or allowed." Def.'s Reply 10-11; *see also* Bestavros Report ¶¶ 319-43. In short, Defendant contends that the condition evaluations stored in ProxySG's policy cache are not related to content allowability while Plaintiff contends that they are. Although Defendant's argument would likely prevail if all policies consist of multiple rules or conditions, the '968 Patent specifically provides that a policy can be just one rule. '968 Patent, col. 1:39-47. Reducing a policy down to a single rule or condition presents a closer question on literal infringement. Rendering all inferences in Plaintiff's favor, a reasonable jury could find that the "policy index" limitation literally reads on ProxySG when the ProxySG policy cache contains a number of condition evaluations, each of which is determinative of whether a file is allowable relative to one of a plurality of single condition policies. Whether that ever occurs in ProxySG is a question of fact for the jury.

As to whether ProxySG infringes the asserted claims of the '968 Patent under the doctrine of equivalents, the parties dispute whether the condition evaluations stored in the policy cache perform substantially the same function as cached allowability determinations based on

1    application of entire policies.  Def.'s Mot. 19-20; Pl.'s Opp. 19-20; Mitzenmacher Report ¶¶ 363-

2    65; Bestavros Report ¶¶ 344-48.  Infringement under the doctrine of equivalents is therefore also a

3    question of fact for the jury to resolve.

4          Defendant's Motion for Summary Judgment is accordingly DENIED with respect to non-

5    infringement by ProxySG and WebPulse of the asserted claims of the '968 Patent either literally or

6    under the doctrine of equivalents.

7          **D.    The '822 Patent and '633 Patents**

8          Defendant seeks summary judgment that the Pop-Up Blocker feature of ProxySG does not

9    infringe Claims 9 and 10 of the '822 Patent and Claim 8 of the '633 Patent.[5]  Def.'s Mot. 20-23.

10   Defendant also argues that Claim 14 of the '633 Patent is indefinite and therefore invalid.  *Id.* at

11   23-25.  The Court addresses each argument in turn.

12              **i.    ProxySG's Pop-Up Blocker does not infringe.**

13         The '822 and '633 Patents are related patents that provide methods and systems for

14   monitoring malicious mobile code by first inspecting the content of incoming downloadable

15   information to determine whether it includes executable code.  Claim 10 of the '822 Patent

16   depends from independent Claim 9.  Claim 8 of the '633 Patent is an independent claim.  Critical

17   to the motions before the Court is the requirement in all of the asserted claims that mobile

18   protection code ("MPC") is communicated to the destination of the downloadable-information "if

19   the downloadable-information is determined to include executable code."  '822 Patent, col. 22:5-

20   10 (Claim 9); '633 Patent, col. 20:58-62 (Claim1).

21         Defendant argues that the accused Pop-Up Blocker feature of ProxySG does not infringe

22

23   _____

24   [5] The parties agree that Defendant's motion does not extend to the MAA features that are also
     accused of infringing the '633 Patent.  *See* Pl.'s Opp. Separate Statement Fact 53, ECF 188-1.
25   The Court further observes that it is not clear whether Plaintiff contends that ProxySG by itself
     infringes Claim 14 of the '633 Patent.  Defendant's motion suggests that ProxySG is only accused
26   of infringing Claim 8, and that ProxySG in combination with CAS and MAA is accused of
     infringing Claim 14.  This interpretation is consistent with the infringement arguments that
     Plaintiff advanced in its motion for summary judgment.  *See* Pl.'s Mot. 20-22.  In any event,
27   because Defendant is seeking a judgment that ProxySG's Pop-Up Blocker does not infringe
     Claims 9 and 10 of the '822 Patent and Claim 8 of the '633 Patent, the Court confines its analysis
28   to those claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the asserted claims because the feature, when it is turned on, injects MPC in the form of JavaScript

2   into "each and every web page," regardless of whether it contains executable code.[6]  Def.'s Mot.

3   21.  Indeed, Defendant's own user manuals indicate that "[p]op up windows are blocked by

4   inserting Javascript code into each HTML Web page."  Kim Decl. Exh. 15 at BC0160303.

5   Defendant's expert on these patents, Dr. Michael Hicks indicates that the injection of JavaScript

6   by Pop-Up Blocker is "not conditioned on the presence of executable code embedded in an HTML

7   page" but rather applies to every page when enabled.  Kim Decl. Exh. 14 (Expert Report of Dr.

8   Michael Hicks, hereinafter "Hicks Report") ¶ 100.  Dr. Hicks moreover confirmed through testing

9   that the Pop-Up Blocker, when enabled, injected popup blocking code into HTML web pages

10  containing executable code and lacking executable code alike.  *Id.* ¶¶ 101-03.  Because the

11  injection of code is indiscriminate and not dependent upon a determination that the web page

12  contains executable code, Defendant contends that Pop-Up Blocker does not satisfy the limitation

13  that MPC is deployed "*if the downloadable-information is determined to include executable code.*"

14  *See* Def.'s Mot. 22.

15         Plaintiff opposes Defendant's motion by arguing that the motion does not address

16  Plaintiff's other infringement theories and with the conclusory assertion that "[Plaintiff] factually

17  disputes how ProxySG operates and when pop-up blocking code is into [sic] webpages."  Pl.'s

18  Opp. 21-22.  To be sure, Plaintiff has advanced other infringement theories against Defendant that

19  are not addressed in Defendant's motion.  These include the ProxySG's active content

20  manipulation and "defang[ing]" of malicious active code.  Pl.'s Opp. 21; *see also* Pl.'s Mot. 20-21.

21  That there are other theories that are not the subject of Defendant's motion fails to address,

22  however, whether—Pop-Up Blocker—the feature that *is* the subject of Defendant's motion

23  communicates MPC conditioned upon a determination that the downloadable-information contains

24

---

25  [6] Defendant also argues in opposition to Plaintiff's motion for summary judgment and in its
26  motion to strike that Plaintiff never disclosed its theory that Pop-Up Blocker's code injection
    infringes the asserted claims of the '822 and '633 Patents.  *See* Def.'s Opp. 22-25, ECF 185-4.
27  While the Court agrees, this argument is moot because Defendant has affirmatively sought
    summary judgment on this theory and because the Court agrees with Defendant on the merits that
28  there is no evidence that Pop-Up Blocker selectively injects code based upon the detection of
    executable code.

executable code. On that narrow issue, Plaintiff fails to raise a genuine dispute.

The best evidence that Plaintiff can muster is the testimony of Mr. Tomic and the report from Plaintiff's expert on these patents, Dr. Eric Cole. *See* Pl.'s Opp. 20-21 (citing Tomic Dep. 217:7-25 and Cole Report ¶¶ 501, 532). As to the former, it is not clear from the cited excerpt that Mr. Tomic is testifying about Pop-Up Blocker when he agrees that ProxySG would add code "to the beginning of JavaScript." Tomic Dep. 217:22-25. As to the latter, Dr. Cole's report addresses all of Plaintiff's various infringement theories and does little to refute Dr. Hicks's report that the Pop-Up Blocker injects code indiscriminately. *See* Cole Report ¶¶ 499-525. Even if Dr. Cole "spent an extensive amount of time configuring and testing the ProxySG products" and is willing and able to reproduce his testing for a jury, his report is light on factual specificity. Pl.'s Opp. 21; Cole Report ¶¶ 29-30. "In the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981); *see also Intellectual Sci. & Tech., Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) ("To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant."). Here, there are no facts in Dr. Cole's report, which mentions Pop-Up Blocker only twice, to indicate that Pop-Up Blocker injects JavaScript into a web page in response to a determination that the page contains executable code. The conclusory statement that he "tested the ProxySG product and [ ] confirmed that it will insert mobile protection code into a javascript which intercepts potentially malicious code from executing" hardly suffices to create a genuine dispute, as it is entirely consistent with Dr. Hicks's assertion that Pop-Up Blocker always injects JavaScript when it is active. *See* Cole Report ¶ 532.

Contrary to Plaintiff's argument, this is not a situation in which the accused product infringes because it *sometimes* accomplishes the entire method of the claimed invention. Rather, much as in *Ferguson Beauregard/Logic Controls, Division of Dover Resources, Inc. v. Mega Systems, LLC*, this is a situation in which the accused feature never performs an essential element

United States District Court
Northern District of California

United States District Court
Northern District of California

of the claimed method even if it sometimes arrives at the same result. 350 F.3d 1327, 1346 (Fed. Cir. 2003). At best, Plaintiff has evidence that the Pop-Up Blocker feature injects JavaScript into a web page that contains executable code. Wells Decl. Exh. 8 (Cole Dep.) 212:2-213:12. That does not mean that the converse—that code is not injected into a page that does not contain executable code—is true. Absent evidence that the injection of popup blocking code is conditioned upon a determination that the web page contains executable code, Plaintiff fails to carry its burden of production to demonstrate a genuine dispute of material fact. Defendant's evidence, supported by Dr. Hick's detailed testimony regarding his testing efforts, amply demonstrates that the Pop-Up Blocker feature of ProxySG does not deploy MPC "*if* the downloadable-information is determined to include executable code"; when enabled, the feature deploys popup blocking code *always*. As such, no reasonable juror could find that the accused Pop-Up Blocker feature contains every limitation recited in Claims 9 and 10 of the '822 Patent and Claim 8 of the '633 Patent. Defendant is accordingly entitled to summary judgment on those claims as they pertain to ProxySG's Pop-Up Blocker.

Likewise, Defendant is entitled to summary judgment of non-infringement under the doctrine of equivalents. Plaintiff offers scant proof on this theory, particularly in regards to how a feature that always deploys mobile protection code is equivalent to the claimed limitation requiring that the communication occur "*if* the downloadable-information is determined to include executable code." *See* Pl.'s Opp. 22; *see generally* Cole Report ¶¶ 533-37. Dr. Cole's cursory conclusion that "[t]he JavaScript is packaged into the received web content with additional code if the web content is determined to include certain code elements, thereby preventing the malicious attack" is insufficiently particular to support a finding, or even a triable issue of fact, of infringement under the doctrine of equivalents. *Stumbo v. Eastman Outdoors*, Inc., 508 F.3d 1358, 1365 (Fed. Cir. 2007); *see also Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("[A] patentee must . . . provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.").

Based on the foregoing, Defendant's Motion for Summary Judgment is GRANTED with respect to non-infringement by ProxySG's Pop-Up Blocker of Claims 9 and 10 of the '822 Patent and Claim 8 of the '633 Patent either literally or under the doctrine of equivalents.

### ii.  Claim 14 of the '633 Patent is not indefinite.

Claim 14 of the '633 Patent, as previously construed by the Court, provides:

> 14. A computer program product, comprising a computer usable medium having a computer readable program code therein, the computer readable program code adapted to be executed for computer security, comprising:
>
> > providing a system, wherein the system comprises distinct software modules, and wherein the distinct software modules comprise an information re-communicator and a mobile code executor
> >
> > receiving, at the information re-communicator, downloadable-information including executable code; and
> >
> > causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code

'633 Patent, cols. 21:58-22:5; *Markman* Order at 13-14.  Relying on the Federal Circuit's ruling in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005), Defendant contends that Claim 14 is indefinite because it contains both apparatus and method claim limitations, thereby rendering it impossible for one of skill in the art to determine when the claim is infringed. Def.'s Mot. 24-25.  Plaintiff asserts that the claim language is sufficiently clear in reciting functional limitations describing the "steps performed by the program code" that is claimed.  Pl.'s Opp. 25.  These arguments were initially presented in the parties' claim construction briefing and the Court deferred decision until a more fulsome factual evidentiary record could be developed. *Markman* Order at 13-14.  The Court now concludes that Claim 14 is not indefinite.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014); 35 U.S.C. § 112.  In other words, a patent claim is indefinite if the

skilled artisan cannot reasonably determine what conduct constitutes infringement of the claim. *IPXL*, 430 F.3d at 1384. In *IPXL*, the Federal Circuit determined that a system claim with a limitation that "the user uses the input means" to perform a certain function was indefinite because it recited both a system and a method for using that system such that the scope of the claimed invention would not be reasonably clear to one of skill in the art. *Id.* Defendant contends that much as in *IPXL*, Claim 14 recites an apparatus—the computer product—as well as method claims—the "providing," "receiving," and "causing" limitations—such that it is not clear to the public when infringement occurs. Def.'s Mot. 24. However, "[t]he use of functional language— generally the gerund form of a verb—does not automatically convert the claims into method claims." *Radware, Ltd. v. A10 Networks, Inc.*, No. C-13-02021, 2014 WL 2738538, at *4 (N.D. Cal. June 11, 2014). Rather, courts confronted with an argument that a claim improperly encompasses two statutory classes generally look to see whether the claim language requires the affirmative performance of the functional limitations in order to infringe. *Id.*; *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277-78 (Fed. Cir. 2012); *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374-75 (Fed. Cir. 2008); *cf. Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011).

Here, although it is likely undisputed that Claim 14 is poorly drafted, it is clear that infringement does not require performance of the "providing," "receiving," and "causing" limitations. Specifically, the two "wherein" clauses following "providing a system" indicate that the computer readable program code provides a system, wherein the *system* is linked to the "receiving" and "causing" steps performed by or at the respective *system* components—the information re-communicator and the mobile code executor. Thus, much as in *Radware*, the "receiving" and "causing" limitations refer to the functionality of the claimed system, as opposed to actual method steps that must be carried out. *Radware*, 2014 WL 2738538, at *4.

To be sure, Plaintiff never outright explains its position regarding what constitutes infringement under Claim 14. Nevertheless, based upon Plaintiff's arguments and the testimony of its validity expert, Dr. Trent Jaeger, the Court gathers that Claim 14 is infringed when an accused infringer makes, uses, offers to sell, or sells an apparatus containing a computer usable

United States District Court
Northern District of California

1    medium that stores computer readable program code that, if executed, will provide the system

2    capable of performing the functional limitations recited in Claim 14. *See* Pl.'s Opp. 24-25; Wells

3    Decl. Exh. 13 (Expert Report of Dr. Trent Jaeger, hereinafter "Jaeger Report") ¶¶ 80-81; *see also*

4    *HTC*, 667 F.3d 1270 at 1277; *Radware*, 2014 WL 2738538, at *6. Stated as such, the Court finds

5    no confusion over when infringement of Claim 14 occurs. Defendant's Motion for Summary

6    Judgment is therefore DENIED with respect to indefiniteness of Claim 14.

7    **IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

8         Plaintiff seeks summary judgment that Defendant infringes all of the asserted claims.[7] As

9    discussed above, genuine disputes of material fact concerning the operation of ProxyAV,

10   ProxySG, and WebPulse in relation to the asserted claims of the '780, '844, '731, and '968 Patents

11   preclude summary judgment in Defendant's favor, and those factual disputes likewise preclude

12   summary judgment for Plaintiff.

13        As to the '822 and '633 Patents, Defendant has demonstrated as a matter of law that

14   ProxySG's Pop-Up Blocker does not infringe Claims 9 and 10 of the '822 Patent and Claim 8 of

15   the '633 Patent. Plaintiff also accuses MAA of infringing the asserted claims of the '633 Patent

16   and seeks summary judgment in that respect. Pl.'s Mot. 12-14, 20-22. Defendant, however, has

17   raised a genuine issue of fact concerning whether ProxySG in combination with CAS actually

18   communicates any mobile protection code to the MAA sandbox, as opposed to sending a remote

19   API "call" that triggers actions by the MAA that, by their very nature, intercept actually or

20   potentially malicious code without needing further communication of MPC. Def.'s Opp. 17;

21   Hicks Report ¶ 150. Plaintiff's cross motion is therefore DENIED in its entirety.[8]

22   _____

23   [7] Plaintiff perplexingly moved for summary *judgment* of infringement but submitted no evidence
     or argument on damages.

24   [8] In its opposition to Plaintiff's motion, Defendant argued—ostensibly couched as evidentiary

25   objections under Civil Local Rule 7-3(a)—that a number of Plaintiff's infringement theories
     should be stricken for failure to properly disclose them in its Patent Local Rule infringement

26   contentions. These are not proper objections under the Federal Rules of Evidence to the evidence
     that Plaintiff relies upon in its moving papers, nor is such a request for affirmative relief properly

27   presented in an opposition brief. In any event, the Court need not address Defendant's arguments
     here because Defendant has since filed a motion to strike the objectionable theories and because

28   genuine issues of material fact preclude summary judgment for either party as to most of those
     theories. *See* Def.'s Mot. to Strike, ECF 216.

United States District Court
Northern District of California

In the alternative, Plaintiff requests partial summary judgment that certain claim "elements" are present in the Accused Products. Pl.'s Mot. 10-17. Defendant acknowledges that some of these supposedly undisputed elements are indeed undisputed, but contends that others are very much disputed.[9] Def.'s Opp. 9-14. More fundamentally, Defendant contends that "infringement" is only appropriate with respect to claims, and not with respect to claim elements. *Id.* at 9. The Court agrees that an element-by-element determination is not appropriate for summary judgment of infringement. To the extent Defendant has indicated that it does not dispute that certain claim limitations are present in the accused products, the Court appreciates Defendant's candor and expects the parties to adopt a stipulation regarding the undisputed claim limitations that can be presented to the jury. The Court declines, however, to enter summary judgment with respect to those undisputed limitations. Plaintiff's Motion for Summary Judgment is therefore DENIED in its entirety.

## V. ORDER

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART:

1. The motion is DENIED with respect to non-infringement of the '780, '844, '731, and '968 Patents, either literally or under the doctrine of equivalents, as well as with respect to the indefiniteness of Claim 14 of the '633 Patent.

2. The motion is GRANTED with respect to non-infringement (both literal and under the doctrine of equivalents) of the '822 and '633 Patents by the ProxySG Pop-Up Blocker.

**IT IS SO ORDERED.**

Dated: June 2, 2015

_____
BETH LABSON FREEMAN
United States District Judge

---

[9] Specifically, Defendant does not dispute that elements 7 and 41(b) of the '844 Patent, element 9(b) of the '822 Patent, element 8(b) of the '633 Patent, elements 1(c) and 33(b) of the '968 Patent, and elements 9(b) and 18(b) of the '780 Patent may be found in the accused products. Def.'s Opp. 9-14 (using Plaintiff's numbering of the claim elements).

United States District Court
Northern District of California