UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>BLUE COAT SYSTEMS, INC.,<br><br>    Defendant. | Case No. 13-cv-03999-BLF<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTION TO STRIKE INFRINGEMENT THEORIES; DENYING PLAINTIFF'S MOTION TO STRIKE INVALIDITY THEORIES**<br><br>[Re: ECF 216, 218] |

Plaintiff Finjan, Inc. ("Plaintiff") accuses defendant Blue Coat Systems, Inc. ("Defendant") of infringing six of Plaintiff's web security patents: U.S. Patent Nos. 6,804,780 (the '780 Patent); 6,154,844 (the '844 Patent); 7,418,731 (the '731 Patent); 7,058,822 (the '822 Patent); 7,647,633 (the '633 Patent); and 6,695,968 (the '968 Patent). The Court assumes familiarity with the facts of this case, including the asserted patents and accused products, as discussed in the Court's summary judgment order of June 2, 2015. Before the Court are the parties' respective motions to strike infringement and invalidity theories that were not properly disclosed under the Patent Local Rules. Def.'s Mot., ECF 216; Pl.'s Mot., ECF 218. For the reasons stated herein, Defendant's Motion to Strike is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Strike is DENIED.

**I.  LEGAL STANDARD**

This district's Patent Local Rules require both parties to provide early identification of their respective infringement and invalidity theories. *See* Patent L.R. 3-1, 3-3. Once served, the contentions constitute the universe of the parties' respective theories, and those contentions may be amended only by order of the court and upon a showing of good cause. Patent L.R. 3-6.

As has been recognized by many courts, the purpose of these disclosures is to "require

parties to crystallize their theories of the case early in the litigation," *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, No. C 95–1987 FMS, 1998 WL 775115, at *2 (N.D. Cal. 1998)), so as to "further the goal of full, timely discovery and provide all parties with adequate notice of and information with which to litigate their cases," *Genentech, Inc. v. Trustees of Univ. of Pennsylvania*, Case No. 10–cv–2037, 2012 WL 424985, at *2 (N.D. Cal. Feb. 9, 2012) (citation and internal quotation marks omitted). "The rules thus seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories." *O2 Micro*, 467 F.3d at 1366. A district court has wide discretion in enforcing the Patent Local Rules. *Id.* at 1365-66; *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).

## II.  DEFENDANT'S MOTION

Defendant seeks to strike the following from Plaintiff's expert reports and assertions: (1) infringement theories concerning features that were not previously accused or disclosed in Plaintiff's Patent Local Rule infringement contentions; (2) infringement theories under the doctrine of equivalents; and (3) willful infringement assertions. Def.'s Mot. 1. Plaintiff acknowledged in its opposition brief that it "will not assert willful infringement against [Defendant]," thus mooting the third part of Defendant's motion.[1] Pl.'s Opp. 15, ECF 240. The Court will therefore only address Defendant's first two requests.

### A.  Accusation of Functions Not Disclosed In Infringement Contentions

Patent Local Rule 3-1 provides that a party claiming patent infringement must serve a disclosure of asserted claims and infringement contentions that addresses "[s]eparately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware." Patent L.R. 3-1(b). "The identification shall be as specific as possible." *Id.* The patentee must further provide "[a] chart identifying specifically where each limitation of each asserted claim is

---

[1] To the extent that the parties dispute the relevance of evidence of Defendant's pre-suit knowledge of the patents-in-suit, that is an evidentiary issue that the Court reserves for a later date. *See* Pl.'s Opp. 15; Def.'s Reply 7 n.3, ECF 247.

1    found within each Accused Instrumentality." *Id.* at 3-1(c).

2    "[A]ll courts agree that the degree of specificity under Local Rule 3-1 must be sufficient to
3    provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of
4    proving infringement.'" *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022,
5    1025 (N.D. Cal. 2010) (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986
6    (Fed. Cir. 2000)); *see also Blue Spike, LLC v. Adobe Sys., Inc.*, No. 14-CV-01647-YGR(JSC),
7    2015 WL 335842, at *4 (N.D. Cal. Jan. 26, 2015). While "[i]nfringement contentions serve as
8    substitutes for interrogatories, [] they also act as forms of pleading that disclose the parties'
9    theories of their case and thereby shape discovery and the issues to be determined at trial." *Apple
10   Inc. v. Samsung Electronics Co.*, No. 12-CV-0630-LHK PSG, 2013 WL 3246094, at *3 (N.D. Cal.
11   June 26, 2013). "Parties accordingly need not 'prove up' their theories by providing evidence
12   beyond the material they have at the time they make their contentions." *Id.*; *see also AntiCancer,
13   Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1338 (Fed. Cir. 2014) (a patentee's infringement contentions
14   "do not need to include proof or direct evidence of infringement"). The dispositive inquiry in a
15   motion to strike is thus whether the allegedly undisclosed "theory" is in fact a new theory or new
16   element of the accused product alleged to practice a particular claim that was not previously
17   identified in the plaintiff's contentions, or whether the "theory" is instead the identification of
18   additional evidentiary proof showing that the accused element did in fact practice the limitation.
19   *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 4479305, at *3 (N.D. Cal. Sept.
20   26, 2011); *see also Genentech*, 2012 WL 424985, at *2. If the theory is *new*, prejudice is
21   "inherent in the assertion of a new theory after discovery has closed." *Adobe Sys. Inc. v. Wowza
22   Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *15 n.7 (N.D. Cal. Feb. 23, 2014).

23   Defendant asserts that Plaintiff is advancing several theories of infringement that were not
24   identified in its Patent Local Rule infringement contentions served January 16, 2014 and were
25   instead disclosed for the first time in Plaintiff's expert reports served a year later. The Court
26   agrees, in part.

3

### i. WebPulse Cookie2 ('844 and '731 Patents) and ProxySG URL Hash Index ('731 Patent)

Defendant contends that Plaintiff identified for the first time in its expert reports that Cookie2, a metadata generated by the accused Dynamic Real-Time Rating ("DRTR") feature of WebPulse, satisfies the "security profile" limitation for the '844 and '731 Patents. Def.'s Mot. 5. Plaintiff's infringement contentions do not mention Cookie2. *See generally* Decl. of Paul Andre, ECF 240-1 Exh. 6. Plaintiff acknowledges this but argues that Cookie2 is simply a part of DRTR, which was clearly disclosed as the feature accused of infringing, and that Plaintiff did not have information about this specific part until after Defendant produced confidential technical information relating to the accused product. Pl.'s Opp. 5-6.

Indeed, Plaintiff disclosed DRTR as the infringing functionality in its infringement contentions, citing publicly available documents indicating that DRTR provides "real-time rating" of new content wherein the feature "disassembles a web page and analyzes its components" to extract information such as language, document type, character set, content words, and scripts. *See, e.g.*, Andre Decl. Exh. 6 at 5. It is undisputed that Cookie2 is a metadata generated by DRTR that stores information from DRTR's analysis. Def.'s Reply 2, ECF 247. Defendant furthermore does not contest that Plaintiff would not have had access to more specific information about Cookie2 without discovery but rather appears to suggest that Plaintiff should have moved for leave to amend its contentions once it obtained that discovery. *Id.* at 2. While greater specificity is certainly preferable, the Patent Local Rules do not require perfect clarity, only reasonable notice that is "as specific as possible" given the information of which a plaintiff is aware. Patent L.R. 3-1(b). Plaintiff's contentions reasonably placed Defendant on notice that DRTR generates and stores information that meets the "security profile" limitation, and Plaintiff's expert report subsequently clarified that the information is stored in Cookie2.[2] As such, Plaintiff's expert report

---

[2] Defendant's assertion that the contentions "appeared" to be "accusing DRTR's ratings to satisfy the elements including the 'security profile' limitation" does make this a closer call. *See* Def.'s Reply 2. However, Defendant's interpretation of the theory identified in Plaintiff's contentions does not eliminate the evidence actually cited that gave reasonable notice of the accused feature and the manner in which it allegedly infringes the asserted claim.

4

merely elaborates on the manner in which DRTR allegedly infringes and does not amount to a last-minute disclosure of a new infringement theory. Defendant's motion to strike Plaintiff's evidence of infringement based upon Cookie2 is accordingly DENIED.

Defendant also argues that Plaintiff did not disclose in its infringement contentions the assertion that the ProxySG functionality of indexing a file using the hash of the URL file satisfies the "file cache . . . wherein each of the stored files is indexed by a file identifier" limitation of Claim 1 of the '731 Patent. Def.'s Mot. 5. Plaintiff responds that it specifically identified "Object Caching" in its infringement contentions and that it had to learn the manner in which the cache was indexed through confidential information and review of Defendant's source code. Pl.'s Opp. 6-7. As with Cookie2, Plaintiff's assertion that the hashing of URL files to create an index of the object cache satisfies claim element 1(c) of the '731 Patent is further explication of its theory that the object caching feature infringes the asserted claim and not a new theory in its own right. Defendant therefore had reasonable notice of Plaintiff's infringement theory on this claim element and Defendant's motion to strike is accordingly DENIED.

### ii. ProxySG Policy Cache ('968 Patent)

Defendant contends that Plaintiff's infringement contentions do not articulate the theory—drawn out in Plaintiff's expert reports—that ProxySG's policy cache meets the "policy index" limitations of the '968 Patent. Def.'s Mot. 5-6. Plaintiff argues that it identified ProxySG's policy *engine*, which generates a "categorized cache," as infringing the "policy index" element, and thus provided sufficient notice of this theory. Pl.'s Opp. 7; *see also* Andre Decl. Exh. 7 at 5 ("the Blue Coat Products categorize a URL then pass it to a policy engine which determines if the URL is allowable or not, the result of which is a categorized cache").

There is little dispute that the policy cache is *not* the categorized cache identified in Plaintiff's contentions. Plaintiff offers no evidence to suggest that the policy cache is merely an internal name for the categorized cache, nor is there evidence that the policy cache is otherwise part of or the same thing as the categorized cache. *See* Pl.'s Opp. 8 (citing Tomic Dep. 151:8-17, 122:1-4; Andre Decl. Exh. 18 (Harrison Dep.) 74:15-76:18, 77:8-15, 138:6-139:17; and Andre Decl. Exh. 24 (Ahlander Dep.) 50:6-17, 89:21-91:2, 115:5-25, 211:11-216:9). Indeed, there are

"multiple" caches in the ProxySG. *See* Tomic Dep. 106:6-10. To this, Plaintiff has two responses. First, Plaintiff asserts that it could not identify the policy cache in ProxySG with greater specificity because that specific term is used by Defendant only internally as part of its "implementation detail" and "never outside of engineering." Pl.'s Opp. 8 (quoting Andre Decl. Exh. 23 (Tomic Dep.) 106:11-15. While that may be the case, if the policy cache is qualitatively different from the categorized cache identified in Plaintiff's contentions (and it appears that the two are different), it was Plaintiff's duty to amend its contentions with the newly identified information. Second, Plaintiff also contended at oral argument that the disclosure of the policy *engine* afforded sufficient notice to Defendant, as both the categorized cache and the policy cache are components of the policy engine. This argument has little force because Plaintiff's infringement contentions more than "appeared" to identify a different theory; they affirmatively identify a different component—the categorized (or categorization) cache—as an "[e]xample of saving entries in the policy index (e.g. storing the category in cache)." Andre Decl. Exh. 7 at 7; *see also id.* at 5. By doing so, Defendant had no notice that Plaintiff would rely on a different cache in ProxySG to meet the "policy index" limitation.

As evinced in Plaintiff's expert report, Plaintiff now appears to be contending that the categorization cache stores profiles of cached content that are *used* by ProxySG to determine whether content is allowable, and that the determination of allowability is stored *elsewhere* (in the policy cache):

> The profile from the content is received from the WebPulse Service and stored by the ProxySG Products in its memory in the dynamic categorization cache. The categorization, including a suspicious categorization, from the WebPulse Service is used by the ProxySG products to determine whether the content is allowable for a particular request, based on conditions for the rules. The ProxySG Products *saves the results of resolving the rule in a policy index* indicating if the content is allowable per the policy." (emphasis added)).

*See* Andre Decl. Exh. 13 (Expert Report of Dr. Michael Mitzenmacher) ¶ 415; *see also id.* ¶¶ 326, 351, 359 (identifying evidence showing that ProxySG saves decisions relating content to allowability in the "policy index"). This is a new theory not previously disclosed in Plaintiff's infringement contentions because Defendant had no way of knowing that Plaintiff's focus would

6

shift to the policy cache and away from the categorization cache identified in the contentions. As this new theory was identified for the first time after the close of fact discovery, prejudice to Defendant is inherent. The Court accordingly GRANTS Defendant's motion to strike Plaintiff's theory that ProxySG's policy cache meets the "policy index" limitations of the '968 Patent.

### iii. Malware Analysis Appliance and Content Analysis System ('822 and '633 Patents)

Defendant identifies four infringement theories allegedly advanced for the first time in Plaintiff's expert reports pertaining to the '822 and '633 Patents. Defendant contends that Plaintiff's infringement contentions never disclosed (1) ProxySG's ability to inject code as an infringing feature; (2) the theory that the Content Analysis System ("CAS") and the Malware Analysis Appliance ("MAA") communicate mobile protection code ("MPC") to infringe the asserted claims of the '633 Patent; (3) the theory that the MAA constitutes an "information-recommunicator" within the meaning of claim elements 14(b) and 14(c) of the '633 Patent; and (4) that ProxySG sends MPC to the MAA for claim element 14(d) of the '633 Patent. Def.'s Mot. 6-7. The fourth of these challenges is moot, as Plaintiff has clarified that it "does not assert that the ProxySG directly sends mobile protection code to the MAA." Pl.'s Opp. 11; Def.'s Reply 4 (acknowledging mootness).

As to the first, the Court determined in its summary judgment order that even if the theory was properly presented, ProxySG's Pop-Up Blocker feature does not infringe the asserted claims of the '822 and '633 Patent as a matter of law. Summary Judgment Order at 18-21. The parties agree that this moots *part* of Defendant's motion with respect to the code injection theory. Plaintiff asserted at oral argument that its contentions disclose evidence of other script code injection that is not mooted by the Court's ruling on Pop-Up Blocker. Be that as it may, the Court finds that no theory of script code injection was properly disclosed in Plaintiff's infringement contentions. Plaintiff, in arguing the contrary in its brief and at oral argument, relies unduly and improperly on *proposed* amended contentions to make its point. *See* Pl.'s Opp. 8-9 (pointing to contentions attached to its "Motion for Leave"). Magistrate Judge Grewal denied Plaintiff leave to serve those contentions, finding that Plaintiff had access to the publicly available information that

7

1    Plaintiff sought to add and failed to diligently seek amendment. Order Granting-in-Part Motion
2    for Leave to Amend Infringement Contentions at 4, ECF 116; *see* Pl.'s Reply 3, ECF 246. The
3    only disclosure that Plaintiff can point to in the operative contentions is a discussion of
4    "Removing Active Content from HTML Pages," wherein selective "de-fanging" of malicious code
5    is identified as a way in which active content can be removed. *See, e.g.*, Andre Decl. Exh. 4 at 15,
6    41; *see* Pl.'s Opp. 9. These disclosures themselves do *not* "discuss[] 'script injection' as a way of
7    'de-fanging' malicious code." Pl.'s Opp. 9. Instead, the disclosures quote from a document that
8    happens to discuss script injection *elsewhere*. *See* Andre Decl. Exh. 25. As such, the passing
9    reference to "de-fanging" in the context of active content transformation and "stripping and
10   replacing" active content is insufficient to place Defendant on reasonable notice that Plaintiff was
11   actually accusing script injection and not some other manner of content removal. *See generally,*
12   *e.g.*, Andre Decl. Exh. 4 at 11-16. Defendant's motion to strike is accordingly GRANTED with
13   respect to Plaintiff's infringement theory based upon ProxySG's ability to inject code.
14         With respect to the second and third of Defendant's challenges, the Court agrees with
15   Plaintiff that the CAS was clearly disclosed as the conduit through which information is
16   communicated to the MAA. Pl.'s Opp. 11-12; *see, e.g.*, Andre Decl. Exh. 5 at 48, 55, 94, 96. This
17   is sufficient notice that the CAS is accused of communicating MPC within the meaning of Claims
18   8 and 14 of the '633 Patent. However, these same disclosures also suggest that the MAA is
19   merely the recipient of MPC and is the mobile code executor (as opposed to the information re-
20   communicator) described in claim elements 14(b) and 14(d) of the '633 Patent. Andre Decl. Exh.
21   5 at 94 ("Information is sent from the ProxySG, *through* the Content [A]nalysis [S]ystem and *to*
22   the Malware Analysis Appliance *which is a mobile code executor*." (emphasis added)). The
23   contentions thus ascribe different functions and different roles to the CAS and MAA respectively
24   within the accused system and affirmatively represents that these components satisfy *different*
25   elements of the asserted claims. Absent further disclosure to dispel that notion, the theory that the
26   MAA communicates MPC and is an information re-communicator is incongruous with the
27   disclosures in Plaintiff's infringement contentions. Defendant's motion is therefore GRANTED
28   as to the theories that (1) the MAA communicates MPC and (2) that the MAA is an "information

8

1  re-communicator," but DENIED as to the assertion that the CAS communicates MPC.

### B.   Doctrine of Equivalents Assertions

Patent Local Rule 3-1(e) provides that a plaintiff's infringement contentions must indicate "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality." Courts in this district roundly agree that a plaintiff asserting the doctrine of equivalents must provide a "limitation-by-limitation analysis, not a boilerplate reservation." *Rambus Inc. v. Hynix Semiconductor Inc.*, No. C-05-00334 RMW, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008); *see also Blue Spike*, 2015 WL 335842, at *6; *Creagri, Inc. v. Pinnaclife Inc., LLC*, No. 11-CV-06635-LHK-PSG, 2012 WL 5389775, at *6 (N.D. Cal. Nov. 2, 2012). "The doctrine of equivalents exists to prevent 'a fraud on the patent.'" *Rambus*, 2008 WL 5411564, at *3 (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950)). "It is not designed to give a patentee a second shot at proving infringement '[t]o the extent that any limitation is found to be not literally present.'" *Id.*

Defendant here contends that the doctrine of equivalents disclosures in Plaintiff's infringement contentions are precisely the type of boilerplate language that the courts in this district routinely reject and urges that Court follow suit by striking the doctrine of equivalents assertions from Plaintiff's expert reports and, effectively, this case. Def.'s Mot. 8-10. Plaintiff argues that Defendant's motion to strike these theories is untimely because Defendant has been aware of these theories since the contentions were served in January 2014 and never raised its concerns with Plaintiff until now. Pl.'s Opp. 13. The Court agrees with Plaintiff.

On this issue, both sides have acted unreasonably. Defendant is correct that Plaintiff's doctrine of equivalents disclosures are boilerplate and generic. These disclosures did not satisfy Plaintiff's obligation to provide a limitation-by-limitation analysis of its theory of infringement. Had Defendant earlier moved to strike those embryonic disclosures, they would likely have been stricken as violative of the Patent Local Rules. Of course, then Plaintiff would also have had the opportunity to seek leave to re-assert the theory with proper factually-based contentions. *See, e.g.*, *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 WL 1517920, at *12 (N.D. Cal. Apr. 2, 2015). As such, the Court cannot overlook the timing of Defendant's motion, which comes

after the close of discovery and summary judgment. Defendant's only explanation for its belated motion is that "because Finjan did not supplement its Infringement Contentions even after it received Blue Coat's confidential information, it was understood that Finjan was not asserting infringement under the doctrine of equivalents." Def.'s Reply 7 (citing *Proofpoint*, 2015 WL 1517920, at *10, for the proposition that "a generic reservation of its right to argue the doctrine of equivalents is not sufficient"). That such language may not be sufficient to survive a motion to strike does not mean that Defendant could simply assume that Plaintiff had abandoned the theory. While the Court declines to go so far as to say that Defendant should have filed a motion to compel amendment to Plaintiff's inadequate disclosures, *some notice* of the deficiencies was still required. Had Defendant communicated to Plaintiff its belief that Plaintiff's doctrine of equivalents disclosures were so deficient as to be no disclosure at all, Plaintiff would be on notice of the deficiency and would fail to supplement at its own risk. Instead, Defendant played the (apocryphal) ostrich, burying its head in the sand until it was safe to raise the issue.[3]

In the present posture, Defendant's motion to strike Plaintiff's doctrine of equivalents theories differs in kind from its request to strike infringement theories not previously disclosed because here, Defendant's argument rests not on the *absence* of disclosure, but on the *sufficiency* of the prior disclosures. While prejudice may be "inherent in the assertion of a *new* theory after discovery has closed," *Adobe Sys.*, 2014 WL 709865, at *15 n.7 (emphasis added), the same does not pertain to insufficiently supported but nevertheless previously disclosed theories. Defendant has identified no particular prejudice from Plaintiff more fully explaining its doctrine of equivalents theories in its expert reports. Indeed, Defendant has had full opportunity to depose Plaintiff's experts and submit its own rebuttal reports on these theories. Absent specific evidence of prejudice caused by the deficient disclosures in Plaintiff's infringement contentions, the Court declines to strike Plaintiff's doctrine of equivalents theories this late in the game. Defendant's motion to strike is therefore DENIED in this respect.

---

[3] As the Seventh Circuit recently noted, "ostriches do *not* bury their heads in the sand when frightened; if they did, they would asphyxiate themselves." *United States v. Macias*, ---F.3d---, No. 13-2166, 2015 WL 3377773, at *2 (7th Cir. May 26, 2015) (emphasis in original).

### III. PLAINTIFF'S MOTION

Plaintiff seeks to strike the following invalidity theories from the case: (1) reliance on the IBM WebSphere product as prior art to the '731 Patent; (2) reliance on four previously un-elected combinations of prior art references to argue invalidity of the '731 Patent; (3) reliance on Mueller, a reference not previously elected, to argue invalidity of the '780 Patent; and (4) invalidity theories that exceed the number that the parties previously agreed to for their final elections. Pl.'s Mot. 1-3. The last two challenges are moot. With respect to the '780 Patent, Defendant clarified that it is only relying on Mueller in combination with Waldo, a combination previously disclosed and elected. Def.'s Opp. 7, ECF 235. Defendant moreover indicated that it does not plan to use the invalidity combinations of "'Chu and WebSphere' for the '731 patent and 'McClain and Uematsu'" for the '968 patent," *id.* at 9, thus bringing the number of invalidity theories down into strict compliance with the parties' prior agreement. *See* Pl.'s Reply 1 (acknowledging mootness).

Plaintiff's first challenge to reliance on WebSphere also became moot during oral argument on Plaintiff's motion, where Defendant clarified that its election of "WebSphere" and its theory of invalidity will be based upon a 2002 manual for the product by Byron Braswell, et al.[4] *See* Def.'s Opp. 5. This reference, which had previously been identified and charted against the '731 Patent as "Braswell," provided the basis for the opinion of Defendant's invalidity expert, Dr. George Necula. *Id.* at 5-6. Plaintiff argues, however, that Dr. Necula's report also appears to rely on a different reference— Ferreira[5]—describing a different version of the WebSphere product as prior art to two limitations of Claim 1 of the '731 Patent. *See* Decl. of James Hannah, ECF 281-1 Exh. 1 (Expert Report of Dr. George Necula, hereinafter "Necula Report") ¶¶ 678-79, 692-93. Defendant asserts that Dr. Necula only relied on Ferreira as "further background regarding WebSphere." Def.'s Opp. 6 n.2; Necula Report ¶ 657. The question is a close one, as some aspects of Dr. Necula's report do suggest reliance on the WebSphere product and not on the

---

[4] "IBM WebSphere Edge Server: New Features and Functions in Version 2," IBM Redbooks, Byron Braswell, Ming can Jing, Tomoyuki Ohta, Henry Orton, April 2002.

[5] "WebSphere Edge Server: Working with Web Traffic Express and Network Dispatcher," IBM Redbooks, Cristiane Ferreira, Ana Mostardinha, Byron Braswell, July 2001.

11

1   Braswell reference. The Court, however, has no occasion to doubt Defendant's assertion that

2   Braswell forms the basis for its invalidity theories referencing "WebSphere," particularly as other

3   disclosures in Dr. Necula's report very clearly indicate that Braswell is the basis of his opinion.

4   *See, e.g.*, *id.* ¶ 685. To be sure, it would have been more clear to all had Defendant elected

5   "Braswell" instead of "WebSphere." However, now that Defendant has stated its reliance on

6   Braswell, the Court perceives no reason under the Patent Local Rules to strike theories based on a

7   reference that was timely disclosed and charted against the '731 Patent.[6]

8   Turning to the second challenge, Plaintiff seeks to preclude Defendant from relying on four

9   prior art combinations identified in its final election of theories that were allegedly not identified

10  in its preliminary election.[7] Pl.'s Mot. 10-12. These are the combinations of (1) Judge[8] and

11  WebSphere[9]; (2) Judge and Chu[10]; (3) Chu and WebSphere; and (4) WebSphere and Hailpern.[11]

12  These combinations were not disclosed in Defendant's preliminary election in their current state,

13  but instead listed with an additional *third* reference in combination with each. In the case of the

14  first three combinations, Defendant had also identified the Ji[12] reference. In the case of the fourth

15  combination of WebSphere and Hailpern, Defendant had identified the Chen[13] reference. *See*

16  Hannah Decl. Exh. 4; Def.'s Opp. 4. After service of the preliminary elections in November 2014,

17  Plaintiff challenged Defendant's reliance on Ji and Chen, arguing that those references had not

---

[6] To the extent Plaintiff continues to assert that Dr. Necula improperly relies on Ferreira (and not Braswell) as prior art for certain claim limitations, the Court reserves that question for an appropriate *Daubert* or pre-trial motion.

[7] The parties stipulated to a schedule, which became an order on September 12, 2014, wherein each side would make a preliminary election of asserted claims and invalidity theories after claim construction, followed by a final election in March 2015 of a smaller subset of the asserted claims and invalidity theories previously identified. *See* Stipulated Case Schedule, ECF 98.

[8] U.S. Patent Publication No. 2003/0172291.

[9] Or, more correctly, Braswell.

[10] Yang-hua Chu, "Trust Management for the World Wide Web," MIT Thesis, June 13, 1997.

[11] U.S. Patent No. 6,275,937.

[12] U.S. Patent No. 5,983,348.

[13] U.S. Patent No. 5,951,698.

12

1    previously been charted and that Defendant's use of those references therefore violated the parties'
2    agreement. Defendant maintained the propriety of its preliminary elections but served
3    supplemental elections with the previously charted Demopoulos[14] and Richards[15] references in
4    lieu of Ji and Chen in an effort to resolve the dispute. Plaintiff challenged the propriety of serving
5    supplemental elections and contended that Defendant would have to file a motion for leave to
6    supplement the elections. Defendant did file that motion and on January 13, 2015 Magistrate
7    Judge Grewal denied leave to supplement. *See* ECF 160. Just a day before that ruling, the parties
8    were required to serve opening expert reports and Defendant served Dr. Necula's invalidity report,
9    which addresses three-reference obviousness combinations for the '731 Patent that include
10   Demopoulos and Richards. Following Judge Grewal's ruling, "Blue Coat was left with the
11   combinations that do not include Demopoulos and Richards." Def.'s Opp. 4. Defendant's final
12   election thus included the common denominator of its prior elections following Plaintiff's
13   challenges and Judge Grewal's ruling: the two-reference combinations of Judge and WebSphere,
14   Judge and Chu, Chu and WebSphere, and WebSphere and Hailpern, *without* any third reference.
15   Plaintiff asserts that these combinations are different from the three-reference combinations
16   previously elected and must therefore be excluded.

17       The Court agrees with Plaintiff's basic proposition that a prior art combination involving
18   three references may present a different theory than a combination involving two references. To
19   the extent that Dr. Necula's report relied upon Demopoulos or Richards to supply limitations not
20   found in Judge, WebSphere, Chu, or Hailpern, Defendant's election not to rely on Demopoulos or
21   Richards could very well prejudice Plaintiff. Dr. Necula's report, however, clearly indicates that
22   Demopoulos and Richards are not critical in the prior art combinations he evaluated. Rather, they
23   at most augment the disclosures in Judge, WebSphere, Chu, and Hailpern to the extent those
24   references are found not to disclose the limitations of the '731 Patent. *See* Necula Report ¶¶ 695-
25   838, 887-928. In this context, Defendant's election of two-reference combinations as opposed to

---

[14] U.S. Patent Publication No. 2005/0193429.

[15] U.S. Patent Publication No. 2002/0099829.

13

three-reference combinations makes little difference. Furthermore, given the litigation history that led to this point, the Court is not convinced that the severe sanction of striking all of these theories is the appropriate remedy. At most, an appropriate remedy would be to allow Plaintiff additional time to depose Dr. Necula concerning the challenged two-reference combinations. Plaintiff has not requested that opportunity here and has not demonstrated any more particular prejudice than the general assertion that Defendant's final election was "highly prejudicial." Pl.'s Mot. 10. As such, the Court declines to strike Defendant's obviousness combinations for the '731 Patent. As to Defendant's reservation of the right to use Demopoulos and Richards "to the extent that it is allowed to do so," it should be sufficiently clear that Defendant will not be allowed to do so. *See* Hannah Decl. Exh. 3; Pl.'s Mot. 11; Pl.'s Reply 6.

Plaintiff's Motion to Strike is accordingly DENIED. Because the motion is denied, the Court does not consider Plaintiff's additional request for "appropriate" sanctions within the Court's discretion. Pl.'s Mot. 13.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion to Strike is DENIED. Defendant's Motion to Strike is GRANTED IN PART and DENIED IN PART:

1. Defendant's motion is GRANTED with respect to the theory that ProxySG's policy cache satisfies the "policy index" limitation of the '968 Patent and that theory is stricken from Plaintiff's expert reports;

2. Defendant's motion is GRANTED as to the assertions that the MAA communicates MPC and is an information re-communicator for purposes of the '633 Patent, and those theories are stricken as well;

3. The remainder of Defendant's motion is DENIED.

**IT IS SO ORDERED.**

Dated: June 11, 2015

BETH LABSON FREEMAN
United States District Judge