1    PAUL ANDRE (State Bar No. 196585)
     pandre@kramerlevin.com
2    LISA KOBIALKA (State Bar No. 191404)
     lkobialka@kramerlevin.com
3    JAMES HANNAH (State Bar No. 237978)
     jhannah@kramerlevin.com
4    KRAMER LEVIN NAFTALIS & FRANKEL LLP
     990 Marsh Road
5    Menlo Park, CA  94025
6    Telephone:  (650) 752-1700
     Facsimile:  (650) 752-1800
7

8    *Attorneys for Plaintiff*
     FINJAN, INC.
9

10         **IN THE UNITED STATES DISTRICT COURT**

11         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12         **SAN JOSE DIVISION**

13    FINJAN, INC., a Delaware Corporation,      Case No.: 13-cv-03999-BLF

14            Plaintiff,      **PLAINTIFF FINJAN, INC.'S**
                               **OPPOSITION TO DEFENDANT BLUE**
15           v.      **COAT SYSTEMS, INC.'S *DAUBERT***
                               **MOTION**
16

17    BLUE COAT SYSTEMS, INC., a Delaware
     Corporation,      Date:     July 6, 2015
                               Time:     9:00 a.m.
18            Defendant.      Ctrm:     3, 5th Floor
                               Before:  Hon. Beth Labson Freeman
19

20

21         **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ........................................................................................................ 1

II.  LEGAL STANDARD ................................................................................................ 1

III.  THERE IS NO BASIS TO EXCLUDE DR. LAYNE-FARRAR'S EXPERT OPINIONS ......... 1

    A.  Dr. Layne-Farrar's Apportionment under Method 1 and 2 are proper ............................ 3

        1.  Dr. Layne-Farrar's Method 1 is based on a tested methodology ......................... 4

        2.  Dr. Layne-Farrar's Apportionment under Method 2 is proper ............................ 5

    B.  Dr. Layne-Farrar's Calculation of Convoyed Sales is proper ............................................ 8

    C.  Dr. Layne-Farrar's Apportionment under Method 3 is Proper ....................................... 10

IV.  BLUE COAT'S MOTION TO EXCLUDE THE OPINIONS OF DRS. COLE AND MITZENMACHER SHOULD BE DENIED ................................................................. 12

    A.  The Testing of Drs. Cole and Mitzenmacher was Properly Disclosed .......................... 12

    B.  Dr. Cole Properly Relied on the Development Documents for His Infringement Position ................................................................................................. 16

V.  Blue coat's motion to exclude dr. medvidovic's opinion SHOULD BE DENIED ................ 18

    A.  Dr. Medvidovic Properly Formed his Opinion through Independent Analysis .............. 18

    B.  Dr. Medvidovic Properly Tested the Accused Products ................................................ 20

    C.  Dr. Medvidovic Properly Relied on the Development Documents for His Infringement Position ................................................................................................. 22

    D.  Dr. Medvidovic is Qualified to Provide His Opinion ................................................... 23

VI.  CONCLUSION ......................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abaxis, Inc. v. Cepheid,*
   No. 10-CV-02840-LHK, 2012 WL 2979019 (N.D. Cal. July 19, 2012) ........................................ 13

*Apple, Inc. v. Motorola, Inc.,*
   757 F.3d 1286 (Fed. Cir. 2014) ......................................................................................... 1, 2, 3, 9

*Atlas IP, LLC, v. Medtronic, Inc.,*
   No. 13-cv-23309, 2014 U.S. Dist. LEXIS 158787 (S.D. Fl. Oct. 6, 2014) ........................................ 7

*Collins v. Cottrell Contracting Corp.,*
   733 F. Supp. 2d 690 (E.D.N.C. 2010) ........................................................................................ 21

*Commonwealth Sci. & Indus. Rsh. Org. v. Cisco Sys., Inc.,*
   No. 11-cv-343, 2014 WL 3805817 ............................................................................................ 6

*DataQuill Ltd. v. High Tech Computer Corp.,*
   887 F.Supp.2d 999 (S.D. Cal. 2011) .......................................................................................... 19

*Daubert v. Merrell Dow Pharms, Inc.,*
   509 U.S. 579 (1993) ..................................................................................................... passim

*Dynetix Design Sol'n, Inc. v. Synopsys, Inc.,*
   No. 11-05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ............................................ 6

*Ericsson, Inc. v. D-Link Sys., Inc.,*
   773 F.3d 1201 (Fed. Cir. 2014) ................................................................................................. 3

*GPNE Corp. v. Apple, Inc.,*
   No. 12-cv-02885-LHK, 2014 WL 1494247 (N.D. Cal. April 16, 2014) .................................... 5, 16

*Hoang v. Funai Corp.,*
   652 F. Supp. 2d 564 (M.D. Pa. 2009) ........................................................................................ 21

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010) ..................................................................................................... 1

*In re Actos (Pioglitazone) Prods. Liab. Litig.,*
   No. 12-CV-00064, 2014 WL 120973 (W.D. La. Jan. 10, 2014) .............................................. 21

*In re High-Tech Employee Antitrust Litig.,*
   No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ..................................... 4

i

*In re Terazosin Hydrochloride Antitrust Litig.,*
    No. 99-MDL-1317, 2005 WL 5955699 (S.D. Fla. Feb. 2, 2005) .................................... 16

*Info-Hold, Inc. v. Muzak LLC,*
    No. 11-cv-283, 2013 WL 4482442 (S.D. Ohio Aug. 10, 2013) ...................................... 22

*Internet Machs. LLC v. Alienware Corp.,*
    No. 6:10-cv-23, 2013 WL 4056282 (E.D. Tex. June 19, 2013) ...................................... 11

*Jamros v. Ford Motor Co.,*
    70 F.3d 1278 (9th Cir. 1995) ............................................................................... 17, 22

*Kalman v. Berlyn Corp.,*
    914 F.2d 1473 (Fed. Cir. 1990) ..................................................................................... 8

*Kaufman Co. v. Lantech, Inc.,*
    807 F.2d 970 (Fed. Cir. 1986) ..................................................................................... 13

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,*
    761 F.2d 649 (Fed. Cir. 1985), *cert. denied,* 474 U.S. 902 (1985) ...................................... 9

*MediaTek Inc. v. Freescale Semiconductor, Inc.,*
    2014 WL 2854890 (N.D. Cal. June 20, 2014) ................................................................ 6

*MediaTek, Inc. v. Freescale Semiconductor, Inc.,*
    No. 11-cv-5341 YGK, 2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ............................... 20

*MGM Wells Servs., Inc. v. Mega List Sys., LLC,*
    No. H-05-1634, 2007 WL 150606 (S.D. Tex. Jan. 16, 2007) ...................................... 22

*Network Appliance, Inc. v. Bluearc Corp.,*
    No. C 03-5665 MHP, 2005 WL 1530222 (N.D. Cal. June 27, 2005) *aff'd,* 205 F.
    App'x 835 (Fed. Cir. 2006) .......................................................................................... 11

*Novartis Corp. v. Ben Venue Labs., Inc.,*
    271 F.3d 1043 (Fed. Cir. 2001) ............................................................................... 15, 16

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010) ................................................................................. 10, 11

*Triangle Software, LLC, v. Garmin Int'l, Inc.*
    Civil Action No. 1:10-cv-1457 (Sept. 30, 2011 E.D. Va.) ........................................... 4

*TWM v. DuraCorp.,*
    789 F.2d 895 (Fed. Cir. 196) ...................................................................................... 9

*Uniloc, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed Cir. 2011) ............................................................................. 5, 7, 11

ii

*United States v. Fernandez–Castillo,*
    324 F.3d 1114 (9th Cir. 2003) ........................................................................ 16

*VirnetX, Inc. v. Cisco Sys., Inc.,*
    767 F.3d 1308 (Fed. Cir. 2014)........................................................................ 3

*Vita-Mix Corp. v. Basic Holding, Inc.,*
    581 F.3d 1317 (Fed. Cir. 2009)........................................................................ 13

FINJAN'S OPPOSITION TO
BLUE COAT'S *DAUBERT* MOTION

Case No. 13-cv-03999-BLF

Plaintiff Finjan, Inc., ("Finjan") submits this opposition to Blue Coat Systems, Inc.'s, ("Blue Coat") motion to exclude Finjan's damages and technical experts from testifying at trial ("Blue Coat's Motion").  Dkt. 245.

## I.   INTRODUCTION

The Court should deny Blue Coat's motion to exclude the testimony of Finjan's experts related to the Asserted Patents[1] because it misapplies the legal standards for excluding a witness under *Daubert*.  All of the issues that Blue Coat raises are (1) issues for cross examination and (2) based on mischaracterizations of the experts' opinion and the disclosures in the expert reports.  At most, the issues Blue Coat raises with respect to four of Finjan's experts go to the weight of the opinions, not their admissibility.  Thus, Blue Coat's motion should be denied.

## II.   LEGAL STANDARD

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).  "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology or judge credibility, including the credibility of one expert over another.  These tasks are solely reserved for the fact finder."  *Apple, Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1314 (Fed. Cir. 2014) (reversing the district court's exclusion of damages expert's testimony).  Any issues with the expert's proposed testimony go to evidentiary weight, not admissibility, and should be dealt with in cross-examination.  *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 596 (1993)("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [allegedly] shaky but admissible evidence.").

## III.   THERE IS NO BASIS TO EXCLUDE DR. LAYNE-FARRAR'S EXPERT OPINIONS

Dr. Layne-Farrar properly apportioned Blue Coat's revenues for the infringing products under

---

[1] U.S. Patent Nos. 6,154,844 ("'844 Patent"), 6,804,780 ("'780 Patent"), 7,418,731 ("'731 Patent"), 6,965,968 ("968 Patent"), 7,058,822 ("'822 Patent") and 7,647,633 ("'633 Patent") (collectively the "Asserted Patents").

FINJAN'S OPPOSITION TO                                          Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

three different methods that are supported by the evidence in the record.  Blue Coat's argument rests on the flawed notion that, because other reliable methods of estimating a reasonable royalty may exist in patent cases, Dr. Layne-Farrar's opinion cannot be reliable.  This is not the appropriate standard under *Daubert*.  *Apple*, 757 F.3d at 1315 ("there may be more than one reliable method for estimating a royalty").  Blue Coat's argument at most goes to weight, not admissibility.

Dr. Layne-Farrar's methodology properly assumed that Finjan's six Asserted Patents are valid and infringed.  Dr. Layne-Farrar then calculated a reasonable royalty for Blue Coat's WebPulse/ WebFilter, ProxySG, SWVGA, ProxyAV, ThreatBLADES, CAS and MAA (collectively, the "Accused Products") that is tied to the footprint of the invention.  To overcome the inherent difficulties present in every damages case regarding assigning a value to the patented technology, Dr. Layne-Farrar used multiple methods to calculate a reasonable royalty.  Method 1 applied a method based on well-known economic literature to determine the value attributable to each of the Asserted Patents and apportioned the royalty base for each of the Accused Products based on the value attributable to the patented technology.  Method 2 apportioned the Accused Products based on the accused functionality that related to the specific patent in relation to overall functionality used to provide the security services offered by the Accused Products.  An alternative measure of damages based on convoyed sales was applied for one patent where ███████████████████████ for the accused WebFilter product to function.  Dr. Layne-Farrar apportioned these convoyed sales first by the number of WebFilter users that purchased ████████ and then further apportioned based on the functionality of the ████████ that worked with WebFilter.  Lastly, Method 3 was applied for one of the accused products, WebPulse, where Dr. Layne-Farrar calculates a royalty based on an established value ████ ████████████████████.

Dr. Layne-Farrar confirmed the reliability of these methods by cross-checking them with several benchmarks, including licensing history, profitability and Blue Coat's own internal valuations for the Accused Products. Ex. 1, Layne-Farrar Report at ¶¶ 170-178.[2]  It is logical that Dr. Layne-

---

[2] All "Ex." citations are to exhibits attached to the Declaration of James Hannah in Support of Finjan's Opposition to Blue Coat's *Daubert* Motion.

FINJAN'S OPPOSITION TO                                                    Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

1   Farrar would apportion in "various ways-by careful selection of the royalty base to reflect the value

2   added by the patented feature, where that differentiation is possible, by adjustment of the royalty rate

3   so as to discount the value of a product's non-patented features; or by a combination thereof."

4   *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)(finding court properly

5   allowed damages expert's testimony regarding royalties based on reference to end product price).  To

6   ensure reliability, Dr. Layne-Farrar applied multiple methodologies and apportionments to tie the

7   damages to Finjan's footprint in the market.  Thus, her opinions meet the essential requirement "that

8   the ultimate reasonable royalty award must be based on the incremental value that the patented

9   invention adds to the end product."  *Id.*  Whether Dr. Layne-Farrar's opinions produced a correct

10  estimation of the value attributed to the patented technology is a factual consideration for the jury.

11  *Apple*, 757 F.3d at 1718.  As such, Blue Coat's Motion to exclude Dr. Layne-Farrar should be denied.

12          **A.      *Dr. Layne-Farrar's Apportionment under Method 1 and 2 are proper***

13          ███████████████████████████████████████████████████████████ Ex. 2, Medvidovic

14  Report at ¶ 47.  Similarly, the Asserted Patents form a logically consistent suite, ensuring (1)

15  protection of a user from disguised, potentially unknown malicious content arriving over the network

16  as described by the '844 Patent (proactive protection against unknown malicious content) and '822 and

17  '633 Patents (sandboxing at the gateway), while (2) providing efficiency improvements that may be

18  critically important through the '968 Patent (policy-based caching), '731 Patent (caching content and

19  security profiles) and '780 Patent (downloadable ID computation via hashing).  *Id.* at ¶¶ 90-91.

20          Blue Coat's reliance on *VirnetX* fails because there the expert "did not even attempt to subtract

21  any other unpatented elements from the base."  *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1328

22  (Fed. Cir. 2014).  Here, Blue Coat admits that Dr. Layne-Farrar did apportion because she did not stop

23  at the smallest saleable patent practicing unit ("SSPPU") "and goes beyond the accused products to

24  apply her apportionment methodology."  Blue Coat's Motion at 10.  The Court has recognized the

25  difficulty that patentees face in assigning a value to specific features and made clear that they "have

26  never required absolute precision in this task; on the contrary, it is well-understood that this process

27  may involve some degree of approximation and uncertainty.  *VirnetX,* 767 F.3d at 1327-28.  Dr.

28

FINJAN'S OPPOSITION TO                                               Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

Layne-Farrar's Methods 1 and 2 are different approaches to apportioning the value attributable to the patented technology.  To support her opinion, Dr. Layne-Farrar relied on Blue Coat's internal documents and tested methodologies.

### 1. Dr. Layne-Farrar's Method 1 is based on a tested methodology

Dr. Layne-Farrar correctly employs tools and methodologies relied upon by economists and accepted under *Daubert* to assign a royalty under Method 1.  Citing to economic literature, Dr. Layne Farrar utilizes a well-known and accepted method of apportionment of assigning a ranking for each Asserted Patent based on the number of times other U.S. patents in the same field of technology cited to the patent (forward citations).  Ex. 1 at ¶¶ 150-155, FN 303, 305, 306-311.  *See In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *25 (N.D. Cal. Apr. 4, 2014) (accepting economic literature as basis for finding a damages methodology reliable).  As the literature explains, the number of citations correlates to the advancement the patent provides over the previous technology.  As such, this methodology considers the six asserted patents as a portfolio and predicts the importance of each patent amongst the portfolio based on the number of forward citations.  Because the Asserted Patents collectively cover various aspects of the security that the Accused Products provide, Dr. Layne-Farrar used the apportionment value to determine the value attributable to the patented technology in each of the Asserted Products.

Dr. Layne-Farrar apportioned the royalty base for each Accused Product based on the ranking assigned to the Asserted Patents.  Ex. 1 at ¶¶ 150-155 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Dr. Layne-Farrar took into account the unpatented features and applied an apportionment to capture only the percentage of the royalty base attributable to the patented technology.  Dr. Layne-Farrar's own patent value ranking methodology was approved in other patent damages cases and in economic literature.  *See, e.g.,* Ex. 33, *Triangle Software, LLC, v. Garmin Int'l, Inc.* Civil Action No. 1:10-cv-1457 (Sept. 30, 2011 E.D. Va.)(denying motion to exclude patent value methodology opinion).

Blue Coat's qualms with the value that Dr. Layne-Farrar ascribed to the patented technology go to the weight the jury would give to her methods, rather than to admissibility.  Blue Coat's only

argument under Method 1 is that it did not apportion for unpatented features and thus lacks "sound economic" predicates. Blue Coat's Motion at 7-8. However, Dr. Layne-Farrar apportioned the royalty base, and in fact, courts have allowed damages experts in other patent cases to testify utilizing similar patent value methods. *See, e.g., GPNE Corp. v. Apple, Inc.,* No. 12-cv-02885-LHK, 2014 WL 1494247, at *6-7 (N.D. Cal. April 16, 2014)(denying motion to exclude expert's apportionment method of a per-patent family profit figure). Thus, it was proper for Dr. Layne-Farrar to rely on this accepted methodology.

Blue Coat's argument that Dr. Layne-Farrar's apportionment was nothing more than application of the entire market value rule ("EMVR") is also flawed. In support of this argument, Blue Coat mistakenly relies on the *Uniloc* decision to exclude Dr. Layne-Farrar's Method 1. Blue Coat's Motion at 8. The expert in *Uniloc* used EMVR, which "allows a patentee to assess damages based on the *entire* market value of the accused product." *Uniloc, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed Cir. 2011)(emphasis added). In *Uniloc*, the expert did not even attempt to apportion the royalty base, even though unpatented features were included in the accused product. *Id*. Here, Dr. Layne-Farrar apportioned the royalty base for each of the Accused Products. Ex. 1 at ¶¶150-155. Dr. Layne-Farrar *did not use 100% of the revenues* for each Accused Product, and thus did not apply EMVR. Instead, Dr. Layne-Farrar accounted for unpatented features by reducing the royalty base pursuant to the value assigned to each patent based on the ranking apportionment attributable to each patent. *Id*. For instance, damages for the '780 Patent were assessed using only ▮▮▮ of the royalty base—far from the entire market value of the accused products for the '780 Patent. In addition, Dr. Layne-Farrar's royalty calculation under Method 1 is proper because it is well within the range of the comparable licenses, acquisitions, and other evidence in the record. Thus, there is no basis to exclude Method 1.

**2.      Dr. Layne-Farrar's Apportionment under Method 2 is proper**

For Method 2, Dr. Layne-Farrar based the apportionment on the functionality attributed to each of the Asserted Patents in the Accused Products. Ex. 1 at ¶¶ 156-159. Dr. Layne-Farrar cites to Dr. Medvidovic's opinion in support of her analysis based on the functionalities accused of infringement in the Blue Coat Products that collectively provide a cohesive security system. *Id.* at 156, FN 315; Ex. 2

FINJAN'S OPPOSITION TO                                     Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

1   at ¶¶ 97-98.  Dr. Layne-Farrar uses Dr. Medvidovic's identification of the functionalities directly

2   correlated to the patented technology to apportion the royalty base of the Accused Products that

3   contain the specific patented technology.  Ex. 1 at ¶¶ 156-159.

4       To apply the apportionment under Method 2, Dr. Layne-Farrar first identified the SSPPU for

5   each of the Accused Products (Blue Coat does not dispute these SSPPUs).  Next, Dr. Layne-Farrar

6   apportioned the royalty base for each SSPPU based on the patented technology that correlates to the

7   functionality in each of the Accused Products.  Dr. Layne-Farrar's apportionment was conservative

8   because she relied upon an internal Blue Coat document that identified a total of ██████

9   ███████████████, which are included in several of Blue Coat's product offerings.

10  Ex. 1 at ¶¶ 156-159; Ex. 2 at ¶¶ 97-98.  Dr. Layne-Farrar used this document to apply an

11  apportionment of ███ for each of the functionalities attributable to the patented technology.  Then, Dr.

12  Layne-Farrar apportioned each Accused Product using the main functionalities that correlated with

13  providing the secure gateway through use of the patented technology.

14      Blue Coat acknowledges that the proper way to apportion is to first identify the SSPPU and

15  then apply the apportionment to that unit.  Blue Coat's Motion at 10-11.  However, Blue Coat argues

16  that the Court should exclude Method 2 because it apportioned based on functionality of Blue Coat's

17  products that provide the security system as a whole rather than the individual features of each product.

18  *Id.*  Blue Coat's motion to exclude Method 2 is improper because it goes to the weight of the testimony

19  not admissibility.  *See, e.g., MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 2854890, *2-4

20  (N.D. Cal. June 20, 2014)(denying motion to exclude patentee's damages expert because whether the

21  expert should have further apportioned the value of the patented feature compared to the SSPPU went

22  to the weight of the testimony not its admissibility).

23      To support Blue Coat's position, Blue Coat cites inapplicable cases that deal with an expert's

24  analysis that ended with identifying the SSPPU and did not apportion further based on the patented

25  technology.  *See supra* at 4*; Dynetix Design Sol'n, Inc. v. Synopsys, Inc.,* No. 11-05973 PSG, 2013 WL

26  4538210, at *4 (N.D. Cal. Aug. 22, 2013)(excluding expert opinion where he skipped the

27  apportionment task); *Commonwealth Sci. & Indus. Rsh. Org. v. Cisco Sys., Inc.*, No. 11-cv-343, 2014

28

FINJAN'S OPPOSITION TO                  Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

WL 3805817, at *7 (awarding damages but criticizing expert for not making specific percentage calculations to apportion non-patented features).  In *Atlas IP, LLC, v. Medtronic, Inc*., the expert took 70% of sales to inflate the royalty base and did not explain how he determined that number.[3]  No. 13-CIV-23309, 2014 U.S. Dist. LEXIS 158787, at *12-13 (S.D. Fl. Oct. 6, 2014).  These cases are not applicable because Dr. Layne-Farrar identified the SSPPU and also gave a thorough explanation on how she apportioned the royalty base for each of the Accused Products.  Ex. 1 at ¶¶ 150-159.  She therefore properly tied the damages owed to Finjan to the claimed invention's footprint in the market place.  *Uniloc*, 632 F.3d at 1317.

There is also no merit to Blue Coat's complaint that Method 2 considers functionalities included in non-accused products, rather than apportioning using the number of features included in each of the Accused Products.  Blue Coat's Motion at 10.  An apportionment using "features" within each product instead of overall functionality is nothing more than a game of semantics.  Blue Coat's damages expert, Ms. Davis, testified that ████████████████████████████ ██████████████████████████████████.  Ex. 3, Davis Tr. at 32:2-14.  For instance, apportioning the ProxySG royalty base as Blue Coat proposes involves ████████████████ ████████████████████████████████████████ ██████.  *Id.*  In contrast, Dr. Layne-Farrar's methodology resulted in a ████████ apportionment for the ProxySG royalty base.  Notably, Blue Coat's expert did not perform an apportionment utilizing Blue Coat's proposed methodology.

To the extent Blue Coat argues that Dr. Layne-Farrar's Method 2 compares functionalities of non-accused products such as ██████████████████████, Dr. Layne-Farrar confirmed that her apportionment did not overinflate the base by using Blue Coat's internal valuations ████████ ████████████████████████████████████████████████ ████████████ as a benchmark. ████████████████████████████████████████

---

[3] The Court found that the report did not disclose the allegation that the 70% came from the accused infringers' website.

1    ████████.[4]  Ex. 1 at ¶¶ 177-178. ████████████████████████████████████

2    ████.  *Id.* at ¶ 176.  Dr. Layne-Farrar used various methods to determine the damages owed to Finjan

3    for Blue Coat's infringement ranged from ████████████████.  *Id.* at ¶ 179.  Blue Coat cannot

4    characterize this small proportion of its total revenue as an application of the EMVR.

5        **B.      Dr. Layne-Farrar's Calculation of Convoyed Sales is proper**

6        In addition to multiple methods of apportionment, Dr. Layne-Farrar also applied a convoyed

7    sales theory for Blue Coat's infringement under the '844 Patent.  Convoyed sales are a factor

8    considered under *Georgia-Pacific*.  Generally, convoyed sales refer to an unpatented item that is sold

9    with the patented item.  Here, WebPulse/WebFilter are accused of infringing the '844 Patent ██

10   ████████████████████████.  Ex. 1 at ¶ 160.  Blue Coat argues that Finjan is not entitled to

11   convoyed sales because it allegedly applied EMVR to these sales.  Yet Dr. Layne-Farrar did not apply

12   the EMVR because she did not take 100% of the revenues for the products. Moreover, Blue Coat's

13   reliance on *Rite-Hite* to argue that Finjan is not entitled to convoyed sales is misplaced, since *Rite-Hite*

14   involved a lost profits theory not applied here.  56 F.3d 1538, 1549-1550 (Fed. Cir. 1995) (allowing a

15   patentee to recover damages under a lost profits theory for convoyed sales if the infringing and non-

16   infringing products form a functional unit).  In any event, it was proper, under a reasonable royalty, for

17   her to calculate a separate damages amount owed to Finjan for use of the patented technology in sales

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████.  Ex. 5,

20   Schoenfeld Tr. at 71:4-6; *see also* Ex. 6, Cole Report at ¶ 20.  Thus, ████████████████████

21   as a single unit and not simply sold together for convenience.  At the time of the hypothetical

22   negotiation, the parties would have considered the necessity of ██████ for WebFilter to function.

23       Even if the Court were to consider *Rite-Hite,* Blue Coat sells its products as a single cohesive

24   security system, and thus convoyed sales are appropriate.  *See, e.g., id.*; *Kalman v. Berlyn Corp.,* 914

25

26   [4] ████████████████████████████████████████████████

27   ████████████████████████████████████████.

28

FINJAN'S OPPOSITION TO                                    Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

F.2d 1473, 1485, (Fed. Cir. 1990) (affirming damages for filter screens used with a patented filtering device); *TWM v. DuraCorp.,* 789 F.2d 895, 900-01 (Fed. Cir. 196)(affirming damages for unpatented wheels and axles sold with patented vehicle suspension system); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 656 (Fed. Cir. 1985) (affirming damages for unpatented uppers of vehicle with patented structure where there was no evidence that the uppers could be used independently), *cert. denied,* 474 U.S. 902 (1985).  The Federal Circuit has also held that associated gains are appropriate.  For example, in *TWM v. Al Nyman & Sons, Inc.*, the Federal Circuit held that the district court had improperly excluded evidence of profits from eyeglass sales, notwithstanding the fact that no patent-in-suit covered them, because the defendant "used the patented [display racks] in promoting sales of" the eyeglasses.  750 F.2d 1552, 1568 (Fed. Cir. 1984).  Whether WebFilter promoted sales of ███████ is a question for the jury.

Blue Coat's accusation that Dr. Layne-Farrar overstated the convoyed sales by applying EMVR and a 100% royalty rate is flawed.  Dr. Layne-Farrar apportioned the ███████ in two different ways.  First, she took the WebFilter sales and apportioned based on the number of WebFilter users that also purchased ███████.  Second, based on the chart below, she apportioned based on the percentage of ███████ functionality that works with WebFilter, i.e., 1/24:



Ex. 1, Layne-Farrar Report at ¶¶ 156-161, FN 316; Ex. 2, Medvidovic Report at ¶¶ 94-100.

It is proper for an expert to use multiple ways of apportioning to determine the value attributable to the patented technology.  *Apple*, 757 F.3d at 1315 ("a party may use the royalty rate

9

from sufficiently comparable licenses, value the infringed features based upon comparable features in the marketplace or estimate the value of the benefit provided by the infringed features.").  Blue Coat does not cite to any case law that requires Dr. Layne-Farrar to apply a royalty rate to her convoyed sales approach, particularly given the circumstances here where she applied two apportionments to reach her final conclusion on convoyed sales damages. As such, Dr. Layne-Farrar did not apply a 100% royalty rate and her convoyed sale theory is appropriate for infringement of the '844 Patent.

### C.    Dr. Layne-Farrar's Apportionment under Method 3 is Proper

WebPulse, either alone or in conjunction with other products, is accused of infringing the '844, '968 and '731 Patents. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████, Blue Coat has identified a value for WebPulse.  Specifically, in an internal document, Blue Coat determined that the ███████████████████████████ ████████████████████████████████. Ex. 1 at ¶¶ 121-124.

For Method 3, Dr. Layne-Farrar considered a conservative royalty ███████████████ ████████████████████████████████ Ex. 1 at ¶¶ 121-125.  To determine this royalty, Dr. Layne-Farrar used Blue Coat's internal sales documents to determine the number of users that purchased WebFilter ████████████████████████████████████████████ ████████████████████. Id.  The first date of infringement of these patents asserted against WebPulse is ██████████████████████████████████████████████████ ██████████████████████████████████.  An expert can properly consider the panoply of "events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."  ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 872 (Fed. Cir. 2010).  In order to compensate Finjan for Blue Coat's infringement through the use of WebPulse and the Cloud Service, this ████████████████████ would have been the starting point for determining a royalty for Blue Coat's use of the patented technology because it tends to prove an established royalty rate for the

1    infringing technology.  *Id.* (finding the record already contained evidence of licenses on the claimed

2    technology and it was proper to rely on that record evidence to show a royalty rate reasonably related

3    to the technology at issue).

4          Blue Coat mischaracterizes Dr. Farrar's approach, claiming it is use of EMVR.  However,

5    Method 3 is not an application of EMVR because it is not taking the full cost of the product.  Instead,

6    Dr. Layne-Farrar employs a royalty that ████████████████████████████████████

7    ███████  *Uniloc*, 632 F.3d at 1318.  If Dr. Layne-Farrar *had* applied EMVR, she would have instead

8    taken the entire revenues derived from WebPulse/WebFilter.  Blue Coat also claims the apportionment

9    should have been just for only one element of WebPulse as infringing the '844, '968 and '731 Patents.

10   However, as described in Finjan's infringement reports, there are multiple aspects of WebPulse,

11   ██████████████, that infringe Asserted Patents.  *See, e.g.*, Ex. 6, Cole Report at ¶ 103; Ex. 10,

12   Mitzenmacher Report at ¶¶ 294-295, 794-795.  Furthermore, as WebPulse infringes three patents,

13   which contribute to more than just one aspect of the patented technology, this is a factual issue for

14   cross-examination not admissibility.  *See Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665

15   MHP, 2005 WL 1530222, at *16 (N.D. Cal. June 27, 2005) *aff'd*, 205 F. App'x 835 (Fed. Cir. 2006)

16   ("As for the soundness of Wagner's methodology, that is a matter of economics rather than a question

17   of law.  For that reason, it is an issue that falls within the province of the jury.").

18         Even if the Court were to find Method 3 utilized the EMVR, it is still permissible in this

19   specific circumstance, because Method 3 takes a royalty per sale of a product based on ████████

20   ████████████████████████████████████████████████████████, (i.e.

21   the smallest saleable unit).  As such, Dr. Layne-Farrar chose the lowest royalty amount to tie proof of

22   damages to the claimed invention's footprint in the market place.  *Internet Machs. LLC v. Alienware*

23   *Corp.*, No. 6:10-cv-23, 2013 WL 4056282, at *13 (E.D. Tex. June 19, 2013)(finding additional

24   apportionment was unwarranted and the EMVR did not apply where the expert used the smallest

25   salable unit as the royalty base).

26         Because Dr. Layne-Farrar's methodologies and qualifications meet the *Daubert* and Federal

27   Rules of Evidence 702 standards, Finjan respectfully requests that the Court deny Blue Coat's Motion.

28

FINJAN'S OPPOSITION TO                                    Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

IV. **BLUE COAT'S MOTION TO EXCLUDE THE OPINIONS OF DRS. COLE AND MITZENMACHER SHOULD BE DENIED**

Drs. Cole and Mitzenmacher offer opinions on Blue Coat's infringement of the Asserted Patents.  In support of their position, they rely on multiple sources of information, including source code, Blue Coat's confidential design documents and emails related to the development of the products, deposition testimony of Blue Coat's employees, and their testing of the Accused Products. Finjan's infringement experts properly rely on this information because experts can rely on any documents or information that is reliable to support their opinion.  Fed. Rule of Evid. 703.  Drs. Cole and Mitzenmacher chronicle their supporting evidence throughout their reports, with over 1,200 pages of analysis, and include citations and excerpts to numerous sources of information.  Finjan's infringement experts properly disclosed and document all of the evidence supporting their positions.

The testing that Drs. Cole and Mitzenmacher performed confirmed the operation of the Accused Products described in Blue Coat's documents and witness testimony cited in the experts' reports.  Drs. Cole and Mitzenmacher provided exhaustive details of this testing, including lengthy descriptions in their reports, as well as hundreds of pages of photos and screen shots documenting the testing—including the setup, steps performed, and results of the testing.  Blue Coat improperly ignores all of these details in its Motion.  Thus, Drs. Cole and Mitzenmacher provided ample notice of their testing and how they intend to demonstrate the operation of the Accused Products at trial.  In addition, to further support his infringement opinion, Dr. Cole properly relied on Blue Coat documents and communications that set forth a contemporaneous record of the development of the Accused Products. Thus, none of the opinions of Drs. Cole or Mitzenmacher or the evidence they rely on should be excluded.

A. *The Testing of Drs. Cole and Mitzenmacher was Properly Disclosed*

Drs. Cole and Mitzenmacher performed several tests of the Accused Products and properly disclosed the substance of their tests in their respective expert reports.  These tests support their

opinions of infringement. [5]  Ex. 8, Cole Tr. at 25:8-17; Ex. 9, Mitzenmacher Tr. at 19:18-20:8.  There

is no basis for Blue Coat's request that the Court exclude Drs. Cole and Mitzenmacher from testifying

regarding their testing of the Accused Products because they allegedly failed to disclose sufficient

information about the tests.  As an initial matter, it is appropriate to describe the testing of the Accused

Products and offer demonstrations of them for the factfinder to see how the products operate.  *See Vita-*

*Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1334 (Fed. Cir. 2009) (allowing videotaped

demonstration of the operation of the accused device to be shown to a fact-finder); *also see Kaufman*

*Co. v. Lantech, Inc.*, 807 F.2d 970, 974 (Fed. Cir. 1986) (allowing demonstration of accused apparatus

to be shown at trial); *Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2012 WL 2979019, at *3 (N.D.

Cal. July 19, 2012) (denying exclusion of expert testimony regarding testing of accused products and

finding that "the credibility of [the expert's] testimony must be resolved on cross-examination, not by

wholesale exclusion of his testimony.").

Moreover, Drs. Cole and Mitzenmacher disclosed overwhelming information regarding the

testing they performed in their expert reports, including specific examples of how they intend to

demonstrate the operation of the Accused Products at trial.  For example, Dr. Cole states the following

regarding his trial demonstration, which Blue Coat completely ignored in its Motion:

> Whether by physical products, demonstration via Internet, video or slides,
> I will show the operation of Accused Products and will demonstrate how
> Downloadables are processed by the Accused Products.  In one example,
> this will include accessing a webpage from a client from a remote source
> through the ProxySG product with WebFilter.  The webpage will be an
> unknown webpage so that it will be processed by WebPulse.  I will
> demonstrate how the webpage is processed by WebPulse, including how
> potentially malicious files are processed.  In another example, I will access
> a webpage and it will be processed by ProxySG alone which will inject
> mobile protection code.  In a further example, I will access a webpage and
> it will be processed by ProxySG, CAS, and MAA.  In this example, the
> webpage (or file) will be processed by ProxySG and sent to CAS.  CAS
> will then send the file to the MAA in order to sandbox the file.  During
> this demonstration, I will show how CAS and MAA process the file and
> the results of the analysis.  I have personally performed these tests on the

---

[5] Drs. Cole, Mitzenmacher, and Medvidovic tested the ProxySG with Web Filter, Content Analysis
System, and Malware Analysis Appliance.  Ex. 6 at ¶ 30.

FINJAN'S OPPOSITION TO                                              Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

Accused Products and will reenact my tests during trial either live or by
video during trial.

Ex. 6 at ¶ 29.

Dr. Mitzenmacher included a similar description of how he intends to use the Accused Products
at trial.  Ex. 10 at ¶ 25.  As such, Finjan's experts provided detailed descriptions on how they will
utilize the Accused Products at trial, thereby providing ample notice to Blue Coat of the testing that
will be performed.

Dr. Cole further describes how he set up the testing lab, what products he tested, how they were
configured, and documentation of the operation of the products and their results:

> Specifically, I set up a lab with the Accused Products so that I could
> perform various tests to inform my opinion.  The Accused Products that I
> tested included the ProxySG with WebFilter, WebPulse, CAS and MAA.
> These products were set up to mimic the exact same configuration of a
> typical Blue Coat customer who was using the products in an enterprise
> setting.  I have taken a number of pictures of the lab and created a number
> of screen shots from operating the Accused Products which I intend to
> show and explain at trial. See e.g., Finjan-BC 166358-166670.   In
> summary, these pictures illustrate how the Accused Products were set up
> so that I could perform my various tests.  Furthermore, the screen shots
> show the various aspects of the user interface of the Accused Products.  I
> was able to configure the products using the user interface shown in the
> screen shots in order to perform a variety of tests.  As a result of my
> testing, my opinion that the Accused Products infringe the Finjan patents
> is confirmed.

Ex. 6 at ¶ 30.

Blue Coat simply ignores this description of the testing performed.  Dr. Mitzenmacher includes
a similar description of how testing was performed.  Ex. 10 at ¶ 26.  As such, Finjan's experts have
properly disclosed how they tested the products and intend to use them at trial in their expert reports.

The over three hundred pages of documentation detailing their testing undermine Blue Coat's
argument that Drs. Cole and Mitzenmacher did not provide sufficient detail to render their testing of
the products reliable.  Blue Coat's Motion at 21-22.  Blue Coat was given numerous screenshots of
how the Accused Products were configured and the results of their tests.  Ex. 6 at ¶ 30; Ex. 10 at ¶ 26;
*see also* Exs. 11-31.  For example, Blue Coat was given screenshots for the configuration of the

FINJAN'S OPPOSITION TO                                           Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

Accused Products (Ex. 11 at FINJAN-BC 166362-67), photographs of testing environment (Ex. 31), sandboxing using the Malware Analysis Appliance (Ex. 11 at FINJAN-BC 166367, Ex. 16 at 166459-467) and sending information to WebPulse (Ex. 11 at FINJAN-BC 166368).  The screenshots also included the dashboard results of running the system.  *See* Ex. 11 at FINJAN-BC 166360, 166372-374; Ex. 24 at FINJAN-BC 166538, 166545-547.  Drs. Cole and Mitzenmacher also included the policies generated by the Accused Products.  Exs. 12-15 at FINJAN-BC 166378-458; Exs. 18-23 at FINJAN-BC 166471-537; *see also* Exs. 27-30.  Blue Coat simply ignores these reams of data describing the tests, undermining Blue Coat's argument that there has been insufficient disclosure of testing the Accused Products.

Furthermore, Blue Coat deposed Drs. Cole and Mitzenmacher at length regarding their testing of the Accused Products.  In fact, Blue Coat introduced the screenshots to Dr. Cole and Dr. Mitzenmacher at their deposition and asked them specific questions regarding their testing of the Accused Products.  Ex. 8, Cole Tr. at 64:16-25; Ex. 9, Mitzenmacher Tr. at 283:9-284:13.  Accordingly, Blue Coat had ample notice of the testing performed and was able to explore their testimony in detail during expert discovery.

Blue Coat's sole reliance on *Novartis*, regarding computer "simulations," is inapposite because it is specific to the problems associated with a computer model for a *chemical reaction* where the expert did not disclose how he "derived the rates for the neutralization or crystallization reactions," and it was "unclear if the[] computations require some assumption about how the surface zones interacts with the bulk solution-assumptions."  *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001).  As described in their reports, Drs. Cole and Mitzenmacher use their testing of the products to confirm that the Accused Products operate in a manner consistent with how the products are described in Blue Coat's documents and by Blue Coat's witnesses.  Finjan's experts will also perform live demonstrations of the products to the jury so they can see the normal operation of the products.

This type of *confirmation* of general operation of the Accused Products is different from the reaction rate simulations run in *Novartis*, which were completely opaque as described and had specific

FINJAN'S OPPOSITION TO                                    Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

output variables that could not be confirmed or disputed.  As such, *Novartis* does not support Blue Coat's position.  Rather, the testing here is more similar to the testing in *GPNE Corp. v. Apple, Inc.*, which the Court found reliable where configuration information was produced.  *See GPNE,* 2014 WL 1494247, at *15 (denying motion to strike where the expert simply attested that he has disclosed all relevant configuration settings for testing a device in an artificial environment).  As a result, Drs. Mitzenmacher and Cole's opinions are proper and Blue Coat's Motion should be denied.

### B.  Dr. Cole Properly Relied on the Development Documents for His Infringement Position

Dr. Cole properly considered documents regarding the development of the Accused Products, including communications, such as emails, in forming his opinion. Fed. Rule of Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed"); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 WL 5955699, at *7 (S.D. Fla. Feb. 2, 2005) (denying to exclude expert testimony where he relied on various documents including e-mails in forming his opinion).  Blue Coat mischaracterizes his opinion when it argues that Dr. Cole cannot testify that Blue Coat "recognized the importance of Finjan's patents" because that would improperly speculate on the state of mind of Blue Coat's employees.  Rather, Dr. Cole uses the communications to further support his infringement opinion—*i.e.*, to establish that it is even more likely that Blue Coat infringes the Asserted Patents.  Any complaints that Blue Coat has regarding this evidence go to its weight, not admissibility.  As such, Blue Coat's Motion should be denied.

Blue Coat does not suggest these documents are unreliable or otherwise improper for Dr. Cole to rely on as tending to show infringement.  Dr. Cole relies on these communications and other development documents related to the Accused Products because they provide a contemporaneous record of Blue Coat's discussion regarding the implementation of the accused technology at the time Blue Coat implemented the technology.  In fact, Courts have acknowledged that contemporaneous documents are often the most reliable.  *See United States v. Fernandez–Castillo,* 324 F.3d 1114, 1119 (9th Cir. 2003) (noting that "reports made contemporaneously with ... observations are generally more reliable than those reports made later in time").  █████████████████████████████



9   As such, Blue Coat has not provided any reason that Dr. Cole should be excluded for relying on this

10  information to support his infringement opinion.

11      Blue Coat cites *Therasense, Inc. v. Becton* as allegedly supporting its position that Dr. Cole

12  cannot rely on these documents.  Blue Coat's Motion at 19.  However, *Therasense* is specific to claims

13  of inequitable conduct, which is not at issue here.  For inequitable conduct claims, subjective intent of

14  the patent owner is an element of the defense.  *Therasense* is inapplicable here, because Dr. Cole uses

15  the evidence to support his opinion as to infringement, not to any subjective intent for inequitable

16  conduct.  Dr. Cole does not provide an opinion on the subjective beliefs of the Blue Coat employees,

17  but rather uses the emails as contemporaneous evidence demonstrating infringement of the Asserted

18  Patents.  Fed. Rule of Evid. 703; *also see Jamros v. Ford Motor Co.*, 70 F.3d 1278 (9th Cir. 1995)

19  ("recognizing that expert opinion testimony is valuable where the circumstances were unwitnessed and

20  thus required scientific deductions from circumstantial evidence") (internal quotations and citations

21  omitted).  Blue Coat also cites *Nano-Proprietary, Inc. v. Canon, Inc.*, another inapplicable case.  Blue

22  Coat's Motion at 23.  *Nano-Proprietary* does not relate to whether an expert can rely on certain types

23  of evidence to support its position, instead it relates to speculation on assigning the total value of a

24  license agreement to a single provision of the agreement.  537 F.3d 394, 402 (2008).  Therefore, Blue

25  Coat has no case law that supports its argument that Dr. Cole cannot rely on this evidence.  As the

26  development documents are proper in supporting Dr. Cole's position on infringement, they should not

27  be excluded from being relied on for his opinion.

28

Accordingly, Blue Coat has provided no basis for excluding any portion of the opinions of Drs. Cole or Mitzenmacher.

## V.   BLUE COAT'S MOTION TO EXCLUDE DR. MEDVIDOVIC'S OPINION SHOULD BE DENIED

Dr. Medvidovic submitted an expert report in which he "offer[s] an opinion as to the importance of technology of [the Asserted Patents] and how they relate to Blue Coat products."  Ex. 2 at ¶ 1.  Contrary to Blue Coat's assertions, Dr. Medvidovic is not offering an infringement opinion.[6] He "reviewed the [infringement] expert reports of Dr. Cole and Dr. Mitzenmacher including documents cited therein" to identify the functionality accused of infringing.  *Id.* at ¶ 21.  Dr. Medvidovic in turn uses this information to opine on the technical advantages of these functionalities in areas such as protecting against unknown viruses and increasing network efficiency through caching.  This is separate from the analysis of Drs. Cole and Mitzenmacher.  *Id.* at ¶¶ 51, 75.  As such, he offers an appropriate opinion distinct from Finjan's experts on infringement.  Blue Coat's request to exclude Dr. Medvidovic's opinion should be denied because Blue Coat: (1) misconstrues Dr. Medvidovic's opinion as an infringement opinion that parrots Drs. Cole and Mitzenmacher, (2) ignores Dr. Medvidovic's disclosure of testing information, and (3) misstates how Dr. Medvidovic will rely on Blue Coat's development documents.

### A.   *Dr. Medvidovic Properly Formed his Opinion through Independent Analysis*

In preparing his opinion on technical benefits, Dr. Medvidovic uses the opinions of Drs. Cole and Mitzenmacher to identify the proper accused functionality within the Accused Products.  For example, Dr. Medvidovic identifies the functionality in Blue Coat's WebPulse service accused of infringing the '844 Patent.  Ex. 2 at ¶ 58.  He then ties the accused functionality in WebPulse to the technical advantages, namely the ability to detect new and previous unknown attacks.  *Id.* at ¶¶ 59-60.  Dr. Medvidovic performs a similar analysis for all of the Accused Products.  *Id.* at ¶¶ 48-89.

---

[6] Dr. Medvidovic unequivocally stated in his report that "I do not provide an opinion regarding infringement."  Ex. 1 at ¶ 28; *see also* Ex. 7, Medvidovic Tr. at 229:18-20 ("Q. Were you asked to opine on infringement of any of the Asserted Claims of the Patents in suit? A. I was not.").

FINJAN'S OPPOSITION TO                                      Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION

Ignoring Dr. Medvidovic's plain statements that he is not offering an opinion on infringement, Blue Coat argues that he "regurgitated" the infringement positions of Drs. Cole and Mitzenmacher. Blue Coat's Motion at 16.  Namely, Blue Coat argues that Dr. Medvidovic did not perform independent analysis to reach his opinion.  Blue Coat is flat wrong, as Dr. Medvidovic independently verified the described operation by reviewing the cited documents, deposition testimony, source code, and testing the Accused Products.  Ex. 2 at Appendix B; Ex. 7, Medvidovic Tr. at 303:20-23 ("Q. Did you rely on your observation and results from your own testing to form opinions that are set forth in your report? A. I did."); 243:24-244:3 (Q. Did you review all of the documents that are relied on by Dr. Mitzenmacher in his report? A. Again I looked at every single one."); 236:15-237:2, 238:22-239:10, 257:11-17.  Blue Coat also alleges that Dr. Medvidovic's opinion is improper because he did not review the entire source code of the Accused Products.  While Dr. Medvidovic did not review the complete source code for the Blue Coat Products, he did review the substantial sections of code included within the infringement reports.  Ex. 7, Medvidovic Tr. at 381:25-382:7 (Q. And when you're reviewing Dr. Mitzenmacher report before finalizing your report, did you review all the source code that was referenced in Dr. Mitzenmacher report? A. I did….").  Dr. Medvidovic was not required to look at every line from the millions of lines of code for the Accused Products, and Blue Coat has put forth no basis for why this would be required.  As Dr. Medvidovic properly performed independent analysis, his opinion should not be excluded.

Blue Coat cites to a statement from Dr. Medvidovic's report that he "agrees" with the analysis of Drs. Cole and Mitzenmacher to support its allegation that he will offer an opinion on infringement. Blue Coat's Motion at 15.  However, Blue Coat misconstrues this statement, which when read in context, indicates that Dr. Medvidovic agrees with the description of the operation of the products set forth in the infringement reports, and *not* that he intends to offer an opinion on infringement.  *See* Ex. 2 at ¶ 28; *see also* Ex. 7, Medvidovic Tr. at 229:18-20.  It is proper for an expert such as Dr. Medvidovic to use another expert to assist him in forming an opinion on the technical importance of the Asserted Patents and Accused Products.  *See DataQuill Ltd. v. High Tech Computer Corp.*, 887 F.Supp.2d 999, 1026 (S.D. Cal. 2011) ("It is routine and proper for a damages expert in a technical patent case to rely

on a technical expert for background."); *MediaTek, Inc. v. Freescale Semiconductor, Inc.,* No. 11-cv-5341 YGK, 2014 WL 971765, at *1 (N.D. Cal. Mar. 5, 2014) ("An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion.") (citations omitted). Dr. Medvidovic's opinion properly used the opinions of Drs. Cole and Mitzenmacher as a starting place to form his own opinions, instead of performing duplicative analysis already completed.

### B. *Dr. Medvidovic Properly Tested the Accused Products*

Contrary to Blue Coat's assertions, Dr. Medvidovic independently tested the Accused Products to show how those products apply Finjan's patented technological advances and that they operate in the manner specified by Blue Coat's documents and witnesses, which is described at length in his expert report and deposition. Ex. 7, Medvidovic Tr. at 277:7-21, 291:12-19. Thus, there is no merit to Blue Coat's requests that the Court exclude Dr. Medvidovic from testifying regarding his testing of the Accused Products. Similar to Drs. Cole and Mitzenmacher (described, *supra*), Dr. Medvidovic includes a description in his expert report of how he intends to use the Blue Coat products at trial, and how he performed testing. Ex. 2 at ¶¶ 23-27. During his deposition, Dr. Medvidovic also made clear that he relied on the same configurations as Drs. Cole and Mitzenmacher and responded to numerous questions regarding the testing. Ex. 7, Medvidovic Tr. at 279:21-280:2;287:8-295:11. Blue Coat alleges that Dr. Medvidovic did not identify the testing he performed until his deposition. Blue Coat's Motion at 17. This is incorrect, because Dr. Medvidovic included an entire section in his report titled "Demonstratives" that outlined the tests he performed and the tutorial he intends to provide at trial. Ex. 2 at ¶¶ 23-27 (Demonstratives). As such, Dr. Medvidovic properly disclosed how he tested the products and how he intends to use them at trial.

Blue Coat also incorrectly argues that Dr. Medvidovic's opinion regarding testing is unreliable because he has insufficient knowledge regarding the testing environment. Dr. Medvidovic understood the configuration of the Accused Products through conversations with Dr. Cole and through his own analysis and review. Ex. 7, Medvidovic Tr. at 273:16-274:12. Dr. Medvidovic performed his testing

independently on two separate occasions. *Id.* at 303:20-23 ("Q. Did you rely on your observation and results from your own testing to form opinions that are set forth in your report? A. I did."). Dr. Medvidovic confirmed his understanding of the testing environment through several hours of his independent research. *Id.* at 272:6-19. As shown, Dr. Medvidovic properly investigated the facts underlying the opinions of Drs. Cole and Mitzenmacher related to the testing of the Accused Products. *See, e.g., Hoang v. Funai Corp.,* 652 F. Supp. 2d 564, 573 (M.D. Pa. 2009) (denying exclusion of expert testimony where the record showed that expert conducted his independent review before relying on other experts' conclusions and observations); *Collins v. Cottrell Contracting Corp.,* 733 F. Supp. 2d 690, 700-01 (E.D.N.C. 2010) (same); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 12-CV-00064, 2014 WL 120973, at *17-18 (W.D. La. Jan. 10, 2014) ("as an expert in his field, Dr. Kessler need not, himself, have conducted certain testing if he is relying on otherwise reliable testing conducted by experts in their respective fields and when Defendants, themselves, admit Dr. Kessler possesses 'a general understanding of what [the accused technologies] are.").[7] As such, Dr. Medvidovic opinion as to testing was reliable because he had personal knowledge of the testing performed.

Blue Coat mischaracterizes Dr. Medvidovic's testimony by stating that he was "unable to testify regarding any of the details of these tests." Blue Coat's Motion at 17. In support, Blue Coat cites a response of Dr. Medvidovic where he states that he does not recall specific configuration information "off the top of [his] head." Ex. 7, Medvidovic Tr. at 274:23-275:1. What Blue Coat conveniently omits is Dr. Medvidovic's later description of the tests performed. *Id.* at 277:7-21. Dr. Medvidovic even offered to demonstrate the exact tests he performed for Blue Coat during his deposition. *Id.* at 279:16-18 ("if we can set up the system here, I'm happy to demo it and show you exactly what I did."). In addition, Dr. Medvidovic testified he used the same configuration as Dr. Cole and that Dr. Cole produced screenshots documenting the configuration. *Id.* at 279:21-280:2; 299:6-300:1. He also answered many questions during his deposition on the testing he performed. *See*, *e.g.*,

---

[7] Blue Coat's own expert witnesses did not personally setup or configure the products they tested, stating, "I was not involved with setting [the product] up. It, it was ready to go." Ex. 32, Hicks Tr. at 350:25-351:1.

*id.* at 272:15-302:7.  Dr. Medvidovic both identified the tests in his expert report and described the tests that he performed during his deposition.

The cases that Blue Coat cites are inapplicable to the facts here because they relate to cases where the experts perform *no independent analysis or verification* of results.  *See Info-Hold, Inc. v. Muzak LLC,* No. 11-cv-283, 2013 WL 4482442, at *5 (S.D. Ohio Aug. 10, 2013) ("Mr. White relies entirely on the numbers provided … with examining any of the Defendant's underlying documentation or independently verifying Mr. Paris' numbers."); *MGM Wells Servs., Inc. v. Mega List Sys., LLC*, No. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007)(expert "did not review data from testing [and] was not aware of the test.").  Thus, Blue Coat has no case law supporting its position that Dr. Medvidovic improperly relied on the testing environment configured by Drs. Cole and Mitzenmacher.

### C.  Dr. Medvidovic Properly Relied on the Development Documents for His Infringement Position

Similar to its argument related to Dr. Cole, Blue Coat argues that Dr. Medvidovic should not be able to testify that Blue Coat "recognized the importance of Finjan's patents" because he would improperly speculate on the state of mind of Blue Coat's employees.  Blue Coat again mischaracterizes the testimony of Dr. Medvidovic who properly considered documents regarding the development of the Accused Products, including communications such as emails, in forming his opinions.  Dr. Medvidovic used the documents to provide a roadmap for the development of the Accused Products, which is relevant in his analysis of the benefits of the patents as applied to the Accused Products.  This type of development documentation shows the relative importance of the accused technology.  Fed. Rule of Evid. 703.  Moreover, for the same reasons described above with respect to Dr. Cole, Blue Coat's reliance on *Therasense* is misplaced.  Here, Dr. Medvidovic does not provide an opinion on the subjective beliefs of Blue Coat's employees, but rather uses the development documents as contemporaneous evidence demonstrating the technical benefits of the patents.  *See* Fed. Rule of Evid. 703; *see also Jamros*, 70 F.3d at 1278 ("recognizing that expert opinion testimony is valuable where the circumstances were unwitnessed and thus required scientific deductions from circumstantial

FINJAN'S OPPOSITION TO
BLUE COAT'S *DAUBERT* MOTION

Case No. 13-cv-03999-BLF

evidence"). As such, Dr. Medvidovic should be able to rely on these documents in support of his opinions.

### D. Dr. Medvidovic is Qualified to Provide His Opinion

Blue Coat also argues that Dr. Medvidovic lacks the expertise to opine on the development documents. Blue Coat's Motion at 20. In doing so, Blue Coat mischaracterizes Dr. Medvidovic's opinion as assigning a *competitive value* of the patents. *Id.* Rather, as stated in the first line of his expert report, Dr. Medvidovic offers an opinion on the *technical merits* of the Finjan Patents as Blue Coat is using them and the development process for the accused the technology. Ex. 2; *see also* Ex. 7, Medvidovic Tr. at 416:6-9 ("I'm not an accountant. I don't, as a matter of course, do market analyses. I do, however, almost on a daily basis, do technical analyses of the kind that I provided in this case."). The technical merits of the Asserted Patents relate to efficiency and benefits in the Accused Products attributable to the Asserted Patents. As a professional in computer science for nearly two decades, Dr. Medvidovic is imminently qualified to offer such an opinion. Ex. 2 at Appendix A. Thus, Blue Coat's request to exclude Dr. Medvidovic's opinion based on his qualifications should be denied.

For the foregoing reasons, there is no basis to exclude any portion of Dr. Medvidovic's opinion.

## VI.   CONCLUSION

For the foregoing reasons, Finjan respectfully requests that the Court deny Blue Coat's *Daubert* Motion in its entirety.

Respectfully submitted,

Dated:  June 11, 2015                    By:   */s/ James Hannah*
                                               Paul J. Andre (State Bar. No. 196585)
                                               Lisa Kobialka (State Bar No. 191404)
                                               James Hannah (State Bar No. 237978)
                                               KRAMER LEVIN NAFTALIS
                                                & FRANKEL LLP
                                               990 Marsh Road
                                               Menlo Park, CA  94025
                                               Telephone: (650) 752-1700
                                               Facsimile: (650) 752-1800

pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

*Attorneys for Plaintiff*
FINJAN, INC.

FINJAN'S OPPOSITION TO                                Case No. 13-cv-03999-BLF
BLUE COAT'S *DAUBERT* MOTION