UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., <br>     Plaintiff, <br>   v. <br> BLUE COAT SYSTEMS, INC., <br>     Defendant. | Case No. 13-cv-03999-BLF <br><br> **ORDER ON *DAUBERT* MOTIONS** <br> [Re: ECF 245, 250] |

Before the Court are the parties' motions to exclude certain opinions of each party's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Pl.'s Mot. 250; Def.'s Mot. 245. The Court heard argument on July 6, 2015. For the reasons stated on the record and set forth below, plaintiff Finjan, Inc.'s motion is GRANTED IN PART and DENIED IN PART and defendant Blue Coat Systems, Inc.'s motion is GRANTED IN PART and DENIED IN PART.

**I.  BACKGROUND**

Plaintiff holds a portfolio of patents directed toward various aspects of Internet security and has accused Defendant's suite of web security appliances and software of infringing six of those patents. All of the patents asserted in this lawsuit are directed toward protecting network computers from hostile files downloaded from the Internet. U.S. Patent No. 6,154,844 ('844 Patent) teaches the inspection of downloaded files for suspicious code or behavior according to a set of rules and generating a profile of the results from that inspection. U.S. Patent No. 6,804,780 ('780 Patent) teaches the generation of a re-usable ID for downloaded files so that future iterations of those files can be easily identified. U.S. Patent No. 7,418,731 ('731 Patent) claims methods and systems for caching security information at a computer or network gateway, again so that

prior analyses of the same downloaded file can be easily retrieved. U.S. Patent No. 6,965,968 ('968 Patent) teaches the management of cached downloadable content accessible to multiple destination computers by creating a policy-based index that stores information indicating the allowability of cached content relative to different user security policies. Finally, U.S. Patent Nos. 7,058,822 ('822 Patent) and 7,647,633 ('633 Patent) are related patents that claim systems and methods for detecting and protecting network computers from malicious code operations through the deployment of "mobile protection code" ("MPC") that can intercept and neutralize hostile operations at runtime.

The products accused of infringing these myriad patents are Defendant's ProxySG appliance and software, ProxyAV appliance and software, WebPulse service, Malware Analysis Appliance ("MAA") component, and Content Analysis System ("CAS") component. Each product has multiple different or overlapping features, only a subset of which are accused of infringing the asserted patents. The ProxySG appliance provides a proxy server or web gateway between an intranet of computers and the Internet that performs a number of network security functions including caching and policy management. The other accused products in this case may be added to ProxySG to provide additional collaborative protection. ProxyAV provides anti-virus and malware detection along with sandboxing. MAA is a customizable sandboxing environment that can integrate with CAS, another antivirus scanner integrated with ProxySG. WebPulse is a cloud-based infrastructure that categorizes web pages and runs background processes that include searching for evidence of malware activity. The WebPulse service requires an add-on to ProxySG—WebFilter. The products, or combinations thereof, accused of infringing each asserted patent are set forth below:

| Patent | Asserted Claims | Accused Product(s) |
|---|---|---|
| '780 Patent | 9, 13 and 18 | ProxyAV; ProxySG with ProxyAV |
| '844 Patent | 1, 7, 11, 15-16 and 41 | WebPulse |
| '731 Patent | 1 | ProxySG (and WebFilter) with WebPulse |
| '968 Patent | 1, 9 and 33 | ProxySG (and WebFilter) with WebPulse |
| '822 Patent | 9 and 10 | ProxySG |

| '633 Patent | 8 and 14 | ProxySG; MAA; ProxySG with CAS and MAA |

*See* Summary J. Order at 4, ECF 256, 265.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) *aff'd*, 131 S. Ct. 2238 (2011). So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury. *Micro Chem.*, 317 F.3d at 1392; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

## III. DISCUSSION

Plaintiff and Defendant have each moved to exclude opinions rendered by the other party's technical and damages experts. Plaintiff seeks to strike the following of Defendant's expert opinions: (1) Dr. George Necula's opinion that the Braswell prior art reference anticipates the '731 Patent; (2) Dr. Michael Hicks's opinion that the Ji prior art reference anticipates the '822 and '633

1  Patents; and (3) all of Ms. Julie Davis's opinion on damages. *See generally* Pl.'s Mot. Defendant,
2  for its part, seeks to exclude the following of Plaintiff's expert opinions: (1) Dr. Nenad
3  Medvidovic's opinions regarding infringement and Defendant's recognition of the importance of
4  Plaintiff's patented technology; (2) Dr. Eric Cole's testing results in support of his infringement
5  opinion as well as his opinion regarding Defendant's recognition of the importance of Plaintiff's
6  patented technology; (3) Dr. Michael Mitzenmacher's testing results in support of his infringement
7  opinion; and (4) all of Dr. Anne Layne-Farrar's opinion on damages. *See generally* Def.'s Mot.
8  The Court addresses the parties' motions regarding their respective technical experts first.

### A. Opinions of Technical Experts

Neither Plaintiff nor Defendant challenges the qualification of the opposing party's technical experts. Rather, both advance arguments grounded largely in the reliability of the opinions offered by each expert and whether his opinion was sufficiently disclosed under Federal Rule of Civil Procedure 26. For the reasons stated on the record at the July 6 hearing, the Court disposes of these issues quickly as follows.

#### i. Dr. Necula's and Dr. Hicks's Opinions on Anticipation

Plaintiff's motion to exclude Dr. Necula's anticipation opinion based upon the Braswell reference is DENIED. Pl.'s Mot. 3-6. As has already been extensively addressed in the Court's rulings on the parties' motions to strike and *in limine* motions, Dr. Necula may offer an opinion that Braswell—and Braswell alone—discloses all elements of the '731 patent, whether overtly or inherently. *See* Order on Mots. to Strike at 11-12, ECF 271; Order on Mots. *in Limine* at 5, ECF 367. Whether or not Dr. Necula improperly considered elements from other sources to form his opinion on anticipation is an issue that may be the subject of cross-examination and goes to Defendant's ability to meet its burden of proving anticipation.

Plaintiff's motion to exclude Dr. Hicks's anticipation opinion based upon the Ji reference is likewise DENIED. Pl.'s Mot. 6-8. Plaintiff's challenge is not to Dr. Hicks's qualification to testify as an expert, nor even to the reliability of his opinion, but rather to its sufficiency. "Anticipation, including whether a limitation is inherent in the prior art, is a question of fact." *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013). As such,

Dr. Hicks, as a qualified expert in the field, may present to a jury his opinion that a person having ordinary skill in the art at the time of the claimed inventions would have understood the Ji reference. *See, e.g.*, *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373-74 (Fed. Cir. 2005). Dr. Hicks may be cross-examined on that opinion and a jury may determine whether his opinion is sufficient to satisfy Defendant's high burden of proving invalidity.

### ii. Dr. Medvidovic's Opinion on Infringement

Defendant's motion to exclude Dr. Medvidovic's infringement opinion is DENIED as moot because Plaintiff has indicated that he will not be offered for infringement. Def.'s Mot. 14-18; Pl.'s Opp. 18, ECF 274.

### iii. Dr. Medvidovic's and Dr. Cole's Opinions on Importance of Plaintiff's Patented Technology

Defendant's motion to exclude Dr. Medvidovic's and Dr. Cole's opinion regarding Defendant's recognition of the importance of Plaintiff's technology is GRANTED. Def.'s Mot. 18-20. While Drs. Medvidovic and Cole may certainly testify to the objective "technical merits" of Plaintiff's patents, Pl.'s Opp. 23, what Defendant thought about Plaintiff's patents is not the proper subject of expert testimony, nor are Drs. Cole and Medvidovic qualified to offer opinions regarding Defendant's subjective beliefs. Fed. R. Evid. 702.

### iv. Testing Conducted by Plaintiff's Experts

Finally, Defendant's motion to preclude Dr. Cole's and Dr. Mitzenmacher's reliance on testing results in support of their respective opinions on infringement is DENIED. Def.'s Mot. 21-23. This challenge is not so much to the reliability of the experts' testing as it is to the sufficiency of their disclosures of that testing. Federal Rule of Civil Procedure 26 requires a disclosed expert to provide an expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "The purpose of the expert disclosure rule is to 'provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (quoting *Reese v.*

*Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008)). Dr. Cole and Dr. Mitzenmacher each disclosed their testing methodology and the results that they observed. *See* Decl. of Olivia S. Kim ECF 245-2 Exh. 8 (Cole Report) ¶¶ 29-30 (methodology); *see, e.g.*, *id.* ¶¶ 86, 95, 98, 133 (observed results); Kim Decl. Exh. 9 (Mitzenmacher Report) ¶¶ 25-26 (methodology). While Dr. Mitzenmacher's disclosures are somewhat less detailed than those of Dr. Cole, both experts were deposed and thus subjected to unfettered questioning regarding their testing. Decl. of James Hannah ECF 274-1 Exhs. 8, 9. As such, Rule 26 does not mandate exclusion of this evidence. *Cf. Rembrandt Vision Techs.*, 725 F.3d at 1382 (opinion properly rejected on judgment as a matter of law where expert did not disclose *any* testing methodology until cross-examination at trial).

By contrast, Dr. Medvidovic's report discloses no methodology other than to assert that he "personally performed these tests on the Accused Products and will reenact my tests during trial either live or by video during trial." *See* Kim Decl. Exh. 6 (Medvidovic Report) ¶¶ 26-27. Furthermore, as Dr. Medvidovic will not testify concerning infringement, it is not clear whether his test results would even be relevant to his testimony. In any case, because Dr. Medvidovic does not disclose any methodology for his test results, Defendant's motion to exclude his testimony regarding testing is GRANTED.

### B. Opinions of Damages Experts

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Two typical categories of compensation for infringement are the patentee's lost profits and the "reasonable royalty he would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The only measure of damages at issue in this case is a reasonable royalty, which is "merely the floor below which damages shall not fall." *Id.* (quoting *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983)).

"A reasonable royalty may be a lump-sum payment not calculated on a per unit basis," *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014), which is what Plaintiff seeks here. The most common method for determining a reasonable royalty is the hypothetical

1  negotiation approach, which "attempts to ascertain the royalty upon which the parties would have
2  agreed had they successfully negotiated an agreement just before infringement began." *Lucent*
3  *Techs.*, 580 F.3d at 1324. The Federal Circuit has approved application of the non-exhaustive
4  factors identified in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120
5  (S.D.N.Y. 1970), to arrive at a reasonable royalty through hypothetical negotiation, and both
6  parties' damages experts have applied that analysis here. *See* Kim Decl. Exh. 1 (Expert Report of
7  Dr. Anne Layne-Farrar, hereinafter "Layne-Farrar Report") at ¶¶ 102-04; Decl. of James Hannah,
8  ECF 250-1 Exh. 9 (Rebuttal Expert Report and Disclosure of Julie L. Davis, hereinafter "Davis
9  Report") at 17.

10  "When the accused infringing products have both patented and unpatented features,
11  measuring this value requires a determination of the value added by such features." *Ericsson, Inc.*
12  *v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). "Indeed, apportionment is required
13  even for non-royalty forms of damages: a jury must ultimately 'apportion the defendant's profits
14  and the patentee's damages between the patented feature and the unpatented features' using
15  'reliable and tangible' evidence." *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 120 (1884)).
16  Here, both parties' experts agree that the hypothetical negotiators would have determined a royalty
17  rate and multiplied it by a properly apportioned royalty base (representing the portion of a
18  product's revenue attributable to the infringing features) in order to arrive at a reasonable royalty
19  for the patents-in-suit. Layne-Farrar Report ¶ 149; Davis Report at 20.

20  Thus, to be admissible under Rule 702, "expert testimony opining on a reasonable royalty
21  rate must 'carefully tie proof of damages to the claimed invention's footprint in the market
22  place.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (quoting
23  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). Nevertheless, the Court is
24  cognizant that "[d]etermining a fair and reasonable royalty is often . . . a difficult judicial chore,
25  seeming often to involve more the talents of a conjurer than those of a judge." *ResQNet.com*, 594
26  F.3d at 869 (quoting *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed.
27  Cir. 1988)); *see also Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). As
28  such, the Court excludes speculation but allows hypothesized damages sufficiently grounded in

fact to reach the jury.

### i. Plaintiff's Motion to Exclude Opinion of Ms. Davis

Plaintiff advances five challenges to the damages opinion proffered by Defendant's expert, Ms. Julie Davis, in large part directed toward her various methods of apportioning accused product revenues to account only for the infringing features. The Court addresses each in turn.

### a. Apportionment Based Upon Percentage of Source Code

Plaintiff argues that Ms. Davis's apportionment of the royalty base using the percentage of each accused product's source code attributable to the feature(s) accused of infringing one or more of Plaintiff's patents-in-suit should be stricken because it is based upon unreliable data. Pl.'s Mot. 8-11; *see* Davis Report at 20, 30, 33.

In passing, and without any citation to authority, Plaintiff suggests that the method itself is unreliable because it varies depending on the competency of the programmer. Pl.'s Mot. at 11 ("an accused infringer who has inefficient programmers would pay less in damages because the overall code base would be larger"). This argument has little appeal because an incompetent programmer is likely to be equally incompetent in programming all of an accused product's code, just as an efficient programmer would efficiently program an entire product's code; the percentage of code attributable to a feature would not change. In any case, although the Federal Circuit has indicated that the portion of an accused product's realizable profit attributable to the patentee's technology, "cannot be reduced to a mere counting of lines of code," the court acknowledged that "the glaring imbalance between infringing and non-infringing features must impact the analysis of how much profit can properly be attributed to the use of the [accused feature] compared to non-patented elements and other features of [the accused product]." *Lucent Techs.*, 580 F.3d at 1332-33 (analyzing *Georgia-Pacific* Factor 13). As such, this apportionment method is neither inherently unreliable nor absolutely barred by Federal Circuit precedent.

The remainder of Plaintiff's arguments is directed toward the veracity of the source code percentages that Ms. Davis used in her analysis. Plaintiff contends that Ms. Davis improperly relied upon information given to her by Defendant's counsel, which was only subsequently confirmed by Defendant's technical experts, Drs. Azer Bestavros and Michael Hicks. Pl.'s Mot.

9; *see* Davis Report at 33 nn.168-69. Drs. Bestavros and Hicks, in turn, based their analysis of the percentage of infringing source code on discussions with Defendant's engineers. Plaintiff asserts that the experts could not be fairly cross-examined on this analysis at their depositions. Pl.'s Mot. at 10. Plaintiff therefore submits that the "inability to test the accuracy of information that is the basis for Ms. Davis's apportionment opinion" demonstrates its unreliability. *Id.*

This argument focuses more on a lack of disclosure under Rule 26 and less on the reliability of the factual basis for Ms. Davis's opinion, as "patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) *overruled on other grounds by Williamson v. Citrix Online, LLC*, ---F.3d---, No. 2013-1130, 2015 WL 3687459 (Fed. Cir. June 16, 2015); Fed. R. Evid. 703. The Court thus looks to whether the factual basis for Ms. Davis's opinion was properly disclosed and available for cross-examination. *See Rembrandt Vision Techs.*, 725 F.3d at 1381. As Defendant notes, Plaintiff had complete access to Defendant's source code as well as the opportunity to depose Drs. Bestavros and Hicks concerning their opinions regarding the percentage of source code attributable to the infringing features. Def.'s Opp. 12, ECF 269. Plaintiff appears to suggest, however, that it had no fair opportunity to cross-examine the technical experts because "when Finjan's counsel asked Dr. Hicks at his deposition about how the lines of source code were determined, he answered that he solely relied upon brief conversations with Blue Coat employees who told him the number and they did not inform him of the number of lines of code for other features of the product." Pl.'s Reply 10, ECF 297.

In recognition of the potential prejudice arising from an inability to cross-examine the source of Ms. Davis's data, the Court ordered the parties to submit relevant portions from the depositions of Drs. Bestavros and Hicks along with short supplemental briefing addressing the Rule 26 issue. The supplemental deposition excerpts reveal that Plaintiff had ample opportunity to cross-examine Drs. Bestavros and Hicks regarding the "lines of code they identified, how they were identified and corresponded to the infringing technology," Pl.'s Mot. 10, and that Plaintiff simply did not ask those questions. For example, Plaintiff's counsel questioned Dr. Hicks

9

extensively concerning his review of Defendant's source code and the amount of time that he spent in that review. Def.'s Supp. Br., ECF 363 Exh. A (Hicks Dep.) 336:12-339:15. When asked whether any of Defendant's employees were present, Dr. Hicks answered that none were present during his source code review but that he had conversations with certain engineers regarding the source code. *Id.* 339:19-340:3. The questioning then transitioned into Dr. Hicks's discussions with Defendant's engineers regarding the size of each accused product's source code and the percentage attributable to the infringing features. *Id.* 340:4-349:20. Plaintiff's questions focused on the amount of time that Dr. Hicks spent in conversation with those engineers. Critically, Dr. Hicks did not testify that he *solely* relied on the engineers' information concerning the percentage of infringing code, as Plaintiff claims, nor was he unable to "identify the lines of code, much less provide any information regarding how Blue Coat's engineers came up with the specific number of lines of code," Pl.'s Supp. Br. at 2, ECF 362, because those questions were not asked.[1] Similarly, Plaintiff's questioning of Dr. Bestavros focused on the amount of time that he spent in conversation with Defendant's engineers and not on his own analysis of the source code. *See id.* Exh. 2. Because Plaintiff failed to ask the necessary questions of Drs. Bestavros and Hicks, it cannot now complain of prejudice from the inability to cross-examine them concerning their opinions regarding the infringing lines of source code, particularly—as Defendant represented at oral argument—when the Defendant's source code computer was available during the experts' depositions. The Court therefore finds that the factual basis for Ms. Davis's apportionment opinion was properly disclosed and that she reasonably relied upon the opinions of Drs. Bestavros and Hicks in performing her analysis.

Plaintiff's other major argument against Ms. Davis's opinion is that the identified source code does not "account for all the elements of the asserted patent claims," nor does it account for the other ways in which Plaintiff accuses Defendant's products of infringing the patents-in-suit. Pl.'s Mot. 10-11. These arguments are really disputes concerning the underlying facts: whether and to what extent Defendant's accused products actually infringe the asserted patents. Since

---

[1] Nor did Plaintiff cite to any portion of the deposition transcripts to support this assertion.

1 Defendant disputes the value of Plaintiff's patented technology and whether all elements of the
2 asserted claims are present in its accused products, Ms. Davis's opinion understandably accounts
3 for the facts as her client sees them. "When, as here, the parties' experts rely on conflicting sets of
4 facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's
5 testimony." *Micro Chem.*, 317 F.3d at 1392. That is a determination better left to the jury.

Plaintiff's motion to strike Ms. Davis's apportionment analysis based upon the percentage of infringing source code in each accused product is therefore DENIED.

### b. Apportionment Based Upon WebPulse Categorizations

Plaintiff next challenges Ms. Davis's apportionment of WebPulse revenues based upon the percentage of "suspicious or malicious" categorizations of webpages returned by WebPulse's accused Dynamic Real Time Rating service ("DRTR"). Pl.'s Mot. 11-12. For the reasons stated on the record, this portion of Plaintiff's motion is DENIED.

Ms. Davis based her analysis upon discussions with Roger Harrison, Defendant's Senior Director of Development for WebPulse, who indicated that of the numerous categories that DRTR can use to classify a webpage, only a small number were implicated by Plaintiff's patents-in-suit. Davis Report at 32. Plaintiff asserts that this apportionment methodology does not reliably account for the value of the patented technology. Pl.'s Mot. 12. The Federal Circuit has recognized, however, that "frequency of expected use and predicted value are related" in considering *Georgia-Pacific* Factor 11, which concerns "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Lucent Techs.*, 580 F.3d at 1333 (quoting *Georgia-Pacific*, 318 F. Supp. at 1120). Ms. Davis's valuation based upon the extent to which the '844 Patent is used in WebPulse is therefore appropriate. Davis Report at 50. Plaintiff's assertions that the analysis does not include all patents or claim elements that it asserts are infringed by WebPulse's DRTR and that the few categorizations considered may be of more significant importance to Defendant's customers are more appropriately subjects for cross-examination so that a jury may determine the ultimate question of value. *See* Pl.'s Mot. 12.

### c. Apportionment Based Upon Plaintiff's Patent Portfolio

Plaintiff's third challenge to apportionment focuses on the royalty rate. Pl.'s Mot. 12-15.

For the reasons stated on the record, this portion of Plaintiff's motion is GRANTED.

Ms. Davis apportioned Plaintiff's proposed royalty rate of 6% to 8% by dividing each by 20 in order to account for the value of each asserted patent in this lawsuit as a portion of the 20 patents that Plaintiff has asserted in all litigation thus far. Davis Report at 50. Although Ms. Davis could reasonably rely on the testimony of Plaintiff's own witness that the patents Plaintiff has asserted in litigation are "core" and thus equally valued, her apportionment analysis is an improper use of the "book of wisdom" comprised of post-infringement evidence. *See* Def.'s Opp. 15-16; *see Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698-99 (1933). As Plaintiff notes, the additional 14 patents that Ms. Davis folded into Plaintiff's portfolio include patents asserted in separate litigation against third parties, "largely after the dates of the hypothetical negotiations." Pl.'s Reply 12 (emphasis in original). Plaintiff's future litigation activity is therefore not probative of the value of the patents-in-suit at the time of the hypothetical negotiation.

### d. Non-Infringing Alternatives and Design Arounds

Plaintiff moves to preclude Ms. Davis from relying on any evidence of non-infringing alternatives to the patents-in-suit or design arounds to inform her damages opinion. Pl.'s Mot. 15-17. This issue is DENIED as moot, following the Court's ruling on the parties' *in limine* motions. Order on Mots. *in Limine*, at 4.

### e. Damages in Past Valued Dollars

Finally, Plaintiff seeks to preclude Ms. Davis from opining on the amount of damages that Defendant would owe in past-valued dollars, as opposed to today's dollars. Pl.'s Mot. 17-18. For the reasons stated on the record, this portion of Plaintiff's motion is GRANTED.

Both experts applied the same net present value discount to the hypothesized lump sum payment for damages, but they differed on the scope of the discounted time period. Ms. Davis discounted her royalty payment to the dates of the hypothetical negotiation for each patent. Davis Report at 50-51. Dr. Layne-Farrar discounted to 2014, the beginning of the period for which Plaintiff seeks damages. Layne-Farrar Report ¶ 163. Defendant presents no persuasive authority to indicate that Ms. Davis's discount is more appropriate than Dr. Layne-Farrar's, and presenting

both discount calculations to a jury would be intractably confusing. As Plaintiff seeks damages only for the period beginning with the filing of the complaint in this action, the Court finds Dr. Layne-Farrar's discounting methodology more appropriate to compensate Plaintiff for the value of what was taken through Defendant's alleged infringement. *Lucent Techs.*, 580 F.3d at 1324.

### ii. Defendant's Motion to Exclude Opinion of Dr. Layne-Farrar

Defendant raises four challenges to Dr. Layne-Farrar's damages opinion all targeted at her apportionment of the royalty base for the accused products. The Court addresses each in turn.

### a. Apportionment Using Forward Citation Analysis (Method 1)

Defendant seeks to exclude Dr. Layne-Farrar's first apportionment methodology based upon academic literature suggesting that a patent's value is strongly correlated with the number of times that patent is cited as prior art by future patents. Def.'s Mot. 7-8; Layne-Farrar Report ¶¶ 150-55. Defendant asserts that this so-called forward citation analysis has little meaningful connection to the accused features in this lawsuit. Plaintiff counters that this method is academically accepted, was properly applied in Dr. Layne-Farrar's analysis, and has been accepted by other courts. Pl.'s Opp. 4. Although a qualitative analysis of asserted patents based upon forward citations may be probative of a reasonable royalty in some instances, the Court finds that Dr. Layne-Farrar's application of the analysis in this case must be rejected.

Most problematically, Dr. Layne-Farrar offers no explanation as to why the forward citation methodology is an appropriate measure of the value of the patents at issue in this case. *See* Layne-Farrar Report ¶¶ 150-51. Without facts tying her analysis to the facts of this case, Dr. Layne-Farrar's reliance on a methodology discussed in empirical economics literature has little more probative value than the "25 percent rule of thumb" and Nash Bargaining Solution analyses that the Federal Circuit rejected in *Uniloc* and *VirnetX*. *Uniloc*, 632 F.3d at 1314-15; *VirnetX*, 767 F.3d at 1331-34; *accord LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (rejecting expert's "vague qualitative notions of the relative importance of the [patented] technology" to arrive at a higher royalty rate). For example, two of the patents-in-suit are related and many of Plaintiff's patents reference one another. Surely a patent's objective quality cannot be based on the number of times an inventor cites himself in prosecuting related

13

patents. Further, as Defendant notes, the patent with the highest number of forward citations is (unsurprisingly) the oldest patent in this suit. Def.'s Mot. 8 n.2. Dr. Layne-Farrar's straightforward application of a forward citation analysis without taking into consideration these potential problems renders the method unreliable for failure to specifically tie the methodology to the facts of this case. *Cf. Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 877125, at *2 (N.D. Cal. Mar. 15, 2012) (rejecting forward citation methodology used to rank reexamined patent in a portfolio because expert did not count citations to predecessor patents).

Equally troubling is Dr. Layne-Farrar's assumption of a six-patent portfolio comprised of the six patents-in-suit in her apportionment analysis. Layne-Farrar Report ¶ 155. As Defendant aptly points out, this methodology does not account for the value of the accused features as a portion of the accused products, but rather demonstrates only the value of each patent-in-suit relative to each other. Def.'s Mot. 8.; Def.'s Reply 1-2, ECF 292. As such, Dr. Layne-Farrar's use of the forward citation analysis in her first apportionment methodology does not demonstrate the value of the asserted patents in the marketplace in relation to other patents that cover or potentially cover the infringing and non-infringing features of the accused products. The resulting apportionment demonstrates, at most, the asserted patents' relative value in the abstract, untethered to any of the facts in this case.

Plaintiff's argument that this apportionment method has been accepted by other courts is unpersuasive. Pl.'s Opp. 4-5. Of the two relevant cases that Plaintiff identifies, *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014), concerned standard essential patents, which are not at issue here. Moreover, unlike Dr. Layne-Farrar's analysis, which is conducted in a vacuum, the allowed expert in *GPNE* apportioned the royalty base by considering the "number of patent families included in the standard," thus accounting for the value of the patents-in-suit relative to other patents covering the standard. *Id.* at *7. Plaintiff's reliance on *Triangle Software LLC v. Garmin Int'l, Inc.*, No. 1:10-cv-1457 (E.D. Va.) is similarly unpersuasive, as there the Court refused to exclude Dr. Layne-Farrar's testimony where she conducted a qualitative analysis of the patents-in-suit compared to other patents "within the same technology market" as a basis for concluding that a hypothetical licensee would be willing to pay

more for a higher quality patent. *Daubert* Motion at 13, *Triangle Software*, No. 1:10-cv-1457 (E.D. Va. Sept. 30, 2011), ECF 315; *id.* at ECF 369 (*Daubert* Order). Here, by contrast, Dr. Layne-Farrar compares the forward citations of the patents-in-suit to one another as a method of apportioning a royalty base that quizzically does not take into account the infringing and non-infringing features in the accused products.

In sum, the Court agrees with Defendant that Dr. Layne-Farrar's forward citation method of apportionment fails to "carefully tie proof of damages to the claimed invention's footprint in the *market place*." *ResQNet.com*, 594 F.3d at 869 (emphasis added). As such, Defendant's motion to exclude Dr. Layne-Farrar's first method of apportionment is GRANTED.

### b. Apportionment of Using Totality of Features in Defendant's Products (Method 2)

Defendant challenges Dr. Layne-Farrar's second method of apportionment on the ground that it also fails to account for the patented features of the accused products. Def.'s Mot. 9-11. For the reasons stated on the record, this portion of Defendant's motion is DENIED.

In her second method of apportionment, Dr. Layne-Farrar relied upon a slide from one of Defendant's internal presentations that identifies 24 functions that cover "all features in the full suite of Blue Coat security products." Layne-Farrar Report ¶ 156. The patents-in-suit correspond to or "drive" the functionality of approximately 9 of these 24 functions. Relying on Dr. Medvidovic's report, Dr. Layne-Farrar concluded that the evidence "suggests a per-feature apportionment of sales revenue" and thus apportioned accused product revenue according to the number of functions out of 24 that each patent-in-suit drives. *Id.* ¶ 158. Dr. Layne-Farrar notes that this apportionment approach is "highly conservative because not every accused product has all 24 features, and yet I apply only $1/24^{th}$ for each feature to each accused product." *Id.* ¶ 159. As with Ms. Davis's apportionment based upon lines of infringing code, Dr. Layne-Farrar's second apportionment method may not be perfect, but it reasonably ties the value that Defendant places on product features to the accused products in this case. Any factual challenges to Dr. Layne-Farrar's analysis are better presented to the jury.

The Court notes one concern: it is not clear how Dr. Layne-Farrar arrived at the conclusion

1  that each of the 24 functions identified in Defendant's presentation should be valued equally.
2  Absent foundational facts to support the assumption that the functions are of equal value, this
3  method of apportionment may be unreliable. *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421,
4  2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014); *see also Good Tech. Corp. v. MobileIron, Inc.*,
5  No. 5:12-CV-05826-PSG, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015). In the absence of
6  sufficient factual foundation supporting a simple 1/24 apportionment for each function, the Court
7  will permit Defendant to renew its objection to this apportionment methodology.

### c. Convoyed Sales for the '844 Patent

Defendant challenges Dr. Layne-Farrar's damages calculation for the '844 Patent because she improperly includes convoyed sales revenue. Def.'s Mot. 11-13. For the reasons stated on the record, this portion of Defendant's motion is GRANTED IN PART and DENIED IN PART.

The '844 Patent is allegedly practiced by the WebPulse service, which is not sold alone. Rather, WebPulse must be run on ProxySG with the WebFilter addition or "alternatively, the Cacheflow appliance" not at issue in this case. Layne-Farrar Report ¶ 160. Relying on evidence that "WebPulse is a part of WebFilter" and that Defendant "touts the value of WebPulse," *id.* ¶¶ 57-58, Dr. Layne-Farrar concludes that "a portion of the sales for the ProxySG should be considered as convoyed sales . . . for the '844 Patent," *id.* ¶ 160. Dr. Layne-Farrar thus includes a portion of ProxySG revenues supposedly driven by purchases of WebPulse in determining the appropriate royalty base for the '844 Patent. *Id.* ¶ 161.

As the Federal Circuit has cautioned, "[the] issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 n.9 (Fed. Cir. 1995) (citing *Deere & Co. v. International Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir. 1983)). Here, however, Dr. Layne-Farrar has done just that by using supposedly convoyed sales of ProxySG to expand the royalty *base* for damages in connection with the '844 Patent. Layne-Farrar Report ¶¶ 160-61. To the extent convoyed ProxySG sales could be used to form the royalty base for the '844 Patent, there must be some evidence or analysis indicating that the ProxySG sales were driven by demand for WebPulse and not the other way around. Absent such evidence, including a product that does not

practice the patent at issue and indisputably has an independent use would overcompensate Plaintiff for the alleged infringement of the '844 Patent by WebPulse.

It is unclear to the Court, however, whether Dr. Layne-Farrar also considered anticipated collateral sales of ProxySG in support of her analysis of *Georgia-Pacific* Factor 6 and the royalty *rate* that Defendant would hypothetically have been willing to pay for the '844 Patent. *See* Layne-Farrar Report ¶ 136-37; *see Georgia-Pac.*, 318 F. Supp. at 1120 (Factor 6: "The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."). Because the likelihood of bundled sales is a relevant consideration in the hypothetical negotiation of a reasonable royalty under *Georgia-Pacific*, the Court will permit Dr. Layne-Farrar to address convoyed or bundled sales only in that limited context, and only upon a sufficient factual foundation. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1386 (Fed. Cir. 2001).

### d. Apportionment Using Proposed Original Equipment Manufacturer Software License for WebPulse (Method 3)

Finally, Defendant moves to strike Dr. Layne-Farrar's third apportionment method for WebPulse revenues. Def.'s Mot. 13-14. For the reasons stated on the record, this portion of Defendant's motion is GRANTED.

Dr. Layne-Farrar's third apportionment methodology is based upon a proposal to license WebPulse to original equipment manufacturers. Layne-Farrar Report ¶¶ 121-25. As it is undisputed that WebPulse contains non-infringing features, *see id.* ¶ 53, this method is only reliable if there is evidence to indicate that the suggested value of the license covers only the accused features at issue in this lawsuit or if Dr. Layne-Farrar properly apportioned the suggested license fee to account only for the accused features. There is nothing in Dr. Layne-Farrar's report to that effect other than the conclusory assertion, without citation to any underlying facts or evidence, that "[t]he WebPulse pricing that Blue Coat considered reflects the value of the WebPulse technology embodied by the '844 Patent, the '968 Patent and the '731 Patent." *Id.* ¶ 124. What's more, Dr. Layne-Farrar makes no attempt to apportion the hypothetical WebPulse

17

OEM license to account only for the accused features. As such, Dr. Layne-Farrar's third apportionment method for WebPulse is insufficiently reliable to reach a jury.

## IV. ORDER

For the foregoing reasons, Plaintiff's and Defendant's *Daubert* motions are both GRANTED in PART and DENIED IN PART.

1. Plaintiff's motion to exclude expert testimony is GRANTED with respect to:
   a. Damages expert Ms. Julie Davis's royalty rate apportionment method based upon Plaintiff's patent portfolio; and
   b. Ms. Davis's calculation of a damages amount discounted to the net present value on the date of the hypothetical negotiations for each patent-in-suit.
2. Plaintiff's motion is DENIED as to the remainder.
3. Defendant's motion to exclude expert testimony is GRANTED with respect to:
   a. The opinions of technical experts Drs. Nenad Medvidovic and Eric Cole regarding Defendant's recognition of the importance of Plaintiff's patented technology;
   b. Dr. Medvidovic's testing results;
   c. Damages expert Dr. Anne Layne-Farrar's first apportionment method based on forward citations to the patents-in-suit;
   d. Dr. Layne-Farrar's reliance on convoyed sales of ProxySG to form the royalty base for the '844 Patent; and
   e. Dr. Layne-Farrar's third apportionment method for WebPulse based on a proposed OEM license for the service.
4. Defendant's motion is DENIED as to the remainder.

**IT IS SO ORDERED.**

Dated: July 14, 2015

BETH LABSON FREEMAN
United States District Judge