EDWARD G. POPLAWSKI (State Bar No. 113590)
epoplawski@wsgr.com
OLIVIA M. KIM (State Bar No. 228382)
okim@wsgr.com
BRIAN LAM (State Bar No. 272624)
blam@wsgr.com
S. FERRELL ALMAN, JR. (State Bar No. 287746)
falman@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone:  (323) 210-2900
Facsimile:   (866) 974-7329

VERA M. ELSON (State Bar No. 156327)
velson@wsgr.com
CHRISTOPHER D. MAYS (State Bar No. 266510)
cmays@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone:  (650) 493-9300
Facsimile:   (650) 493-6811

Counsel for Defendant
BLUE COAT SYSTEMS, INC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> BLUE COAT SYSTEMS, INC., a Delaware Corporation, <br><br> Defendant. | CASE NO.: 13-cv-03999-BLF-PSG <br><br> **DEFENDANT BLUE COAT SYSTEMS, INC.'S OPENING BRIEF REGARDING NON-JURY LEGAL ISSUES** <br><br> Date:  September 9, 2015 <br> Time:  9 a.m. <br> Place:  Courtroom 3, 5th Floor <br> Before:  Hon. Beth Labson Freeman |

## <u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>

# **TABLE OF CONTENTS**

I.    PRIORITY DATES FOR THE '844 AND '731 PATENTS ........................................- 1 -

    A.    The Priority Date Of The '844 Patent Is December 22, 1997............................- 1 -

    B.    The Priority Date Of Claims 1 And 17 Of The '731 Patent Is May 3, 2004. ....- 3 -

II.   PROSECUTION HISTORY ESTOPPEL ............................................................- 4 -

    A.    The '844 Patent. ...............................................................................................- 5 -

    B.    The '633 Patent. ...............................................................................................- 6 -

    C.    The '968 Patent. ...............................................................................................- 7 -

    D.    The '780 Patent. ...............................................................................................- 8 -

III.  THE '844 PATENT IS INVALID UNDER SECTION 101 ..................................- 9 -

    A.    Claim 1 Is Patent-Ineligible.............................................................................- 10 -

        1.    *Alice* Step 1: Claim 1 Is Directed To An Abstract Idea. ....................- 10 -

        2.    *Alice* Step 2: The Elements Of Claim 1 Individually And In Combination. ........................................................................................- 11 -

    B.    Claims 15 And 41 Are Likewise Patent-Ineligible. .........................................- 15 -

    C.    Dependent Claims 7 And 11 Are Likewise Patent-Ineligible. ..........................- 16 -

    D.    Preemption. ......................................................................................................- 16 -

IV.   LACHES .............................................................................................................- 17 -

    A.    Finjan's Delay In Filing Suit Was Unreasonable And Inexcusable..................- 17 -

    B.    Finjan's Delay Caused Material Economic Prejudice To Blue Coat. ...............- 20 -

    C.    Finjan's Delay Caused Material Evidentiary Prejudice To Blue Coat..............- 21 -

        1.    Finjan's Former Executives And Employees Were Unable To Provide Testimony Concerning Issues Key To Blue Coat's Claims And Defenses. ..................................................................................- 22 -

        2.    Finjan Failed To Retain Documents Relevant To This Litigation. .......- 24 -

**TABLE OF AUTHORITIES**

**CASES**

*A.C. Aukerman Co. v. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ...............17, 18, 20, 21

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157 (Fed. Cir. 1993) ........................................................................................................................18

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ........................9, 10, 11, 14, 15, 16

*Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296 (Fed. Cir. 2005) ........................4, 5

*Bilski v. Kappos,* 561 U.S. 593 (2010) ...........................................................................................14

*buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350 (Fed. Cir. 2014) ................................................12, 15

*Canton Bio-Med., Inc. v. Integrated Liner Tech., Inc.*, 216 F.3d 1367 (Fed. Cir. 2000)........................................................................................................................5, 7, 9

*Comcast IP Holdings I, LLC v. Sprint Comms. Co. L.P.*, No. 12-205-RGA, 2014 U.S. Dist. LEXIS 96289 (D. Del. July 16, 2014)............................................10, 14

*Content Extraction & Trans. LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014).....................................................................................10, 11, 12

*Dawson v. Dawson*, 710 F.3d 1347 (Fed. Cir. 2013) ...................................................................2, 3

*Digitech Image Techs., LLC v. Elec. for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014)...................................................................................................11, 13, 14

*Festo Corp. v. Shoketsu Kinzoky Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).................4, 5, 6, 8, 9

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995) ................................17

*In re Mulder*, 716 F.2d 1542 (Fed. Cir. 1983) .................................................................................3

*IpLearn v. K12 Inc.*, No. 11-1026-RGA, 2014 U.S. Dist. LEXIS 173850 (D. Del. Dec. 17, 2014) ............................................................................................................15

*Lane & Bodley Co. v. Locke*, 150 U.S. 193 (1893) ........................................................................17

*Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) ........................12, 16

*McRo, Inc. v. Sega of Am., Inc.*, No. CV 12-10327-GW(FFMx), 2014 U.S. Dist. LEXIS 135267 (C.D. Cal. Sept. 22, 2014)...................................................13, 16

*Money Suite Co. v. 21st Century Ins. & Fin. Servs.*, No. 13-984-GMS, 2015 U.S. Dist. LEXIS 8978 (D. Del. Jan. 27, 2015) ............................................................14

*Morales v. Square, Inc.*, No. 5:13-cv-1902-DAE, 2014 U.S. Dist. LEXIS 178525
(W.D. Tex. Dec. 30, 2014) ...............................................................................15

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008) ...................................3, 4

*Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010) ......................................1

*SCA Hygiene Products Atiebolag v. First Qualify Baby Products, LLC*, No. 2013-
1564 (Fed. Cir. Dec. 30, 2014) ........................................................................17

*Scott v. Koyama*, 281 F.3d 1243 (Fed. Cir. 2002) ...........................................................1

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 (Fed. Cir. 2008).........................................1

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ....................................................10

*Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334 (Fed. Cir. 1998) ...........................................17, 18, 20, 21

**STATUTES**

35 U.S.C. § 101 .............................................................................9, 10, 11, 12, 14

35 U.S.C. § 111(b)(5) ............................................................................................1

35 U.S.C. § 112 .............................................................................................3, 4

36 U.S.C. § 119 ................................................................................................2

35 U.S.C. § 119(e)(1) ......................................................................................1, 2

**RULES**

37 C.F.R. § 1.76(b)(5) ......................................................................................2

37 C.F.R. § 1.78(d)(2) ......................................................................................2

I.      **PRIORITY DATES FOR THE '844 AND '731 PATENTS**

"Priority of invention is a question of law, based on findings of evidentiary fact directed to conception, reduction to practice, and diligence." *Scott v. Koyama*, 281 F.3d 1243, 1246 (Fed. Cir. 2002) (citation omitted).  The patentee has the burden to show that the asserted prior art is "not prior art because the asserted claim is entitled to the benefit of an earlier filing date." *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008).  As a matter of law, the priority date of the '844 patent is December 22, 1997 and the priority date of the asserted claims of the '731 patent is May 3, 2004.

A.      **The Priority Date Of The '844 Patent Is December 22, 1997.**

Finjan has put forth two theories to support its contention that the '844 patent is entitled to an earlier effective filing date of November 8, 1996.  Both fail as a matter of law. ***First***, "Finjan contends that the '844 Patent is entitled to an earlier date of invention of November 8, 1996 based on the earlier filing dates of Provisional application No. 60/030,639, and patent applications dated January 29, 1997 and November 6, 1997 that are listed in the first sentence of the specification of the '844 Patent."  (Dkt. 437, Jury Instructions at 38:8-11.)  But claiming priority to a provisional application requires that the applicant file a formal patent application within 12 months of filing the provisional application to be able to claim benefit to the earlier filing date of the provisional application.  35 U.S.C. §§ 111(b)(5), 119(e)(1).  It is undisputed that the Provisional Application No. 60/030,639, listed on the first page of the '844 patent, has a filing date of November 8, 1996, which is over 12 months from the filing of the '844 patent, which is December 22, 1997.  (Ex.[1] 1, '844 patent.)  Finjan recognized this defect during the prosecution of the '844 patent, and filed a "Petition to Amend Priority Claims Listed in Patent."  (Ex. 3 at Finjan-BC 000136-139.)  Finjan specifically admitted that "[t]he first paragraph of the detailed description is being amended to remove the direct claim of priority to provisional application 60/030,639, which had expired before the filing date of this application."  (*Id.* at Finjan-BC 000137.)

---

[1] All exhibits are attached to the Declaration of Olivia M. Kim filed in support of this brief concurrently hereto.

1  Finjan's attempt to claim priority though the other two applications, the 08/964,388 and

2  08/790,097 applications, listed within the "Priority Reference to Related Applications" section of

3  the '844 patent also fails.  (Ex. 1 at 1:5-20.)  Finjan recognized that it had not appropriately

4  claimed priority through these applications during prosecution, and attempted to correct the issue

5  through a certificate of correction, admitting that "[a]lthough priority is still achieved through the

6  chain of priority, it cannot be claimed directly from this [60/030,639 provisional] application."

7  (Ex. 3 at Finjan-BC 000137, 000139.)  Yet this certificate of correction was never approved by the

8  USPTO.  Additionally, Finjan failed to identify any relationship between these applications and

9  the application that led to the '844 patent, namely, whether the '844 patent application is a

10  continuation, divisional, or continuation-in-part of the prior-filed patent applications, as required

11  by statute.  36 U.S.C. § 119; 37 C.F.R. §§ 1.76(b)(5), 1.78(d)(2).

12  ***Second***, "Finjan also contends that the '844 Patent is entitled to the earlier date of

13  invention based on conception of the invention by at least November 8, 1996, and diligence in its

14  reduction to practice of the invention by December 22, 1997."   (Dkt. 437, Jury Instructions at

15  38:11-13.)  Here, Finjan is attempting to impermissibly circumvent the requirements of 35 U.S.C.

16  § 119(e)(1) which it failed to meet, as discussed above.  Additionally, Finjan failed to put forth

17  any evidence of conception or diligence in its reduction to practice.  "[C]onception is complete

18  only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be

19  necessary to reduce the invention to practice, without extensive research or experimentation," and

20  that "[a]n idea is definite and permanent when the inventor has a specific, settled idea, a particular

21  solution to the problem at hand, not just a general goal or research plan he hopes to pursue."

22  *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013) (citation omitted).  The only named

23  inventor of the '844 patent that was presented at trial, Shlomo Touboul, provided no evidence of

24  conception for the '844 patent.  (Dkt. 405, 07/21/15 Trial Tr. at 366:21.)  There was also no

25  evidence of conception provided by Finjan's validity expert, Dr. Trent Jaeger.  (Dkt. 433, 07/31/15

26  Trial Tr. at 1918:8-1919:1.)  Instead, Dr. Jaeger only stated that the '844 patent specification told

27  him that the idea for the patent was disclosed on November 8, 1996 by claiming benefit to the

28  provisional.  (*Id.*)  But he never provided any evidence as to why the disclosure of the November 8,

1996 provisional informed him that one of ordinary skill in the art could reduce the '844 patent's invention to practice without extensive research or experimentation.  *Dawson* at 1352.

In addition, Finjan failed to put forth any evidence of diligence between its alleged date of conception, November 8, 1996, and its reduction to practice by December 22, 1997.   Neither Mr. Touboul nor Dr. Jaeger attempted to provide any such evidence.  Even a two-day period between the alleged date of conception and reduction to practice for which no diligence can be shown has been deemed by the Federal Circuit to be fatal.  *In re Mulder*, 716 F.2d 1542, 1545 (Fed. Cir. 1983).  Accordingly, Finjan's complete lack of evidence as to any diligence is fatal to Finjan's claim of earlier priority date for the '844 patent.

**B.      The Priority Date Of Claims 1 And 17 Of The '731 Patent Is May 3, 2004.**

Finjan failed show that the claims 1 and 17 of the '731 patent are entitled to a priority date earlier than the filing date of the '731 patent—May 3, 2004—which must therefore serve as the priority date for these claims as a matter of law.  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305 (Fed. Cir. 2008) ("When neither the PTO nor the Board has previously considered priority, there is simply no reason to presume that claims in a CIP [continuation-in-part] application are entitled to the effective filing date of an earlier filed application.").  Finjan failed to support its contention "that the '731 Patent is entitled to an effective filing date of November 6, 1997 based on an earlier continuation-in-part patent application [No. 09/539,667] filed on March 30, 2000, which is a continuation of a patent application [No. 08/964,388] filed on November 6, 1997, that are listed in the first sentence of the specification of the '731 Patent."  (Dkt. 437, Jury Instructions at 38:22-26.)  Finjan was required to demonstrate that the '667 and '388 applications (which share the same specification) supported every element of claims 1 and 17 of the '731 patent.  *PowerOasis*, 522 F.3d at 1306 ("It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.") (citation omitted).

The asserted claims 1 and 17 of the '731 patent contain the terms "cache, "file cache," and "security profile cache."  (Ex. 2.)  Claim 1 also contains the term "security policy cache."  (*Id.*)

1    Yet Finjan failed to and cannot show that any of these terms are supported by the disclosure of

2    the '388 application (now U.S. Patent No. 6,092,194) as required by 35 U.S.C. § 112.  *See*

3    *PowerOasis*, 522 F.3d at 1306.  None of these terms appear within the '388 application  (Ex. 8 at

4    FINJAN-BC 062877-926) and Finjan's own expert, Dr. David Lyon, confirmed this at trial (Dkt.

5    433, 07/31/05 Trial Tr. at 1907:6-8.)  In fact, during the prosecution of the '731 patent, Finjan

6    argued that the prior art Ji reference did not disclose a "security profile cache" because "***Ji***

7    ***provides no discussion of a security profile cache, or, for that matter, any cache at all***."  (Ex. 5

8    at FINJAN-BC 000982.)  Thus, Finjan argued that the use a "security profile cache" was essential

9    to distinguishing claims 1 and 17 over prior art, which, according to Finjan, did not disclose this

10   term because it was never mentioned.  But now, Finjan argues that the same term is disclosed by

11   an application that similarly "provides no discussion of a security profile cache, or, for that matter,

12   any cache at all."  (*Id.*)  Accordingly, as a matter of law, Finjan cannot claim any priority date that

13   is earlier than the filing date of the '731 patent, which is May 3, 2004.

14   **II.     PROSECUTION HISTORY ESTOPPEL[2]**

15       "When the patentee responds to the rejection by narrowing his claims, this prosecution

16   history estops him from later arguing that the subject matter covered by the original, broader claim

17   was nothing more than an equivalent.  Competitors may rely on the estoppel to ensure that their

18   own devices will not be found to infringe by equivalence."  *Festo Corp. v. Shoketsu Kinzoky*

19   *Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002).  "Prosecution history estoppel is a legal

20   limitation on the doctrine of equivalents.  Issues relating to the application and scope of

21   prosecution history estoppel, including whether the presumption of surrender of subject matter has

22   arisen and whether it has been rebutted, are questions of law to be decided by the court.  Rebuttal

23   of the presumption may be subject to underlying factual issues, which may properly be decided by

24   the court."  *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1301-02 (Fed. Cir.

25   2005) (citations omitted).  "[T]he patentee . . . bear[s] the burden of showing that the amendment

26   _____

27   [2] Blue Coat moved for judgment as a matter of law ("JMOL") under Rule 50(a) that Finjan did
     not show legally sufficient evidentiary basis for a reasonable jury to find infringement under the
     doctrine of equivalents for the patents-in-suit.  Blue Coat will be renewing its motion for JMOL
28   under Rule 50(b).

1   does not surrender the particular equivalent in question." *Festo*, 535 U.S. at 740.

2       The Supreme Court in *Festo* observed:   "Our 'prior cases have consistently applied

3   prosecution history estoppel only where claims have been amended for a limited set of reasons,'

4   such as 'to avoid the prior art or otherwise to address a specific concern—such as obviousness—

5   that arguably would have rendered the claimed subject matter unpatentable." *Id.* at 735.   The

6   Court further observed that:   "That rationale does not cease simply because the narrowing

7   amendment, submitted to secure a patent, was for some purpose other than avoiding prior art." *Id.*

8   The Court then held that "a narrowing amendment made to satisfy any requirement of the Patent

9   Act may give rise to an estoppel." *Id.* at 736.   Accordingly, "[a] narrowing amendment made for

10  a substantial reason relating to patentability gives rise to a presumption that the patentee has

11  surrendered all subject matter between the original claim limitation and the amended claim

12  limitation.   If the narrowing amendment was the addition of a new claim limitation . . . equivalents

13  are presumptively not available with respect to that limitation." *Biagro Western Sales, Inc.*, 423

14  F.3d at 1305 (citations omitted).   Further, "amendment is not essential when argument is made,

15  and relied on, to distinguish the claimed subject matter from the prior art." *Canton Bio-Med., Inc.*

16  *v. Integrated Liner Tech., Inc.*, 216 F.3d 1367, 1371 (Fed. Cir. 2000) (finding that arguments made

17  to distinguish prior art give rise to estoppel) (citations omitted).

18      As set forth below, Finjan is barred from asserting infringement under the doctrine of

19  equivalents for the asserted claims of the '844, '633, '968, and '780 patents.

20      **A.    The '844 Patent.**

21      Finjan asserted infringement under the doctrine of equivalents only for two limitations

22  found in claim 1 (and also claims 7 and 11, which depend on claim 1) of the '844 patent:   (1)

23  "generating by the inspector a first Downloadable security profile that identifies suspicious code in

24  the receive Downloadable"; and (2) "linking by the inspector the first Downloadable security

25  profile to the Downloadable before a web server makes the Downloadable available to web client."

26  (Dkt. 407, 07/22/15 Trial Tr. at 513:5-515:7, 527:21-529:21.)   Finjan is estopped from asserting

27  doctrine of equivalents for these limitations because they were both narrowed by amendment to

28  avoid prior art during the prosecution of the '844 patent.

**First**, in response to the Office Action dated September 2, 1999, which rejected pending claims in view of a prior art called Atkinson (Ex. 3 at FINJAN-BC 000077-084), Finjan in its November 23, 1999 Amendment and Response amended the following limitation (new additions underlined): "generating a first Downloadable security profile <u>that identifies suspicious code in</u> the received Downloadable." (*Id.* at FINJAN-BC 000087.)  Finjan noted in its response that after an interview with the Examiner, "[a]greement was reached that the claims as amended overcome the art of record [*i.e.*, Atkinson]." (*Id.* at FINJAN-BC 000090.)  **Second**, in response to the Office Action dated February 8, 2000, which rejected pending claims in view of prior art called Ji and in view of combination of Ji and Atkinson (*id.* at FINJAN-BC 000085-101), Finjan in its May 11, 2000 Amendment and Response amended the following limitation (new additions underlined): "linking <u>by the inspector</u> the first Downloadable security profile to the Downloadable <u>before a web server makes the Downloadable available to web clients</u>." (*Id.* at FINJAN-BC 000104.) Finjan made this amendment to overcome the prior art.  Finjan argued:  "Ji does not teach generating the Downloadable security profile or linking the Downloadable security profile to a Downloadable <u>before the web server makes the Downloadable security profile available to web clients</u>." (*Id.* at FINJAN-BC 000107, emphasis in original.)  Finjan made the same argument with regards to the Atkinson prior art.  (*Id.* at FINJAN-BC 000108.)

Accordingly, doctrine of equivalents is not available to Finjan for the two limitations discussed above under *Festo* because the two limitations were narrowed by amendment during the prosecution of the '844 patent to avoid prior art.  Consequently, Finjan's assertion of infringement under the doctrine of equivalents for claims 1, 7 and 11 of the '844 patent fails as a matter of law.

**B.**    **The '633 Patent.**

Finjan asserted infringement under the doctrine of equivalents only for the following limitation found in claim 14 of the '633 patent:  "causing mobile protection code to be executed by the mobile code executor at a downloadable-information destination such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code."  (Dkt. 407, 07/22/15 Trial Tr. at 610:21-612:14.)  Finjan is estopped from

asserting doctrine of equivalents for this limitation because Finjan made arguments during the prosecution of the '633 to distinguish the claimed subject matter from the prior art.

In response to the Office Action dated February 25, 2009, which rejected the pending claims in view of a prior art called Golan (Ex. 4 at FINJAN-BC 001281-286), Finjan in its May 26, 2009 Amendment and Response argued the following to overcome the Examiner's rejection for the pending claims, including for original claim 30 which later became claim 14:

> In distinction with the claimed invention, ***Golan does not describe the packaging of protection code***.  Instead, Golan discusses a situation whereby a security monitor is already resident on a client computer, as illustrated in FIGS. 2, 5 and 9 of Golan, without concerning itself as to how the security monitor was installed.  In fact, prima facie the methodology of the claimed invention, of packaging mobile protection code with downloadable information, seems wasteful and counter-intuitive, since such ***protection code is typically re-transmitted to the client computer many times - in particular, each time a downloadable with executable code is downloaded***.

(*Id.* at FINJAN-BC 001269, emphasis added.)  Finjan cannot now reclaim this abandoned subject matter by asserting doctrine of equivalents for claim 14 of the '633 patent.[3]  Finjan's arguments made during the prosecution of the '633 patent constitute a clear disclaimer beyond what is literally present in the claims, and Finjan should be estopped from advancing doctrine of equivalents for claim 14 of the '633 patent.  *See Canton*, 216 F.3d at 1371.

## C.     The '968 Patent.

Finjan asserted infringement under the doctrine of equivalents only for the first limitation found in claim 1 of the '968 patent:  "a memory storing cache of digital content, a plurality of policies, and a policy index to the cache contents, the policy index including entries that relate cache content and policies by indicating cache content that is known to be allowable relative to a given policy, for each of a plurality of policies."  (Dkt. 426, 07/24/15 Trial Tr. at 833:5-836:6.) The prosecution history estoppel applies to this limitation because Finjan narrowed this limitation by amendment to avoid prior art during the prosecution of the '968 patent.

---

[3] The same arguments apply to claims 9 and 10 of the '822 patent.  To the extent that Finjan attempts to argue that the jury should have found infringement under the doctrine of equivalents for the '822 patent, Finjan should be estopped from arguing doctrine of equivalents based on argument-based estoppel.

1      In response to the Office Action dated February 9, 2005, which rejected pending claims in

2   view of a prior art called McClain (Ex. 6 at FINJAN-BC 000482-489), Finjan in its May 11, 2005

3   Amendment and Response amended the first limitation of claim 1 as follows (new additions

4   underlined): "a memory storing a cache of digital content, a plurality of policies, and a policy

5   index to the cache contents, the policy index <u>including entries that relate cache content and</u>

6   <u>policies by</u> indicating cache content <u>that is known to be allowable relative to a given policy,</u> for

7   each of a plurality of policies." (*Id.* at  FINJAN-BC 000463.)  This amendment was made to

8   avoid McClain.  Finjan argued that "although McClain does restrict vending of content to a client

9   according to predefined user policies for acceptability, as indicated by the Examiner, McClain

10  does not teach a <u>policy index to cache contents</u> indicating allowable cache content for each of a

11  plurality of policies." (*Id.* at FINJAN-BC 000472, emphasis in original.)  Accordingly, doctrine of

12  equivalents is not available to Finjan for the first limitation of claim 1 under *Festo* because this

13  limitation was narrowed by amendment during the prosecution of the '968 patent to avoid prior art.

14  As such, Finjan's assertion of infringement under the doctrine of equivalents for claim 1 of

15  the '968 patent fails as a matter of law.

16      **D.**      **The '780 Patent.**

17      Finjan asserted infringement under the doctrine of equivalents only for the last limitation

18  found in claim 9 (and also claim 13, which depends on claim 9) of the '780 patent:  "an ID

19  generator coupled to the communications engine that fetches at least one software component

20  identified by the one or more references, and for performing a hashing function on the

21  Downloadable and the fetched software components to generate a Downloadable ID."  (Dkt. 426,

22  07/24/15 Trial Tr. at 855:17-858:4.)  Finjan is barred from asserting doctrine of equivalents for

23  this limitation because Finjan narrowed this limitation by amendment twice to avoid prior art

24  during the prosecution of the '780 patent.

25      ***First***, in response to the Office Action dated July 1, 2013, which rejected pending claims

26  in view of a prior art called Apperson and in view of combination of Apperson and Khare (Ex. 7 at

27  FINJAN-BC 000353-357), Finjan in its August 4, 2003 Amendment and Response amended

28  original claim 11, which later became claim 9, as follows (new additions underlined):  "an ID

generator coupled to the communications engine for fetching, if the Downloadable includes one or more references to a component, at least one software component identified by the one or more references, and for performing a function on the Downloadable and all fetched software components fetched to generate a Downloadable ID."   (*Id.* at FINJAN-BC 000363.)   In distinguishing Apperson and Khare, Finjan argued that "the present invention fetches software components required by the Downloadable, and performs a hashing function on the Downloadable together with its fetched components."  (*Id.* at FINJAN-BC 000366.)  **Second**, in response to the final Office Action dated October 27, 2003, which again rejected the pending claims in view of Apperson and Khare (*id.* at FINJAN-BC 000375-379), Finjan authorized the Examiner in a telephone interview to make the following amendment to original claim 11, which later became the asserted claim 9:  "an ID generator coupled to the communications engine that fetches for fetching at least one software component identified by the one or more references, and for performing a hashing function on the Downloadable and fetched software components to generate a Downloadable ID."  (*Id.* at FINJAN-BC 000395, Examiner's Amendment; *see also* FINJAN-BC 000388.)   The Examiner gave following reason for allowing the pending claims, including the asserted claim 9:  "It was not found to be taught in the art of a downloadable that includes references to software components required to be executed by the downloadable and performing a hashing function on the downloadable and the fetched software component to generate a downloadable ID."  (*Id.* at FINJAN-BC 000396.)

Accordingly, the doctrine of equivalents is not available to Finjan for the last limitation of claim 9 under *Festo* and *Canton* because this limitation was narrowed by amendment and argument during the prosecution of the '968 patent to avoid prior art.  Consequently, Finjan's assertion of infringement under the doctrine of equivalents for claims 9 and 13 of the '780 patent fails as a matter of law.

## III.   THE '844 PATENT IS INVALID UNDER SECTION 101

The Supreme Court recently re-confirmed that "abstract ideas" are an implicit exception to 35 U.S.C. § 101 and are not patent eligible.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct.

2347, 2354 (2014).  The *Alice* Court went on to articulate the proper framework for identifying patent-ineligible claims:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so, we then ask, "[w]hat else is there in the claims before us?"  To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.  We have described step two of this analysis as a search for an "'inventive concept'" – *i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the [ineligible concept] itself."

*Id.* at 2355 (citations omitted) (emphasis added).  As discussed below, applying this test shows that the asserted claims of the '844 patent are directed to patent-ineligible subject matter because they lay claim to the abstract idea of receiving, generating and associating information.

For the purpose of this brief, Blue Coat will focus on claim 1 as a representative claim.  *Content Extraction & Trans. LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1358-59 (Fed. Cir. 2014) (noting that a claim is representative of another claim if the claims are "substantially similar and linked to the same abstract idea.").  Once Blue Coat establishes that invalid claims are representative of the remaining asserted claims, Finjan must show that there are material distinctions between the claims, sufficient to show that the remaining claims are patent eligible, to avoid a ruling of invalidity under Section 101.  *Id.* at 1348.

### A.   Claim 1 Is Patent-Ineligible.

#### 1.   *Alice* Step 1: Claim 1 Is Directed To An Abstract Idea.

Step 1 of the *Alice* framework requires the Court to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014); *see also Comcast IP Holdings I, LLC v. Sprint Comms. Co. L.P.*, No. 12-205-RGA, 2014 U.S. Dist. LEXIS 96289, at *9 (D. Del. July 16, 2014) ("[T]he question for the Court at this juncture is not to determine whether there are sufficient limitations, but instead to determine whether and what is 'the abstract idea at the heart' of the claim.").  Claim 1 of the '844 patent broadly recites:

1. A method comprising:

[a] ***receiving*** by an inspector a Downloadable;

[b] *generating* by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable; and

[c] *linking* by the inspector the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients.

(Ex. 1 at 11:13, emphasis added.)  The "Background" section of the specification states that the benefit of the purported invention over the prior art is that it would be advantageous to "recognize computer viruses" in a downloadable.  (*Id.* at 1:42.)  However, claim 1 does not recite or offer any concrete solution to the problem of recognizing a computer virus in a downloadable.  Nothing in claim 1 recites any specific, identifiable modification or specific improvement to the basic structure of a computer network (or any component thereof) directed to identifying viruses (indeed, none of the asserted claims do so).  Rather, claim 1 is directed to the idea of "receiving" a downloadable, generating some derivative information labeled a "security profile," and then broadly associating the two.  *Digitech Image Techs., LLC v. Elec. for Imaging, Inc.*, 758 F.3d 1344, 1347 (Fed. Cir. 2014) (finding patent ineligible claims "directed to a device profile and a method for creating a device profile within a digital image processing system").

The steps of claim 1 are highly analogous to the steps of claim 1 in *Content Extraction* where the Federal Circuit "agree[d] with the district court that the claims of the asserted patents are drawn to the abstract idea of 1) *collecting* data, 2) *recognizing* certain data within the collected data set, and 3) *storing* that recognized data in a memory. The concept of data collection, recognition, and storage is undisputedly well-known."  776 F.3d at 1347 (affirming finding of patent-ineligibility under §101) (emphasis added).  The addition of a "scanner" to recognize the data was not sufficient to salvage the claims from ineligibility.  *Id.*  Because what is claimed is no more than an abstract idea, Step Two of the Section 101 is analyzed below.

### 2.   *Alice* Step 2: The Elements Of Claim 1 Individually And In Combination.

In Step Two, the individual claim elements are considered to determine whether they add an "inventive concept," or "significantly more" to the abstract idea sufficient to overcome the threshold for patent eligibility required by Section 101.  *Alice*, 134 S. Ct. at 2357.

Element 1[a]:   The step of "receiving" a "Downloadable" (*i.e.*, transmitting the downloadable from a source computer to a destination computer) is acknowledged and described

in the "Background" section of the specification as a known and pre-existing network function. (Ex. 1 at 1:44-47; *see also id.* at 5:8-13 and 5:63-65.)[4]  Thus, by admission in the "Background" section of the specification, receiving a Downloadable cannot be an inventive contribution of the patentee.  *See buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012) ("the inclusion of well-understood, routine, conventional activity previously used in the field is normally not sufficient to transform an unpatentable law of nature [or abstract idea] into a patent-eligible application[.]").  Next, the mere recitation of an "inspector" in this step is merely an abstract label, and in and of itself provides no inventive concept.  Even if a plain English "inspection" of the downloadable were to be implied, the use of a computer to "inspect," or otherwise recognize content is a routine and generic computer function, and thus not sufficient to confer patentability.  *Content Extraction*, 776 F.3d at 1347 (finding patent ineligibility despite the claim limitation of "*recognizing* certain data") (emphasis added).  In sum, this first element adds no inventive concept.

Element 1[b]:  The phrase "Downloadable security profile that identifies suspicious code in the received Downloadable" in claim 1 was construed by the Court as a "a profile that identifies code in the received Downloadable that performs hostile or potentially hostile operations."  (Dkt. 118 at 16.)  First, this construction only addresses the content of the profile itself, and not *how* the profile is generated.  But as to the contents of the claimed profile, the construction of "code. . . that performs *hostile or potentially hostile* operations" offers no meaningful limitation sufficient to confer patentability.  Indeed, any specificity is illusory in that the claim provides no objective limits on what constitutes a "hostile or potentially hostile" operation.  At this step of the Section 101 analysis the Court need not go beyond the language of

---

[4] The term "Downloadable" was agreed by the parties and adopted by the Court as meaning "an executable application program, which is downloaded from a source computer and run on the destination computer," which mirrors the definition provided in the "Background" of the patent at 1:45-47. (Dkt. 118 at 4.)

the claims; but notably with respect to the Supreme Court's heightened concern about preemption, the specification merely provides a laundry list of highly subjective options for the contents of the profile.  It states that the profile may "preferably" include "a list of ***all potentially hostile or suspicious*** computer operations that ***may be*** attempted by the Downloadable."  (Ex. 1 at 4:4-7, emphasis added.)  Nor does the term "suspicious" provide any meaningful limitation.  The specification puts no boundaries on what can be "deemed suspicious" again using only highly subjective words like "undesirable"—thereby leaving the patentee open to "fill in the blanks" later in litigation based upon anything an individual user or system administrator may consider hostile or "suspicious" at any point in time, and consequently improperly preempting a vast range of activity without adequate notice to the public.  (*See id.* at 5:18-24.)

Critically, neither the express language of this step, nor the Court's construction, provides any limitation, restriction or specificity as to ***how*** the profile is ***actually generated***.  The Federal Circuit has held that "a process that employs mathematical algorithms to manipulate existing information to ***generate*** additional information is not patent eligible." *Digitech*, 758 F.3d at 1351 (emphasis added).   The '844 specification broadly states that "***generating*** a Downloadable Security Profile (DSP) [is] based on a ***rules*** base."  (Ex. 1 at 4:2-4.)  It then goes on to say that "[a]ccordingly, the ***rules*** base may include a list of operations and code patterns deemed suspicious, known hostile Downloadables, known viruses, etc.," followed by a breathtakingly expansive list of "Example" rules, including basic file operations (e.g., READ, WRITE, DELETE and RENAME), basic network operation (e.g., LISTEN, CONNECT, SEND data, RECEIVE data), registry operations, operating system operations, and "Resource usage thresholds: memory, CPU and graphics, etc."  (*Id.* at 4:1-34; *see also* 8:51-61.)  In short, the "***rules***" may be whatever the patentee later says they are.  *McRo, Inc. v. Sega of Am., Inc.*, No. CV 12-10327-GW(FFMx), 2014 U.S. Dist. LEXIS 135267, at *27 (C.D. Cal. Sept. 22, 2014) (finding claims "drawn to the idea of automated rules-based use of morph targets and delta sets for lip-synchronized three-dimensional animation" to be patent ineligible because the "claims do not require any particular rules.").  Claim 1 is not even limited to the use of ***any*** rules, much less any specific rule(s).  The profile need only be "generated"—the epitome of an abstract concept;

1   *ergo* this element adds nothing as far as an inventive concept. *Digitech*, 758 F.3d at 1350 ("Data

2   in its ethereal, nonphysical form is simply information that does not fall under any of the

3   categories of eligible subject matter under *section 101*.") (emphasis in original).

4        **Element 1[c]**: The "linking" step requires the inspector to link the downloadable to the

5   "security profile" before the downloadable is made available to web clients. However, calling

6   the profile a "security profile" does not salvage the claims from patent ineligibility. At best, the

7   term "security profile" suggests that claim is limited to a particular technological environment

8   (*i.e.*, network security). *Alice*, 134 S. Ct. at 2358 ("the prohibition against patenting abstract

9   ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular

10  technological environment.") (quoting *Bilski v. Kappos,* 561 U.S. 593, 610-11 (2010) (brackets

11  in original)); *see also Comcast IP Holdings,* 2014 U.S. Dist. LEXIS 96289, at *14-15 ("Here, the

12  generic references to a telephony network and an application [in Finjan's case, a network

13  security application] are not sufficient to render the claim patentable.").

14       As to "linking," the patentee left itself open to accuse linking by any manner of

15  ***association***. (Ex. 1 at 6:13-24.) The patentee does not purport to have invented the idea of

16  linking or associating two items of computerized information, expressly conceding that "***one***

17  ***skilled in the art*** will recognize that the [Downloadable Security Profile] can be linked to the

18  Downloadable [] using other techniques." (*Id.*)  *Money Suite Co. v. 21ˢᵗ Century Ins. & Fin.*

19  *Servs.*, No. 13-984-GMS, 2015 U.S. Dist. LEXIS 8978, at *11 (D. Del. Jan. 27, 2015) ("But

20  Money Suite does not contend that it 'invented' any of these limitations"). Thus the "linking"

21  step cannot be an inventive concept.  When these application-specific labels and routine

22  functions are set aside, this step boils down to ***associating*** in some unspecified way computer-

23  generated information (the "profile") with a downloadable from a generic "web server" and

24  destined for generic "web clients." The Court's construction adds that the web server is a "non-

25  networked gateway" web server—in effect any gateway web server out on the Internet.

26  However, as the Supreme Court held in *Alice*, the addition of a conventional component, such as

27  a computer or server, does not transform the claim into a patentable invention. *Alice*, 134 S. Ct.

28  at 2358 ("the mere recitation of a generic computer cannot transform a patent-ineligible abstract

idea into a patent-eligible invention."); *see also buySAFE,* 765 F.3d at 1354.  There is nothing unconventional added by the "web server" or "web clients" limitation.  *See IpLearn v. K12 Inc.*, No. 11-1026-RGA, 2014 U.S. Dist. LEXIS 173850, at *16 (D. Del. Dec. 17, 2014) (That the claimed steps are an abstraction, "is apparent when the steps are summarized without their generic references to computers and networks").  Again, there is no unique or distinct "inventive concept" supplied by this element.

The "Ordered Combination" of Elements:  Consistent with the framework outlined in *Alice*, the next consideration is whether the combination of elements of Claim 1 is sufficient to ensure that the claim amounts to ***significantly more*** than a claim upon an ineligible concept.  134 S. Ct. at 2355.  In this case, the combination of claimed steps fails to independently provide any synergistic or "inventive concept."  This is apparent when one considers the articulated goal of the purported invention.  *See Morales v. Square, Inc.*, No. 5:13-cv-1902-DAE, 2014 U.S. Dist. LEXIS 178525, at *16 (W.D. Tex. Dec. 30, 2014).  The "Background" section of the patent identifies the problem as the purported inability of existing systems to "recognize computer viruses."  (Ex. 1 at 1:42.)  But the core holding of *Alice* teaches that a patentee cannot simply identify a problem and then claim an abstract solution.  Finjan hereby seeks to broadly preempt any and all manner of identifying the presence of not only a virus, but any and all content subjectively "deemed suspicious" by an accused infringer.  The relevant question here is whether claim 1 does more than simply instruct a practitioner to implement the abstract idea of allowing a user to receive, generate and then associate computerized information.  It does not.  Thus, the elements of claim 1, taken in combination, do not yield any synergies or provide an actual improvement to existing computer networks.  Thus, claim 1 should be held patent-ineligible.

## B.  Claims 15 And 41 Are Likewise Patent-Ineligible.

The attached chart of the independent claims, Ex. 9, shows that independent claims 15 and 41 are directed to the same abstract concept of receiving, generating and linking information, and in effect merely say "apply it" to a computer network.  *Alice*, 134 S. Ct. at 2358 ("Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility.") (citations omitted).  Claim 15 adds a memory for storing a "***rule set***," followed by a "content inspection

engine for using the first *rule set* to generate a first Downloadable security profile[.]"   As discussed above, the addition of a "rule set" for generating the profile adds no meaningful limitation since the patentee failed to include any specific rules, thereby attempting to pre-empt the use of any and all rules.  *McRo*, 2014 U.S. Dist. LEXIS 135267, at *32.  Claim 41 is simply a cognate of claim 1 that adds a "computer-readable storage medium" term.  Again, the addition of a generic computer component such as a memory or storage medium is not an inventive concept.  Nor does rewording a method claim into an apparatus claim confer patent eligibility.  *Alice* at *2360 ("[T]he system claims are no different from the method claims in substance.").

**C.**     **Dependent Claims 7 And 11 Are Likewise Patent-Ineligible.**

Claim 7 adds that the "Downloadable includes a JavaScript™ script."  However, the "Background" of the '844 patent concedes that JavaScript™ scripts were developed by Sun Microsystems, Inc. (as evidenced by the Trademark symbol).  (Ex. 1 at 1:51.)  Thus, the addition of this element alone and/or in combination with the other elements of claim 1 add no inventive concept.   Claim 11 only adds that the profile "includes a list of operations deemed suspicious."  This element suffers from the same infirmities discussed above, including that (i) this element is directed to the content of the profile, and provides no specificity as to how that profile is generated in the first place; (ii) the phrase "deemed suspicious" again begs the question of by whom, and is open-ended; and (iii) creating a list of operations is a generic and routine computer function, particularly in light of the expansive list of "Examples" that the specification provides.  (Ex. 1 at 4:1-34.)  In sum, these dependent claims therefore add no inventive concept.

**D.**     **Preemption.**

The astounding breadth of Finjan's patent claims should trigger the very concern the Supreme Court articulated in its *Alice* decision; namely, the preemption of legitimate, innovative techniques and structures designed to actually improve a network to address the deficiencies that the patents purport to address, but never actually claims how to solve.  134 S. Ct. at 2354; *see also Mayo*, 132 S. Ct. at 1294.   Finding these claims to be patent eligible will result in

preempting a broad swath of network security-based innovation without the *quid pro quo* of any inventive contribution to the art in return.

## IV.     LACHES[5]

Laches is a long-recognized defense to a patent infringement action that arises when a patent holder "neglect[s] or delay[s] in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992).  In order to prove laches, a defendant must establish two elements:  (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) the delay resulted in material prejudice or injury to the defendant.   *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).   These elements must be proven by a preponderance of the evidence. *Aukerman*, 960 F.2d at 1045.  The application of the doctrine of laches falls within the sound discretion of the trial court, and the district court must look to all the facts and circumstances of the case and weigh the equities of the parties.  *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995).  If established, longstanding Supreme Court precedent holds that this equitable defense may bar a patent holder's entitlement to prospective relief, including injunctive relief, in addition to relief for infringing acts occurring prior to the commencement of suit.  *See Lane & Bodley Co. v. Locke*, 150 U.S. 193, 200 (1893) (affirming denial of relief in view of "the long period that plaintiff permitted to elapse before he resorted to his legal remedy").[6]

### A.     Finjan's Delay In Filing Suit Was Unreasonable And Inexcusable.

Finjan's delay in filing suit is presumed by law to be unreasonable and inexcusable because Finjan knew or should have known about Blue Coat's alleged infringement on or before

---

[5] Blue Coat will provide more evidence in support of laches at the scheduled laches bench trial on September 9, 2015.

[6] On December 30, 2014, the Federal Circuit granted the petition for rehearing en banc to reassess current laches law.  *SCA Hygiene Products Atiebolag v. First Qualify Baby Products, LLC*, No. 2013-1564 (Fed. Cir. Dec. 30, 2014).

the date of first alleged infringement for each of the patents.  *See Aukerman*, 960 F.2d at 1032 ("The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit.").   Constructive knowledge of the alleged infringement arises where the plaintiff would have reasonably been expected to inquire about the subject matter, such as in the case of "pervasive, open, and notorious activities" that a reasonable patentee would suspect were infringing.  *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). Indeed, patent owners have a duty to police their rights, and as the Federal Circuit instructed in *Wanless*, "a reasonable patentee, motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor."  *Wanless*, 148 F.3d at 1339.  Accordingly, constructive knowledge may be imputed to a plaintiff even where the plaintiff "***has no actual knowledge*** of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor.   The patentee who is negligently or willfully oblivious to these types of activities cannot later claim his lack of knowledge as justification for escaping the application of laches . . . ."  *Id.* at 1338 (emphasis added).  For each of the respective accused products, Finjan has alleged the first use of the allegedly infringing features of the accused products began on the following dates (Dkt. 244-6, Layne-Farrar Report at p. 53):

| Patent | Issue Date | Alleged First Use |
| --- | --- | --- |
| '844 | Nov. 28, 2000 | April 2008 |
| '780 | Oct. 12, 2004 | Early 2004 |
| '968 | Nov. 15, 2005 | April 2008 |
| '822 | June 6, 2006 | 2007 |
| '731 | Aug. 26, 2008 | April 2008 |
| '633 | Jan. 12, 2010 | 2007 |

The Finjan documents and testimony showing Finjan's activities in monitoring Blue Coat's products and technologies demonstrate that Finjan cannot justify its delay in filing suit against Blue Coat:

- **December 31, 2002**:  Finjan and Blue Coat entered into an OEM Agreement for the resale of Finjan's "SurfinGate" product.  (Ex. 13; ¶ 14 to Kim Decl.)

- **October 10, 2005**: Finjan's CTO reports to Finjan's CEO concerning ███████████ ████████████████████████████. (Ex. 14; ¶ 15 to Kim Decl.)

- **October 2006**: Finjan performs competitive landscape analysis of several companies in the web security marketplace, including Blue Coat. (Ex. 15 at FINJAN-BC039880; ¶ 16 to Kim Decl.)

- **October 2007**: Finjan performs competitive analysis of Blue Coat, including an analysis of the accused ProxySG, ProxyAV, WebFilter, and DRTR technologies. (Ex. 16; ¶ 17 to Kim Decl.) Finjan specifically notes that Blue Coat's DRTR offers a "unique, patented technology that can actually categorize web sites "on the fly." (*Id.* at FINJAN-BC 166270.)[7]

- **September 9, 2008**: Finjan board meeting discusses ███████████████████ ████████████████████████████, which Finjan characterized as including Blue Coat. (Ex. 17 at FINJAN-BC 166225, 228–229; ¶ 18 to Kim Decl.)

- **November 8, 2008**: Finjan board meeting discusses Blue Coat as part of the Secure Web Gateway market for enterprises, as well as Gartner, IDC, and Infonetic's discussion of the Secure Web Gateway Market, which included Blue Coat. (Ex. 18 at FINJAN-BC 088486–487, 492; ¶ 19 to Kim Decl.) The board meeting also included a discussion of ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ (*Id.* at FINJAN-BC 088517, 524, 526.)

- **November 2, 2009**: In connection with the sale of its operating assets, Finjan executed a Patent License Agreement with M86 Security, Inc., in which Blue Coat is listed as an "Excluded Person" for the purposes of the license. (Ex. 19 at FINJAN-BC 027153; ¶ 20 to Kim Decl.)

- **March 2012**: In connection with Trustwave Holdings, Inc.'s purchase of M86 Security, Inc., Finjan executed an Amended and Restated Patent License Agreement, in which Blue Coat was again listed as an "Excluded Person" for purposes of the license. (Ex. 20 at FINJAN-BC 030476; ¶ 21 to Kim Decl.)

Apart from the documentary evidence demonstrating Finjan's pattern of following Blue Coat and its products, a number of former Finjan employees confirmed the existence of Finjan's practices of monitoring Blue Coat's products. For example, Finjan's former CTO, Yuval Ben-Itzhak, testified concerning: Finjan documents discussing and analyzing Blue Coat and its products, Finjan's knowledge of and analysis of Blue Coat and its products, Finjan's monitoring of Blue Coat and its products, his work with the external legal team concerning Finjan's intellectual property, Finjan's acquisition of a physical Blue Coat product, Finjan's alleged

---

[7] Finjan also had possession of Blue Coat documents concerning ProxySG, ProxyAV, and DRTR technology dated from 2007 to 2011. (Exs. 38-40; ¶¶ 39-41 to Kim Decl.)

1   partnership with Blue Coat, and its discussion of Blue Coat at Board of Director meetings.[8]

2   Importantly, throughout this time period of 2002 to the sale of its assets in 2009, Finjan

3   considered Blue Coat to be a business and technology partner.  (Dkt. 405, 07/21/15 Trial Tr. at

4   333:10-333:22.)  Indeed, Finjan's CEO, Phil Hartstein, testified as to Finjan's belief that "the

5   moment" that the alleged partnership ended and Blue Coat allegedly "launched products similar

6   to what Finjan had invented, they became a patent infringer."  (*Id.* at 333:20-333:22.)  Similarly,

7   Mr. Ben-Itzhak, testified that during his time at Finjan he believed that Finjan and Blue Coat

8   "were partners but [] also were competitors."  (Ex. 21, 12/17/14 Ben-Itzhak Dep. Tr. at 220:5-

9   220:10.)

10      Despite's Finjan's ongoing monitoring of Blue Coat's products from 2002 until present,

11   Finjan did not file suit against Blue Coat until almost ten years later, on August 28, 2013.  Given

12   the abundance of evidence and testimony demonstrating Finjan's actual or constructive

13   knowledge of Blue Coat's allegedly infringing activity, Finjan cannot show that its delay was

14   legally justified.  At the very least, in light of Finjan's monitoring and analysis of Blue Coat's

15   products, Finjan's negligent or willful blindness as to Blue Coat's products is no excuse for its

16   delay in filing suit against Blue Coat.  *See Wanlass*, 148 F.3d at 1338.

17      **B.      Finjan's Delay Caused Material Economic Prejudice To Blue Coat.**

18      Economic prejudice may arise where a defendant "will suffer the loss of monetary

19   investments or incur damages which likely would have been prevented by earlier suit."  *Wanlass*,

20   140 F.3d at 1337 (quoting  *Aukerman*, 960 F.2d at 1033).  In determining economic prejudice,

21   courts look for a change in the economic position of the alleged infringer during the period of

22   delay.  *Aukerman*, 960 F.2d at 1033.  However, "this does not mean that a patentee may

23   intentionally lie silently in wait watching damages escalate . . . particularly where an infringer, if

24   he had had notice, could have switched to a noninfringing product."  *Id.*

25   _____

26   [8] Ex. 21, 12/17/14 Ben-Itzhak Dep. Tr. at 163:19-165:19, 165:20-166:7, 169:8-171:11, 172:3-
    174:22, 175:22-176:22, 178:15-178:23, 179:18-180:9, 187:11-187:22, 188:18-188:23, 191:16-

27   192:3, 195:18-196:15, 198:5-200:2, 200:10-200:15, 205:1-206:17, 206:20-208:3, 212:16-213:21,
    219:8-219:11, 220:5-220:10, 234:15-234:18, 233:25-235:7, 235:23-236:17, 249:5-250:2, 256:13-

28   256:24, 257:1-257:16, 264:24-265:14, 315:23-316:1, 317:2-7.

1    By the time Finjan filed suit on August 28, 2013, Blue Coat had long been selling the

2  majority of the accused products, including ProxySG, ProxyAV, WebFilter, and WebPulse, and

3  it completed the acquisition of the Malware Analysis Appliance ("MAA") technology in

4  December 2013.  Furthermore, during the period of Finjan's delay in filing suit, Blue Coat spent

5  hundreds of millions of dollars developing and introducing into the market the products that are

6  now accused of infringement.  For example, Blue Coat's product development efforts have

7  included the following acquisitions: (1) in 2003, Blue Coat acquired Ositis Software, Inc., whose

8  WinProxy product would form the basis for Blue Coat's ProxyAV product (Ex. 11, 10/30/14

9  Schoenfeld Dep. at 150:4-150:21); (2) in 2004, Blue Coat acquired Cerberian, Inc., whose DRTR

10  technology was one of the bases for the continued development of Blue Coat's WebPulse

11  technology (Ex. 12, 11/06/14 Harrison Dep. at 10:15–12:1); (3) in December 2013, Blue Coat

12  acquired Norman Shark, whose technology evolved into Blue Coat's MAA (Dkt. 427, 07/27/15

13  Trial Tr. at1173:12–1173:20).  Throughout this time period, Blue Coat continued in the research

14  and development of its other products and services, including the ProxySG product.  (Dkt. 430,

15  07/28/15 Trial Tr. at 1350:10–1350:22.)  If Finjan had filed suit or contacted Blue Coat at an

16  earlier time, Blue Coat would have had the option to invest its resources into alternative non-

17  infringing technologies and structure its business and development accordingly.   Finjan,

18  however, did not timely file suit—rather, it lay in waiting for almost a decade, during which time

19  Blue Coat continued to develop and acquire the products and services that have been accused of

20  infringement in this case.  Because Blue Coat expended substantial resources in the development

21  and marketing of these accused products, Finjan's delay has caused Blue Coat substantial,

22  material economic prejudice.

23    **C.    Finjan's Delay Caused Material Evidentiary Prejudice To Blue Coat.**

24    Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and

25  fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of

26  memories of long past events, thereby undermining the court's ability to judge the facts."

27  *Wanlass*, 148 F.3d at 1337 (quoting *Aukerman*, 960 F.2d at 1033).  Throughout this litigation,

28  Blue Coat's discovery efforts have been severely prejudiced by Finjan's missing, incomplete, or

1   illegible document productions, as well as Finjan's witness and former employee's complete

2   inability to recall information concerning key issues and documents that are central to a number

3   of Blue Coat's claims and defenses.[9]

4       **1.    Finjan's Former Executives And Employees Were Unable To Provide Testimony Concerning Issues Key To Blue Coat's Claims And Defenses.**

5           On December 17, 2014, Blue Coat deposed Finjan's former CTO, Mr. Ben-Itzhak, whom

6   Finjan identified as knowledgeable concerning the Finjan Vital Security Appliances, which

7   Finjan has asserted as practicing the patents-in-suit.   (Ex. 10, Finjan's Supplemental Initial

8   Disclosures at 3.)  During his deposition, however, Mr. Ben-Itzhak testified that he did not have

9   any detailed understanding of Vital Security, did not know whether any of Vital Security

10  Products ever practiced any of the six asserted patents and does not have the skill set to

11  determine this, and that his recollection of the Vital Security technology would have been much

12  more accurate five years ago.  (Ex. 21, 12/17/14 Ben-Itzhak Dep. Tr. at 145:15-151:9, 260:1-

13  261:1, 261:3-261:12, 294:15-295:2.) Throughout his testimony, Mr. Ben-Itzhak was unable to

14  recall any information concerning a number of key issues that occurred during his time as the

15  CTO of Finjan, including valuations of Finjan's company and patents, Finjan's products,

16  Finjan's marketing documents, Finjan competitive analyses discussing Blue Coat and its

17  products, Finjan's analyses of Blue Coat's products, sales allegedly lost to Blue Coat, Finjan's

18  Board of Directors meetings, and Finjan's IP enforcement strategies.[10]   Similarly, Mr. Ben-

19  Itzhak deferred many of Blue Coat's questions as best answered by Finjan's marketing and

20  product management employees from Finjan's pre-2009 business, and for many of these former

21  employees was unable to provide names or current locations.[11]   Importantly, when questioned as

22  to Finjan's knowledge and analysis of Blue Coat's products, Mr. Ben-Itzhak testified that

23

24  _____

25  [9] *See* Exs. 13-37 and ¶¶ 14-38 to Kim Declaration.

26  [10] Ex. 21, 12/17/14 Ben-Itzhak Dep. Tr. at 98:3-98:24, 145:15-151:9, 156:24-158:16, 166:8-168:6, 181:19-182:20, 186:9-187:2, 192:13-192:24, 211:8-211:16, 249:5-250:2, 250:25-251:5, 252:1-252:9, 264:24-265:14, 315:3-315:18, 317:2-7.

27  [11] Ex. 21, 12/17/14 Ben-Itzhak Dep. Tr. at 101:9-101:25, 112:4-112:23, 113:16-113:25, 125:9-

28  125:25, 126:16-141:10, 153:19-154:5, 154:14-156:12, 252:1-252:9.

1 Finjan's product managers at the time would have been most knowledgeable about the

2 functionality of Blue Coat products.  (*Id.* at 181:6-183:22, 186:9-187:2.)

3       Blue Coat also deposed Finjan's former CEO, Daniel Chinn, who has also served

4 continuously as a Finjan board member since 2005 and was identified by Finjan as the most

5 knowledgeable person regarding the M86 Security, Webroot, Intel, and Trustwave license

6 negotiations.  (Ex. 22, 11/10/14 Chinn Dep. Tr. at 44:16-44:21, 52:20-52:2.)  Throughout his

7 testimony, Mr. Chinn was unable to recall any information concerning a number of key issues

8 that occurred during his CEO and board tenure, including Finjan's competitors, Finjan's products

9 or services, Finjan's customers, Finjan's alleged relationship with Blue Coat, Finjan's suspicions

10 of Blue Coat's alleged infringement, Finjan's document retention practices, Finjan's past

11 licenses and license negotiations, and valuations of Finjan's intellectual property.[12]  Even more

12 troubling is Mr. Chinn's inability to recall specific details concerning the M86 and Trustwave

13 license negotiations, despite having been designated by Finjan as the most knowledgeable person

14 concerning these license negotiations.  (*Id.* at 140:10-140:24, 149:20-150:1, 153:20-154:6,

15 228:18-228:25.)  Indeed, on a number of issues, Mr. Chinn testified to his belief that Finjan's

16 management at the time would be in the best position to provide information concerning these

17 issues.  (*Id.* at 63:18–64:10.)

18       Similarly, Finjan's founder, former CEO, corporate witness, and named inventor, Shlomo

19 Touboul, was unable to recall any information concerning a number of key events and issues that

20 occurred during Mr. Touboul's time at Finjan, including Finjan's analyses and knowledge of

21 Blue Coat's business and products, Finjan's 2002 OEM Agreement with Blue Coat, and Finjan's

22 alleged competition with Blue Coat. [13]  Additionally, Blue Coat deposed Finjan's former

23 President and CEO, Mr. John Vigouroux, who served in those roles from September 2007 to

---

24 [12] Ex. 22, 11/10/14 Chinn Dep. Tr. at 43:6-43:21, 62:11-63:17, 66:11-66:20, 75:3-76:16, 79:11-
25 80:5, 91:10-93:7, 95:5-95:21, 98:4-101:23, 106:16-108:21, 112:3-113:4, 114:5-114:17, 118:20-
26 120:15, 129:11-130:20, 131:23-134:13, 140:10-140:24, 149:20-150:1, 153:20-154:6, 228:18-
228:25.

27 [13] Ex. 23, 12/03/14 Touboul Dep. Tr. at 151:20-152:1, 152:23-153:2, 162:16-163:11, 166:13-
167:4, 172:5-173:7, 173:8-173:10, 174:13-175:2, 176:4-176:12, 176:13-176:23, 178:19-179:24,
28 187:19-187:23, 188:8-188:22, 189:14-189:23, 191:7-191:13.

1   April 2009.  (Ex. 24, 04/07/15 Vigouroux Dep. Tr. at 17:17-17:20.)  Mr. Vigouroux was unable

2   to recall specific information concerning a number of key issues that occurred during his time as

3   Finjan's president and CEO, including Finjan's document retention or litigation hold policies,

4   discussions concerning potential acquisition by a third party, any Finjan communication with

5   Blue Coat, specific competition with Blue Coat, whether any analysis was performed concerning

6   Blue Coat's potential infringement, competitive analyses of Blue Coat, whether Finjan ever

7   tested any Blue Coat products, and Finjan's IP strategy.  (*Id.* at 30:25-31:8, 32:10-32:20, 33:4-

8   33:10, 34:2-34:6, 38:6-38:20, 40:11-40:14, 43:18-44:11, 55:19-56:23.)  Indeed, Mr. Vigouroux

9   confirmed that his memory would have been better if his deposition had occurred closer to 2009

10   and that he was "sure [he] would have been able to explain everything."  (*Id.* at 47:18-48:3.)

11   **2.      Finjan Failed To Retain Documents Relevant To This Litigation.**

12        In addition to the inability of Finjan's witnesses to recall information concerning issues

13   key to this litigation and to Blue Coat's claims and defenses, Blue Coat has been severely

14   prejudiced by Finjan's failure to properly retain documents relevant to this litigation, despite

15   being continuously in litigation against the industry since 2006.  For example, Blue Coat alone

16   produced a 2002 OEM Agreement entered into between Blue Coat and Finjan.   (Ex. 13.)

17   Despite the fact that Finjan itself was a party to this agreement, Finjan failed to produce a

18   counterpart version of this agreement.   Finjan nevertheless relied on this OEM Agreement at

19   trial, with its current CEO testifying concerning the OEM Agreement, despite the fact that

20   Finjan's CEO testified that he was not in any position to interpret or explain that OEM license

21   agreement.  (Dkt. 405, 07/21/15 Trial Tr. at 291:21-292:7, 335:23-336:3.)

22        Importantly, Finjan's own witnesses and former employees (including its corporate

23   representatives) were unable to affirmatively state whether Finjan had previously implemented a

24   document retention policy or whether, in fact, Finjan had retained documents from the time

25   before it sold its operating assets to M86 in 2009.  Finjan's former CEO and longstanding board

26   member, Mr. Chinn, was deposed in 2011, during which he testified that ██████████████

27   ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

1   ███████████████████████████████████████████ (Ex. 25, 12/05/11

2   Chinn Dep. Tr. at 141:10-142:3.)  Mr. Chinn further testified that ███████████

3   ███████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████

5   ██████████████████████████ (*Id.* at 151:20-153:11, 178:4-178:18; *see also* Ex. 26,

6   02/05/12 Chinn Dep. Tr. at 62:12-64:1, 173:15-173:25.)   Similarly, Mr. Ben-Itzhak, when

7   deposed in this litigation, testified that there was a central server in which documents were stored

8   at Finjan, but Mr. Ben-Itzhak did not know whether these documents were archived and whether

9   there was a policy for the retention and storage of documents.  (Ex. 21, 12/17/14 Ben-Itzhak

10  Dep. Tr. at 179:11-181:5.)

11          Aside from the evidentiary prejudice that has affected Blue Coat's ability to develop its

12  defenses and counterclaims, Finjan's delay has caused evidentiary prejudice with regards to Blue

13  Coat's defense under the doctrine of laches itself.  For example, Finjan's presentation from its

14  September 9, 2008 and November 8, 2008 Board of Directors meetings discuss Finjan's

15  ███████████████████████████████████████████████████████████

16  ████████████████████████████████████████████ (Ex. 18 at FINJAN-

17  BC 088524; Ex. 17 at FINJAN-BC 166228–229.)   When questioned on these documents ***in***

18  ***2012***, Finjan's former CTO, Mr. Ben-Itzhak, was unable to recall the specific details or

19  background of these discussions.  (Ex. 27, 03/14/12 Ben-Itzhak Dep. Tr. at 242:6-257:12.)

20  Similarly, Mr. Vigouroux had no recollection of whether, during his time as president and CEO

21  in 2007 to 2009, Finjan had considered bringing other lawsuits apart from its Secure Computing

22  litigation.  (Ex. 24, 04/07/15 Vigouroux Dep. Tr. at 27:20–28:13.)

23          In sum, Finjan's delay in filing this lawsuit was unreasonable as a matter of law and has

24  caused both economic and evidentiary prejudice to Blue Coat.  Finjan is therefore barred under

25  the doctrine of laches from recovering any damages that may have accrued both before and after

26  the date on which Finjan filed this lawsuit.  Further, the doctrine of laches bars Finjan from

27  receiving any equitable relief on the claims brought in this lawsuit.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

DATED:   August 20, 2015          By:   */s/ Olivia M. Kim*
                                        EDWARD G. POPLAWSKI
                                        OLIVIA M. KIM
                                        BRIAN LAM
                                        S. FERRELL ALMAN, JR.
                                        VERA M. ELSON
                                        CHRISTOPHER MAYS

                                        Counsel for Defendant
                                        BLUE COAT SYSTEMS, INC.