EDWARD G. POPLAWSKI (State Bar No. 113590)
epoplawski@wsgr.com
OLIVIA M. KIM (State Bar No. 228382)
okim@wsgr.com
BRIAN LAM (State Bar No. 272624)
blam@wsgr.com
S. FERRELL ALMAN, JR. (State Bar No. 287746)
falman@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

VERA M. ELSON (State Bar No. 156327)
velson@wsgr.com
CHRISTOPHER D. MAYS (State Bar No. 266510)
cmays@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Counsel for Defendant
BLUE COAT SYSTEMS, INC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>BLUE COAT SYSTEMS, INC., a Delaware Corporation,<br><br>Defendant. | CASE NO. 3:13-cv-03999-BLF-PSG<br><br>**DEFENDANT BLUE COAT SYSTEMS, INC.'S OPPOSITION TO PLAINTIFF FINJAN, INC.'S MOTION PURSUANT TO FED. R. CIV. P. 59(e) TO AMEND THE JUDGMENT TO INCLUDE ENHANCED DAMAGES AND PRE- AND POST-JUDGMENT INTEREST**<br><br>Date: April 28, 2016<br>Time: 9 a.m.<br>Place: Courtroom 3, 5th Floor<br>Before: Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

**Page**

I.     FINJAN IS NOT ENTITLED TO ENHANCED DAMAGES ........................................... 1

    A.     Finjan Did Not Assert Willful Infringement. .......................................................... 2

    B.     The *Read* Factors Do Not Warrant Awarding Of Enhanced Damages. .................. 4

II.    FINJAN IS NOT ENTITLED TO PRE-JUDGMENT INTEREST ................................. 19

    A.     Finjan's Conduct And Delay In Filing Suit Warrants A Denial Of Pre-Judgment Interest. .......................................................................................... 19

    B.     If Prejudgment Interest Is Awarded, It Should Be Limited To The Amount Of Damages Prior To Entry Of Judgment. ........................................................... 20

    C.     If Awarded, Prejudgment Interest Should Be Limited To The Originally Requested Damages For The '731, '633, And '968 Patents. ............................... 21

    D.     Prejudgment Interest For The '844 Patent Damages Award Should Be Limited. ............................................................................................................ 22

    E.     If Prejudgment Interest Is Awarded, It Should Be Awarded At T-Bill Rate. ........ 23

III.   POST-JUDGMENT INTEREST ............................................................................. 25

IV.    CONCLUSION .................................................................................................... 25

1

## <u>TABLE OF CONTENTS</u>

2

Page(s)

3

### CASES

*AAT Bioquest, Inc. v. Texas Fluorescence Labs., Inc.*,
  No. 14-cv-03909-DMR, 2015 WL 7708332 (N.D. Cal. Nov. 30, 2015) ............................18

*Adaptix, Inc. v. Apple, Inc.*,
  No. 5:13-cv-01776-PSG, 2015 U.S. Dist. LEXIS 117275 (N.D. Cal. Sept. 2,
  2015)........................................................................................................................................12

*Aevoe Corp. v. AE Tech. Co.*,
  727 F.3d 1375 (Fed. Cir. 2013) .................................................................................................3

*Allen Archery, Inc. v. Browning Mfg. Co.*,
  898 F.2d 787 (Fed. Cir. 1990)..................................................................................................24

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ...............................................................................................10

*Apple, Inc. v. Samsung Elecs. Co.*,
  67 F. Supp. 3d 1100 (N.D. Cal. 2014) .....................................................................................24

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 479 (1961) ...................................................................................................................2

*Asetek Danmark A/S v. CMI U.S., Inc.*,
  No. 13-cv-457-JST, 2015 U.S. Dist. LEXIS 52989 (N.D. Cal. Apr. 21,
  2015)..........................................................................................................................................5

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*,
  923 F.2d 1576 (Fed. Cir. 1991) .................................................................................................2

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  No. 2014–1492, 2015 U.S. App. LEXIS 13622 (Fed. Cir. 2015)..............................................2

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  No. 09-290, 2014 U.S. Dist. LEXIS 43042 (W.D. Pa. Mar. 31, 2014).....................................20

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ...............................................................................................20

*DataTreasury Corp. v. Wells Fargo & Co.*,
  No. 2:06-CV-72 DF, slip op. (E.D. Tex. Aug. 3, 2011)...........................................................20

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  No. 2:06-CV-42-JRG, Dkt. 533 (E.D. Tex. June 20, 2013)....................................................21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Dowling v. United States*,
    473 U.S. 207 (1985) ........................................................................................2

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) ........................................................................................3

*Finjan Software, Ltd. v. Secure Computing Corp.*,
    No. 06-369, 2009 WL 2524495 (D. Del. Aug. 18, 2009) ...............................23

*Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010) ....................................................................18

*Gen. Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983) .............................................................16, 19, 20, 21, 22, 25

*Global Traffic Techs, LLC v. Morgan*,
    No. 2015-1537, 2015 U.S. App. LEXIS 9281 (Fed. Cir. 2015)........................2

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    769 F.3d 1371 (Fed. Cir. 2014) ...................................................................2, 3

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    No. 14-1514 (S. Ct. 2014) ...............................................................................3

*Highmark Inc. v. Allcare Health Management Sys., Inc.*,
    134 S. Ct. 1744 (2014) ....................................................................................3

*Humanscale Corp. v. CompX Intern., Inc.*,
    No. 3:09-cv-86, 2010 U.S. Dist. LEXIS 86396 (E.D. Va. Aug. 23, 2010).........20

*I, LLC v. Sprint Communications Co.*,
    No. 12-CV-0205-RGA, 2015 WL 4730899 (D. Del. Aug. 10, 2015)...............21

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ......................................................................17

*In re Seagate Technology, LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ................................................................2, 3, 4

*Japan Cash Mach. Co. v. MEI, Inc.*,
    No. 2:05-cv-01433-RCJ-RJJ, 2009 U.S. Dist. LEXIS 133657 (D. Nev. Sept.
    17, 2009)....................................................................................................23, 24

*Jurgens v. CBK, Ltd.*,
    80 F.3d 1566 (Fed. Cir. 1996) ........................................................................2

*K-Tec, Inc. v. Vita-Mix Corp.*,
    696 F.3d 1364 (Fed. Cir. 2012) ......................................................................2

*Kaufman Co v. Lantech, Inc.*,
    807 F.2d 970 (Fed. Cir. 1986) ......................................................................18

*Kilopass Tech., Inc. v. Sidense Corp.*,
    738 F.3d 1302 (Fed. Cir. 2013) ..................................................................................4

*Laitram Corp. v. NEC Corp.*,
    115 F.3d 947 (Fed. Cir. 1997) ..................................................................................23

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
    No. 03-927-GMS, 2005 WL 1331216 (D. Del. June 6, 2005)...........................................10

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    449 F.3d 1209 (Fed. Cir. 2006) ..................................................................................2

*Mars, Inc. v. Coin Acceptors*,
    513 F. Supp. 2d 128 (D.N.J. 2007) ....................................................................24, 25

*Mondis Tech. Ltd. v. Chimei Innolux Corp.*,
    No. 2:11-CV-378-JRG, 2012 WL 1554645 (E.D. Tex. June 20, 2013) ...........................21

*Mondis Tech. Ltd. v. LG Elecs., Inc.*,
    No. 2:07-CV-565-TJW-CW, slip op. (E.D. Tex. Aug. 30, 2011).....................................21

*Nichia Corp. v. Seoul Semiconductor Ltd.*,
    No. C-06-0162 MMC, 2006 U.S. Dist. LEXIS 29959 (N.D. Cal. May 9,
    2006) ....................................................................................................................4

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ..........................................................................................3, 4

*Odetics, Inc. v. Storage Technology Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999) ..................................................................................19

*Phelps v. Alameida*,
    569 F.3d 1120 (9th Cir. 2009) ..................................................................................3

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992).......................................................2, 3, 4, 5, 11, 17, 18, 19

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
    950 F. Supp. 2d 876 (E.D. Va. 2013)..........................................................................2

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
    563 F.3d 1358 (Fed. Cir. 2009) ..................................................................................5

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995)....................................................................................25

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*,
    No. 2013-1564, 2015 U.S. App. LEXIS 16621 (Fed. Cir. Sept. 18, 2015) .........6, 11, 15, 16

*Server Tech. Inc. v. Am. Power Conversion Corp.*,
    No. 3:06-CV-00698-LRH-VPC, 2015 U.S. Dist. LEXIS 41987 (D. Nev.
    Mar. 31, 2015) ................................................................................................................23

*Seymour v. McCormick*,
    57 U.S. 480 (1854) ..........................................................................................................4

*Southwest Efuel Network, L.L.C. v. Transaction Tracking Techs., Inc.*,
    No. 2:07-cv-311-TJW, 2010 U.S. Dist. LEXIS 37029 (E.D. Tex. Jan. 13,
    2010) ................................................................................................................................2

*Stragent, LLC v. Intel Corp.*,
    No. 6:11-cv-421, 2014 U.S. Dist. LEXIS 169080 (E.D. Tex. Aug. 6, 2014) .....................12

*Stryker Corp. v. Zimmer, Inc.*,
    No. 14-1520 (S. Ct. 2014) ................................................................................................3

*Studiengesellschaft Kohle v. Dart Indus.*,
    862 F.2d 1564 (Fed. Cir. 1988) .....................................................................................23

*Turner v. Burlington N. Santa Fe R. Co.*,
    338 F.3d 1058 (9th Cir. 2003) .........................................................................................3

*Underwater Devices, Inc. v. Morrison-Knudsen Co.*,
    717 F.2d 1380 (Fed. Cir. 1983) .....................................................................................22

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
    939 F.2d 1540 (Fed. Cir. 1991) ...............................................................................23, 24

*United States v. Bentson*,
    947 F.2d 1353 (9th Cir. 1991) .......................................................................................22

*W.M. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
    683 F.3d 1356 (Fed. Cir. 2012) .....................................................................................11

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ...........................................................................................2

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .......................................................................................6

**STATUTES**

28 U.S.C. § 1961 ...................................................................................................................24, 25

28 U.S.C. § 1967 .........................................................................................................................24

35 U.S.C. § 284 ..............................................................................................................1, 3, 4, 19

## RULES

FED. R. CIV. P. 59(e)................................................................................................................1, 3

FED. R. CIV. P. 60(b)...................................................................................................................3

Defendant Blue Coat Systems, Inc. ("Blue Coat") respectfully submits this Opposition to Plaintiff Finjan, Inc.'s ("Finjan") Motion Pursuant to FED. R. CIV. P. 59(e) to Amend the Judgment to Include Enhanced Damages and Pre- and Post-Judgment Interest (Dkt. 505).

## I.   FINJAN IS NOT ENTITLED TO ENHANCED DAMAGES

Despite the fact that it did not assert willful infringement in this case, Finjan seeks an award of enhanced damages under Section 284.  But the current law is clear:  an award of enhanced damages requires a showing of willful infringement.  Thus, under the current law, Finjan is not entitled to enhanced damages.  Even if absent willfulness the Court were to consider the factors Finjan urges to determine whether and to what extent enhanced damages should be awarded, no such award is warranted.

Notably, as set forth in Blue Coat's JMOL motion, the damages awarded by the jury grossly overcompensates Finjan.  (Dkt. 498 at 2-8.)  The award for the '844 patent was $24 million, which was a result of adopting Finjan's counsel's request at closing to use: (1) 75 million users of WebPulse, which improperly includes worldwide users (*i.e.*, includes users outside of the U.S.); (2) 4% allegedly representing the accused portion of web requests processed by DRTR, but in reality includes many features not accused for infringement; and (3) an alleged $8 per user royalty, where there is no evidence on record that the parties would have actually negotiated or agreed to this high royalty amount.  The damages awards for the '633, '731, '968, and '780 patents also grossly overcompensate Finjan because Finjan failed to properly apportion the infringing features from the non-infringing features.  Even further, at the insistence of Finjan's counsel at closing argument, the jury doubled the damages of what was originally calculated by Finjan's damages expert.  Now, Finjan seeks punitive ***trebling of*** the already excessive damages award without any willful infringement claim or any evidence of egregious misconduct amounting to extraordinary infringement. Yet, Blue Coat was not even aware of Finjan's asserted six patents until sued in August 2013.  Finjan's concocted "evidence" of deliberate copying was a subsidiary fact issue relevant, if at all, to willfulness or obviousness, and cannot now be raised.  Finjan's motion should be denied.

### A.      Finjan Did Not Assert Willful Infringement.

The test for an award for enhanced damages involves a two-step process:  first, the fact finder must determine whether an infringer is guilty of willful infringement; and second, if willful infringement is found, the court then determines whether and to what extent, if any, it will increase the damages awarded given the totality of the circumstances.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) (citing *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)).  The Federal Circuit has consistently held that willfulness is an essential predicate to enhancement and is thus necessary to trigger consideration of other factors, such as alleged litigation misconduct.[1]  Willfulness requires clear and convincing evidence[2] and copying of the patented invention with knowledge of the patent can be evidence of willfulness.  *See, e.g., Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006); *K-Tec, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1378 (Fed. Cir. 2012).

Here, Finjan did not claim willful infringement in its Complaint.  (Dkt. 1.)  Finjan further confirmed before trial that it is not asserting willfulness.  (Dkt. 385.)  By requesting an award of

---

[1] *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826, 830 (Fed. Cir. 1992); *Jurgens,* 80 F.3d at 1570-71. To establish willfulness, a prevailing plaintiff must show (1) that the infringer was objectively reckless by acting "despite an objectively high likelihood that its actions constituted infringement of a valid patent"; and (2) that this "objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer."  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368, 1370-71 (Fed. Cir. 2007).  The Federal Circuit has also held that if the infringer ultimately presents an objectively reasonable (though unsuccessful) defense of non-infringement or invalidity at trial, its conduct cannot be viewed as objectively reckless and an enhanced-damages award is categorically precluded.  *See, e.g.*, *Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*, No. 2014–1492, 2015 U.S. App. LEXIS 13622, at *36 (Fed. Cir. 2015); *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 769 F.3d 1371, 1381-83 (Fed. Cir. 2014).

[2] *See, e.g.*, *Seagate*, 497 F.3d at 1368, 1370-71; *Carnegie Mellon*, 2015 U.S. App. LEXIS 13622, at *35; *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed. Cir. 1991); *see also Global Traffic Techs, LLC v. Morgan*, No. 2015-1537, 2015 U.S. App. LEXIS 9281, at *18-21 (Fed. Cir. 2015).  This well-established standard accords with Supreme Court precedent.  *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 479, 508 (1961); *see also Dowling v. United States*, 473 U.S. 207, 227 n.19 (1985).  "Federal Circuit authority makes clear that an allegation of willful infringement must depend upon pre-suit knowledge of the patent in issue."  *Rembrandt Soc. Media, LP v. Facebook, Inc.,* 950 F. Supp. 2d 876, 884 (E.D. Va. 2013); *see also Southwest Efuel Network, L.L.C. v. Transaction Tracking Techs., Inc.*, No. 2:07-cv-311-TJW, 2010 U.S. Dist. LEXIS 37029, at *9 (E.D. Tex. Jan. 13, 2010).

1   enhanced damages under Rule 59(e), Finjan is essentially improperly asking the Court to find

2   that there was willful infringement, including making an impermissible subsidiary finding of

3   deliberate copying that, if at all, was a factual issue for the jury and is now waived.  In the Ninth

4   Circuit, a Rule 59(e) motion may be granted if: (1) the motion is necessary to correct manifest

5   errors of law or fact upon which the appealable order is based; (2) the moving party presents

6   newly discovered or previously unavailable evidence; (3) the motion is necessary to prevent

7   manifest injustice; or (4) there is an intervening change of law.  *Aevoe Corp. v. AE Tech. Co.*,

8   727 F.3d 1375, 1378-79 (Fed. Cir. 2013) (citing *Turner v. Burlington N. Santa Fe R. Co.*, 338

9   F.3d 1058, 1063 (9th Cir. 2003)).  None of these conditions apply to Finjan's request for

10   enhanced damages because there was no judgment as to willful infringement, and therefore

11   nothing for the Court to alter or amend to make a finding of enhanced damages.  Finjan had the

12   opportunity to allege willful infringement and chose not to, and therefore is now precluded from

13   raising the issue again.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).

14   Therefore, the Court may not consider Finjan's alleged copying evidence, which pervades its

15   application of several *Read* factors, and award enhanced damages under Rule 59(e).

16         Although Finjan argues that the "flexible approach" articulated in *Octane Fitness, LLC v.*

17   *Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) and *Highmark Inc. v. Allcare Health*

18   *Management Sys., Inc.*, 134 S. Ct. 1744 (2014) (collectively, "*Octane*") should apply to

19   determine enhanced damages under Section 284, that approach is clearly not the current law.

20   Indeed, the Supreme Court has decided to take up this very issue in *Halo Electronics, Inc. v.*

21   *Pulse Electronics, Inc.*, No. 14-1514 (S. Ct. 2014) and *Stryker Corp. v. Zimmer, Inc.*, No. 14-

22   1520 (S. Ct. 2014) (collectively, "*Halo*"), but until its decision comes down (oral arguments will

23   be either in the spring or fall of 2016), the standard for willful infringement set out in *Seagate* is

24   the current law and must be followed.  Finjan is using an improper procedural process to ask for

25   enhanced damages under *Octane*.  Because no willful infringement was alleged or ever presented

26   to the jury, the appropriate time, if any, for the Court to consider enhanced damages under a

27   different standard is in a Rule 60(b) motion *after* the Supreme Court has decided the issues in

28   *Halo*.  FED. R. CIV. P. 60(b)(6); *see also Phelps v. Alameida*, 569 F.3d 1120, 1132, 1134 (9th Cir.

1   2009).

2   Furthermore, there are compelling reasons why *Octane* is inapplicable to Section 284.

3   As an initial matter, the Supreme Court's decision in *Octane* concerns the fee shifting provision

4   of Section 285, which is compensatory and not punitive like Section 284 is meant to be.  *See*

5   *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013) ("[I]t is clear that the

6   aim of § 285 is to compensate a defendant for attorneys' fees it should not have been forced to

7   incur.  The aim is not to punish a plaintiff for bringing those claims.").  Therefore, the reasoning

8   of *Octane* and goal of providing the district courts greater discretion in managing patent

9   litigation is not applicable to the punitive goals of deterring bad-faith conduct in the market, *i.e.*

10  willful infringement that Section 284 attempts to curtail.    Additionally, applying the

11  discretionary standard of *Octane* would lead back to the unpredictability and inconsistency in

12  awarding enhanced damages that *Seagate* attempted to solve.  Even under the *Octane* standard,

13  the facts of this case do not support an award of enhanced damages.  Historically, awards under

14  Section 284 have long been used to punish infringers whose misconduct is egregious in a way

15  ordinary infringement is not.  S*ee Seymour v. McCormick*, 57 U.S. 480, 488-489 (1854)

16  ("wanton or malicious" injury); *see also Read*, 970 F.2d at 826 ("The paramount determination

17  in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's

18  conduct based on all the facts and circumstances.").

19  **B.      The *Read* Factors Do Not Warrant Awarding Of Enhanced Damages.**

20  Finjan urges this Court to apply the *Read* factors that "taken together assist the trial court

21  in evaluating the degree of the infringer's culpability and in determining whether to exercise its

22  discretion to enhanced damages and how much the damages should be increased."  (Dkt. 505 at

23  3:11-22, citing *Read*, 970 F.2d at 828.)   But Finjan fails to mention that such factors are

24  considered only ***after*** there is a predicate finding of willful infringement.  *Id.* at 826-30.  That is

25  why the *Read* court reversed the trial judge for relying in part on bad faith litigation behavior to

26  enhance damages in the absence of willfulness.   *Id.* at 830; *see also Nichia Corp. v. Seoul*

27  *Semiconductor Ltd.*, No. C-06-0162 MMC, 2006 U.S. Dist. LEXIS 29959 (N.D. Cal. May 9,

28  2006).  Of course, even "a finding of willful infringement does not mandate that damages be

1    enhanced, much less mandate treble damages." *Id.* at 826.  Accordingly, because Finjan did not

2    even assert willfulness, the *Read* factors are irrelevant in this case and they need not be applied

3    to determine the degree of enhanced damages.[3]  *See Revolution Eyewear, Inc. v. Aspex Eyewear,*

4    *Inc.*, 563 F.3d 1358, 1373 (Fed. Cir. 2009) ("The most important fact here is that [counter-

5    claimant] failed to plead a claim for willful infringement.  As a result, it was barred from seeking

6    enhanced damages based on willful infringement, and no fact finder ever addressed the question

7    of willfulness.").  Not surprisingly, however, even if the *Read* factors are applied to this case, the

8    factors do not support awarding of enhanced damages as discussed below.[4]

9        ***Read* Factor 1**:  There is no evidence of deliberate copying of any patented invention.

10   As an initial matter, Finjan was excluded from asserting copying at trial.  The Court ruled that

11   "[g]iven the potential for unfair prejudice, the Court concludes that Plaintiff may only present

12   evidence of copying in rebuttal to Defendant's theory of obviousness."  (Dkt. 367 at 10:25-26.)

13   This was because since Finjan did not assert willful infringement or indirect infringement, the

14   only permissible purpose for a copying allegation would be as a secondary consideration of non-

15   obviousness.  Because Blue Coat did not present an obviousness defense at trial, Finjan was not

16   allowed to present copying in rebuttal.  Finjan now argues that the Court should determine that

17   there was deliberate copying.  This is improper.  *See Asetek Danmark A/S v. CMI U.S., Inc.*, No.

18   13-cv-457-JST, 2015 U.S. Dist. LEXIS 52989, at *45-47 (N.D. Cal. Apr. 21, 2015) (finding that

19   the court could not consider defendant's defense post-trial after defendant effectively waived the

20   defense by presenting no evidence during trial for the jury and withdrawing defense from the

21   final jury instructions and verdict form)  Even if the Court is allowed to determine whether there

22   is deliberate copying at this stage, Finjan failed to satisfy the framework put in place by the

---

23

24   [3] The *Read* factors are: (1) "whether the infringer deliberately copied the ideas or design of
     another"; (2) "whether the infringer, when he knew of the other's patent protection, investigated

25   the scope of the patent and formed a good-faith belief that it was invalid or that it was not
     infringed"; (3) "the infringer's behavior as a party to the litigation"; (4) "Defendant's size and

26   financial condition"; (5) "Closeness of the case"; (6) "Duration of defendant's misconduct"; (7)
     "Remedial action by the defendant"; (8) "Defendant's motivation for harm"; and (9) "Whether

27   defendant attempted to conceal its misconduct."  *Read*, 970 F.2d at 827.

28   [4] It is noted that Finjan does not discuss Factor 9 in its motion—"Whether defendant attempted
     to conceal its misconduct."  *Read*, 970 F.2d at 827.

1  Federal Circuit.

2       **First**, in order to prove copying, Finjan is required by the Federal Circuit to provide

3  "evidence of [Blue Coat's] efforts to replicate a ***specific product***."   *Wyers v. Master Lock Co.*,

4  616 F.3d 1231, 1246 (Fed. Cir. 2010) (emphasis added).   But Finjan does not identify any

5  specific product in its motion.  Rather, Finjan lumps different documents from different periods

6  to vaguely argue that Blue Coat copied Finjan because Blue Coat decided to focus on security.

7  (Dkt. 505 at 4-7.)  But reviewing carefully the documents relied on by Finjan tells a far different

8  story.  Back in 2002, Blue Coat and Finjan entered into an OEM agreement for Blue Coat to

9  resell Finjan's "SurfinGate" product.  However, Finjan does not assert nor did it provide any

10  evidence that Blue Coat copied Finjan's "SurfinGate" product or that such product practiced any

11  of Finjan's asserted patents.  Nor is there any evidence that any Finjan product, or any product of

12  M86 which acquired all of Finjan's operations in 2009, practices any of such patents.[5]

13  • August 2002:  Blue Coat changed its name from CacheFlow because its focus became
14  security, which added to its well-known caching technology.  (Dkt. 504-6, JTX 2013 at
BC0210304.)

15  • December 31, 2002: Blue Coat and Finjan entered into an OEM Agreement.  (Dkt. 504-8,
16  PTX 177.)  Under the agreement, Finjan was to provide its "SurfinGate" product, which
used Blue Coat's ICAP support.[6]  (*Id.* at BC0054776; *see also* Dkt. 430, 07/28/15 Trial
17  Tr. at 1255:17-1257:13.)

18  Finjan argues that through its partnership with Finjan in late 2002, it began to "realize
19  how advantageous it would be to have Finjan's innovative security techniques as part of
its own product line."  (Dkt. 505 at 5:3-4.)  But Blue Coat only made payments to Finjan
20  as a vendor for a ten-month period for a total of $131,183.74.  (Dkt. 430, 07/28/15 Trial
Tr. (Schoenfeld) at 1257:14-1259:11; *see also* JTX 2080.)  Finjan's "SurfinGate" product
21  was not successful with the customers.[7]  Notably, in addition to Finjan, Blue Coat had
many technical partners who were in the security market—including McAfee, Panda,
22  Sophos, Symantec, and TrendMicro—some of whom are still partners of Blue Coat

23  ――――――――――――
[5] Blue Coat also maintains its objection during trial to Finjan's introduction of various Blue Coat
24  internal e-mails and other documents into evidence under the guise of having limited relevance
to one or more *Georgia-Pacific* factors underlying the hypothetical negotiation.

25  [6] ICAP integration allowed customers to integrate Blue Coat's ProxySG to any scanning
26  appliance that can integrate via ICAP (Internet Content Adaptation Protocol).  (*See, e.g.*, Dkt.
430, 07/28/15 Trial Tr. at 1273:16-1274:11; Dkt. 465, 09/09/15 Bench Trial Tr. at 14:4-15:10.)

27  [7] Indeed, when Finjan was in the market selling its products until it sold its product business in
2009, it never made a profit.  (*See, e.g.*, Dkt. 427, 07/27/15 Trial Tr. (Layne-Farrar) at 1128:14-
28  20.)

today.  (*See, e.g.*, Dkt. 505-7 and 505-8, PTX 476 at FINJAN-BC 017481.)  There is no evidence that Blue Coat—through or because of the OEM Agreement arrangement—copied Finjan's SurfinGate product.

From 2002, Finjan jumps to 2007 to 2008 to argue that Blue Coat did not have the security capabilities, and thus, sought out to copy Finjan.  (Dkt. 505 at 5:15-26.)  However, the documents merely show that there may have been some competition between Finjan and Blue Coat concerning Blue Coat's ProxyAV product, a product which uses third-party AV (antivirus) technology and a product which was accused only for the '780 patent regarding hashing (which had nothing to do with any security technology).  And the documents do not provide which specific Finjan product is at issue.

- June 2007:  Finjan argues (Dkt. 505 at 5:6-11) that in 2007, Blue Coat did not have any security capability because Gartner noted that "Blue Coat has no malware filtering capabilities of its own; it relies solely on its partners for this purpose." (Dkt. 504-18 and 504-19, PTX 623 at BC0184331.)  But Finjan fails to mention that in that context, Gartner was referring to Blue Coat's **ProxyAV**: "Malware filtering is offered via Blue Coat's ProxyAV appliances, which offer a choice of many popular antivirus engines." (*Id.*)  Indeed, Blue Coat still does not have its own antivirus engines—it has always used and still does use third-party AV (antivirus) engines, such as McAfee, Sophos, Kaspersky, and Panda.  (*See, e.g.*, Dkt. 430, 07/28/15 Trial Tri. 1228:19-1231:4.)

  Gartner also noted that Blue Coat focused on application acceleration in 2006, but expected Blue Coat to *re*-focus on security in 2007.  (Dkt. 504-18 and 504-19, Ex. 9 to Wells Decl., PTX 623 at BC0184331.)  Indeed, even though Blue Coat's focus was on application acceleration in 2006, Blue Coat was still considered by Gartner to be a "leader" in the Secure Web Gateway industry, noting that "Blue Coat's flagship product is its ProxySG family of proxy/cache appliance, which provide a strong platform for an SWG [Secure Web Gateway], given their ability to support URL filtering, malware filtering and application control." (*Id.* at BC0184331, -327.)

- October 2007:  Finjan uses an internal email that stated "[h]ere is an example where Finjan would have something to offer, that we could potentially offer too" to argue that Blue Coat was seeking to copy Finjan.  (Dkt. 504-23, PTX 200 at BC0312864.)  However, the email was referring to availability to control "PHP scripting" in **ProxyAV**, and a discussion of whether Blue Coat's third-party vendors are working on controlling PHP scripting.  (*Id.* at BC0312864, -866.)

- November 2007:  An internal email that states "we need to zoom in on: Behavioral Analysis[,] Script Analysis/Controls" does not illustrate that Blue Coat was copying Finjan.  (Dkt. 504-23, Ex. 12 to Wells Decl., PTX 203 at BC0312921.)  This internal email was merely discussing the capabilities of Blue Coat's **ProxyAV** vendors for malware solution and what Blue Coat can do to better market the malware solution against competitors like Finjan and Webwasher which also provided malware solution. (*Id.* at BC0312921, -922.)

- January 2008:  An internal email that states that Blue Coat's Germany group wanted Webwasher ("WW") and Finjan killer reports.  (Dkt. 504-23, PTX 204 at BC0312858.) Webwasher and Finjan were both competing against Blue Coat for the **ProxyAV** product in Germany.  (*Id.*)  Finjan refers to the quote that Blue Coat wanted "to go toe-to-toe on features," but this goes not only to Finjan's features, but also to features of another competitor, Webwasher.  (*Id.*)  Dealing with a niche competition on ProxyAV in Germany does not amount to Blue Coat copying Finjan, especially when Finjan was not the only competitor in this market.

- July 2008: Finjan uses two internal emails to argue that "[w]hile Finjan believed at this time that Finjan and Blue Coat were still partners, Blue Coat was planning to compete against Finjan."[8]  (Dkt. 505 at 5:20-22.)  But the first internal e-mail merely discusses that Blue Coat may want to have its own anti-malware solution and if so, to acquire a company for the anti-malware solution.  (Dkt. 504-23, PTX 423 at BC0313488.)  Blue Coat did not proceed to acquire any company to have an internal anti-malware solution, and still uses third-party malware solution (*i.e.*, antivirus engines) for its **ProxyAV** (and CAS) products as discussed above.  For the second internal e-mail, Finjan quotes "Malware is the key selling feature for SWG solutions today . . . Blue Coat needs to change its focus."  (Dkt. 504-23, PTX 421 at BC0313077.)  But Finjan again ignores the context of the email.  The email discusses whether to update **ProxyAV** to support 2-3 AV engines (rather than just one engine).   This hardly qualifies as an evidence of copying of any of Finjan's products.

Finjan also cites to internal emails and documents from 2008-2009 to argue that "Blue Coat continued to express specific concerns internally about not having the security functionality of Finjan's products."  (Dkt. 505 at 6:1-13.)  But none of these documents support Finjan's contention:

- August 2008: Finjan states that the August 2008 email refers to "Blue Coat employee commenting that NASA had seen a demonstration that Finjan detected malware that Blue Coat did not and that '[t]his happens every week," and noting that the 'best malware protection product gets selected despite other features.'"  (Dkt. 505 at 6:3-5.)  But this is out of context.  The email chain discusses the competitors' misuse of Blue Coat's sitereview website.  (Dkt. 504-23, PTX 207 at BC0313273.)  Sitereview.bluecoat.com is a website in which the public can input any URL and see the Blue Coat's categories (*e.g.*, shopping, news, malware, etc.) that exist for that URL.  (Dkt. 465, 09/09/15 Bench Trial Tr. at 22:7-19.)  The email chain discusses the fact that both Finjan and Websense have been using the sitereview website to show that Blue Coat is not catching malware.  (Dkt. 504-23, PTX 207 at BC0313273.)  But such demonstration was misleading because Blue Coat's sitereview does not reflect all layered defenses provided by Blue Coat.  (*Id.*)  As such, the email chain discusses what can be done to make this fact known to the customers and how to defend against the competitors' misuse of the sitereview website.

---

[8] There is no evidence that Finjan in July 2008 believed Blue Coat was a still partner—in fact, the last payment made to Finjan by Blue Coat under the OEM Agreement was back in 2003. (Dkt. 430, 07/28/15 Trial Tr. at 1257:14-1259:11; *see also* JTX 2080.)

(*Id.* at BC0313272-277.)

- August 2008: Finjan argues that Blue Coat believed that Finjan was one of the "most relevant" competitors to target for Blue Coat's malware research team.  (Dkt. 505 at 6:5-6.)  But in fact, Finjan was the last (and the least important) of the competitors identified, which included Websense, Cisco Ironport, and Secure Webwasher.  (Dkt. 504-23, PTX 208 at BC0313151-152.)  It is not surprising that Blue Coat was studying all competitors in the market for malware detection, which included Finjan that had limited competition with Blue Coat.  This does not amount to copying Finjan.

- December 2008: One internal email shows that one deal was lost to Finjan.  (Dkt. 504-23, PTX 626 at BC0313151-152.)  This does not evidence that Blue Coat copied Finjan.

- January 2009:  The fact that an internal email agrees that Blue Coat needs to increase its capability to recognize potentially malicious javascript after reading a Finjan article does not evidence copying, especially when the email states that "[s]everal projects focused on this are already underway," meaning that the projects have already been started even before reviewing the Finjan article.  (Dkt. 504-23, PTX 105 at BC0313358.)

- May 2009: Finjan again quotes an email from May 2009 and states "discussing 'losing million dollar deals to Finjan . . .'"  (Dkt. 505 at 6:11-12.)  This is also out of context.  The email fully states that "EMEA [*i.e.*, Europe, Middle East, and Africa] sales teams are selling ProxyAV as our only defense and losing million dollar deals to Finjan, etc."  (Dkt. 504-23, PTX 105 at BC0313358.)  Accordingly, the email merely shows that Finjan was competing against Blue Coat in EMEA for the **ProxyAV**.

- June 2009:  The "Finjan Attack Pack" is merely a sales document showing how to compete against Finjan.  (Dkt. 504-25, PTX 45.)  Such documents are commonly created for competitors in the industry.  This in no event evidences copying.

Finjan further argues that "[b]y 2009, Blue Coat began to explicitly acknowledge that its products included Finjan's proprietary methods."  (Dkt. 505 at 7:1-2.)  But this is far from the facts:

- April 2009: Finjan implies that Blue Coat was copying Finjan because an email stated: "it doesn't look like [Finjan is] doing anything we don't already do with Blue Coat ProxySG, ProxyAV and Blue Coat Web Filter."  (Dkt. 505 at 7:2-4.)  However, this was merely commenting that Blue Coat already had capabilities that Finjan had.  (Dkt. 504-27, PTX 210 at BC0313629.)  In fact, the same email states that Blue Coat had more capabilities than Finjan: "However they don't look like [Finjan does] on-box caching, Streaming protocols or Peer-to-Peer protocols.  They don't look like they scale. . ."  (*Id.*)

- June 2009: Finjan argues that Blue Coat's WebPulse provided "sandboxing just like Finjan. . ."  (Dkt. 505 at 7:4-6.)  But this is irrelevant as WebPulse stopped providing any sandboxing feature in WebPulse before Finjan filed this lawsuit and more importantly, Finjan did not even accuse any sandboxing feature used in WebPulse.

- November 2009: By this time, Finjan sold its products and business to M86, thus any

documents dating after Finjan sold its business are irrelevant to Finjan's alleged copying. Nevertheless, Finjan argues that Blue Coat's Competitive Update document shows that Blue Coat allegedly copied Finjan's product because it states that "WebPulse technology 'mirror[]s Finjan.'"  (Dkt. 505 at 7:6-7.)  But this again is out of context.  The document attempts to distinguish Blue Coat from Finjan by stating that it provided all the capabilities that Finjan provided, but Blue Coat also provided additional capabilities that Finjan does not have:  "Blue Coat on the other hand does all real-time code analysis in the WebPulse cloud using multiple threat detect technologies that mirror Finjan and ***go beyond*** with web content expertise in 'web hunters to detect anomalies in dynamic link chains." (Dkt. 504-27, PTX 180 at BC0192944, emphasis added.)

In sum, Blue Coat's internal emails and documents relied on by Finjan do not support Finjan's copying allegations.  These documents merely show that there may have been some competition between Finjan and Blue Coat, mostly outside of the U.S., on Blue Coat's ProxyAV product, and not related to the patented features.  However, as discussed above, the core technology in ProxyAV—the AV (antivirus) engines—was never Blue Coat's technology as Blue Coat uses third-party AV vendors.   Notably, ProxyAV was only accused for the '780 patent, which concerned hashing technology, not even any technology relating to security.  This is not surprising as the core malware technology in ProxyAV is from a third-party and not Blue Coat.  Moreover, the documents relied on by Finjan do not identify any specific Finjan product and Finjan itself failed to identify any specific product that Blue Coat allegedly copied in its motion.  Accordingly, Finjan failed to and cannot prove copying.

***Second***, not only did Finjan fail to identify a specific product allegedly copied by Blue Coat, Finjan also failed to demonstrate that any such product practiced any of the patents-in-suit. This is fatal to Finjan's copying allegation.  *See, e.g.*, *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, No. 03-927-GMS, 2005 WL 1331216, at *2 (D. Del. June 6, 2005).  Rather than showing that any of its products practiced any of the patents-in-suit, Finjan argues that Blue Coat knew about Finjan's patents and disregarded them.  But there is no evidence that Blue Coat was aware about the specific patents-in-suit before the litigation.  Blue Coat was only generally aware that Finjan owned patents, as Finjan was enforcing its patents in litigation since 2006 and such litigation was public knowledge.  But there is no evidence that Blue Coat was ever aware of the specific six patents-in-suit or that Finjan notified Blue Coat about them before the Complaint was filed in

1   this action.[9]

2       ***Third***, the documents relied on by Finjan are devoid of any evidence that could fulfill the

3   Federal Circuit's requirement that "a nexus between the copying and the novel aspect of the

4   claimed invention [in the asserted claims] must exist."  *W.M. Wrigley Jr. Co. v. Cadbury Adams*

5   *USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012).

6       <u>***Read*** **Factor 2**</u>:  Blue Coat was not aware of the patents-in-suit until the lawsuit was filed

7   and had good faith belief that the patents-in-suit were not infringed and invalid during litigation.

8   Indeed, Blue Coat was not aware of any of the patents-in-suit before the lawsuit was filed in this

9   case.  (Dkt. 405, 07/21/15 Trial Tr. (Hartstein) at 326:19-24.)   During litigation, Blue Coat

10  developed timely-disclosed non-infringement theories that passed muster on summary judgment,

11  and also set forth detailed contentions of invalidity.  Blue Coat was even successful in obtaining

12  partial summary judgment of noninfringement for the '822 and '633 patents.  (Dkt. 256, MSJ

13  Order at 18:7-22:3.)  In such circumstances, Finjan cannot argue that Blue Coat did not have

14  good faith in its non-infringement or invalidity defenses.

15      <u>***Read*** **Factor 3**</u>:  Finjan argues that Blue Coat engaged in a "vexatious" litigation strategy,

16  where Blue Coat "pursued objectively unreasonable claims and defenses and failed to limit its

17  case in a meaningful way before trial."  (Dkt. 505 at 7:22-23.)  But as discussed below, the

18  record shows that Finjan's claim is meritless and without any basis.

19      ***First***, Blue Coat reasonably did not present certain meritorious invalidity positions at

20  trial.  Finjan claims that "Blue Coat litigated in an unreasonable manner by pursuing frivolous

21  invalidity defenses of obviousness and written description that it dropped at the last second at

22  trial, when it had no intention of actually pursuing them."  (Dkt. 505 at 8:23-25.)  But Blue Coat

23  did not unreasonably delay in dropping certain defenses at trial.  Blue Coat timely and fully

24  preserved its defenses in the Joint Pretrial Order until after it finally knew what Finjan has

25  presented in its case-in-chief.  (Dkt. 293-4, Joint Pretrial Order at 4-6 (clearly disclosing all of

26  the defenses of which Finjan complains in its motion).)  This is the normal distilling process at

27  ───────────────

28  [9] As such, Finjan did not assert willfulness or indirect infringement (which requires knowledge of the patents-in-suit prior to filing of the lawsuit) at trial.  (Dkt. 385.)

1   trial to which this Court referred when Finjan *also* demanded to know before trial exactly what

2   witnesses Blue Coat would call in its defense case.  (Dkt. 356, 07/02/20 Pre-Trial Conf. Tr. at

3   98:17-99:25 (denying Finjan's demand to know what witnesses Blue Coat intended to actually

4   call at trial and referring to the "[e]volving concept of how the case is going to be tried.  So I'm

5   not going to require that.").)   Indeed, such distilling process and decisions are part and parcel of

6   the normal litigation process and do not amount to any litigation misconduct.  *See, e.g.*, *Adaptix,*

7   *Inc. v. Apple, Inc.*, No. 5:13-cv-01776-PSG, 2015 U.S. Dist. LEXIS 117275, at *21 (N.D. Cal.

8   Sept. 2, 2015) (denying motion for fees under § 285 where plaintiff "shift[ed] the focus of its

9   infringement case" to a different, previously disclosed theory, before trial); *Stragent, LLC v. Intel*

10  *Corp.*, No. 6:11-cv-421, 2014 U.S. Dist. LEXIS 169080, at *17 (E.D. Tex. Aug. 6, 2014)

11  ("[Defendant] argues that [Plaintiff] delayed in disclosing certain positions and in abandoning

12  certain other claims and positions, and that this constituted litigation misconduct.  It did not.").

13          Further, when Finjan requested after it closed its case to "give [Finjan] some insight as to

14  what [Blue Coat is] going to do on validity," Blue Coat agreed to provide the requested

15  information and, indeed, notified Finjan of the defenses it would withdraw later that same day.

16  (Dkt. 427, 07/27/15 Trial Tr. at 1196:21-1197:9.)   Finjan made no argument that Finjan was

17  somehow prejudiced by a delay, and made no mention of Mr. Ben-Itzhak or issues with his

18  travel.  Importantly, the parties were under strict time constraints at trial.  Due to the numerous

19  claims and theories, Blue Coat had proposed "12 to 13 days (excluding jury selection, openings,

20  and closing)" for the trial, which would have left room for additional evidence and/or defenses.

21  (Dkt. 293-4, Joint Pretrial order at 16:14-16.)   However, the Court could only spare 18 hours,

22  which was much less than Blue Coat's proposal.  (Dkt. 356, 07/02/20 Pre-Trial Conf. Tr. at 79:5-

23  9.)   As the Court acknowledged, both parties were reserving their right to preserve positions

24  disclosed in the Joint Pretrial Order.  (*Id.*)  Indeed, Blue Coat had to repeatedly ask Finjan—and

25  ultimately had to seek the Court's assistance—to get Finjan to disclose whether, and on what

26  basis, Finjan maintained that it was still entitled to present a case on the '968, 822, and '633

27  patents.  (Dkt. 356, 07/02/15 Pre-Trial Conf. Tr. at 85:24-87:9; Dkt. 365, *Daubert* Hrg. Tr. at

28  101:17-102:11.)

In addition, Finjan argues that Blue Coat's obviousness combinations were frivolous because "Finjan's experts demonstrated that Blue Coat failed to show motivation to combine or that the resulting combination would be operable." (Dkt. 505 at 10:15-17.) But Blue Coat's experts proffered different combinations of references for each of the six asserted patents. Finjan makes no effort to parse out or address the specifics of any one obviousness defense with respect to any one patent. Further, the fact that Finjan's experts disagreed with Blue Coat's experts on issues such as motivation to combine or operability is markedly unexceptional in patent litigation and does not show that Blue Coat's positions were frivolous. Tellingly, Finjan did not seek a ruling of summary judgment regarding these obviousness theories, did not seek to bar these theories through its Motions *in Limine*, and did not seek to preclude Blue Coat's experts from testifying on these topics during the *Daubert* phase. (*See* Dkt. 175-4, Finjan's MSJ; Dkt. 256, MSJ Order; Dkt. 367, Order on Parties' Motions *In Limine* and Pretrial Order; Dkt. 365, *Daubert* Hrg. Tr. at 58:6-12.)

Moreover, Finjan alleges that as a consequence of not knowing earlier that Blue Coat would elect not to present its obviousness defenses, it incurred the unnecessary expense of having Mr. Ben-Itzhak fly to California for the trial. (Dkt. 505 at 10:5-14.) Finjan thereby implies that Blue Coat should have known that the only subject matter on which Mr. Ben-Itzhak was going to testify was to rebut obviousness. But on Finjan's Witness List, Finjan described the Subject Matter of Mr. Ben-Itzhak's testimony as relating to "Finjan's products, history, development and recognition of Finjan's technology, the market and competition for Finjan's technology." (Dkt. 293-5 Finjan's Witness List at 6.) There was no express statement that Mr. Ben-Itzhak's testimony would be limited to only secondary considerations in rebuttal to obviousness. While the disclosed subject matter could encompass secondary considerations, it just as well describes "face of the Company" testimony relevant to Finjan's case-in-chief. That Blue Coat failed to divine Mr. Ben-Itzhak's purpose or travel schedule is not "vexatious" litigation strategy.

Finjan further argues that Blue Coat's written description defense was also frivolous. (Dkt. 505 at 10:21-22.) Finjan once again relies solely on its expert's report. (*Id.* at 11:5-15,

1   citing Dr. Lyon's report.)  As before, Finjan's preference for its own expert's opinion does

2   nothing to establish that Blue Coat's written description defense lacked merit.  Finjan also fails

3   to mention that Blue Coat's written description defense only applied to two of the six patents-in-

4   suit (*i.e.*, the '780 and '968 patents).  (Dkt. 293-4, Joint Pretrial order at 4-6.)  Again, Finjan

5   never attacks the actual merits of the defense for either of the two patents.  This is consistent

6   with the fact that Finjan made no attempt to dispose of these allegedly frivolous written

7   description theories on summary judgment, motions *in limine*, or *Daubert*.  (*See* Dkt. 175-4,

8   Finjan's MSJ; Dkt. 256, MSJ Order; Dkt. 367, Order on Parties' Motions *In Limine* and Pretrial

9   Order; Dkt. 365, *Daubert* Hrg. Tr. at 58:6-12.)  Thus, Finjan failed to show that Blue Coat's

10  written description defenses lacked merit.

11      ***Second***, Blue Coat's positions on anticipation and noninfringement of the '844 patent

12  were reasonable.  Finjan argues that "Blue Coat's inherency-based anticipation arguments were

13  frivolous."  (Dkt. 505 at 12:1.)  Finjan's primary argument appears to be that proving inherency

14  is "a very high and difficult burden."  (*Id.* at 12:11.)  While that may be, the fact that the defense

15  requires "clear and convincing evidence" is nothing new to the patent case.  Indeed, Blue Coat's

16  invalidity expert, Dr. Necula, provided a detailed and well-reasoned theory of anticipation for the

17  '844 patent at trial.  (*See, e.g.*, Dkt. 431, 07/29/15 Trial Tr. at 1698:1-1712:8.)  Again, Finjan did

18  not seek a ruling on summary judgment on anticipation of the '844 patent, did not seek to bar the

19  issue via its motions *in limine*, nor did it seek to bar the theory during the *Daubert* phase.  (*See*

20  Dkt. 175-4, Finjan's MSJ; Dkt. 256, MSJ Order; Dkt. 367, Order on Parties' Motions *In Limine*

21  and Pretrial Order; Dkt. 365, *Daubert* Hrg. Tr. at 58:6-12.)  Finjan next alleges that "for non-

22  infringement of the '844 Patent, Blue Coat rested its case on the incoherent defense that one

23  could 'count' suspicious code without first 'identifying' the suspicious code being counted."

24  (Dkt. 505 at 12:21-23.)  But the history of litigation shows that Blue Coat's non-infringement

25  defense was not frivolous.  Finjan failed to disclose the specific accused functionality of the '844

26  patent until expert discovery and then obtained what the Court has acknowledged as a generous

27  order allow it to present this new infringement theory.  (Dkt. 271 at 4-5.)  Finjan's motion for

28  summary judgment of infringement on the '844 patent was denied due to "genuine disputes of

1    material fact concerning the operation" of the accused products, including the use of Cookie2 in

2    WebPulse.  (Dkt. 256, MSJ Order at 24:7-12.)   The Court devoted three pages to explain the

3    complicated issues and factual disputes involved.  (*Id.* at 13:13-15:22.)   Ultimately the Court

4    found that "[t]he parties' dispute concerning the actual operation and use of Cookie2 precludes

5    summary judgment for either side." (*Id.* at 15:11-12.)   Finjan's citation of a small snippet of Dr.

6    Bestavro's testimony does not support Finjan's contention.   That during cross Dr. Bestavros

7    actually *disagreed* that the code at issue operates like a coin analogy with which Finjan's counsel

8    was  apparently  enamored  does  nothing  to  advance  an  allegation  that  Blue  Coat's  non-

9    infringement position was frivolous.  (Dkt. 431, 07/29/15 Trial Tr. at 1539:5 ("[Dr, Bestavros]: I

10   disagree.  When it comes to the code, I disagree.").)

11          ***Third***, Blue Coat's defenses on laches and prosecution history estoppel were timely and

12   not frivolous.  Finjan argues that "Blue Coat's laches defenses were irrelevant to any issue in the

13   case as a matter of law because Finjan only sought post-complaint damages, yet laches only

14   pertains to pre-suit damages" and that "Blue Coat's laches defenses were not based on any

15   established understanding of the law of laches."  (Dkt. 505 at 13:20-22 and 14:3-4.)   But on

16   December 31, 2014, the Federal Circuit granted a request for an *en banc* rehearing in *SCA*

17   *Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, No. 2013-1564, 2015 U.S. App. LEXIS

18   16621, at *11 (Fed. Cir. Sept. 18, 2015) to consider issues relating to laches.  Further, as of June

19   18, 2015, Finjan was still seeking (i) "an injunction"; and (ii) "[t]o the extent that injunctive

20   relief is not available, Finjan is seeking an ongoing royalty[.]"  (Dkt. 293-4, Joint Pretrial Order

21   at 6.)   Finjan hereby never clearly foreclosed its pursuit of an injunction, even if it did later

22   obtain a lump-sum reasonable royalty.[10]  Thus, the extent to which laches would bar any post-

23   filing damages, or weigh against the issuance of an injunction, was a live issue at the bench trial.

24   Given that Finjan had left the door open to pursuing an injunction despite the jury's award of a

25   lump-sum reasonable royalty, Blue Coat was well within its rights to establish a record that

26   _____

27   [10] Blue Coat's position was that if Finjan obtained a lump-sum reasonable royalty, it was not
     entitled to an injunction—a position with which Finjan, as far as Blue Coat can discern, would
28   not agree.  (Dkt. 293-4, Joint Pretrial Order at 7.)  In fact, at a jury instructions charge conference
     during trial, Finjan's counsel suggested that Finjan could seek a permanent injunction.

1    might later weigh against the issuance of an injunction.  Indeed, in *SCA Hygiene*, which issued

2    after the bench trial, the Federal Circuit reaffirmed that laches "remains a viable defense to legal

3    relief in patent law."  *SCA Hygiene*, 2015 U.S. App. LEXIS 16621, at *43.  There, the Federal

4    Circuit held that laches could bar a permanent injunction and "courts must weigh the facts

5    underlying laches in the *eBay* framework when considering and injunction."  *Id.* at *53.  In

6    addition, the Federal Circuit also held that under extraordinary circumstances laches could

7    preclude an on-going royalty.  *Id.*  Further, the Supreme Court had previously held that laches

8    might also operate to reduce or eliminate prejudgment interest.  *Gen. Motors Corp. v. Devex*

9    *Corp.*, 461 U.S. 648, 656-57 (1983).

10    As of the time of the bench trial, for Blue Coat to lay a record that might have: (i)

11    established facts that could weigh against the grant of any injunctive relief; (ii) barred post-filing

12    damages; and/or (iii) operated to reduce or eliminate prejudgment interest, is rational and well

13    within the bounds of zealous and permissible advocacy.  Finjan advances its argument with the

14    use of hindsight.  At the time of the bench trial, neither the parties nor the Court knew that the

15    Federal Circuit would expressly refer to an "ongoing royalty," rather than more broadly to post-

16    filing royalties, which factored into the Court's conclusion that the issue was moot.  (Dkt. 486,

17    Order Regarding Non-jury Legal Issues at 20.)   Indeed, applying hindsight, it was Finjan's

18    position that laches could only apply to pre-filing damages that proved incorrect because the

19    Federal Circuit held that it can also apply to "ongoing royalties."  Accordingly, since the issues

20    in *SCA Hygiene* were still pending, it was not objectively baseless for Blue Coat to pursue its

21    laches defense at the bench trial, even though the Court—with the benefit of the by-then issued

22    Federal Circuit's *SCA Hygiene* opinion—ultimately found the laches issue to be moot.  (*Id.*)

23    Finjan further argues that "Blue Coat's laches defense related to the '780 Patent was

24    untimely."  (Dkt. 505 at 14:8-9.)  However, Blue Coat's disclosures during discovery showed

25    that Finjan was aware of the accused ProxySG product since at least 2002.  Finjan included

26    ProxySG as an infringing product for the '780 patent at trial.  (*See, e.g.*, Dkt. 451-6, Ex. 6 to

27    Kobialka Decl. at 24.)   Accordingly, Blue Coat had a good-faith and reasonable basis for

28    pursuing a defense under the doctrine of laches for the '780 patent.

With regards to Blue Coat's prosecution history estoppel defense with respect to the '844, '968, and '780 patents, Finjan argues that "raising this defense was nonsensical, as prosecution history estoppel is only available as a defense when there is a finding of infringement under the doctrine of equivalents." (Dkt. 505 at 14:15-16, emphasis in original.) As this Court noted during side bar with counsel, "[d]espite the instructions on the verdict form, the jury decided whether each asserted claim was infringed under the doctrine of equivalents." (Dkt. 486, Order Regarding Non-jury Legal Issues at 11:7-10.) The jury found that the '844, '968 and '780 patents were infringed literally and under the doctrine of equivalents. (*Id*.) During a post-verdict side bar, Blue Coat reserved its right to deal with this inconsistency in post-trial motions and has done so, including laying the record regarding the jury's findings on this issue for appeal should it become necessary. (Dkt. 441, 08/04/15 Trial Tr. at 2192:17-23.) This is not "vexatious litigation conduct" that warrants the enhanced damages and Finjan cites no authority to the contrary.

***Read* Factor 4**: Finjan argues that Blue Coat's size and financial condition favor an enhanced of damages because "Blue Coat is a large multinational corporation with over 1,400 employees worldwide." (Dkt. 505 at 15:2.) Finjan relies on *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238, which found that "the jury's award [of $200 million] was only a small fraction" of infringing profits. (*Id.* at 15:17-20.) But Blue Coat is nothing like a company like Microsoft, which has more than 115,000 employees with annual net revenue over $90 billion. (*See* http://news.microsoft.com/facts-about-microsoft/.) Unlike the facts in *i4i*, an award of enhanced damages sought by Finjan of $120 million to Blue Coat is not a "small fraction" of allegedly infringing profits—Blue Coat's *gross* profit is about $440 million, which consists of not only profits of the accused products but non-accused products as well. (*See* Dkt. 505 at 15:15-17.) Importantly, as this factor is to serve as punitive function for defendants that have willfully infringed, this factor is irrelevant and does not apply to Blue Coat as there was no willful infringement.

***Read* Factor 5**: Finjan argues that the "closeness of the case" factor in *Read* favors an enhanced damages. (Dkt. 505 at 15:25-27.) As an initial matter, there was no closeness of

1   willfulness as willfulness was not asserted by Finjan.  *See Read*, 970 F.2d at 827.  Indeed,

2   because Finjan did not even assert willfulness in this case, this factor is irrelevant and not

3   applicable to this case.  Notably, Finjan's reliance on *Kaufman Co v. Lantech, Inc.*, 807 F.2d

4   970, 978-79 (Fed. Cir. 1986) and *AAT Bioquest, Inc. v. Texas Fluorescence Labs., Inc.*, No. 14-

5   cv-03909-DMR, 2015 WL 7708332, at *14 (N.D. Cal. Nov. 30, 2015) (Dkt. 505 at 18:26-19:3)

6   only highlights Finjan's incorrect application of the law as both of these cases involved awarding

7   enhanced damages where there was finding of willful infringement.  Even if this factor were to

8   apply in this case—which it does not—Finjan has no legal support for its arguments that because

9   the decision was in Finjan's favor, that evidences that there was no close question on the merit.

10  (Dkt. 505 at 15:25-27.)  Finjan's argument that Blue Coat's defenses were baseless and weak

11  does not match the history and the record of this case.  As discussed above, the non-infringement

12  positions regarding the '844 patent and Blue Coat's invalidity and laches positions were timely

13  and reasonable.  (*See also* Dkt. 502, Blue Coat's Opposition to Finjan's Motion for Attorneys'

14  Fees; Dkt. 499, Blue Coat's Motion for New Trial at 7-19.)  The non-infringement positions for

15  all of the patents-in-suit were also reasonable as detailed in Blue Coat's post-judgment motions.

16  (*See, e.g.*, *id.*)  *See also Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1376-77

17  (Fed. Cir. 2010).  With regards to Blue Coat's Section 101 defense, Finjan argues that it "was a

18  weak defense, particularly in view of the hypothetical claim in the Patent Office's guidance. . ."

19  (Dkt. 505 at 18:19-20.)  But as explained in Blue Coat's Motion to Amend Findings, the claim in

20  the Patent Office's Guidance relied on by Finjan is different and contrary to what is found in the

21  '844 patent claims and specification.  (Dkt. 500 at 7-8.)

22       ***Read* Factor 6**:  Finjan argues that this factor favors enhanced damages because "Blue

23  Coat's accused products have enjoyed substantial commercial success at the expense of Finjan's

24  patent rights during Blue Coat's years of infringement."  (Dkt. 505 at 19:10-12.)  However, as

25  admitted by Finjan, the damages period began from the date of the filing of the Complaint in this

26  case—August 28, 2013.  (Dkt. 437, Jury Instructions at 48.)  This is consistent with the fact that

27  Finjan did not assert willfulness or indirect infringement at trial because there was no evidence

28  that Blue Coat was aware of any patents-in-suit prior to this lawsuit.  To now change its position

1   to argue that it is entitled to enhanced damages because of "years of infringement" when it did

2   not even get awarded regular damages prior to the filing of the lawsuit is unreasonable and

3   incomprehensible.  Indeed, the inconsistent positions taken by Finjan stems from the notion that

4   Finjan is entitled to enhanced damages when there was no finding of willfulness in the case.

5      ***Read* Factor 7**:  As discussed above, there is no evidence of deliberate copying of any

6   patented invention.  There is also no evidence that Blue Coat was aware of any of the patents-in-

7   suit before the lawsuit was filed in this case.  During litigation, Blue Coat developed timely-

8   disclosed non-infringement theories that passed muster on summary judgment, and also set forth

9   detailed contentions of invalidity.  Blue Coat was even successful in obtaining partial summary

10  judgment of noninfringement for the '822 and '633 patents.  (Dkt. 256, MSJ Order at 18:7-22:3.)

11  Because Blue Coat had a good faith belief of its non-infringement and invalidity defenses, Blue

12  Coat did not take any action to cease its manufacture of the accused products or develop design-

13  around for the products.   Notably, willful infringement was not even asserted in this case.

14  Further, Finjan was awarded lump sum damages for the life of the patents.  (Dkt. 438, Jury

15  Verdict.)  To enhance damages on top of the lump sum already awarded by the jury would be to

16  penalize Blue Coat without any cause.

17     ***Read* Factor 8**:  There was no motivation to harm.  Finjan argues that Blue Coat stole

18  Finjan's technology.  (Dkt. 505 20:24.)  But there is no evidence that Blue Coat *stole* Finjan's

19  technology, let alone copied its technology, or even knew about the patents-in-suit before the

20  lawsuit.  There is simply no evidence that Blue Coat had "bad faith motivation" to harm Finjan.

21  (Dkt. 505 at 21:8-9.)  *See Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1274 (Fed.

22  Cir. 1999).

23  **II. FINJAN IS NOT ENTITLED TO PRE-JUDGMENT INTEREST**

24     **A. Finjan's Conduct And Delay In Filing Suit Warrants A Denial Of Pre-Judgment Interest.**

25

26     The Supreme Court has held that that 35 U.S.C. § 284 does not require an "award of

prejudgment interest whenever infringement is found."  *Devex*, 461 U.S at 657.  The Supreme

27  Court interpreted § 284 to leave courts discretion in awarding prejudgment interest, and in

28  certain situations, there might be grounds for limiting or denying prejudgment interest altogether.

1   *Id.* at 656-57.  For example, a court may limit or deny prejudgment interest when the patent

2   owner has been responsible for undue delay in prosecuting the lawsuit.  *Id.* at 657.  The Federal

3   Circuit, following *Devex*, has affirmed a district court's denial of prejudgment interest where the

4   "record contain[ed] sufficient evidence . . . that [the patent-holder's] delay was self-serving and

5   resulted in prejudice to the defendants" by "caus[ing] the damages owed . . . to escalate."

6   *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361-62

7   (Fed. Cir. 2001).  Similarly, district courts have held that despite finding that a patentee's delay

8   in bringing suit did not constitute laches, prejudgment interest may still be denied based upon the

9   patentee's delay.  *Humanscale Corp. v. CompX Intern., Inc.*, No. 3:09-cv-86, 2010 U.S. Dist.

10  LEXIS 86396, at *5-6 (E.D. Va. Aug. 23, 2010); *Carnegie Mellon Univ. v. Marvell Tech. Grp.,*

11  *Ltd.*, No. 09-290, 2014 U.S. Dist. LEXIS 43042, at *21-28 (W.D. Pa. Mar. 31, 2014).

12      As discussed more fully in Blue Coat's Motion to Amend Findings and Judgment (Dkt.

13  500 at 8-11), Finjan's delay in filing suit against Blue Coat was unreasonable as a matter of law,

14  caused economic and evidentiary prejudice to Blue Coat, and due to its extraordinary nature,

15  should bar Finjan from recovering, *inter alia*, prejudgment interest.  Further, Finjan's decision to

16  lay in wait for years before filing suit allowed Finjan to recover a higher royalty figure given

17  Blue Coat's increased annual revenues.  *See Crystal Semiconductor*, 246 F.3d at 1361-62.

18  Accordingly, Finjan's conduct in delaying its suit against Blue Coat warrants a denial of

19  prejudgment interest.

20      **B.      If Prejudgment Interest Is Awarded, It Should Be Limited To The Amount**
            **Of Damages Prior To Entry Of Judgment.**

21

22      Finjan is seeking prejudgment interest to be applied to the entire lump sum jury award as

23  of the date the Complaint was filed.  Finjan's damages award, however, represents damages for

    the ***life*** of the patents; in other words, Finjan receives a single payment representing, *inter alia*,

24  all royalties beyond the date of the judgment.  (Dkt. 434 at 2011:15-22.)  As a result, Finjan

25  cannot recover prejudgment interest on the portion of the award representing damages occurring

26  ***after*** the date of the judgment.  Indeed, the cases cited by Finjan support applying prejudgment

27  interest only for the damages amount up the judgment.  *See DataTreasury Corp. v. Wells Fargo*

28

*& Co.*, No. 2:06-CV-72 DF, slip op. at 2-3 (E.D. Tex. Aug. 3, 2011) (applying prejudgment interest to the lump sum award for infringement from the time of the hypothetical negotiation up through trial and accounted for future infringing sales by setting a post-judgment running royalty); *Mondis Tech. Ltd. v. LG Elecs., Inc.*, No. 2:07-CV-565-TJW-CW, slip op. at 3-5 (E.D. Tex. Aug. 30, 2011) (applying prejudgment interest to the jury's award as a lump sum for past infringement and severed Mondis's motion for ongoing royalties into a new case); *Mondis Tech. Ltd. v. Chimei Innolux Corp.*, No. 2:11-CV-378-JRG, 2012 WL 1554645, at *6, *14 (E.D. Tex. June 20, 2013) (awarding prejudgment interest on the lump sum for the jury award which accounted only for the past infringement and stayed the ongoing royalty award upon the defendant posting a supersedeas bond sufficient to secure the judgment); *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2:06-CV-42-JRG, Dkt. 533 at 60-61 (E.D. Tex. June 20, 2013) (instructing the jury to award either a running royalty or a "fully paid, lump-sum royalty for the time period of the infringement"; in other words, the lump sum did not account for any future sales); *Comcast IP holdings I, LLC v. Sprint Communications Co.*, No. 12-CV-0205-RGA, 2015 WL 4730899, at *21 (D. Del. Aug. 10, 2015) (the jury awarded a lump sum only extended through the date of trial and Comcast was entitled to an ongoing royalty).

Accordingly, prejudgment interest should be awarded—if at all—only on the portion of damages that represents those damages occurring prior to the date of Judgment, November 20, 2015.[11]   To hold otherwise would allow Finjan to recover interest on future damages, *i.e.*, damages that it has not yet suffered.  Such an award is impermissible as it would do more than merely serve to make Finjan whole.  *See Devex*, 461 U.S. at 656.

### C.    If Awarded, Prejudgment Interest Should Be Limited To The Originally Requested Damages For The '731, '633, And '968 Patents.

As discussed in more detail in Blue Coat's Renewed Motion For JMOL and Motion for New Trial (Dkts. 489, 499), Finjan's counsel for the first time during closing asked the jury to "double" the requested damages awards for the '731, '633, '968, and '822 patents.  (Dkt. 434, 08/03/15 Trial Tr. at 2083:20-2084:5, 2086:9-2087:4.)   The jury did, in fact, adopt Finjan's

---

[11] Prejudgment interest calculations are set forth in Appendix A.

1    requested "doubling" of damages for the '731, '633, and '968 patents.  (Dkt. 438 at 6-7.)  Aside

2    from the fact that the jury's "doubling" of the damages awards for these patents was both

3    factually and legally improper, Finjan cannot recover prejudgment interest for the portion of the

4    damages award that represents the "doubling" of these damages.  *Underwater Devices, Inc. v.*

5    *Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed. Cir. 1983) (overruled on other grounds in

6    *Seagate*, 497 F.3d) ("[W]e hold that prejudgment interest can only be applied to the primary or

7    actual damage portion and not to the punitive or enhanced portion.").  To hold otherwise would

8    eviscerate the Supreme Court's clear instruction that prejudgment interest "merely serves to

9    make the patent owner whole."  *Devex*, 461 U.S. at 656.  Accordingly, for the '731, '633, and

10   '968 patents, the Court should award prejudgment interest, if at all, on only half of the jury's

11   award, *i.e.*, the portion of damages that would have been awarded absent the "doubling" of

12   damages.

13       **D.       Prejudgment Interest For The '844 Patent Damages Award Should Be
                     Limited.**

14

15       For the first time in closing arguments, Finjan's counsel asked the jury to award $24

16   million in damages for the '844 patent.  Specifically, Finjan's counsel asked the jury to use 75

17   million users of WebPulse, multiply that number by 4% (representing the alleged portion of web

18   requests processed by DRTR), and multiply that number by an alleged $8 per use royalty, which

19   was adopted by the jury.  (Dkt. 434 at 2084:6-2085:6.)  The sole location in which the $8 per

20   user fee exists in the record is in the trial testimony of Finjan's witness, Mr. Ivan Chaperot.  (*See*

21   Dkt. 426 at 907:10-908:1.)  Further, Finjan's counsel successfully objected to Blue Coat's cross-

22   examination by representing that, Mr. Chaperot's direct testimony was that the $8 per user fee is

23   Finjan's **current starting point** in licensing negotiations and that he was not testifying

24   concerning Finjan's **past licenses or past licensing practices**.  (Dkt. 426 at 903:14-15, 907:10-

25   908:1, 911:11-912:3.)[12]  Indeed, the $8 per user fee did not appear anywhere in the record until

26   Mr. Chaperot's testimony at trial on July 24, 2015.  Accordingly, the prejudgment interest to be

27

28   _____

[12] This is a binding judicial admission against Finjan.  *United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991).

1   awarded for the '844 patent, if any, would be limited to the time period of July 24, 2015 to the

2   date of Judgment, November 20, 2015.

3          **E.      If Prejudgment Interest Is Awarded, It Should Be Awarded At T-Bill Rate.**

4          Finjan argues that the appropriate award of interest is at the Prime Rate.  (Dkt. 505 at 22-

5   23.)  While Finjan misleadingly implies that the Court's award of interest must be at or above the

6   Prime Rate, the proper legal standard instructs that courts have wide discretion in selecting the

7   interest rate to use, and the Federal Circuit has affirmed that district courts have the power to

8   utilize the Treasury Bill ("T-Bill") rate or the Prime Rate.  *See Studiengesellschaft Kohle v. Dart*

9   *Indus.*, 862 F.2d 1564, 1579 (Fed. Cir. 1988); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955

10  (Fed. Cir. 1997); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

11  Indeed, the general circumstances meriting use of the Prime Rate are notably absent here.  Courts

12  have held that the Prime Rate is best suited for situations in which the period of infringement is

13  long, as the Prime Rate would adequately cover the effects of inflation over a long period of

14  time.  *See, e.g., Server Tech. Inc. v. Am. Power Conversion Corp.*, No. 3:06-CV-00698-LRH-

15  VPC, 2015 U.S. Dist. LEXIS 41987, at *20 (D. Nev. Mar. 31, 2015).  Similarly, Courts have

16  held that the Prime Rate provides a better measure of the risk of nonpayment that the plaintiff

17  bears by not receiving the royalty payment, such as when the damages award is paid as a running

18  royalty as opposed to a one-time lump sum payment.  *See Japan Cash Mach. Co. v. MEI, Inc.*,

19  No. 2:05-cv-01433-RCJ-RJJ, 2009 U.S. Dist. LEXIS 133657, at *104-05 (D. Nev. Sept. 17,

20  2009).

21         The facts and circumstances of this case dictate that the Prime Rate is inappropriate as

22  none of the above considerations are present.  First, the litigation and damages period during this

23  case is relatively short: 2.33 years as opposed to the litigation in *Server Tech.*, which spanned

24  over nine years.  *See Server Tech.*, 2015 U.S. Dist. LEXIS 41987, at *9.  Second, the risks

25  inherent in borrowing, such as nonpayment or lack of secured collateral assets, are not present in

26  this case given that Finjan requested a one-time, lump sum, fully-paid royalty for the life of the

27  patents.  *See Japan Cash Mach.*, 2009 U.S. Dist. LEXIS 133657, at *104-05.  Indeed, the lone

28  case cited by Finjan on this issue highlights that "the prime rate best compensates a patentee . . .

because the *prime rate represents the cost of borrowing money*." (Dkt. 505 at 22 (citing *Finjan Software, Ltd. v. Secure Computing Corp.*, No. 06-369, 2009 WL 2524495, at *13 (D. Del. Aug. 18, 2009) (emphasis added)).)   This loan analogy is inappropriate here because the loss suffered in the parties' hypothetical license relationship is "the foregone use" of the royalty payment, not the risk of default on an imaginary hypothetical loan. *See Mars, Inc. v. Coin Acceptors*, 513 F. Supp. 2d 128, 134 (D.N.J. 2007).   While acknowledging the Federal Circuit's statement in *Uniroyal* that a patentee need not prove that it borrowed at the prime rate in order to receive that rate, the *Mars* court distinguished the statement, holding that "where there is no evidence that the patent owner had to borrow at all, and where there is evidence of an investment rate that will sufficiently compensate the plaintiff, the court finds that the more prudent approach is to utilize the investment rate." *Id.* at 136.

In fact, numerous courts have held that the T-Bill rate is a more appropriate measure for placing the plaintiff in the position it would have been in had the infringer entered into a reasonable royalty agreement. *See Mars*, 513 F. Supp. 2d at 137; *Japan Cash*, 2009 U.S. Dist. LEXIS 133657, at *104; *Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1121-22 (N.D. Cal. 2014).   Specifically, courts have held that the use of the T-Bill rate is a more appropriate means of effecting the purpose of prejudgment interest, namely to "make the patent owner whole." *See Mars*, 513 F. Supp. 2d at 133-37.   As the Federal Circuit has recognized, the T-Bill rate "represents a benchmark as the shortest term, risk-free investment available to ordinary investors." *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 789 (Fed. Cir. 1990). Courts have held that because T-Bills are virtually risk-free investments, their use permits the court to avoid the speculation involved with determining whether possibly higher-yielding, but riskier, investments would have been successful for the Plaintiff. *Mars*, 513 F. Supp. 2d at 136– 37.   Courts have also found persuasive the fact that the 52-week T-Bill rate is the statutorily prescribed measure for post-judgment interest under 28 U.S.C. § 1961, and therefore, should be utilized for calculating pre-judgment interest as well. *See Mars*, 513 F. Supp. 2d at 137; 28 U.S.C. § 1967.   Furthermore, Courts have consistently applied the T-Bill rate where plaintiff has failed to provide any evidence justifying the use of the higher prime rate. *See Japan Cash*, 2009

U.S. Dist. LEXIS 133657, at *104 (D. Nev. Sept. 17, 2009).  While the *Uniroyal* court noted that a patentee does not necessarily have to demonstrate that it borrowed at the Prime Rate in order to be entitled to prejudgment interest at that rate, courts have held that where there is no evidence that the plaintiff had to borrow at all, and where there is evidence of an investment rate that will sufficiently compensate the plaintiff, the prudent approach is to utilize the investment rate.  *See Mars*, 513 F. Supp. 2d at 136.  Here, Finjan has failed to provide ***any*** evidence to support a finding that the Prime Rate is the appropriate rate in the present case.  Use of the T-Bill rate is therefore a more appropriate measure of calculating the prejudgment interest, if any, due to Finjan.

In addition, Finjan has failed to show that it is entitled to prejudgment interest on a compounded basis.  The Federal Circuit has declined to hold that prejudgment interest must be compounded as a matter of law.  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995).  Blue Coat respectfully submits that there is no justification for compounding prejudgment interest as damages began on the date the Complaint was filed and this case followed a routine schedule.  Due to Finjan's delay in filing suit and the resulting prejudice to Blue Coat, the Court should use its inherent discretion to limit Finjan's recovery of prejudgment interest on a simple, rather than compound, basis.  *Devex*, 461 U.S. at 657 (noting that courts have discretion to limit or deny prejudgment interest); *Rite-Hite*, 56 F.3d at 1555 ("[D]etermination whether to award simple or compound interest is a matter largely within the discretion of the district court.").

**III.   POST-JUDGMENT INTEREST**

In the event that Post-Judgment Interest is awarded, Blue Coat does not dispute that the relevant statute, 28 U.S.C. § 1961, instructs that the Post-Judgment Interest is to be calculated at a rate equal to the weekly average 1-year constant maturity Treasury yield.

**IV.   CONCLUSION**

For the foregoing reasons, Blue Coat respectfully submits that Finjan's Motion be DENIED.

1

2          Respectfully submitted,

3          WILSON SONSINI GOODRICH & ROSATI
           Professional Corporation

4    DATED:  January 4, 2016          By:  /s/ Olivia M. Kim
                                           EDWARD G. POPLAWSKI
5                                          OLIVIA M. KIM
                                           BRIAN LAM
6                                          S. FERRELL ALMAN, JR.
                                           VERA M. ELSON
7                                          CHRISTOPHER MAYS

8                                          Counsel for Defendant
                                           BLUE COAT SYSTEMS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28