PAUL J. ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
HANNAH LEE (State Bar No. 253197)
hlee@kramerlevin.com
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 752-1700
Facsimile:   (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>           Plaintiff,<br><br>      v.<br><br>BLUE COAT SYSTEMS, INC., a Delaware Corporation,<br><br>          Defendant. | Case No.: 13-CV-03999-BLF<br><br>**PLAINTIFF FINJAN, INC.'S OPPOSITION TO BLUE COAT SYSTEMS, INC.'S MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a); AND MOTION TO AMEND JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**<br><br>Date:     April 28, 2016<br>Time:    9:00 a.m.<br>Place:   Courtroom 3 – 5th Floor<br>Before:  Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

**Page**

I.    BLUE COAT'S MOTION FOR A NEW TRIAL SHOULD BE DENIED ............................... 1

    A.    The Inclusion of All Licenses was Proper. .......................................................... 1

    B.    Finjan Presented Revenues of the Smallest Salable Patent Practicing Unit. .................. 4

    C.    The Clear Weight of the Evidence Supports the Jury's Damages Award. ...................... 6

    D.    The Infringement Verdict was Based on the Clear Weight of Evidence. ........................ 7

        1.    Finjan Proved Literal Infringement of the '844 Patent by WebPulse. .................. 7

        2.    Finjan Proved Literal Infringement of the '731 Patent. ..................................... 10

        3.    Finjan Proved Literal Infringement of the '968 Patent. ..................................... 10

        4.    Finjan Proved Literal Infringement of the '780 Patent. ..................................... 12

        5.    Finjan Proved Infringement of the '633 Patent under the DOE. ......................... 13

    E.    The Validity Verdict was Based On the Clear Weight of Evidence. .............................. 17

        '844 Patent ..................................................................................................... 18

        '822 and '633 Patents ...................................................................................... 19

        '780 Patent ..................................................................................................... 20

        '731 Patent ..................................................................................................... 21

        '968 Patent ..................................................................................................... 21

    F.    Finjan's Closing Arguments were Not Prejudicial and Did Not Confuse the Jury. ....... 21

II.   BLUE COAT'S MOTION TO AMEND JUDGMENT SHOULD BE DENIED ..................... 22

    A.    The Judgment Does Not Need Clarification ...................................................... 22

    B.    There is No Basis for Blue Coat's Request for JMOL of DOE. .................................... 23

III.  CONCLUSION ......................................................................................................... 25

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR           Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)..................................................................................... 3

*Allstate Ins. Co. v. Herron*,
634 F.3d 1101 (9th Cir. 2011) .................................................................................... 22

*Apple, Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)..................................................................................... 6

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2013 U.S. Dist. LEXIS 160337 (N.D. Cal. Nov. 7, 2013)........................ 4

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2014 WL 549324 (N.D. Cal. Feb. 7, 2014)................................. 4

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014)....................................................................................... 3

*AquaTex Indus., Inc. v. Techniche Sols.*,
479 F.3d 1320 (Fed. Cir. 2007)............................................................................... 13, 14

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)................................................................................. 2, 5

*Brocade Commun'ns Sys., Inc. v. A10 Networks, Inc.*,
No. C 10-3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013)................................. 5

*Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*,
No. 2:09-cv-00290-NBF, Dkt. No. 604, Memorandum Order (W.D. Pa. Nov. 5, 2012)................... 5

*DMI, Inc. v. Deere & Co.*,
802 F.2d 421 (Fed. Cir. 1986).................................................................................... 1

*DSPT Int'l, Inc. v. Nahum*,
624 F.3d 1213 (9th Cir. 2010) ..................................................................................... 1

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2015).................................................................................. 5, 6

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
593 F.Supp.2d 1088 (N.D. Cal. 2009), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010) ................................ 13

*Gemtron Corp. v. Saint-Gobain Corp.*,
   572 F.3d 1371 (Fed. Cir. 2009).................................................................. 5

*Golden Bridge Tech. v. Apple, Inc.*,
   No. 5:12-cv-04882-PSG, 2014 WL 4057187 (N.D. Cal. June 1, 2014)........................... 5

*GPNE Corp. v. Apple, Inc.*,
   No. 5:12-cv-02885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014)........................... 2, 3, 4

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983).................................................................. 4

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003)................................................................ 14

*HTC Corp. v. Tech. Props. Ltd.*,
   No. 5:08-cv-00882-PSG, 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013) ........................ 5

*In re MSTG, Inc.*,
   675 F.3d 1337 (Fed. Cir. 2012).................................................................. 3

*Intellectual Ventures I, LLC v. Canon Inc.*,
   104 F.Supp.3d 629 (D. Del. May 18, 2015) .................................................... 22

*Interwoven, Inc. v. Vertical Computer Sys.*,
   No. CV-10-04-645 RS, 2013 WL 3786633 (N.D. Cal. July 18, 2013) ........................ 14

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005)................................................................ 22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012).............................................................. 3, 4, 5

*Malta v. Schulmerich Carillons, Inc.*,
   952 F.2d 1320 (Fed. Cir. 1991)................................................................ 13

*McDowell v. Calderon*,
   197 F.3d 1253 (9th Cir. 1999) ................................................................ 22

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   No. C 08-04990-JW, 2012 WL 2339762 (N.D. Cal. June 7, 2012) ............................ 3

*Motorola Mobility, LLC v. Int'l Trade Comm'n*,
   737 F.3d 1345 (Fed. Cir. 2013)................................................................ 18

*Motorola, Inc. v. Interdigital Tech. Corp.*,
   121 F.3d 1461 (1997).......................................................................... 19

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR          Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

*Norian Corp. v. Stryker Corp.*,
    363 F.3d 1321 (Fed. Cir. 2004) ................................................................................. 4

*Oracle Am., Inc. v. Google Inc.*,
    No. C 10-03561 WHA, 2012 WL 877125 (N.D. Cal. Mar. 15, 2012) ................................ 3

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    No. C-05-00334 RMW, 2008 WL 5411564 (N.D. Cal. Dec. 29, 2008) .......................... 14

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ........................................................................... 1, 2, 3

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ............................................................................... 2

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ............................................................................... 1

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002) ............................................................................. 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ............................................................................... 5

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2015) ............................................................................... 5

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ................................................................................. 22

**Other Authorities**

Cal. Rule 5-200 ............................................................................................................ 22

Federal Rule of Civil Procedure 59 ..................................................................... 1, 22, 23

Federal Rule of Evidence 103(a)(1) ........................................................................... 4

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR        Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

# I.    BLUE COAT'S MOTION FOR A NEW TRIAL SHOULD BE DENIED

Blue Coat Systems, Inc. ("Blue Coat" has fallen far short of the high standard necessary to demonstrate a new trial is warranted.  New trials under Federal Rule of Civil Procedure 59 are appropriate "only if the jury verdict is contrary to the clear weight of the evidence."  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010).  The decision to grant a new trial should only be exercised where "an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair," which is not this case.  *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1361 (Fed. Cir. 1999) (quoting *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427 (Fed. Cir. 1986)).

## A.    The Inclusion of All Licenses was Proper.

Blue Coat's claim that settlement agreements were unfairly relied upon to determine damages in this case is incorrect.  Notably, the damages award for the '844 Patent was determined based on a per user royalty, and not any royalty rates based on a percentage of revenues, including any from settlement agreements.  Ex. 1[1], Trial Tr. at 2084:10-2085:6.  The admission of three settlement licenses[2] does not warrant a new trial because: (1) ***all*** of Finjan, Inc.'s ("Finjan") license agreements to the Patents-in-Suit, including settlement agreements, were entered into evidence for the jury to consider and weigh in accordance with the relevant *Georgia-Pacific* factors; (2) the jury was instructed about the differences between a license based on a settlement and other licenses and had  fact and expert testimony regarding the history of each Finjan licenses, and (3) Blue Coat did not previously object to the jury instruction, such that it waived any such objections.

Finjan identified every license it had to the Patents-In-Suit and the background of each agreement, so the jury could appropriately consider and weigh them.  Ex. 1, Trial Tr. at 282:11-16, 292:16-301:25, 1076:1-1090:17.  A failure to present licenses to the Patents-in-Suit, even when it is the result of a litigation settlement, has been considered reversible error.  *See ResQNet.com, Inc. v. Lansa*,

---

[1]   All references to "Ex." herein are to the Declaration of Hannah Lee in Support of Finjan's Opposition to Blue Coat's Motion for a New Trial and Motion to Amend Judgment filed herewith.

[2] The Court denied Blue Coat's earlier motions to exclude settlement agreements,  stating that these agreements "concern one or more patents asserted in this case and are therefore not wholly irrelevant." Dkt. No. 367 at 8.  There was substantial evidence of the similarities and differences (Ex. 1, Trial Tr. at 1088:16-1089:5; 1090:1-1091:10; 1138:18-1140:13; Dkt. No. 437 at 50 (Instruction No. 4.4)), such that the jury could "consider the relevance of the challenged settlement agreements for themselves." *Id.*

*Inc.*, 594 F.3d 860, 871-73 (Fed. Cir. 2010) (holding district court erred by failing to place appropriate weight on the straight rate-based license that covered the claimed invention when it was the most reliable license in the record); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299-300 (Fed. Cir. 2015) (affirming denial of JMOL of no damages because the "jury verdict was supported by sufficient evidence and tied to the facts of th[e] case" including a license settlement agreement and plaintiff's damages expert's testimony regarding the same); *GPNE Corp. v. Apple, Inc.*, No. 5:12-cv-02885, 2014 WL 1494247, at *9 (N.D. Cal. Apr. 16, 2014) ("[T]he Federal Circuit has found that, in certain circumstances, the most reliable license in the record can be one that arose out of litigation" (citing *ResQNet*, 594 F.3d at 872).  Thus, to avoid any concerns on appeal, all licenses to the Patents-in-Suit were introduced and explained thoroughly to the jury.  Mr. Hartstein explained the historical background of Finjan's patent licenses, and specifically identified which licenses were in settlement of litigation or related to a jury award.  Ex. 1, Trial Tr. at 292:16-301:25, 327:11-25, 328:17-329:9.  Finjan's damages expert, Dr. Layne-Farrar, explained in detail to the jury the difference between a settlement agreement and an arm's length agreement.  *Id.*, 1088:16-1089:5, 1090:1-1091:10, 1138:18-1140:13.  She also testified that litigation settlements can be informative of a reasonable royalty, but less informative than an arm's length agreements.  *Id.*  Furthermore, she explained how they informed her opinion—that the rates in those agreements were consistent with non-litigation licenses.  *Id.*  Specifically, she testified that the 6-8% and 8% rates associated with the Websense and Webroot licenses, respectively, were consistent with rates of Finjan's other non-settlement licenses that had associated rates ranging between 6% to 7.5% and 8 to 16%.  *Id.*, 1077:20-1084:16, 1088:3-1090:17.  In addition, she testified that the McAfee/Intel license did not have a royalty rate associated with the agreement, but it ended the Secure Computing litigation.  *Id.*, 1087:3-16.  In fact, Blue Coat cross-examined her about the settlement licenses, establishing how they were different from the license Finjan was seeking from Blue Coat.  *Id.*, 1136:14-1138:7.

Settlement licenses are not *per se* inadmissible.  *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1336 (Fed. Cir. 2015) ("While the fact that a settlement or settlement offer comes in the midst of litigation may affect the relevance of the settlement or offer, there is no per se rule barring reference to

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

Case No.: 13-CV-03999-BLF

settlements simply because they arise from litigation.")(citation omitted); *In re MSTG, Inc.,* 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties.")(citation omitted); *ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08-04990-JW, 2012 WL 2339762, at *3 (N.D. Cal. June 7, 2012).  Even when such agreements are after the hypothetical negotiation date, the jury can still consider them, and weigh their relevance based on their dates.  *ResQNet.com*, 594 F.3d at 872 (an expert can properly consider the panoply of "events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators").  In recent years, juries routinely consider and weigh evidence dated after the hypothetical negotiation date.  *See, e.g.*, *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014); *GPNE Corp.*, 2014 WL 1494247, at *9; *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 877125, at *3 (N.D. Cal. Mar. 15, 2012).

Moreover, the jury received an individual jury instruction directed explicitly to settlement licenses, which described what they are, how they are different from non-settlement licenses and how to weigh them.  *See* Dkt. No. 437 at 50.  There was no prejudice to Blue Coat given the evidence presented about all of Finjan's licenses to the Patents-in-Suit and the jury instructions regarding settlement licenses and how to weigh them.

Blue Coat's citations to *LaserDynamics, Hanson*, and *Apple* decisions do not support its arguments.  In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, the one disputed settlement agreement was found to be the "least reliable license by a wide margin" because there was no showing that the license amount appropriately reflected the value of the claimed invention.  694 F.3d 51, 77-78 (Fed. Cir. 2012).  By contrast, here, the jury heard evidence that the disputed settlement license agreements had license amounts consistent with other patent licenses that Blue Coat does not challenge: the M86 Security license and the Trustwave license.  Mot. at 4.  The Websense and Webroot settlement agreements had royalty rates in line with the M86 and Trustwave license agreements that were executed outside of litigation, and Dr. Layne Farrar discussed, for the jury's consideration, what differences did exist between the Intel agreement and other licenses.  Ex. 1, Trial Tr. at 1084:7-

3

1087:16.  Therefore, the jury had substantial evidence to calculate the same damages award, even without these three settlement agreements, as the royalty rates were consistent with other evidence in the record.  Blue Coat's citation to *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983), is also inapposite because it concerned offers to license rather than actual licenses, like the settlement licenses here.  And, unlike *Apple, Inc. v. Samsung Elecs. Co.*, each settlement license had a specific royalty amount, and addressed a single litigation, not the "50 worldwide patent infringement litigations and other patent proceedings" between the parties in the *Apple* case.  No. 5:11-cv-01846, 2013 U.S. Dist. LEXIS 160337, at *7, 8, 10 (N.D. Cal. Nov. 7, 2013).

Finally, Blue Coat waived its objections to the jury instruction.  During trial, Blue Coat only generally objected to the instruction (Dkt. No. 425 at 2), but did not call out any specific language from the instruction that it objected to, including the language: patents "other than" the Patents-in-Suit.  *Id.*; *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1329-30 (Fed. Cir. 2004) (affirming the district court's denial of a party's motion for a new trial when there was no objection to the jury instruction).  In fact, in its proposed jury instructions, Blue Coat did not propose any jury instruction on settlement licenses or alternative language.  Dkt. 323-1.  Thus, Blue Coat has waived its objection it attempts to raise now.

### B.   Finjan Presented Revenues of the Smallest Salable Patent Practicing Unit.

Finjan did not present total product revenues to the jury, but only presented the revenues of Blue Coat's smallest salable patent-practicing unit ("SSPPU").  Ex. 1, Trial Tr. at 1103:5-1104:3, 1104:23-1105:2.  Because Finjan's damages were through the life of the Patents-in-Suit, Finjan's expert presented Blue Coat's SSPPU revenues projected through the life of each patent based on the information Blue Coat had produced.  *Id.*, 1104:23-1106:1.  This was an entirely appropriate starting point to calculate damages, as Finjan's expert then apportioned the SSPPU revenues to the infringing components of the SSPPU, in compliance with the law.  *LaserDynamics*, 694 F.3d at 67.  Thus, the only revenues were the SSPPU and the apportioned SSPPU revenues.  Notably, Blue Coat never objected during trial when such information was presented, such that any belated objection now has been waived.  Fed. R. Evid. 103(a)(1); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK,

2014 WL 549324, at *10 (N.D. Cal. Feb. 7, 2014) ("[The party] cannot now establish that it is entitled to a new trial absent a showing of 'plain or fundamental error[,]'" because it failed to object to, among other things, testimony, during trial.) (citation omitted); *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1381 (Fed. Cir. 2009).

Blue Coat's cited cases are inapposite. In *Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*, the Court distinguished *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) and *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011), which Blue Coat relies upon to allege that reference to total product revenues should be excluded. No. 2:09-cv-00290-NBF, Dkt. No. 604, Memorandum Order at 7-8 (W.D. Pa. Nov. 5, 2012) (Ex. 3). As noted by the Court in *Carnegie Mellon*, the Federal Circuit confirmed that *Uniloc* does not "foreclos[e] the use of these figures, and indeed, a number of them are necessary for [expert] to testify coherently on the issue of damages"— a conclusion that the Federal Circuit found *LaserDynamics* supported. *Id.* at 7. The expert in *Carnegie Mellon* was permitted to rely on total product revenues as a "starting point" for a reasonable royalty analysis. Here, Finjan's expert did not even rely on total product revenues, but revenues of the SSPPU, and used those revenues as a starting point. Ex. 1, Trial Tr. at 1103:5-1104:3, 1104:23-1105:2. Thus, Finjan's approach at trial complied with the law.

The remaining cases Blue Coat cited address entirely different issues. At issue in *HTC*, unlike here, was the exclusion of using the accused's company size as a "check" to confirm the reasonableness of a jury award. *HTC Corp. v. Tech. Props. Ltd.*, No. 5:08-cv-00882-PSG, 2013 WL 4782598, at *6 (N.D. Cal. Sept. 6, 2013). The *Golden Bridge Tech. v. Apple, Inc.* decision related to the use of license agreements, and does not discuss the use of product revenues. No. 5:12-cv-04882-PSG, 2014 WL 4057187 (N.D. Cal. June 1, 2014). The *Ericsson*, *VirnetX*, and *Astrazeneca,* address the entire market value rule ("EMVR"), namely relying on the entire product **without apportioning** the revenue to the infringing components, which is not at issue here. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2015); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327-28 (Fed. Cir. 2015); *Astrazeneca*, 782 F.3d at 1337-38; *see also Brocade Commun'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 831528, at *13-15 (N.D. Cal. Jan. 10, 2013). Finjan did

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR       Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

not use EMVR (*i.e.,* the entire product revenue as a royalty base) and Blue Coat is not accusing Finjan of doing so.  Rather, Finjan apportioned the SSPPU revenues to the footprint of the invention in compliance with the Federal Circuit in *Ericsson*, which held that the SSPPU could be used as a "realistic starting point," as long as the patentee apportions the revenues to the patented invention as necessary.  773 F.3d at 1226-27.

### C.      The Clear Weight of the Evidence Supports the Jury's Damages Award.

As set forth in Finjan's Opposition to Blue Coat's JMOL Motion ("JMOL Opposition") filed concurrently herewith, there was substantial evidence to support the jury's damages award.  Blue Coat elected not to rebut this substantial factual evidence at trial.  The jury had substantial and unrebutted factual evidence for its $24 million verdict for Blue Coat's infringement of the '844 Patent.  *See, e.g.*, *Apple, Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1330 (Fed. Cir. 2014).

Finjan presented evidence that WebPulse was developed and updated within the United States.  Ex. 1, Trial Tr. at 1106:2-15.  Blue Coat never rebutted or contested this evidence.  Finjan's 4% apportionment of the $8 per user fee, which was Finjan's starting point for a royalty base, was based on the number of requests that the infringing component, DRTR, processed.  Ex. 1, Trial Tr. at 194:18-19, 260:11-13, 474:20-475:1, 495:21-22, 907:17-908:1, 1069:14-1071:14 (PTX-271), 1100:24-1101:5, 1234:12-14.  Even though Blue Coat knew of the facts Finjan was relying upon from its case-in-chief for its damages case for the '844 Patent, which Finjan described during oral argument in opposition to Blue Coat's Rule 50(a) motion, Blue Coat *chose* not to rebut the evidence in its case-in-chief, such that it was the only evidence before the jury.  Ex. 1, Trial Tr. at 1759:21-1761:20.

Similarly, the substantial evidence supported Finjan's apportionment for the '633, '731, '968, and '780 Patents, and the jury did not "enhance" damages or "double" or "triple-dip" as Blue Coat suggests and Finjan's expert only presented the floor for damages in compliance with the law.  Ex. 1, Trial Tr. at 2081:14-21; *see also id.*, 1112:23-1114:24; 1116:21-1118:1; 1150:17-1151:6; 1153:6-15; 1158:17-20 (Finjan's expert testifying that her method was very conservative and removed 87-95% of revenues after apportionment).  For these reasons, the Court should deny Blue Coat's motion for a new trial on the issue of damages.

### D.      The Infringement Verdict was Based on the Clear Weight of Evidence.

Finjan presented overwhelming evidence of Blue Coat's infringement of the '844, '731, '780, '968 and '633 Patents, including: (1) testimony and supporting exhibits of three leading, highly-credentialed experts, Dr. Bims (Ex. 1, Trial Tr. at 367:23-385:11), Dr. Cole (*id.*, 453:22-466:20, 613:3-630:2 (general); 466:20-541:19, 630:3-656:15, 725:10-736:16 ('844 Patent); 578:15-612:17, 712:14-724:25, 738:20-741:10 ('633 Patent)), and Dr. Mitzenmacher (*id.*, 744:19-762:15 (general); 762:16-816:19, 859:25-883:19, 895:20-898:13 ('731 Patent); 842:13-859:12, 887:20-894:22, 896:15-20 ('780 Patent) and 816:20-842:12, 883:20-887:19, 898:14-900:8 ('968 Patent)); (2) numerous Blue Coat confidential internal documents identified during the testimony of Dr. Cole and Dr. Mitzenmacher (PTX 32, 33, 38, 84, 85, 105, 149, 152, 160, 161, 200, 203, 204, 205, 221, 225, 231, 343, 380, 381, 426, and JTX 2001-2006, 2013, 2015, 2018, 2019, 2022, 2040-2042, 2074, and 2076), (3) testing of Blue Coat's infringing accused products by Dr. Cole and Dr. Mitzenmacher described during their testimony, (3) testimony and supporting exhibits of Blue Coat personnel and engineers, including Messrs. Ahlander (PTX 615), Anderson (PTX 614), Harrison (PTX 611), Larsen (PTX 616), Runald (PTX 612) and Tomic (PTX 613), and (4) testimony and supporting exhibits of Finjan's inventors, Messrs. Touboul (PTX 610) and Kroll (Ex. 1, Trial Tr. at 337:16-366:6).  Blue Coat did not rebut this evidence, and in many instances, Blue Coat's witnesses verified it.  Blue Coat's Motion fails to raise any issues that show that the jury's  verdict is against the clear weight of the evidence.

### 1.      Finjan Proved Literal Infringement of the '844 Patent by WebPulse.

Finjan proved that WebPulse satisfies the security profile element of the '844 Patent when it generates the DRTR response.  To be perfectly clear, the DRTR response is the security profile that identifies suspicious code within incoming Downloadables as demonstrated in the source code.  Ex. 1, Trial Tr. at 469:2-472:25, 478:4-479:16, 490:7-497:13, 504:4-11, 507:9-515:6, 530:2-536:9, 644:13-19, 735:9-736:16.  Blue Coat ignores the voluminous fact and expert testimony and Blue Coat documents that Finjan identified to prove how WebPulse satisfies this element.  *Id.*  Specifically, Finjan proved that the DRTR component of WebPulse receives Downloadables and inspects them for suspicious code.  *See e.g.*, Ex. 1, Trial Tr. at 472:6-25, 478:4-479:16, 490:7-497:13, 504:4-11, 507:9-

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR                Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

515:6, 530:2-536:9, 644:13-19, 735:9-736:16.  In one example, DRTR analyzes Javascript within a webpage and generates a DRTR response that identifies suspicious code including  eval, unescape, document.write functions.  *Id.*, 490:11-493:23; *see also* 510:7-521:17, 527:21-530:22.  In another example, DRTR analyzes a PDF and generates a DRTR response that identifies the suspicious operations within the PDF responsible for opening and launching files.  *See, e.g.*, *id.*, 509:5-510:6, 734:17-735:3, 771:18-772:8.  DRTR stores the DRTR response in the DRTR response cache (which is located on the SG component within WebPulse).  *Id.*, 510:7-521:17, 527:21-530:22.  The DRTR response includes Cookie2 among other information necessary for the system to process the information.[3]  *See, e.g.*, Ex. 1, Trial Tr. at 490:7-497:13, 507:9-515:6, 530:2-536:9; *see also, e.g., id.*, 497:14-499"20, 511:5-513:4, 732:13-736:16; JTX 2018; JTX 2022; JTX 2018; JTX 2019; PTX 33; PTX 32; JTX 2076; PTX 38; PTX 426.  As such, there is substantial evidence that WebPulse generates a profile that identifies code in the received Downloadble that performs hostile or potentially hostile operations which is fatal to Blue Coat's Motion.

Shockingly, Blue Coat continues to misunderstand Finjan's position that the DRTR response is the security profile and argues instead that the security profile is limited to Cookie2.  Assuming arguendo that this was true, there is substantial evidence that demonstrates that Cookie2 identifies suspicious code within Downloadables and meet the requirements of the '844 Patent.  Ex. 1, Trial Tr. at 495:7-500:24.  For example, it is undisputed that Cookie2 identifies the eval, unescape and document.write functions.  *Id.*, 469:2-474:17, 490:1-515:16, 531:21-540:24, 732:20-736:16.  It is also undisputed that Cookie2 contains Metarule Label 29 which contains the actual suspicious operations of analyzed PDF files.  *Id.*, 509:5-513:4, 773:5-776:18.  Thus, there is substantial evidence that Cookie2 itself identifies suspicious code and meets the security profile limitation of the '844 Patent.

In its Motion, Blue Coat rehashes the same factual arguments that have been rejected

---

[3] For both the '844 and '731 Patents, Blue Coat repeats the claim in its Motion that Finjan asserts that Cookie2 *itself* is the security profile.  This was not Finjan's allegation, as Finjan asserted (and proved) that Cookie2 is "evidence of" the security profile.  Ex. 1, Trial Tr. at 497:14-499:20, 511:5-513:4, 732:13-736:16, JTX 2018; *see also* JTX 2022, JTX 2018, JTX 2019, PTX 33, PTX 32, JTX 2076, PTX 38, PTX 426.  Regardless, Cookie2 itself identified suspicious code such as eval and even contained the suspicious operations of PDF files.  Ex. 1, Trial Tr. at 510:7-521:17, 527:21-530:22.  As such, even if the profile is limited to Cookie2, there is substantial evidence that Blue Coat infringes.

8

throughout this case, [4] namely that WebPulse and DRTR do not identify suspicious operations, it only

counts them.  Blue Coat's position was flatly rejected with the testimony of its own engineers,

including the testimony of Mr. Harrison, who confirmed that WebPulse identifies suspicious code

within Downloadables.  PTX-611 at 42:2-11, 47:21-48:2; *see also id.*, 103:7-104:2 (agreeing that the

response from the DRTR analysis is "put…into the DRTR logs," that part of this analysis is the "shady

PDF, shady EXE, shady JavaScript," and that "part of the response…would include information that

would be filled into the fields of the cookie2 that would be stored in the DRTR logs.").  Finjan

provided substantial evidence that Blue Coat's theory defies common sense as it is impossible to count

something without identifying it.  Ex. 1, Trial Tr. at 1538:18-1539:5.

　　　　Blue Coat's "linking" arguments are also a rehash of the same factual (and illogical) arguments

it made during trial which the jury rejected.  Specifically, Blue Coat argues that WebPulse is a web

client rather than an inspector.  However, Finjan provided substantial evidence that WebPulse is an

inspector that inspects content for suspicious code and that the web client is the user who originally

requested the webpage.  Ex. 1, Trial Tr. at 469:2-472:25.  Indeed, this is the very purpose of WebPulse

– to inspect unknown content in real-time to protect a user from being infected with malicious content.

*Id.*  Finjan presented substantial evidence that WebPulse's analysis occurred before the web client (i.e.

the user) receives the webpage. (*e.g.*, Ex. 1, Trial Tr. at 478:23-479:16, 493:18-23, 500:14-24, 525:6-

527:20, 731:24-732:12).  This evidence included Dr. Cole's testing of Blue Coat's products (*e.g., id.*,

525:6-18) and Blue Coat's own documents (*e.g., id.*, 525:6-527:20; PTX 38 ("WebPulse …

download[s] and analyz[es] [sites] in real-time (i.e., while the client waits)").  Even more, Dr. Cole

provided that Cookie2 itself contained the requisite linking because it includes the IP address of the

Downloadable.  Ex. 1, Trial Tr. at 495:7-500:24.  Tellingly, even Blue Coat's experts confirmed that

the "***web client would be the client machine for the user***" rather than WebPulse.  Ex. 1, Trial Tr. at

1547:7-10 (emphasis added).  As such, the jury's factual determination that WebPulse is an inspector

and not a web client rests upon substantial evidence which is fatal to Blue Coat's Motion.

---

[4] As the Court noted in its summary judgment order, "[r]endering all inferences in Plaintiff's favor, a reasonable jury could find that the totality of information reported in Cookie2—counts of suspicious files and bitstrings identifying suspicious operations—satisfy each of the 'security profile' limitations found in the asserted claims of the '844 and '731 Patents."  Dkt. No. 256 at 15.

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR　　　　Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

1           **2.**       **Finjan Proved Literal Infringement of the '731 Patent.**

2         In its Motion, Blue Coat only addresses the '731 Patent's "security profile" element repeating

3    the same argument made for the '844 Patent, *i.e.*, that Cookie2 is merely a string of numbers and

4    characters and Finjan did not show there is a profile that includes "a list of computer commands."

5    Mtn. at 9.  As discussed above, Blue Coat misunderstands Finjan's position that the DRTR response is

6    the security profile that includes a list of suspicious computer commands and that Cookie2 is part of

7    the DRTR response.  Regardless, Dr. Mitzenmacher repeatedly explained based on Blue Coat's

8    documents that the infringing security profile includes a list of computer commands.  *See, e.g.*, Ex. 1,

9    Trial Tr. at 769:15-770:2, 772:9-773:4,781:20-782:13, 794:3-23; *see also generally id.*, 763:11-767:4,

10   769:9-783:3, 790:14-797:16; PTX 33; JTX 2018; JTX 2076; PTX 84; PTX 333; PTX 85.  In addition

11   to documents, Dr. Mitzenmacher proved that the security profile was in the source code, denoted as an

12   "R" that stands for the DRTR response, and showed exactly how the profile is generated and that it

13   contained a list of detected suspicious computer commands.  Ex. 1, Trial Tr. at 771:18-775:7.  Dr.

14   Mitzenmacher's opinion was unwavering when faced with Blue Coat's extensive cross-examination

15   for the security profile element of the '731 Patent.  For instance, he explained: "It's clearly a list of

16   computer commands.  You have in that case three computer commands…In fact, it's giving you more

17   detail and potentially more useful information and at a minimum certainly it comprises a list of

18   computer commands."  Ex. 1, Trial Tr. at 881:18-882:6; *see also id.*, 873:16-883:19.  Furthermore, it is

19   undisputed that MetaRule Label 29 contains the actual suspicious operations of an analyzed PDF file

20   which Dr. Mitzenmacher, again, showed was in the source code.  *Id.*, 773:5-783:3. Thus, the clear

21   weight of the evidence supports the jury's conclusion.

22          **3.**       **Finjan Proved Literal Infringement of the '968 Patent.**

23        Blue Coat's Motion regarding the '968 Patent rests entirely on the "policy index" element of

24   Claim 1 and a rehash of its rejected trial argument that "final" decisions are not saved.  Blue Coat

25   ignores the substantial evidence Finjan presented demonstrating that Blue Coat's ProxySG contains a

26   policy index which stores policy decisions in member variables that indicate allowability of the

27   analyzed content.  Dr. Mitzenmacher explained that ProxySG applies policies to digital content at

28

**FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR**     Case No.: 13-CV-03999-BLF
**A NEW TRIAL AND MOTION TO AMEND JUDGMENT**

multiple "checkpoints," that the results of these policy decisions are saved in the policy index, and that these policy decisions are used throughout the system to speed up subsequent policy evaluations. *See, e.g.*, Trial Tr. at 823:14-26:12, 833:5-35:23, 836:1-10, 24-842:4, 898:14-900:6.  Dr. Mitzenmacher showed where the policy decisions were stored in the policy index when he discussed the PE evaluator source code and the associated comments that discussed committing policy decisions to member variables.  Ex. 1, Trial Tr. at 826:13-827:6, 840:6-25, 841:19-24, JTX 2076, *see also* 836:24-840:5. Dr. Mitzenmacher's testing of Blue Coat's products was consistent with these conclusions, and was further evidence of infringement. *See* Ex. 1, Trial Tr. at 754:11-755:5, 820:12-823:1.  He relied on Blue Coat's internal confidential documents to support his opinion regarding the policy index.  *See, e.g. id.*, 840:6-14 (discussing source code at JTX 2076 that shows "where the policy decisions that you made so far…stored and maintained for future use…"); *see also* JTX 2013 at 22-23, 26.  Additionally, Blue Coat's engineer, Chris Larson, testified that one of the main features of ProxySG is to apply policy to content and to cache web content to make the network work more efficiently.  PTX 616 at 36:4-18.  Thus, as Dr. Mitzenmacher explained, this meant the content needs to be evaluated and that the policy decision regarding the content is stored in the policy index.  *See, e.g.*, Ex. 1, Trial Tr. at 819:15-820:19.

While Blue Coat claims that the "final" policy decision is not stored by ProxySG, as Dr. Mitzenmacher explained on cross-examination, this is irrelevant because the various prior decisions are stored, a fact which Blue Coat does not dispute.  *See, e.g.*, Ex. 1, Trial Tr. at 885:7-886:5.  While Blue Coat incorrectly implies that these prior decisions do not relate to whether the content is allowed as required by Claim 1 (Motion, 10), Dr. Mitzenmacher provided extensive testimony that these prior decisions do in fact  indicate whether content is allowed.  *See, e.g., id.*, 834:25-835:23, 899:4-900:6 ("[T]he corresponding properties like *if [content] might be allowed or deleted* because of that evaluation are further saved as well and are used, you know, throughout the entire checkpoint system…" (899:24-900:3); "…[T]he results of these policy decisions at the various checkpoints, even the earliest checkpoint regarding the category information is saved and *the corresponding allowability decision is again stored with it* and …those cache decisions are used throughout the process to speed

up and more efficiently allow us to decide whether to allow or to deny content." (835:16-23); "…so that you can speed up all of these policy evaluations through the system…the…properties corresponding as to **whether the belief is that they should be allowed or denied is also stored**…And then those stored decisions, those cache decisions, are used throughout the system at later points…"; "Q. And all of those are saved as entries in the policy index, those **allowability decisions**?  A.  Yes.") (900:4-6)) (emphasis added).  Thus, the policy index in ProxySG indicates "cache content that is known to be **allowable** relative to a given policy…" as required by Claim 1.

Moreover, Blue Coat never proffered any evidence to show that the final or any other decisions are **not** stored.  Rather, Blue Coat claims that certain of these decisions are not stored based solely on a test performed by Dr. Bestavros that, at best, related to whether a particular policy decision was **used** at some later point.  It, however, in no way proved whether ProxySG **stored** policy decisions.  Indeed, PTX 629 specifically discusses the various policy checkpoints and states, "Decisions can be referenced at later points in the request flow code path," which further proves that these decisions are saved, since they cannot be referenced if they are not saved.  *See* Ex. 1, Trial Tr. at 1563:18-1564:7.

Blue Coat 's reliance on *Arthur Collins* to imply that Finjan did not identify the infringing structure for the "policy index" is misplaced.  Dr. Mitzenmacher specifically explained that the corresponding structure for the policy index is the "memory in the ProxySG and in particular in the member variables associated with this structure."  *Id.*, 839:24-840:5, *see also id.*, 833:5-834:6.

### 4.      Finjan Proved Literal Infringement of the '780 Patent.

Blue Coat gives short shrift to the '780 Patent in its Motion and only contests the "performing a hashing function" element of Claims 9 and 13 of the '780 Patent in a single paragraph.  As an initial matter, Blue Coat's primary basis for claiming this element is not satisfied is based on the wrong construction of the element.  Thus, Blue Coat's argument should be disregarded as improper as a matter of law.  The parties agreed that this element should be construed as "performing a hashing function on the Downloadable **together with** its fetched software components."  Dkt. No. 118 at 4 (emphasis added).  At trial, however, Dr. Bestavros used a construction that would require performing a hashing function **on the combination of** the Downloadable and its fetched software components.  *See*

12

Ex. 1, Trial Tr. at 1549:10-1551:17.  Blue Coat used this narrower construction as the basis for its noninfringement defense which is detrimental to its Motion.  *Id.*

More importantly, Finjan proved infringement based on the agreed-upon claim construction.  *See* Ex. 1, Trial Tr. at 849:15-25.  Finjan showed that when the web page is obtained, its components are fetched *in parallel* via object pipelining, and the objects are passed to ProxyAV.  Ex. 1, Trial Tr. at 851: 9-852:11.  As Dr. Mitzenmacher explained based on the source code, the webpage and its components are gathered in a buffer and then hashes are created to form a Downloadable ID of the webpage and its components.  *Id.*, 854:18-855:6, 1553:20-1554:13.  Dr. Mitzenmacher substantiated his opinion with documents, source code and testimony of Blue Coat's engineers.  *Id.*, 851:1-858:23.

### 5.  Finjan Proved Infringement of the '633 Patent under the DOE.

Blue Coat's three bases relating to the '633 Patent are meritless.  ***First***, Blue Coat misstates the legal requirements for proving infringement under the DOE.  Proof does not require the use of *exact* words; in particular, there is no need to use the word "substantially" for the function, way, and result test, rather, all that is required is to show why the infringing products are equivalent to each element of the claim at issue.  *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 593 F.Supp.2d 1088, 1098-101 (N.D. Cal. 2009), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010).  Notably, Blue Coat did not cite any cases that require magic words to be used.  Moreover, the jury was instructed to apply the law on doctrine of equivalents ("DOE") using the function/way/result standard.  Ex. 1, Trial Tr. at 2000:1-2001:25; *see also Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1342 (Fed. Cir. 1991).

Finjan provided particularized testimony and linking argument in compliance with the law.  *See AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007).  In claiming that Dr. Cole did not address the same function and achieve the same result parts of the DOE test (Motion at 12:16-20), Blue Coat ignores the testimony ***immediately*** following the portion that Blue Coat cites.  Specifically, Finjan proved that the accused products satisfy the mobile protection code ("MPC") element of Claim 14 (i.e., "causing [MPC] to be executed … will be processed by the [MPC]") under DOE. Ex. 1, Trial Tr. at 610:21-612:9.  Dr. Cole testified that the accused products "function[] in the same manner" as this element, including because "CAS receives the executable downloadable,"

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR                Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

1  "recommunicate[s] that to the MAA," which "would then spin up a virtual Windows machine," and

2  "execute that code within that machine and then the Kernel Scout…monitor[s] and detect[s] malicious

3  activity as that code runs within that environment." *Id.*  Dr. Cole further testified that the accused

4  products "function in the same way" as this element, including because the "virtual machine

5  environment, which is the mobile code executor…would take the executable and run it within that

6  virtual machine environment, and then you add the Kernel Scout that was the MPC, that would

7  monitor and look for that malicious activity, and then go in and be able to record to be able to

8  determine whether this file was suspicious." *Id.*  Dr. Cole further described how WebPulse "yielded

9  the same results" as this element because "the CAS re-communicates the executable to the MAA, the

10  MAA spins up a virtual environment which is the mobile code executor," which then "has the Kernel

11  Scout that monitors and looks for that suspicious activity, which is the [MPC] component." *Id.*

12         Defendant cites to cases that are nothing like the circumstances here.  In *Hewlett-Packard*, the

13  expert baldly replied with a "yes" when asked whether the accused products performed the same

14  function, way, and result as the claim element, failing to provide any reasoning for his answer.

15  *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1322 (Fed. Cir. 2003).  In *Interwoven*, the

16  expert's report "merely parrot[ed] the language of the doctrine, without any analysis or explanation of

17  the claims themselves."  *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV-10-04-645 RS, 2013 WL

18  3786633, at *5-6 (N.D. Cal. July 18, 2013).  In *Rambus*, the expert report "[did] not explain how the

19  equivalent of any of the actual claim limitations [could] be found in the [] accused products."  *Rambus*

20  *Inc. v. Hynix Semiconductor Inc.*, No. C-05-00334 RMW, 2008 WL 5411564, at *1-2 (N.D. Cal. Dec.

21  29, 2008).  Here, in stark contrast to the cases Blue Coat cited, Dr. Cole  provided detailed

22  explanations on an element-by-element basis for why Blue Coat's products function in the same

23  manner, way, and yielded the same results, in compliance with the standard set forth in *AquaTex*.  Ex.

24  1, Trial Tr. at 610:21-612:9.  He addressed the insubstantiality of the differences between Blue Coat's

25  products and the claim elements, which was more than sufficient to prove infringement under DOE.

26         ***Second***, Finjan proved that the mobile protection code ("MPC") element of Claim 14 (*i.e.*,

27  "causing [MPC] to be executed … will be processed by the [MPC]") is satisfied, at a minimum, under

28

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR       Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

DOE.  There is no dispute that the MAA employs MPC, which the Court construed as "code that, at runtime, monitors or intercepts actually or potentially malicious code operations."  Dkt. No. 118.  On cross-examination, Blue Coat's expert, Dr. Hicks, **admitted** that "Kernel Scout" used by the MAA is MPC.  Ex. 1, Trial Tr. at 1667:3-24; *see also id.*, 691:6-21 (Blue Coat's counsel admitting that it "never disputed" that "Kernel Scout monitors and intercepts" operations, consistent with the Court's construction of MPC); PTX-612 at 41:25-42:25 (testimony of Mr. Runald admitting that executable code is monitored and intercepted).

Dr. Cole also provided extensive testimony and there was substantial documentary evidence unrebutted by Blue Coat that the MPC element is met.  Specifically, Finjan proved that ProxySG receives executable code, acts as a re-communicator and sends the executable code to CAS, which acts as a re-communicator and sends the executable code to the MAA.  *See, e.g.*, Ex. 1, Trial Tr. at 578:15-584:12, 589:3-612:15; PTX 380; PTX 160; PTX 152; PTX 149; PTX 161; JTX 2076; testimony of Mr. Runald relied on by Dr. Cole.  Finjan also proved that the MAA, in turn, executes the code in a virtual machine, such as IntelliVM, or the sandbox, where the MPC, *i.e.*, either Kernel Scout (in IntelliVM) or "hooks" will monitor the executable code for any malicious or potentially malicious activity.  *Id.*

Blue Coat's claim that the MPC element is not "communicated" mischaracterizes the Court's claim construction and is contrary to the record.  As an initial matter, Claim 14 has no requirement that MPC must be "communicated," unlike other unasserted claims of the '633 Patent.  *See, e.g.,* Claim 8 of JTX 2006.  The Court previously rejected Blue Coat's request to import limitations into the MPC element during claim construction, holding that the MPC element should be given its plain and ordinary meaning.  Specifically, the Court held that: "The disputed phrase…presumes that the MPC has **already arrived** at the downloadable-information and, as such, the construction of this phrase **need not expressly contain limitations on the manner in which the MPC is communicated**."  Dkt. No. 118 at 15 (emphasis added).  While the Court clarified that there is an understanding that the "[MPC] **was** communicated to the downloadable-information destination…," "communication" is not an active requirement of the MPC element and the focus in the Court's order was that the executable code was not modified.  *Id* (emphasis added).  Blue Coat argued at trial that MPC itself must be "mobile" (*e.g.*,

Ex. 1, Trial Tr. at 275:2-14, 1591:24-1592:11, 1652:14-1653:24), there was nothing in the construction of MPC that requires this MPC to be mobile.  At most, MPC *protects against* "mobile" code.

In any case, the clear weight of the evidence demonstrates that irrespective of whether "communication" is required, Finjan proved that communication occurs.  It was undisputed that the MAA hardware is manufactured without software, including Kernel Scout and the sandbox hook, which are later installed onto the MAA.  Ex. 1, Trial Tr. at 1668:11-15, 1668:24-1669:5.  Thus, the MPC was communicated to the MAA during installation of the software.  Furthermore, Dr. Hicks agreed that the Court's construction does not require that the MPC be communicated to the destination (*i.e.*, the MAA) at any particular time, such as at the same time as the executable code, so long as the MPC is communicated to the destination "at some time."  *Id.*, 1654:9-1655:3.  Thus, it was entirely reasonable for the jury to conclude that MPC is communicated to the MAA during installation.

Blue Coat's claim that installation occurs by a third party is irrelevant because the claim does not require the direct infringer to perform any act of communicating MPC as Claim 14 is not a method claim.  Rather, the most the claim could require is that the MPC was communicated without modifying the executable code (Court's claim construction order at Dkt. No. 118 at 15) "at some time."  Ex. 1, Trial Tr. at 1654:9-1655:3.  Nothing requires the computer readable program code covered in Claim 14 to perform that communication.  Indeed, Claim 14 is a product claim as the Court found (Dkt. No. 118 at 12-14), and therefore, Blue Coat infringes if it makes, uses or sells a product with MPC that was communicated without modifying executable code.  Thus, because MPC has been installed on Blue Coat's accused products, and Blue Coat use and sells those products, Blue Coat is liable for infringement.

*Third*, Finjan proved with substantial evidence that the MAA satisfies Claim 14's "downloadable-information destination" element.  *See* Ex. 1, Trial Tr. at 738:20-740:3; *see also id.*, 578:15-584:12, 589:3-612:15; PTX 380; PTX 160; PTX 152; PTX 149; PTX 161; JTX 2076.  In no uncertain terms, Dr. Cole explained that the MAA is the information destination and that it makes sense to have this type of architecture because you want to be able to execute the code in a safe environment before it even makes it to the client.  Ex. 1, 739:18-740:3.  Blue Coat witnesses, Mr.

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

Case No.: 13-CV-03999-BLF

Runald and Dr. Hicks, confirmed Dr. Cole's opinion and testified that a copy of the file containing executable code is made, with one copy going to the user and the other to MAA as its final destination. Ex. 1, Trial Tr. at 1332:25-1336:14, 1666:4-13, 17-23, 1668:7-10.  In its Motion, Blue Coat attempts to limit the "downloadable-information destination" element to the end-user by importing limitations into this term, including the requirements that the destination needs to "request" information or be the device intended to be protected.  Motion at 15.  However, these are simply not requirements of the claim.   In fact, although Blue Coat initially took the position during claim construction that this element should be limited to a client or "user device," it ultimately agreed that no was construction necessary—therefore acknowledging that this term is not limited to the end-user.  Dkt. No. 66.  While Blue Coat attempts to use Finjan's statements during claim construction in support of its claim that the destination must be the end-user (Motion at 14-15), Finjan's statements  in no way support limiting the destination to a user device.  Rather, Finjan was only referring to an "example" where a user requests a webpage, not the situation here, where the MAA acts as a final destination for a copy of the file.  In view of this record, the clear weight of the evidence was that the MAA satisfies the "downloadable-information destination" element, at the very least, under DOE.

### E.    The Validity Verdict was Based On the Clear Weight of Evidence.

Blue Coat does not meaningfully challenge the validity finding of the jury in its Motion.  In its Motion, Blue Coat only makes conclusory statements for each patent without any explanation of how it allegedly proved invalidity on an element-by-element basis, without addressing Finjan's extensive rebuttal evidence.  This rebuttal evidence includes two expert's testimony, upon which the jury could easily have based its validity verdict.  Blue Coat also repeats the conclusory statement for each patent that "Finjan did not provide substantial evidence" that each reference "was missing any claimed element."  These statements reflect Blue Coat's misstatement of its burden.  Blue Coat was required to prove invalidity by clear and convincing evidence and now needs to show why the validity is against the clear weight of the evidence, which it failed to do.[5]

Blue Coat's invalidity defense, which relied entirely on inherency, fell far short of meeting its

---

[5] For the same reasons stated herein, Finjan opposes Blue Coat's JMOL motion on invalidity.  *See* Motion at n.21; *see also* Dkt. No. 498.

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR                    Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

burden of clear and convincing evidence, and was frivolous.  *See* Dkt. No. 493.  For inherency, a difficult standard to prove, Blue Coat was required to demonstrate by clear and convincing evidence that elements not disclosed in a single prior art reference are "necessarily present" in that reference. *See Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348-50 (Fed. Cir. 2013); *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002).  Every anticipation position depended on Blue Coat's claim that at least one element, if not nearly all elements of an asserted claim, were "inherently" present in a reference.  Blue Coat could not come close to meeting its burden of proof and, at times, did not even try.  Dkt. No. 496-1, Ex. 5; Ex. 1, Trial Tr. at 1632:16-19, 1644:11-25, 1651:1-6; 1843:18-22; 1855:5-10, 1858:23-25, 1859:10-14.

Drs. Necula and Hicks also failed to map every element of the claims to the references or explain their basis for their conclusory opinions on anticipation, and imported knowledge from a person of ordinary skill in the art to fill in gaps in the purported prior art references.  Ex. 1, Trial Tr. at 1621:14-1629:5; 1632:11-1635:6; 1637:3-1645:14; 1646:16-1647:17; 1648:4-1651:10; 1690:16-1724:8; 1794:7-1819:10, 1820:20-1829:15; 1831:19-1834:15.  A more specific description of the various shortcomings in Blue Coat's invalidity defense is provided below:

**'844 Patent**

Receiving by an inspector a Downloadable:  For Claims 1, 7, 11, and 15 of the '844 Patent, Blue Coat failed to identify a downloadable in Abadi that meets the Court's definition of "downloadable."  Dr. Necula testified that the downloadable in Abadi is intermediate code.  Ex. 1, Trial Tr. at 1698:1-16.  Intermediate code is not an executable application program.  Dr. Necula also failed to provide clear and convincing evidence that his alleged inspector (i.e. annotator) receives an executable application program.  Dr. Necula's testimony also fails to provide evidence that Abadi discloses generating a downloadable security profile that identifies suspicious code.

Generating by the inspector a first Downloadable security profile that identifies suspicious code in the received Downloadable:  Dr. Necula also relies on a person of ordinary skill in the art to fill in the gaps in Abadi alleged security profile (i.e. annotations).  For claims 1, 7, 11, 15, and 41, Dr. Necula relies his knowledge of static code analysis to read identification of suspicious code into Abadi's

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR          Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

annotations.  Ex. 1, Trial Tr. at 1699:19-1701:15.  This is improper for anticipation as neither

identification of suspicious code nor static code analysis is not disclosed by Abadi.  As the Federal

Circuit stated in *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (1997), the presumed

knowledge of one skilled in the art of the claim invention "does not grant a license to read into the

prior art reference teachings that are not there."  Aside being incorrect on static code analysis, there is

nothing in Abadi to support Dr. Necula's testimony that there identification of suspicious code.

Linking:  Dr. Necula also relies on a person of ordinary skill in the art to fill in the gaps in

Abadi alleged security profile (i.e. annotations).  For claims 1, 7, 11, 15, and 41, Dr. Necula relies his

knowledge of static code analysis to read identification of suspicious code into Abadi's annotations.

Ex. 1, Trial Tr. at 1699:19-1701:15.  This is improper for anticipation as neither identification of

suspicious code nor static code analysis is not disclosed by Abadi.  Thus, Dr. Necula improperly relies

on the presumed knowledge of one skilled in the art of the claim invention to modify the teachings of

Abadi.

JavaScript:  Dr. Necula argues that JavaScript is a high-level code that is inherently disclosed

as a Downloadable in Abadi.  Ex. 1, Trial Tr. at 1706:22-1708:4.  However, he testified that there are

several high-level code languages.  *Id.*, 1862:10-20.  By definition, the element cannot be inherent

because there are numerous possibilities for the intermediate code, thus not necessarily present.

List of suspicious operations:  For claim 11, Dr. Necula  fails identify what in Abadi inherently

discloses a list of operations deemed suspicious by the inspector.  Abadi does not disclose that its

annotations includes this list.  Further, Dr. Necula improperly relies on his knowledge of static analysis

of code into Abadi.  In addition, Dr. Necula provides no factual basis that static analysis of code

necessarily requires Abadi's annotations to include a list of suspicious operations.

First rule set:  Dr. Necula failed to show that Abadi addresses all the parts of the elements of

Claim 15 including "a memory storing a first rule set" or "first rule set to generate a first

Downloadable security profile."  Dr. Necula reliance on inherency is also improper.

**'822 and '633 Patents**

Dr. Hicks improperly relies on a person of ordinary skill in the art to understand an undisclosed

19

trick for Ji to anticipate Claims 9 and 10 of the '822 Patent and Claim 14 of the '633 Patent.  Again, Dr. Hicks is improperly adding presumed knowledge that is not present in or supported by the prior art reference.

Claim 9:  Dr. Hicks also misapplies the inherency standard in arguing Ji anticipates Claim 9. Dr. Hicks does not provide a technological basis for how the content inspection engine detects executable code and has downloadable-information analyzers or an inspection controller.  Dr. Hicks further fails to explain where Ji discloses the elements of a downloadable-information analyzer and inspection controller within a content inspection engine.

Claim 10:  Dr. Hicks also failed to map Ji to the claim 10.  Dr. Hicks testified that because Claim 9 of the '822 Patent is invalid, then Claim 10 of the '822 Patent is invalid without mapping the Ji to actual claim language.  Ex. 1, Trial Tr. at 1645:1-14.  He also fails to address downloadable-information characteristic and executable code characteristic correspondence elements of the claim. His inherency argument does not provide any technological basis to support Ji inherently discloses a level of downloadable-information characteristic and executable code characteristic correspondence.

Claim 14:  Dr. Hicks also failed to map Ji to the claim 14.  Dr. Hicks testified that because Claim 9 of the '822 Patent is invalid, then Claim 14 of the '633 Patent is invalid without mapping the Ji to actual claim language.  Ex. 1, Trial Tr. at 1648:8-1650:12.  In addition, Dr. Hicks fails to provide any evidence that Ji provides a system with distinct software modules or that the mobile protection code will process the operations of the executable code at the destination.  Dr. Necula conclusory states the elements of claim 14 are inherently present without explanation or providing a technological basis for his opinion.  *Id.*, 1649:20-1650:4.

**'780 Patent**

For the '780 Patent, Dr. Necula failed to map the Waldo reference to elements of Claim 9 and 13.  For example, Dr. Necula failed to show how the communications engine that obtains a downloadable element of these claims is met.  Dr. Necula failed to provide support that the Waldo reference discloses hashing a downloadable to create a downloadable id.  For claim 13 of the '780, Dr. Necula relies on a person of ordinary skill to state that a digital information stream encompasses

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR          Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

1   HTML code.  Ex. 1, Trial Tr. at 1827:25-1828:14.

2   **'731 Patent**

3       For claims 1 and 17 of the '731 Patent, Dr. Necula heavily relies on presumed knowledge on

4   PICS, which is outside the scope of Braswell. Ex. 1, Trial Tr. at 1812:21-1814:15.  Dr. Necula failed

5   to map Braswell to the elements of claims 1 and 17 of the '731 Patent.  Dr. Necula testified that PICS

6   satisfies the security profile element but relies on citation to Braswell unrelated to PICS for security

7   profile cache element.  *Id.*, 1812:21-1816:9.  There is no evidence in Braswell and Dr. Necula provides

8   no support linking PICS to "the dynamic result data generated by execution of JSPs and servlets on

9   WebSphere Application Server" because PICS are unrelated to JSPs and servlets. Dr. Necula picked

10  unrelated components that do not map to the claim elements.  Dr. Necula also misapplies inherency in

11  claims 1 and 17 of the '731 Patent.

12  **'968 Patent**

13      For claim 1 of the '968 Patent, Dr. Necula fails to establish by clear and convincing evidence

14  that McClain discloses a policy index.  Dr. Necula testifies that McClain's logs are a policy index.  Ex.

15  1, Trial Tr. at 1798:1-1799:2.  Dr. Necula failed to establish by clear and convincing evidence that

16  these "logs" are a policy index to cached contents, are stored in memory, have entries that relate

17  cached content and policies, or save a determination that a given digital content is allowable relative to

18  a given policy, based on a content profile.  For the content scanner and content profile, Dr. Necula

19  asserts that the object parser in McClain derives a rating. McClain only states that the object parser

20  looks for words and phrases without any need to generate a rating.  *Id.*, 1799:16-1800:8.  Thus, the

21  clear weight of the evidence is that Finjan's Patents-in-Suit are valid.

22      **F.   Finjan's Closing Arguments were Not Prejudicial and Did Not Confuse the Jury.**

23      There was nothing improper or confusing about Finjan's closing argument, to which Blue Coat

24  did not object to during trial.  As discussed *supra*, Finjan's request to the jury to award $24 million in

25  damages was based on an unrebutted factual record and was an appropriate damages analysis.  The

26  statements regarding the Dr. Bestavros were nothing more than conclusory statements.  Blue Coat

27  made no showing of prejudice based on the closing argument.  All Finjan's counsel explained during

28

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR        Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

closing is why Dr. Bestavros was not credible during closing arguments.[6]

Finjan's closing was unlike the facts in *Whitserve* and *Intellectual Ventures*.  Counsel in *Whitserve* used inflammatory language to make an "emotional plea" to support the damages award. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 34 n.18 (Fed. Cir. 2012) ("During closing, Whitserve stated that 'according to the law,' the jury could add $5-10 million to the award as 'compensation for the *four years of hell*' resulting from litigation.") (emphasis added).  Here, Finjan's counsel based its damages on the unrebutted facts.  In *Intellectual Ventures*, counsel's technical witness did not provide testimony on non-infringement, yet counsel "played the role of expert witness by inferring from factual testimony that the accused devices do not meet the claim limitations." *Intellectual Ventures I, LLC v. Canon Inc.*, 104 F.Supp.3d 629, 659 (D. Del. May 18, 2015).  At no point did Finjan's counsel "substitute for competent, substantiated expert testimony," let alone act as an expert witness.  *Id.* (citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005)).  Accordingly, Defendant's request for a new trial should be denied.

## II.     BLUE COAT'S MOTION TO AMEND JUDGMENT SHOULD BE DENIED

Blue Coat has no legitimate basis to seek to amend the Judgment pursuant to Rule 59(e).  The Ninth Circuit has reiterated that "amending a judgment after its entry remains 'an extraordinary remedy which should be used sparingly.'"  *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1112 (9th Cir. 2011) (citing *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (en banc) (per curiam)).

### A.     The Judgment Does Not Need Clarification

Blue Coat's claim that the Court failed to specify the relief awarded to Finjan in its Judgment (Dkt. No. 487) and did not indicate "who has won and what relief has been awarded" is wrong. Motion at 2-21.  The Judgment states that "judgment is entered in favor of [Finjan]" and is made "pursuant to" the jury verdict ("Verdict") (Dkt. No. 48) and the bench trial order ("Bench Order") (Dkt. No. 486).  The Judgment further physically ***attaches*** the Verdict, which identifies the jury's

---

[6] California has not adopted a counterpart to the cited portion of Model Rule 3.4.  *See* Cal. Rule 5-200 Trial Conduct.  Indeed, these are merely *recommendations* to the states, and are not themselves binding.  California only states that counsel should not testify as to personal knowledge, but does not address personal opinions about witness credibility.  Blue Coat has no law or explanation why this warrants a new trial under Rule 59.

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR       Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

findings for each claim and the relief on a patent-by-patent basis.  As the Court explained: "The judgment will simply recite that this is a judgment in favor of Finjan and against Blue Coat on these various patents, and it doesn't give the reasons.  You have the verdict form" which the Judgment "incorporates."  Ex. 2, Bench Trial Tr. at 203:18-22.  Thus, the Judgment is a "self-contained document" setting forth who won and the relief, and identifies what the specific infringement and validity issues Finjan won.  Because the Bench Order did not alter the jury's findings, it was not necessary for the Court to incorporate it into the Judgment.  Thus, there is no reason to amend the Judgment and certainly no manifest error or injustice pursuant to Rule 59(e).

There is also no lack of clarity or inconsistency in the jury's findings on infringement on the Verdict.  The jury found that Blue Coat infringed the '844, '968 and '780 Patents literally and under DOE.  These two findings are not mutually exclusive and are thus entirely consistent.  *See* Ex. 1, Trial Tr. at 1209 (Mr. Andre "And I think the finding of literal and doctrine of equivalents are not mutually exclusive.  I think they can find both."  The Court:  "I agree").  As the Court noted, there was no need to devote resources on Blue Coat's prosecution history estoppel post-verdict that do not affect resolution of the action simply "in the off chance that on appeal" they become an issue, since the jury also found literal infringement.  Ex. 2, Bench Trial Tr. at 205:5-10.  Thus, the Verdict and Bench Order are consistent and the Judgment is proper.

### B.    There is No Basis for Blue Coat's Request for JMOL of DOE.

Finjan demonstrated that Blue Coat infringes the '844, '968 and '780 patents under DOE, including particularized testimony (*i.e.*, testimony not subsumed within literal infringement) about how Blue Coat's products satisfy certain claim elements under DOE.  Finjan proved that WebPulse satisfies the "generating…a first downloadable security profile that identifies suspicious code in the received downloadable" element of the '844 Patent under DOE.  Ex. 1, Trial Tr. at 513:5-515:4.  Dr. Cole testified that WebPulse is "functioning in the same way as this claim element, including because "WebPulse did the analysis, it found that suspicious activity, it created that profile, [and] it determined that it was suspicious" and that in his testing he "got a block message saying this was suspicious…" *Id.*  Dr. Cole further testified that WebPulse was "doing these functions in the same way" because the

1   shadies of DRTR are analyzing and inspecting the content, DRTR then creates the security profile for

2   which Cookie2 is evidence, showing the tracking of suspicious calls and therefore identifying of

3   suspicious code.  *Id.*  Dr. Cole further described how WebPulse "yielded the same result" as this

4   element because "it creates the security profile" and "is able to identify suspicious code as suspicious

5   activity."  *Id.*

6       Finjan also proved that WebPulse satisfies the "linking" element of the '844 Patent under DOE.

7   Ex. 1, Trial Tr. at 527:21-529:2. Dr. Cole testified that WebPulse "function[s] in the same way"

8   because when he turned WebPulse on, "it clearly knew that site was suspicious, and the only way it

9   would be able to know that site was suspicious is if it linked the information from the security profile

10  with that URL" and "the fact that it was able to block and categorize shows that linking or association

11  occurred between those two components."  *Id.*  Dr. Cole further explained that WebPulse was "doing

12  that function in the same way" because "the I.P. address that is derived from the URL is in that

13  Cookie2" and also because based on source code "clearly the URL is an argument or parameter that is

14  associated with that URL."  *Id.*  Dr. Cole further testified that WebPulse "had the same results"

15  because "information in the security profile about the suspicious content was being associated both

16  with the URL and with the I.P. address" which shows "two levels of information between the security

17  profile and the downloadable."  *Id.*

18      Finjan proved that ProxySG with WebPulse satisfies the "policy index" element for the '968

19  Patent under DOE.  Ex. 1, Trial Tr. at 833:5-836:6.  Dr. Mitzenmacher testified that ProxySG with

20  WebPulse is "functioning at least substantially in the same way" because there is "memory at the

21  ProxySG including corresponding member variables which include entries that deal with policy

22  decisions and related the cache content to the policies" "by indicating cache contents that is known to

23  be allowable relative to a given policy…."  *Id.*  Dr. Mitzenmacher also explained that ProxySG with

24  WebPulse was "working at least substantially in the same way" by "relating what is in the cache and

25  the cache content and the policies that indicate whether this is allowable or not allowable."  *Id.*  He

26  also testified that ProxySG with WebPulse "yield[] at the very least substantially the same result"

27  because the intended result is to "allow or block certain content according to a number of

28

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR          Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

1  policies…and cache information regarding those policy decisions to increase the efficiency" and Blue

2  Coat's products do this because "the various decisions are saved usually at various points in order to

3  increase the efficiency of the system."  *Id.*

4       Finjan proved that ProxySG and ProxyAV satisfy the "performing a hashing function" element

5  of Claims 9 and 13 of the '780 Patent under DOE.  Ex. 1, Trial Tr. at 855:17-858:6. Dr. Mitzenmacher

6  testified that ProxySG and ProxyAV have "at the very least substantially the same function" because

7  "MD5 is a hashing function that is applied to the components" and "you can use the combination of

8  those as a hashing function on a downloadable that includes the original file…along with all of those

9  components," so "you calculate the individual pieces, put all of the pieces together, and you get the

10  I.D."  *Id.*  He also explained that ProxySG and ProxyAV "are doing the functions in substantially the

11  same way" as this claim element because "it's all based on hashing" which is "approximately what the

12  MD5 does, it performs the hashing in substantially the same way"  *Id.*  He further testified that

13  ProxySG and ProxyAV "yield[] substantially the same result" because "there's a certain I.D. for the

14  downloadable which consists of the combination, the various MD5 applications to the individual

15  components" which "has the same result of being able to save yourself processing time [and] energy,

16  taking advantage of the fact of whether you have seen something before and know whether it's safe...."

17  *Id.*

18  **III.    CONCLUSION**

19       For the foregoing reasons, Finjan respectfully requests that the Court deny Blue Coat's motion

20  for a new trial and motion to amend judgment.

21  ///

22  ///

23  ///

24

25

26

27

28

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR    Case No.: 13-CV-03999-BLF
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  January 4, 2016

By: */s/ Hannah Lee*
Paul J. Andre (SBN 196585)
Lisa Kobialka (SBN 191404)
James Hannah (SBN 237978)
Hannah Lee (SBN 253197)
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 752-1700
Facsimile:   (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
hlee@kramerlevin.com

*Attorneys for Plaintiff*
FINJAN, INC.

FINJAN'S OPPOSITION TO BLUE COAT'S MOTION FOR
A NEW TRIAL AND MOTION TO AMEND JUDGMENT

Case No.: 13-CV-03999-BLF